**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**HARTFORD DIVISION**

| In re: JOHNSON MEMORIAL MEDICAL CENTER, INC., JOHNSON MEMORIAL HOSPITAL, INC., HOME & COMMUNITY HEALTH SERVICES, INC., JOHNSON HEALTH CARE, INC., THE JOHNSON EVERGREEN CORPORATION, and JOHNSON PROFESSIONAL ASSOCIATES, P.C., Debtors. | Chapter 11<br>Case No. ________<br>Case No. ________<br>Case No. ________<br>Case No. ________<br>Case No. ________<br>Case No. ________<br>(Joint Administration Requested) |
|---|---|

**MOTION OF DEBTORS AND DEBTORS IN POSSESSION, PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 361 362, 363 AND 364 AND BANKRUPTCY RULES 2002, 4001, 6004 AND 9014 FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING THE DEBTORS TO REPAY CERTAIN EXISTING DEBT, (III) AUTHORIZING THE DEBTOR TO USE CASH COLLATERAL, (IV) GRANTING ADEQUATE PROTECTION, (V) STIPULATING TO THE VAFLIDITY, ENFORCEABILITY AND NON-AVOIDABILITY OF CERTAIN PRE-PETITION LIENS, (VI) SCHEDULING A FINAL HEARING AND (VII) GRANTING RELATED RELIEF**

Johnson Memorial Medical Center, Inc. ("JMMC"), Johnson Memorial Hospital, Inc. ("JMH"), Johnson Health Care, Inc. ("JHC"), The Johnson Evergreen Corporation ("JEC"), Johnson Professional Associates, P.C. ("JPA"), and Home and Community Health Services, Inc. ("HCHS"; together with JMMC, JMH, JEC, JPA and JHC, the "Debtors"), for their motion pursuant to Bankruptcy Code sections 105, 362, 363 and 364 and Federal Rules of Bankruptcy Procedure 2002, 4001, 6004 and 9014, for interim (the "Interim Order") and final (the "Final Order") orders (I) authorizing the Debtors to obtain post-petition financing, (II) authorizing the Debtors to repay certain existing debt, (III) authorizing the Debtors to use cash collateral, (IV)

granting adequate protection, (V) stipulating to the validity, enforceability and non-avoidability of certain pre-petition liens, (VI) scheduling a final hearing and (VII) granting related relief, respectfully state:

1. On January 14, 2015 (the "Petition Date"), the Debtors filed voluntary petitions for reorganization under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §101 et seq. (the "Bankruptcy Code"). Since the Petition Date, the Debtors have continued in possession and management of their businesses and properties as a debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

2. JMMC, JMH, JEC, HCHS and JHC are private, not for profit corporations. JMMC is the parent corporation of JMH, JEC, JHC and HCHS. JMMC also owns real estate in Enfield, Connecticut, including two medical office buildings. JMMC's revenue in 2014 was approximately $1.2 million.

3. JMH owns and operates a ninety-two bed, acute care hospital located in Stafford Springs, Connecticut. JMH also leases space in the Enfield property from JMMC, where JMH operates a surgery center, an advanced wound care center, and an infusion center. JMH offers a comprehensive array of inpatient and outpatient services, including medical and surgical, obstetrics and gynecology, pediatrics, behavioral health, intensive/coronary care, infusion and chemotherapy, rehabilitation and emergency care. JMH has 607 employees and its revenue in 2014 was approximately $67 million.

4. JEC owns and operates a 180 bed skilled nursing facility located in Stafford, Connecticut. JEC leases the land on which the nursing facility is located from JMH. Services provided by JEC include skilled nursing care, palliative/hospice care, physical medicine and rehabilitation, occupational therapy, speech therapy, restorative nursing, wound management,

pain management and nutritional education. JEC has 281 employees and its 2014 revenue was approximately $16.6 million.

5. HCHS provides home health and hospice care to residents of North Central Connecticut. Services provided by HCHS include skilled nursing, behavioral health, wound care, hospice, bereavement, palliative care, physical, occupational and joint replacement therapy, cancer care rehabilitation, cardio/respiratory rehabilitation, health screenings, flu clinics and health education programs. HCHS has 67 employees and its revenue in 2014 was approximately $5.64 million.

6. JHC provides occupational medicine services. JHC works exclusively with businesses, and offers, among other services, effective management of workers' compensation cases and return to work programs. Services provided by JHC include physical exams, drug screenings, rehabilitation, worksite assistance focused on safety and productivity, ergonomic evaluations, medical surveillance exams, travel immunizations, and educational programs, clinics and presentations. JHC has six employees and annual revenue of approximately $525,000.

7. JPA is a multi-specialty physician group with offices in Stafford Springs and Enfield. JPA is an affiliate of the other Debtors. Services provided by JPA include family medicine, orthopedics, wound care and oncology. JPA has fourteen providers and eleven employees and its revenue in 2014 was approximately $3.3 million.

8. Since prior to 2008, the Debtors have faced significant financial operating deficits and struggled to maintain financial stability, especially in light of national trends of shrinking reimbursement levels, lower investment returns, and the need for hospitals generally to make ongoing and substantial investments in new medical and information technologies and facilities.

Confronted with the reality that due to market and government regulatory forces in the health care industry, lack of capital, reduced government reimbursement rates, low census and an unsustainable level of debt, continuing to operate as independent, stand alone entities would be extremely difficult, the Debtors commenced these cases to sell substantially all of the assets of JMMC, JMH, JEC, HCHS and JHC, without delay, to Saint Francis *Care*, Inc., pursuant to Bankruptcy Code section 363. Such a sale will preserve and maximize the going concern value of the Debtors' properties, preserve and provide jobs for the Debtors' employees, and allow for the continued delivery of healthcare services to residents of North Central Connecticut. The Debtors believe that the proposed sale is the best available alternative to accomplish the foregoing under all of the facts and circumstances.

9. By this motion, pursuant to Bankruptcy Code sections 105, 362, 363 and 364 and Federal Rules of Bankruptcy Procedure2002, 4001, 6004 and 9014, the Debtors seek:

(a) authorization for the Debtors to obtain postpetition financing (collectively, the "Postpetition Financing" or the "DIP Facility") up to a maximum outstanding principal amount of $7.0 million in accordance with, the Debtor-In-Possession Revolving Loan and Security Agreement among the Debtors, as borrowers, HFG Healthco-4 LLC ("HF-4") and its assigns, as lender (the "Lender") and Healthcare Finance Group, LLC ("HFG"), as administrative and collateral agent (the "Agent" and together with the Lender, the "Lender Parties"), substantially in the form annexed hereto as Exhibit A (the "DIP Loan Agreement"), together with such other documents and agreements required by the Lender Parties including the Participation Agreement (as defined below) (the "DIP Loan Documents").[1]

(b) authorization for the Debtors to obtain from the Lenders on the Initial Funding Date and from time to time thereafter pending the Final Hearing (as defined below) revolving advances ("Revolving Loans") in amounts not to exceed a maximum outstanding principal amount of $5 million (the "Interim Amount") in accordance with the DIP Loan Agreement and the Interim Order, which Interim Amount includes the amount of Existing Revolving Debt (as defined below) being repaid by the Debtors in accordance with the DIP Loan Agreement and the Interim Order;

---

1 Capitalized terms not otherwise defined herein or in the Interim Order shall have the definitions ascribed to them in the DIP Loan Agreement.

(c) authorization for the Debtors to repay immediately the Existing Debt (as defined below);

(d) authorization for the Debtors to obtain from the Lenders upon entry of the Final Order, revolving advances in amounts not to exceed a maximum outstanding principal amount of $7.0 million (the "Total Commitment") in accordance with the DIP Loan Agreement, the DIP Loan Documents and the Final Order which Total Commitment includes the amount of Existing Debt assumed by the Debtors as Lender Debt in accordance with the DIP Loan Agreement and the Interim Order;

(e) authorization for the Debtors to execute and deliver the DIP Loan Agreement and the DIP Loan Documents and to perform such other and further acts as may be necessary or appropriate in connection therewith;

(f) approving and authorizing the Participation Agreement among HF-4, HFG and Saint Francis Care, Inc. ("Saint Francis"), substantially in the form annexed hereto as Exhibit B (the "Participation Agreement"), pursuant to which Saint Francis has agreed to purchase a last-out participation interest in the Postpetition Financing in order to increase the Debtors' availability thereunder;

(g) authorization for the Debtors to grant to the Lender Parties assurances for the full and timely payment of the Lender Debt by granting to the Lender Parties (i) pursuant to section 364(c)(1) of the Bankruptcy Code, a superpriority administrative expense claim (a "Superpriority Administrative Expense Claim") having priority over any and all expenses and claims specified in any other section of the Bankruptcy Code, including, without limitation, sections 503(b) and 507(b) of the Bankruptcy Code; and (ii) pursuant to section 364(c)(2), (3) and (d) of the Bankruptcy Code, liens on, and security interests in, any and all of the Collateral (as defined below), subject only to the Valid Pre-Petition Senior Liens (as defined below);

(h) authorization for the Debtors to use the Prepetition Collateral (as defined below), including the Cash Collateral (as defined below) and approving the grant of adequate protection to the Legacy Creditors (as defined below) as provided herein;

(i) scheduling, pursuant to Bankruptcy Rule 4001, an interim hearing (the "Interim Hearing") on the Motion to be held before this Court to consider entry of the Interim Order, among other things, authorizing the Debtors, on an interim basis, to borrow the Interim Amount under the Interim Order, the DIP Loan Agreement and the DIP Loan Documents; and

(j) scheduling, pursuant to Bankruptcy Rule 4001, a final hearing (the "Final Hearing") on the Motion to consider entry of a final order (the "Final Order") authorizing and approving, on a final basis, the Postpetition Financing, and establishing notice procedures in respect of the Final Hearing.

10. The Debtors have determined, in the exercise of their sound business judgment, that they require post-petition financing to meet their ongoing working capital and general

business needs and that the terms of the DIP Facility will reasonably address the Debtors' financing requirements and constitute the best alternative available under the circumstances. Accordingly, subject to the Court's approval, the Debtors have determined to enter in to the DIP Facility with the Lender Parties. The principal terms of the DIP Facility are summarized below:

(a) Interest Rate. LIBOR plus 5.25%. (DIP Loan Agreement Art. 2.2(a)).

(b) Default Interest Rate. 2.5% in excess of the rate then otherwise applicable. (DIP Loan Agreement Art. 2.2(b)).

(c) Maturity. The earlier of (i) January 14, 2016, (ii) the consummation of the sale of substantially all of the assets of JMMC, JMH, HCHS and JHC, (iii) the declaration by HFG or HF-4 of the Maturity Date in accordance with Article 11.2(a) of the DIP Loan Agreement, and (iv) the date on which the DIP Facility is paid in full and the commitments to lend thereunder are terminated. (DIP Loan Agreement p. 15).

(d) Events of Default. Events of default include, among others, failure to pay principal or interest when due; failure to pay any fee or expense when due; termination of the asset purchase agreement with Saint Francis; and default in performance of certain covenants. (DIP Loan Agreement Art. 11.1).

(e) Liens. As is customary for financings of this nature, all loans and other obligations owing by the Debtors under the DIP Facility shall at all times (i) constitute superpriority administrative expenses pursuant to Bankruptcy Code section 364(c)(1) and (ii) be secured by liens on all of the Debtors' personal property pursuant to Bankruptcy Code section 364(c)(2) and (3) and (d). (DIP Loan Agreement Art. 3; Interim Order ¶¶ 9 and 11). The liens securing the Lender Debt in the Receivables Collateral are not subject to any Valid Pre-Petition Senior Liens and shall be first-priority, senior liens, consistent with the lien priority securing the Existing Debt as of the Petition Date. Liens on other personal property of the Debtors' will be subject and subordinate to any existing, valid liens.

(f) Commitment. $7,000,000. (DIP Loan Agreement p. 3).

(g) Sale Deadlines. The DIP Loan Agreement contains provisions requiring approval of bidding procedures and sale transactions within certain fixed periods of time. (DIP Loan Agreement Art. 8.18).

(h) Affirmative Covenants. The DIP Loan Agreement contains affirmative covenants that are usual and customary for financings of this type, including regarding compliance with laws, reporting requirements, and preservation of existence. (DIP Loan Agreement art. 8).

(i) Negative Covenants. The DIP Loan Agreement contains negative covenants that are usual and customary for financings of this type, including, without limitation, restrictions on incurrence of liens and indebtedness, asset sales, changes in business, changes in credit and collection policy, changes in payment instructions, deviation from terms of receivables, mergers and acquisitions, transactions with affiliates, and distributions. (DIP Loan Agreement Art. 9).

(j) Financial Covenants. The DIP Loan Agreement includes certain financial covenants related to minimum liquidity, minimum EBIDA, and budget variances. (DIP Loan Agreement Art. 10).

(k) Representations and warranties. The DIP Loan Agreement contains representations and warranties by the Debtors as are usual and customary for this type of financing, including with respect to the following matters: financial condition; no material adverse change; corporate existence; compliance with laws; corporate power and authority; enforceability of DIP Loan Documents; ownership of property; and no material litigation. (DIP Loan Agreement Art. 7).

(l) Waiver of state law perfection requirements. The Lender Parties shall not be required to file any financing statements, mortgages, notices of lien or similar instruments in any jurisdiction or filing office, or to take any other action in order to validate or perfect the liens and security interests granted by or pursuant to the Interim Order, the DIP Loan Agreement and the DIP Loan Documents. (Interim Order ¶ 13; DIP Loan Agreement Art. 3.2(b)).

(m) 506(c) Waiver. Other than the Carveout, no claim or expense having a priority senior or *pari passu* to the priority granted to the Lender Parties in the Interim Order shall be granted or permitted in the Case, or any superseding chapter 7 case, and, subject to entry of the Final Order, no other costs or expenses of administration of any kind, nature or description whatsoever shall be imposed against the Collateral under sections 105, 506(c) or 552 of the Bankruptcy Code or otherwise, in each case, while any portion of the Lender Debt remains outstanding. (Interim Order ¶ 9; DIP Loan Agreement Art. 9.20).

(n) Liens on Avoidance Actions. Subject to entry of the Final Order, post-petition liens include liens on avoidance actions arising under chapter 5 of the Bankruptcy Code and applicable state law. (Interim Order ¶ 11; DIP Loan Agreement Art. 3.2(10)).

(o) Automatic Stay. The automatic stay imposed by virtue of section 362 of the Bankruptcy Code is vacated and modified insofar as necessary to permit the Lender Parties to take any action authorized or contemplated by the Interim Order or the DIP Loan Agreement, the DIP Loan Documents and to carry out the terms thereof, subject, however, to the satisfaction of any notice, procedural and other conditions contained in the Interim Order, and/or the DIP Loan Agreement or the DIP Loan Documents. (Interim Order ¶ 32).

11. Prior to the Filing Date, the Debtors, as borrowers, HF-4 as revolving lender, and HFG, as agent (collectively, in such capacities, the "Existing Lender Parties"), entered into that certain Revolving Loan and Security Agreement dated as of September 27, 2010 (as amended, modified and supplemented from time to time, including the schedules and exhibits thereto, the "Existing Loan Agreement") and related agreements, documents and instruments delivered in connection therewith (collectively, together with the Existing Loan Agreement, the "Existing

Loan Documents"), pursuant to which, among other things, the Existing Lender Parties made revolving loans and extended other financial accommodations to the Debtors.

12. Pursuant to the Existing Loan Documents, the Debtors granted the Existing Lender Parties, a first-priority, senior lien on and security interest in certain of the Debtors' assets including, but not limited to, all of the Debtors' receivables, the Debtors' lockbox and lockbox account, the Debtors' cash, the Debtors' payment-related general intangibles and contracts necessary for the collection of receivables, the Debtors' related records and all proceeds of all of the foregoing (collectively, as defined and specified in the Existing Loan Documents as "Collateral", the "Existing Lender Collateral"), to secure the Debtors' obligations under the Existing Loan Documents. All proceeds of the Existing Lender Collateral (including cash on deposit at depository institutions as of the Filing Date, securities or other property) constitute "cash collateral" of the Existing Lender Parties within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral").

13. As of the Filing Date, the Debtors were validly indebted to the Existing Lender Parties under the Existing Loan Documents in the approximate amount of $4.6 million on account of the revolving loans under the Existing Loan Documents, plus accrued and unpaid interest, fees and expenses including professional fees and expenses incurred under or in connection with the Existing Loan Documents (the "Existing Debt"), and the Debtors do not have any counterclaim, setoff, defense or objection against or relating to the Existing Debt. No portion of the Existing Debt is subject to avoidance, recharacterization, recovery, disallowance or subordination pursuant to the Bankruptcy Code (including, but not limited to, section 502(d) thereof) or applicable non-bankruptcy law. To the best of the Debtors' knowledge and belief,

based on the value of the Existing Lender Collateral, the Existing Debt is oversecured as of the Filing Date.

14. The Debtors are not aware of any facts that would support, nor are they aware of, any claims, causes of action or equitable remedies against or defenses to or abatement of the claims and liens asserted by the Existing Lender Parties, whether arising at law or in equity, including any recharacterization, subordination, avoidance or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state or federal law.

15. The Existing Debt is fully secured by valid, binding, enforceable and properly perfected first priority liens and security interests in the Existing Lender Collateral, each of which lien is not subject to avoidance, subordination, or disallowance pursuant to the Bankruptcy Code (including, but not limited to, section 502(d) thereof) or applicable non-bankruptcy law. The Debtors are unaware of any action taken by the Existing Lender Parties which would result in the avoidance, postponement, disallowance, recharacterization or subordination of the Existing Debt.

16. The Debtors have an immediate need to obtain the Postpetition Financing and to use the Existing Lender Collateral as well as the Debtors' other assets which are the subject to the liens of creditors (the "Prepetition Collateral"), including the proceeds thereof (collectively, the "Cash Collateral"). The Debtors do not have sufficient available sources of working capital and financing to carry on the operation of their businesses without the Postpetition Financing and the Debtors' use of the Existing Lender Collateral and the Prepetition Collateral (including Cash Collateral). The ability of the Debtors to pay employees, maintain business relationships with vendors and suppliers, purchase new inventory, and otherwise finance their operations is

essential to the Debtors' continued viability and to the well-being of the Debtors' patients dependent on the Debtors' healthcare services and is essential to the Debtors' efforts to consummate a sale of their assets. Without the Postpetition Financing and the Debtors' use of the Prepetition Collateral (including Cash Collateral), the continued orderly operation of the Debtors' healthcare services would not be possible, and serious and irreparable harm to the Debtors and their estates as well as the community and the patients dependent on the Debtors' healthcare services would result. The purpose of the Postpetition Financing and the Debtors' use of the Prepetition Collateral (including Cash Collateral) will thus be to preserve, maintain and enhance the going concern value of the Debtors, protect the community and the patients dependent on the Debtors' healthcare services and facilitate a sale of the Debtor's assets.

17. Given the Debtors' financial condition, financing arrangements, and capital structure, as well as the uncertain timing of collections of receivables, the Debtors do not have sufficient Cash Collateral to fund their businesses and are otherwise unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. Financing on a postpetition basis is not otherwise available without the Debtors' granting, pursuant to section 364(c)(1) of the Bankruptcy Code, claims having priority over any and all administrative expenses of the kinds specified in sections 503(b) and 507(b) of the Bankruptcy Code, and securing such indebtedness and obligations with the security interests in and the liens upon the Collateral pursuant to section 364(c) and (d) of the Bankruptcy Code. The Debtors are unable to obtain the necessary postpetition financing that they need on terms more favorable than those provided by the Postpetition Financing.

18. The Debtors are unable to obtain an adequate unsecured credit facility allowable under section 503(b)(1) of the Bankruptcy Code and must grant to the Lender Parties a

Superpriority Administrative Expense Claim as contemplated by section 364(c)(1) of the Bankruptcy Code and liens as contemplated by section 364(c)(2), (c)(3) and (d) of the Bankruptcy Code. The Lender Parties have conditioned all loans and advances to be made under the DIP Loan Agreement upon the grant to the Lender Parties of: (a) a Superpriority Administrative Expense Claim pursuant to section 364(c)(1) of the Bankruptcy Code with priority over any and all expenses of any kind or nature whatsoever specified in sections 503(b) and 507(b) of the Bankruptcy Code, other than the Carveout; and (b) subject to the Valid Pre-Petition Senior Liens and the Carveout, in accordance with section 364(c)(2), (3) and (d) of the Bankruptcy Code, liens on and security interests in the Collateral.

19. The Debtors have agreed to repay the Existing Debt with proceeds of the Postpetition Financing because such repayment will avoid a disputed hearing over the Debtors' use of Cash Collateral and provide the Debtors with increased borrowing availability under the Postpetition Financing particularly over the next approximate ninety days. Absent the repayment of the Existing Debt or a non-consensual use of Cash Collateral (which itself is insufficient to finance the Debtors during the Case), 100% of collections on prepetition receivables would be applied in reduction of the Existing Debt and, accordingly, such collections may not result in any additional availability to the Debtors until such time as the Existing Debt is repaid in full and the Debtors would have very limited cash with which to operate their hospitals and their health care facilities until post-petition receivables were collected. The Debtors believe the Existing Lender Parties are substantially oversecured in respect of the Existing Debt and the Debtors will receive substantially increased availability in the first several weeks of the Case as a consequence of the repayment of the Existing Debt, which liquidity is critical for the Debtors to be able to meet their operating expenses during that time period. The Interim Order preserves the rights of parties in

interest to investigate and, if appropriate, challenge the validity, enforceability, perfection and priority of the Existing Debt and the Existing Lender Parties' security interests in and liens on the Existing Lender Collateral, including, without limitation, the repayment of the Existing Debt, such that there will not be prejudice to any party in interest as a consequence of the Debtors' immediate repayment of the Existing Debt as Lender Debt. Based on the foregoing, the proposed repayment of the Existing Debt under the Postpetition Financing as Lender Debt is in the best interests of the Debtors and their estates and does not adversely affect any party in interest.

20. Pursuant to the DIP Facility, the Lender Parties have agreed to provide Revolving Loans to the Debtors in amounts not to exceed the maximum outstanding principal amount at any one time of (i) following entry of the Interim Order and prior to entry of the Final Order, $5 million in accordance with the DIP Loan Agreement, the DIP Loan Documents, the budget annexed hereto as Exhibit C (the "Budget") and the Interim Order, and (ii) upon entry of the Final Order, $7.0 million, in accordance with the DIP Loan Agreement, the DIP Loan Documents, the Budget and the Final Order.

21. Pursuant to the Participation Agreement, Saint Francis has agreed to purchase a last-out participation interest in the Postpetition Financing from the Lender Parties in an amount not to exceed $1.2 million. The Lender Parties have agreed to increase the Debtor's availability under the DIP Facility on account of the participation interest purchased by Saint Francis. As reflected in the Budget, the Debtors require that additional availability in order to fund their anticipated working capital needs during the pendency of the Case.

22. The liens securing the DIP Facility shall not prime the Valid Pre-Petition Senior Liens, as defined in the DIP Loan Agreement and set forth on Schedule VII of the DIP Loan

Agreement (only with respect to the assets set forth therein). The liens securing the Lender Debt in the Receivables Collateral are not subject to any Valid Pre-Petition Senior Liens and shall be first-priority, senior liens, consistent with the lien priority securing the Existing Debt as of the Petition Date. Any liens (including liens securing Other Debt Obligations) in the Receivables Collateral shall be junior in priority to the liens securing the Lender Debt.

23. The terms of the Postpetition Financing are at least as favorable to the Debtors as those available from alternative sources. Indeed, the Debtors believe that not only is the DIP Facility the best financing arrangement available, it is the only debtor in possession financing available. The Debtors have no doubt that no other lender would be willing to extend the necessary amount of credit on comparable terms to those contained in the DIP Facility, nor would any lender extend such credit without requiring that its liens prime the existing first liens.

24. The terms of the Postpetition Financing have been negotiated in good faith and at arm's length between the Debtors and the Lender Parties, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are fair and reasonable under the circumstances, and are enforceable in accordance with applicable law. The credit extended to the Debtors by the Lender Parties under the Postpetition Financing and the Interim Order should be deemed to have been extended in "good faith" as that term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections set forth therein, and should be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that the Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

25. The Debtors have requested immediate entry of the Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the Local Bankruptcy Rules. Absent granting the relief sought by the Interim Order, the Debtors' estates will be immediately and irreparably

harmed. The Debtors have no alternative source of financing to meet their immediate and projected obligations, including payroll and other operating expenses, and consequently, it is essential that the Court approve the interim financing contemplated hereby on an immediate basis. Consummation of the Postpetition Financing and authorization of the use of the Prepetition Collateral (including Cash Collateral) in accordance with the terms of the Interim Order are therefore in the best interests of the Debtors' estates, and are consistent with the Debtors' exercise of their fiduciary duties.

26. The Debtors seek a modification of the automatic stay imposed by Bankruptcy Code section 362 to the extent contemplated by the provisions of the DIP Loan Documents as described above. Such stay modification provisions are customary features of post-petition financing facilities and, in the Debtors' business judgment, are reasonable under the circumstances. Accordingly, the Debtors respectfully request that this Court modify the automatic stay to the extent contemplated by the DIP Facility and the Interim Order.

27. As adequate protection for the granting of liens to secure the DIP Facility and the Debtors' use of the Prepetition Collateral including the Cash Collateral, to the extent of any diminution in value (if any) of the liens (if any) of Clifford Zucker, as "Plan Custodian" and the Pension Benefit Guaranty Corporation (collectively, the "Legacy Creditors") in the Collateral following the Filing Date, the Debtors propose to grant the Legacy Creditors replacement liens (the "Adequate Protection Liens") in all Collateral. The Adequate Protection Liens shall be junior in priority to the Valid Pre-Petition Senior Liens and the liens of the Lender Parties securing the Lender Debt. The Legacy Creditors shall not be required to file any financing statements, mortgages, notices of lien or similar instruments in any jurisdiction or filing office, or to take any other action in order to validate or perfect the Adequate Protection Liens granted

by or pursuant to the Interim Order. The Legacy Creditors shall have no right to seek or exercise any rights or remedies in respect of the Adequate Protection Liens unless the Lender Parties have consented thereto or the Lender Debt has been indefeasibly paid and satisfied in full accordance with the DIP Loan Agreement, the DIP Loan Documents and the Interim Order. Section 7.7 of that certain Collateral Subordination Agreement between HFG and the Legacy Creditors made as of September 27, 2010, provides that the rights and obligations of HFG shall be succeeded by any replacement lender who makes available to the Debtors a credit facility, the proceeds of which are used to pay the Existing Debt, and the Legacy Creditors agree that they will acknowledge such succession of the rights and obligations of HFG to such replacement lender.

28. The Debtors have agreed to waive the right to challenge the validity, enforceability, perfection and priority of the Existing Debt and the Existing Lender Parties' security interest and liens on the Existing Lender Collateral. Each other party, including the Committee or any trustee appointed before the Challenge Deadline (as defined below), shall have waived any right to challenge the validity, enforceability, perfection and priority of the Existing Debt and the Existing Lender Parties' security interest and liens on the Existing Lender Collateral, unless that party commences in the Court an adversary proceeding challenging such validity, enforceability, perfection and/or priority (a "Challenging Action") on or before 75 days after the entry of the Interim Order (or in the case of the Committee 60 days after the appointment of the Committee) (the "Challenge Deadline"). The Existing Debt and the Existing Lender Parties' security interest and liens on the Existing Lender Collateral shall be deemed, as against any party in interest that does not file a Challenging Action on or before the Challenge Deadline, to be legal, valid, binding, perfected, not subject to defense, counterclaim, offset of any kind, subordination and otherwise unavoidable. If no Challenging Action is commenced on

or before the Challenge Deadline or, in the event one or more Challenging Actions is commenced on or before the Challenge Deadline and such Challenging Actions are dismissed, then the Existing Debt and the Existing Lender Parties' security interest and liens on the Existing Lender Collateral shall not be subject to any other or further challenge by any party in interest seeking to exercise the rights of the Debtors' estates or otherwise, including without limitation, any successor thereto. None of the advances under the DIP Facility may be used to prosecute actions, claims, demands or causes of action against the Lender Parties or the Existing Lender Parties or to object to or contest in any manner, or to raise any defense in any pleading to the validity, perfection, priority or enforceability of the Existing Debt or the Existing Lender Parties' liens and security interests in the Existing Lender Collateral, the liens and security interests granted to the Lender Parties under the Interim Order, or the Lender Debt, including in respect of a Challenging Action; *provided*, *however*, up to an aggregate of $10,000 of the Existing Lender Collateral including the Cash Collateral and/or advances under the DIP Facility, may be used by the Committee to investigate the validity, enforceability, perfection and priority of the Existing Debt and the Existing Lender Parties' security interests and liens on the Existing Lender Collateral.

29. Pursuant to Bankruptcy Rule 4001(c)(2), the Debtors respectfully request that the Court set a date for the Final Hearing that is not later than 25 days after the entry of the Interim Order.

30. No trustee or examiner has been appointed in these chapter 11 cases. Notice of this Motion has been given to: (a) the U.S. Trustee; (b) counsel to the Existing Lender Parties and the Lender Parties; (c) counsel to Peoples United Bank; (d) counsel to Saint Francis *Care*,

Inc.; (e) counsel to Clifford Zucker; (f) counsel to the Pension Benefit Guaranty Corporation; and (g) the twenty largest unsecured creditors of each of the Debtors.

31. No prior request for the relief sought in this Motion has been made to this or any other court in connection with these chapter 11 cases.

WHEREFORE, the Debtors respectfully request that this Court (1) enter the Interim Order, (2) schedule a hearing on the Final Order, (3) after such hearing, enter the Final Order, and (4) grant the Debtors such other and further relief as this Court deems just and proper.

Dated at Hartford, Connecticut this 14th day of January, 2015.

JOHNSON MEMORIAL MEDICAL CENTER, INC., JOHNSON MEMORIAL HOSPITAL, INC., JOHNSON HEALTH CARE, INC., and HOME AND COMMUNITY HEALTH SERVICES, INC.

By /s/

Eric Henzy
Federal Bar No. ct12849
Jon P. Newton
Federal Bar No. ct03376
Reid and Riege, P.C.
One Financial Plaza
Hartford, CT 06103-2600
(860) 278-1150
Fax (860) 240-1002
ehenzy@rrlawpc.com
jnewton@rrlawpc.com