# EXHIBIT A

**DEBTOR-IN-POSSESSION
REVOLVING LOAN AND SECURITY AGREEMENT**

dated as of January [_], 2015

among

**JOHNSON MEMORIAL MEDICAL CENTER, INC.,
JOHNSON MEMORIAL HOSPITAL, INC.,
THE JOHNSON EVERGREEN CORPORATION,
HOME & COMMUNITY HEALTH SERVICES, INC.,
JOHNSON HEALTH CARE, INC.,**
and
**JOHNSON PROFESSIONAL ASSOCIATES, P.C.,**
as debtors and debtors-in-possession and as Borrowers,

**HFG HEALTHCO-4 LLC,**
as the Lender

and

**HEALTHCARE FINANCE GROUP, LLC,**
as the Agent

## TABLE OF CONTENTS

Page

ARTICLE 1. DEFINITIONS ................................................................................................................... 2
    1.1     Definitions ......................................................................................................................... 2
    1.2     Other Terms; Rules of Construction .............................................................................. 23
    1.3     Accounting Terms ........................................................................................................... 23

ARTICLE 2. AMOUNTS AND TERMS OF THE REVOLVING LOAN ....................................................... 24
    2.1     Revolving Advances ........................................................................................................ 24
    2.2     Interest and Fees ............................................................................................................ 25
    2.3     Computation of Interest; Payment of Fees ................................................................... 26
    2.4     Procedures for Payment ................................................................................................ 26
    2.5     Indemnities ..................................................................................................................... 28
    2.6     Maximum Interest .......................................................................................................... 29
    2.7     Use of Proceeds of Revolving Loan ............................................................................... 29

ARTICLE 3. SECURITY ...................................................................................................................... 29
    3.1     Superpriority Administrative Expense Claim ................................................................. 29
    3.2     Grant of Security Interests ............................................................................................. 29

ARTICLE 4. PAYMENT MECHANICS ................................................................................................. 31
    4.1     Payment Mechanics ....................................................................................................... 31
    4.2     Misdirected Payments; EOBs ......................................................................................... 32
    4.3     No Rights of Withdrawal ................................................................................................ 32

ARTICLE 5. COLLECTION AND DISTRIBUTION .................................................................................. 32
    5.1     Collections on the Receivables; Distributions ............................................................... 32
    5.2     Distribution of Funds to the Lenders ............................................................................. 33
    5.3     Servicing Receivables ..................................................................................................... 33
    5.4     Distributions Generally ................................................................................................... 34

ARTICLE 6. CONDITIONS PRECEDENT ............................................................................................. 34
    6.1     Conditions Precedent to Closing .................................................................................... 34
    6.2     Conditions Precedent to all Funding Dates .................................................................... 36

ARTICLE 7. REPRESENTATIONS AND WARRANTIES ......................................................................... 37
    7.1     Organization; Good Standing and Qualification ............................................................ 37
    7.2     Authority; No Conflict .................................................................................................... 37
    7.3     Compliance with Certain Material Agreements ............................................................. 38
    7.4     Burdensome Agreements ............................................................................................... 38
    7.5     Certain Fees ..................................................................................................................... 38
    7.6     Valid and Binding Obligation; Enforceability ................................................................ 38
    7.7     Permits, Licenses, and Other Approvals ........................................................................ 38
    7.8     Healthcare Laws ............................................................................................................. 39
    7.9     Liability Event .................................................................................................................. 39
    7.10    Certain Reports; Claims; Reviews .................................................................................. 39
    7.11    Rescission and Renewal of Permits, Licenses, and Other Approvals ............................ 39

Page

7.12    Subsidiaries; Capitalization.................................................................. 39
7.13    Real Property ........................................................................................ 40
7.14    Conditions Precedent ........................................................................... 40
7.15    Financial Statements and Other Information......................................... 40
7.16    Litigation ............................................................................................... 40
7.17    Ownership of Collateral; Liens ............................................................. 40
7.18    Locations .............................................................................................. 40
7.19    Notices ................................................................................................. 41
7.20    Taxes .................................................................................................... 41
7.21    Lockbox and Lockbox Accounts ........................................................... 41
7.22    ERISA Matters...................................................................................... 41
7.23    Patient Consent Forms ........................................................................ 42

ARTICLE 8. AFFIRMATIVE COVENANTS........................................................ 42
8.1    Compliance with Laws .......................................................................... 42
8.2    Offices, Records and Books of Account, Names.................................. 42
8.3    Performance and Compliance with Contracts and Credit and Collection Policy ........... 42
8.4    Audits; Appraisals................................................................................. 43
8.5    Reporting Requirements ....................................................................... 43
8.6    Notice of Proceedings; Overpayments ................................................. 47
8.7    Taxes .................................................................................................... 47
8.8    Preservation of Existence; Dissolution of Non-Active Entities............. 47
8.9    Loan Documents.................................................................................... 47
8.10    Invoices................................................................................................. 48
8.11    ERISA Compliance ............................................................................... 48
8.12    Equipment ............................................................................................. 48
8.13    Insurance .............................................................................................. 48
8.14    Financial Advisors................................................................................. 48
8.15    Collections Services ............................................................................. 48
8.16    The Budget ........................................................................................... 49
8.17    The Orders ............................................................................................ 49
8.18    Qualified Sales ..................................................................................... 49

ARTICLE 9. NEGATIVE COVENANTS .............................................................. 50
9.1    Corporate Documentation ..................................................................... 50
9.2    Debt ...................................................................................................... 50
9.3    Subordination ........................................................................................ 50
9.4    Liens ..................................................................................................... 50
9.5    Lease Obligations.................................................................................. 50
9.6    Asset Sales; Sale/Leaseback Transaction; Etc.................................... 51
9.7    Change in Business ............................................................................... 51
9.8    Change in Credit and Collection Policy................................................. 51
9.9    Change in Payment Instructions............................................................ 51
9.10    Deviation from Terms of Receivable ..................................................... 51
9.11    Mergers and Acquisitions; Dissolutions ............................................... 52
9.12    No "Instruments" ................................................................................... 52
9.13    Margin Loan Restrictions....................................................................... 52

Page

9.14    Loans or Investments .................................................................................. 52
9.15    Transactions with Affiliates ........................................................................ 52
9.16    Distributions ............................................................................................... 52
9.17    Deviation from Patient Consent Form ....................................................... 52
9.18    Equity Interests; Subsidiaries .................................................................... 52
9.19    Interim Financing Order; Final Financing Order; Administrative Expense Claim
         Priority; Lien Priority; Payments................................................................ 53
9.20    Prohibition on Priming of Liens of the Lender .......................................... 53
9.21    Press Releases ............................................................................................ 53
9.22    Modification of Saint Francis Agreements ................................................. 53

ARTICLE 10. FINANCIAL COVENANTS ...................................................................... 53
10.1    Minimum Liquidity ..................................................................................... 53
10.2    Minimum EBIDA ......................................................................................... 53
10.3    Budget Variances........................................................................................ 54

ARTICLE 11. EVENTS OF DEFAULT ............................................................................ 55
11.1    Events of Default ........................................................................................ 55
11.2    Events of Default; Remedies ...................................................................... 59
11.3    Attorney-in-Fact ......................................................................................... 60

ARTICLE 12. THE AGENT ........................................................................................... 60
12.1    Agency Provisions........................................................................................ 60
12.2    No Third Party Beneficiaries ...................................................................... 64

ARTICLE 13. MISCELLANEOUS .................................................................................. 64
13.1    Amendments .............................................................................................. 64
13.2    Notices ....................................................................................................... 65
13.3    Assignments; Participations ...................................................................... 66
13.4    Further Assurances..................................................................................... 67
13.5    Costs and Expenses; Collection Costs ........................................................ 67
13.6    Term and Termination; Fees ...................................................................... 68
13.7    No Liability ................................................................................................. 69
13.8    Entire Agreement; Severability .................................................................. 69
13.9    Governing Law............................................................................................ 69
13.10   Waiver of Jury Trial, Jurisdiction, Venue and Other Rights........................ 69
13.11   Execution in Counterparts.......................................................................... 70
13.12   No Proceedings........................................................................................... 70
13.13   Confidentiality and Notices ....................................................................... 70
13.14   Accounting Information .............................................................................. 70
13.15   USA PATRIOT Act ....................................................................................... 70
13.16   Nature and Extent of Each Borrower's Liability ........................................ 70
13.17   Appointment of Borrower Representative ................................................. 72
13.18   HFG Web Portal .......................................................................................... 73

**EXHIBITS**

| | |
|---|---|
| Exhibit I | Eligibility Criteria |
| Exhibit II | Form of Borrowing Base Report |
| Exhibit III | Receivable Information |
| Exhibit IV | Form of Notice to Obligors |
| Exhibit V | Transmission of Electronic Data Files |
| Exhibit VI | Closing Document Checklist |
| Exhibit VII | Form of Budget |
| Exhibit VIII | Interim Financing Order |
| Exhibit IX | Depository Agreement Confirmation |
| Exhibit X | Saint Francis Confirmation |
| Exhibit XI | People's United Confirmation |
| Exhibit XII | Form of Compliance Certificate |

**SCHEDULES**

| | |
|---|---|
| Schedule I | Addresses for Notices |
| Schedule II | Disclosures |
| Schedule III | Lockbox Information |
| Schedule IV | Net Value Factors |
| Schedule V | Credit and Collection Policy |
| Schedule VI | Permitted Debt |
| Schedule VII | Specified Accounts |
| Schedule VIII | Pre-Petition Liens |

**DEBTOR-IN-POSSESSION REVOLVING LOAN AND SECURITY AGREEMENT** (as it may be amended, modified or supplemented from time to time in accordance with its terms and the Orders (as hereinafter defined), the "**Agreement**") dated as of January [__] 2015, among JOHNSON MEMORIAL MEDICAL CENTER, INC., a Connecticut not-for-profit corporation ("**JMMC**"), JOHNSON MEMORIAL HOSPITAL, INC., a Connecticut not-for-profit corporation ("**JMH**"), THE JOHNSON EVERGREEN CORPORATION, a Connecticut not-for-profit corporation ("**Johnson Evergreen**"), HOME & COMMUNITY HEALTH SERVICES, INC., a Connecticut not-for-profit corporation ("**HCHS**"), JOHNSON HEALTH CARE, INC., a Connecticut not-for-profit corporation ("**JHC**"), JOHNSON PROFESSIONAL ASSOCIATES, P.C., a Connecticut professional corporation ("**JPA**"), and each other Person joined hereto from time to time as a borrower (JMMC, JMH, Johnson Evergreen, HCHS, JHC and JPA, collectively prior to the Filing Date (as defined below), the "**JMMC Entities**", and on and following the Filing Date, each a debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code (as hereinafter defined), and each together with its successors and assigns, a "**Borrower**" and collectively, the "**Borrowers**"), JMH, as the Borrower Representative (as hereinafter defined), HFG HEALTHCO-4, LLC, a Delaware limited liability company ("**HF-4**"), in its capacity as a lender with a Revolving Commitment (as hereinafter defined) (together with its successors and permitted assigns in its capacity as the initial lender making Revolving Advances, the "**Lenders**"), and HEALTHCARE FINANCE GROUP, LLC, a Delaware limited liability company ("**HFG**"), in its capacity as administrative agent and collateral agent for the Lenders (in such capacity, together with its successors and permitted assigns in such capacity, the "**Agent**").

The Borrowers each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Connecticut (the "**Bankruptcy Court**") on January 14, 2015 (the "**Filing Date**").

Prior to the Filing Date, the JMMC Entities and certain of their Affiliates borrowed funds pursuant to that certain Revolving Loan and Security Agreement, dated as of September 27, 2010 (as amended, modified and supplemented prior to the Filing Date, the "**Pre-Petition Revolving Loan Agreement**", and together with all documents, instruments, agreements, schedules and exhibits executed and/or delivered in connection therewith, the "**Pre-Petition HFG Revolving Facility**"), among the JMMC Entities, JDF, Wellcare, and JMS, as borrowers, HF-4, as the lender (the "**Pre-Petition Revolving Lender**") and HFG, as administrative agent and collateral agent for the Pre-Petition Revolving Lender (in such capacity, the "**Pre-Petition Revolving Agent**" and together with the Pre-Petition Revolving Lender, the "**Pre-Petition Revolving Lender Parties**"), secured by a first priority lien in the "Collateral" (as defined in the Pre-Petition Revolving Loan Agreement), including all of the Borrowers' accounts, lockboxes, related general intangibles, money and cash, related records and contracts and the proceeds of all of the foregoing (the "**Pre-Petition Collateral**"). As of the Filing Date, the total principal amount outstanding under the Pre-Petition HFG Revolving Facility is approximately $4,600,000 plus accrued and unpaid interest, fees and expenses including professional fees and expenses incurred under or in connection with the Pre-Petition HFG Revolving Facility (collectively, the "**Existing Debt**"). Pursuant to the Interim Financing Order and effective on the Interim Financing Order Date, the Existing Debt is being assumed by the Borrowers as Lender Debt hereunder.

The Borrowers have requested that the Lenders provide to the Borrowers a debtor-in-possession revolving credit facility secured by a first priority Lien in the Collateral (subject only to the Valid Pre-Petition Senior Liens) in the manner set forth herein and in the Orders (as this Agreement and the Orders may be amended, modified or supplemented from time to time, the "**DIP Facility**"), the proceeds of which are to be used for the purposes set forth in the Budget, and the Lenders have agreed

to make available to the Borrowers such facility upon the terms and conditions set forth in this Agreement.

Saint Francis *Care*, Inc., a Connecticut corporation ("**Saint Francis**"), has entered into the Asset Purchase Agreements with the Borrowers that respectively provide for the purchase by Saint Francis of the Hospital/Surgery Center Assets and the Nursing Home Assets (each, as defined herein), all pursuant to the terms of the Asset Purchase Agreements and consistent with the Orders.

As a condition to and in connection with the commitment of the Lenders to make the Revolving Loans under this Agreement, Saint Francis has agreed to purchase a subordinate, last-out participation interest in the Revolving Loans pursuant to the Participation Agreement, dated as of the Filing Date, among the Agent, the Lenders and Saint Francis (as such agreement may be amended, modified or supplemented in accordance with its terms, the "**Participation Agreement**").

Accordingly, the parties agree as follows:

## ARTICLE 1.

## DEFINITIONS

1.1     **Definitions.**  As used in this Agreement (including the Exhibits and Schedules attached hereto), the following definitions apply:

"**Accounts Receivable Days Outstanding**" means, at any date, the quotient obtained by dividing (1) aggregate net accounts receivables of the Borrowers as presented on their balance sheet as of such date by (2) an amount equal to the aggregate net revenue of the Borrowers for the 3-month period then ended divided by 90.

"**Accrued Amounts**" means, as at any date, the aggregate amount of accrued or incurred but unpaid or unreimbursed (whether or not due and payable) (1) interest on the Revolving Loan, (2) Non-Utilization Fees, (3) Collateral Monitoring Fees, and (4) legal and due diligence costs and expenses.

"**Actual Total Operational Disbursements**" means the Borrowers' actual disbursements during the prior Budget Testing Periods, as reflected in the Budget as line items and as measured against the immediately prior Budget on a line item-by-line item basis.

"**Actual Total Professional Fee Disbursements**" means the Borrowers' actual disbursements for Professional Expenses during the prior Budget Testing Periods, as reflected in the Budget as line items and as measured against the immediately prior Budget on a line item-by-line item basis.

"**Adjusted Borrowing Limit**" means an amount equal to the result of (1) the Borrowing Limit, *minus* (2) the sum of (a) Accrued Amounts and (b) the Liquidity Block.

"**Adjusted Estimated Net Value**" means, with respect to any Eligible Receivable, an amount equal to the Estimated Net Value, plus or minus any adjustments and reserves made or established and maintained from time to time by the Agent (including the Medicare/Medicaid Reserve, reserves for deferred revenue, unapplied cash, and credit balances and other reserves). The Adjusted Estimated Net Value of Eligible Receivables of the Borrowers as of any time is indicated on the applicable Borrowing Base Report.

"**Advance Rate Percentage**" means 85%.

"**Affiliate**" means, as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by or is under common control with such Person or is a director or officer of such Person. For the purposes of this definition, "control", when used with respect to any specified Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise.

"**Agent**" has the meaning set forth in the preamble to this Agreement.

"**Aggregate Committed Amount**" means $7,000,000.

"**Asset Purchase Agreements**" means the Asset Purchase Agreement – H/SC and the Asset Purchase Agreement – NH, collectively, and "**Asset Purchase Agreement**" means either the Asset Purchase Agreement – H/SC or the Asset Purchase Agreement – NH, as the context may require.

"**Asset Purchase Agreement – H/SC**" means that certain Asset Purchase Agreement, dated as of January __, 2015, by and among Saint Francis, as buyer, and the Hospital/Surgery Center Borrowers, as Sellers, with respect to the purchase by Saint Francis of the Hospital/Surgery Center Assets, subject to higher and better offers, as the same may be amended, modified, supplemented or replaced from time to time in accordance with its terms with the consent of the Bankruptcy Court.

"**Asset Purchase Agreement – NH**" means that certain Asset Purchase Agreement, dated as of January __, 2015, by and among Saint Francis, as buyer, and Johnson Evergreen, as Seller, with respect to the purchase by Saint Francis of the Nursing Home Assets, subject to higher and better offers, as the same may be amended, modified, supplemented or replaced from time to time in accordance with its terms with the consent of the Bankruptcy Court.

"**Assignment and Assumption**" means an assignment and assumption agreement in a form satisfactory to the Agent in its sole discretion.

"**Authorized Officer**" means the chief executive officer or the chief financial officer of the Borrower Representative and each other Person designated from time to time by the chief executive officer or the chief financial officer of the Borrower Representative in a notice to the Agent, which designation shall continue in force and effect until terminated in a notice to the Agent from the chief executive officer or the chief financial officer of the Borrower Representative.

"**Availability**" means, as of any date, the positive difference, if any, between (1) the Adjusted Borrowing Limit indicated on the most recent Borrowing Base Report, Budget, Monthly Report, Weekly Report or as otherwise determined by the Agent, *minus* (2) the Outstanding Balance.

"**Avoidance Actions**" means all causes of action of the Borrowers and their estates under sections 544, 545, 547, 548, 550 and 724 of the Bankruptcy Code, and any cash or non-cash proceeds thereof.

"**Bankruptcy Code**" means the United States Bankruptcy Code (11 U.S.C. §§ 101 et seq.), as amended, and any successor statute.

"**Bankruptcy Court**" has the meaning set forth in the recitals to this Agreement.

"**Borrower**" and "**Borrowers**" have the meanings set forth in the preamble to this Agreement.

"**Borrower Account**" means initially account #052-7015649 of the Borrowers at People's United Bank, ABA #221172186, or such other bank account designated by the Borrower Representative by notice to the Agent from time to time.

"**Borrower Lockbox Account**" means each account set forth on Schedule III hereto in the name of a Borrower established and controlled by that Borrower to deposit Collections, including Collections received by wire transfer directly from Governmental Entities, all as more fully set forth in the applicable Depositary Agreement.

"**Borrower Representative**" means Johnson Memorial Hospital, Inc. in its capacity as Borrower Representative pursuant to the provisions of Section 13.18, or any successor Borrower Representative selected by Borrowers and approved by Agent.

"**Borrowing Base**" means, as of any time, an amount equal to (A) the product of (1) the Adjusted Estimated Net Value of Eligible Receivables of the Borrowers at such time (as set forth on line VIII of the applicable Borrowing Base Report), multiplied by (2) the Advance Rate Percentage (as set forth on line IX of the applicable Borrowing Base Report) *minus* (B) the Carveout, *minus* (C) additional reserves established by the Agent from time to time.

"**Borrowing Base Deficiency**" means, as of any date, the positive difference, if any, between (1) the Outstanding Balance of the Revolving Loan, *minus* (2) the Adjusted Borrowing Limit indicated on the most recent Borrowing Base Report or Budget, or as otherwise determined by the Agent.

"**Borrowing Base Report**" means a certificate (which may be sent by Transmission), signed by an Authorized Officer, substantially in the form set forth in Exhibit II hereto, which shall provide the most recently available information with respect to the Eligible Receivables of the Borrowers (segregated by the classes (if any) set forth on Schedule IV hereto) that is set forth in the aged accounts receivable trial balance and books and records of the Borrowers, in form and substance satisfactory to the Agent.

"**Borrowing Limit**" means, as of any date, the lesser of (1) the Total Revolving Commitment and (2) the sum of (x) the Borrowing Base *plus* (y) the Funded Participation Amount as of that date.

"**BPO Sub-Agreement**" has the meaning set forth in the Business Process Outsourcing Agreement.

"**Budget**" means the 13-week weekly cash flow budget for the Borrowers in substantially the form attached hereto as Exhibit VII, containing forecasts of revenues, receipts, disbursements (including disbursements related to restructuring expenses and expenses arising on account of the Chapter 11 Cases, including Professional Expenses), accounts receivable, cash flows and applicable assumptions, prepared by the Financial Advisor and/or management of the Borrowers, as such Budget shall be updated and revised by the Borrower Representative from time to time as required in Section 8.5(1) in form and substance satisfactory to, and approved in writing by, the Agent, and following such approval by the Agent, such updated and revised budget shall become the "Budget" hereunder.

"**Budget Testing Period**" means any period commencing on the first Business Day of the first week of the most recent Budget delivered pursuant to Section 6.1(5) or Section 8.5(1), as applicable, and ending on the last Business Day of the week most recently ended.

"**Business Associate Agreement**" means the business associate agreement, dated the date hereof, between the Agent, for itself and each other "Business Associate" (as defined therein), and each "Covered Entity" (as defined therein), in form and substance satisfactory to the Agent.

"**Business Day**" means any day on which banks are not authorized or required to close in New York City, New York.

"**Business Process Outsourcing Agreement**" means that certain Business Process Outsourcing Agreement, dated as of July __, 2012, among Saint Francis, on behalf of itself and its affiliates Saint Francis Hospital and Medical Center and Saint Francis Medical Group, P.C., JMH, Johnson Evergreen, JMMC and JPA.

"**Capital Expenditures**" means, with respect to any Person for any period, the aggregate of all expenditures (including, without limitation, obligations created under Capital Leases in the year in which created) of such Person in respect of the purchase or other acquisition of fixed or capital assets, as determined in accordance with GAAP.

"**Capital Lease**" means, as applied to any Person, any lease of any Property (whether real, personal or mixed) by that Person as lessee, the obligations of which are required, in accordance with GAAP, to be capitalized on the balance sheet of that Person.

"**Carveout**" means amounts payable after the Lender Group have ceased making Loans or Advances following an Event of Default for the payment of all unpaid fees payable to the U.S. Trustee under 28 U.S.C. § 1930 in such amounts as determined in agreement with the U.S. Trustee or by a final order of the Court.

"**Change of Control**" means any of the following:  (1) Stuart Rosenberg or another qualified individual reasonably acceptable to Agent shall cease to act as chief executive officer and president of the Borrowers; (2) John Grish shall cease to serve as chief financial officer of the Borrowers without a transition period that is reasonably acceptable to Agent to a replacement chief financial officer; (3) the sale, lease or transfer of all or substantially all of the assets of any Borrower to any Person or group (as such term is defined in Section 13(d)(3) of the Exchange Act); (4) the liquidation or dissolution of (or the adoption of a plan of liquidation by) any Borrower; (5) the acquisition by any Person of any Borrower by way of merger or consolidation or otherwise; (6) the loss by any Borrower of its status as an exempt corporation under Section 501(c)(3) of the IRC; (7) any change in the member of a Borrower who has the power to appoint the governing body of such Borrower; (8) any change in the composition of the board of directors (or equivalent governing body) of any Borrower such that a majority of the members of such board or body were not members thereof on the Closing Date or nominated or elected by the affirmative vote of a majority of the members of such board or body where such majority members were also members thereof on the Closing Date or were previously so nominated or elected; or (9) JPA shall continue to exist but cease to be controlled, directly or indirectly, by JMMC.

"**Chapter 11 Cases**" means the cases under chapter 11 of the Bankruptcy Code commenced on the Filing Date by each of the Borrowers pending in the Bankruptcy Court.

"**Claims**" has the meaning set forth in Section 2.5(b).

"**Closing Date**" means the date that this Agreement is executed by all the parties hereto and all of the conditions set forth in Section 6.1 have been satisfied.

"**CMS**" means the Centers for Medicare and Medicaid Services of the United States Department of Health and Human Services.

"**Collateral**" has the meaning set forth in Section 3.2(a).

"**Collateral Monitoring Fee**" has the meaning set forth in Section 2.2(d)(2).

"**Collection Account**" means the Agent's account maintained at Citibank, N.A., ABA #021-000-089, DDA Account #36263566, Ref:  A&T SF c/o HFG Healthco-4 LLC-Collection Account, or such other bank account designated by the Agent from time to time.

"**Collections**" means all cash collections, wire transfers, electronic funds transfers and other cash Proceeds of Receivables deposited in or transferred to the Collection Account.  For purposes of the calculation of Availability (as set forth on line XXIII of the applicable Borrowing Base Report) and the Non-Utilization Fee hereunder, Collections will be applied as of the date of receipt in the Collection Account.  For all other purposes, Collections shall be applied hereunder only following a 3 Business Day clearance period applied thereto.

"**Compliance Certificate**" means a certificate (which may be sent by Transmission), signed by an Authorized Officer, substantially in the form set forth in Exhibit XII hereto, that (1) states as of the date of such certificate (A) that no Default or Event of Default has occurred and is continuing (or if any Default or Event of Default then exists, states the nature thereof and describes the steps being taken to address such Default or Event of Default); and (B) that all representations and warranties set forth in this Agreement are true and correct in all respects (except any representation or warranty that expressly indicates that it is being made only as of a specific date, in which case such representation or warranty shall be true and correct in all respects on and as of such date); and (2) details compliance for the applicable fiscal period with all the financial covenants contained in Article 10 of this Agreement (and attaches a schedule showing the calculations thereof).

"**Contracts**" means, collectively, all rights of each Borrower under all leases, contracts and agreements to which such Borrower is now, or hereafter becomes, a party, including all rights of such Borrower to receive moneys due or to become due thereunder or pursuant thereto, but excluding rights under (but not excluding proceeds of) any lease, contract or agreement (including, without limitation, any license) that by the terms thereof, or under applicable law, cannot be assigned or a security interest granted therein in the manner contemplated by this Agreement unless consent from the relevant party or parties has been obtained and under the terms of which lease, contract or agreement any such assignment or grant of a security interest therein in the absence of such consent would, or could, result in the termination thereof, but only to the extent that (1) those rights are subject to such contractual or legal restriction and (2) that restriction is not, or could not be, rendered ineffective pursuant to the UCC of any relevant jurisdiction or any other applicable law (including the Bankruptcy Code) or principles of equity.

"**Credit and Collection Policy**" means those account receivable credit and collection policies and practices of the Borrowers as in effect on the date of this Agreement and set forth in Schedule V hereto, as modified from time to time with the consent of the Agent.

"**Cumulative Net Cash Flow**" has the meaning set forth in Section 10.3.

"**Debt**" of any Person means (without duplication):  (1) all obligations of such Person for borrowed money; (2) all obligations of such Person evidenced by bonds, notes, debentures, or other similar instruments or upon which interest payments are customarily made or for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction; (3) all obligations of such Person to pay the deferred purchase price of Property or services (other than trade payables or other accounts payable incurred in the ordinary course of such Person's business and not outstanding for more than 90 days after the date such payable was due); (4) all Debt of others directly or indirectly guaranteed (which term shall not include endorsements in the ordinary course of business) by such Person; (5) all obligations created under Capital Leases of such Person; (6) all obligations secured by a Lien on any Property owned by such Person, whether or not the obligations secured thereby have been assumed by such Person or are non-recourse to the credit of such Person (but only to the extent of the value of such Property); (7) the aggregate unfunded pension liabilities pursuant to such Person's pension plans; (8) the minimum assumed annual funding obligation pursuant to such Person's pension plans; and (9) all obligations of such Person under a bankruptcy plan of reorganization, including the Other Debt Obligations.

"**Default**" means an event, act or condition which with the giving of notice or the lapse of time, or both, would constitute an Event of Default.

"**Depositary Agreements**" means the (i) Existing Depositary Agreement, as modified by the Orders, as supplemented by the Depositary Bank Confirmation, and as may be further amended, modified or supplemented from time to time with the consent of the Agent in accordance with its terms, and (ii) any successor agreement entered into by a Depositary Bank, the Lockbox Borrowers, JMMC and the Agent in form and substance satisfactory to the Agent.

"**Depositary Bank**" means any banking institution party to a Depositary Agreement as depositary bank, and initially People's United as the depositary bank under the Existing Depositary Agreement.

"**Depositary Bank Confirmation**" has the meaning set forth in Section 6.1.

"**DIP Facility**" has the meaning set forth in the recitals to this Agreement.

"**Distribution**" means any dividend payment or other distribution of assets, properties, cash, rights, obligations or securities on account of any Equity Interests in any Borrower, any return of capital to any Borrower's equity holders as such, or any action to purchase, retire, defease, redeem or otherwise acquire for value or make any payment in respect of any Equity Interests in any Borrower or any warrants, rights or options to acquire any such interests, now or hereafter outstanding.

"**EBIDA**" of any Person for any period means, the sum of (1) net income (or net loss) of such Person (calculated before extraordinary items) during such period plus (2) the result of the following, in each case (unless otherwise indicated) to the extent included in determining such net income (or net loss):  (A) interest expense (including that portion attributable to Capital Leases in accordance with GAAP and capitalized interest) during such period; plus (B) depreciation and amortization expense; plus (C) unrealized losses on investments; plus (D) costs and expenses of administering the Chapter 11 Cases consistent with the Budget and the Orders; minus (E) gains from asset dispositions outside of the normal course of business; minus (F) unrealized gains on investments; determined in each case in accordance with GAAP; minus (G) income associated with the Borrowers' projected revenue for an anticipated CMS settlement regarding the United States Department of Health and Human Services' calculation of the

rural floor budget neutrality adjustment for the federal fiscal years 2007 through 2011, in an amount of approximately $600,000. For the purposes of determining EBIDA of any Person for any period, "net income (or net loss)" means and refers to the amount set forth on the applicable financial statements of such Person for such period as "Net Increase/Decrease in Unrestricted Assets."

"**Eligible Assignee**" means any Lender, any Affiliate of any Lender, any other financial institution or fund that extends credit or buys loans as one of its businesses including insurance companies, mutual funds and lease financing companies, and any trust or special purpose funding vehicle; provided, that none of the Borrowers nor any Affiliate of any of the Borrowers shall be an Eligible Assignee.

"**Eligibility Criteria**" means the criteria and basis for determining whether a Receivable will be deemed by the Agent to qualify as an Eligible Receivable, all as set forth in Exhibit I hereto, as such Eligibility Criteria may be modified from time to time as determined by the Agent in its good faith discretion upon notice to the Borrower Representative.

"**Eligible Receivables**" means Receivables of each Borrower that satisfy the Eligibility Criteria, as determined by the Agent.

"**Employee Benefit Plan**" means any employee benefit plan within the meaning of Section 3(3) of ERISA (including a Plan) maintained for current or former employees of any Borrower or any of their respective ERISA Affiliates or any such plan to which any of them is required to contribute on behalf of any of its current or former employees or with respect to which any of them has any liability.

"**Environmental Laws**" means any and all applicable federal, state and local laws, statutes, ordinances, rules, regulations, permits, licenses, approvals, interpretations and orders of courts or Governmental Entity, relating to the protection of human health from exposure to hazardous materials or the environment, including, but not limited to, the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. § 9601 et seq.), the Hazardous Material Transportation Act (49 U.S.C. § 331 et seq.), the Resource Conservation and Recovery Act (42 U.S.C. § 6901 et seq.), the Federal Water Pollution Control Act (33 U.S.C. § 1251 et seq.), the Clean Air Act (42 U.S.C. § 7401 et seq.), the Toxic Substances Control Act (15 U.S.C. § 2601 et seq.), the Safe Drinking Water Act (42 U.S.C. § 300, et seq.), the Environmental Protection Agency's regulations relating to underground storage tanks (40 C.F.R. Parts 280 and 281), and the Occupational Safety and Health Act (29 U.S.C. § 651 et seq.), and the rules and regulations thereunder, each as amended or supplemented from time to time. Environmental Laws include but are not limited to requirements pertaining to the manufacture, processing, distribution, use, treatment, storage, disposal, transportation, handling, reporting, licensing, permitting, investigation or remediation of hazardous materials.

"**EOB**" means the explanation of benefit or remittance advice from an Obligor that identifies the services rendered on account of the Receivable specified therein.

"**Equity Interest**" means any share, interest or other equivalent of capital stock of any Person, whether voting or non-voting and whether common or preferred (including any membership interest in a not-for-profit entity), all options, warrants and other rights to acquire, and all securities convertible into, any of the foregoing, all rights to receive interest, income, dividends, distributions, returns of capital and other amounts (whether in cash, securities, property, or a combination thereof), and including, without limitation, all rights to receive amounts due and to become due under or in respect of any investment agreement or upon the termination thereof, and all other rights, powers, privileges, interests, claims and other property in any manner arising out of or relating to any of the foregoing.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the guidance issued thereunder.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) that, together with any Borrower, is treated as a single employer under Section 414(b), (c), (m) or (o) of the IRC or Section 4001 of ERISA.

"**ERISA Event**" means (1) a Reportable Event; (2) the withdrawal of any Borrower or any ERISA Affiliate from a Plan subject to Section 4063 of ERISA during a plan year in which such entity was a "substantial employer" (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (3) the complete or partial withdrawal of any Borrower, or any ERISA Affiliate from any Multiemployer Plan; (4) a notice of reorganization or insolvency of a Multiemployer Plan; (5) the filing of a notice of intent to terminate a Plan or the treatment of a Plan amendment as a termination under Section 4041 or 4041A of ERISA; (6) the institution by the PBGC of proceedings to terminate a Plan; (7) the failure to make any required contribution to a Plan or Multiemployer Plan; (8) the imposition of a lien under Section 430 of the IRC or Section 303 of ERISA on any Borrower or any ERISA Affiliate; (9) the existence with respect to any Plan of an "accumulated funding deficiency" (as defined in Sections 430 or 431 of the IRC or Sections 303 or 304 of ERISA), whether or not waived; (10) any event or condition that constitutes grounds under ERISA Section 4042 for the termination of, or the appointment of a trustee to administer, any Plan; (11) the determination that any Plan is considered an at-risk plan or a plan in endangered or critical status within the meaning of Sections 430, 431, and 432 of the IRC or Sections 303, 304, and 305 of ERISA; (12) any event or condition that might reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan or Multiemployer Plan; (13) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA on the Borrower or any ERISA Affiliate; (14) that a request for a minimum funding waiver under Section 412 of the IRC has been filed with respect to any Plan; or (15) any other event or condition with respect to an Employee Benefit Plan as a result of which any Borrower or any ERISA Affiliate could reasonably be expected to incur liability other than in the ordinary course.

"**Estimated Net Value**" means, with respect to any Eligible Receivable, the gross unpaid amount of such Receivable on the date of creation thereof, times the Net Value Factor.

"**Event of Default**" has the meaning set forth in Section 11.1.

"**Exchange Act**" means The Securities Exchange Act of 1934, as amended, and as it may be further amended from time to time.

"**Excluded Claims**" has the meaning set forth in Section 2.5(b).

"**Existing Debt**" has the meaning set forth in the recitals to this Agreement.

"**Existing Depositary Agreement**" means the Depositary Agreement, dated as of September 27, 2010, by and among People's United, JMH, Johnson Evergreen, HCHS, JMMC, JPA, and HFG, as Pre-Petition Revolving Agent, as amended, modified and supplemented prior to the Filing Date in accordance with its terms.

"**Exit Fee**" has the meaning set forth in Section 2.2(d)(3).

"**Facility Fee**" has the meaning set forth in Section 2.2(d)(1).

"**Filing Date**" has the meaning set forth in the recitals to this Agreement.

"**Filing Date Cash**" means cash and cash equivalents held in the Specified Accounts on the Filing Date.

"**Final Financing Order**" means an order of the Bankruptcy Court, in form acceptable to the Agent in its sole discretion, approving this Agreement and the other Loan Documents, as such order may be amended, modified or supplemented from time to time with the express written consent of the Agent and the approval of the Bankruptcy Court, which order (i) shall be in full force and effect, (ii) has not been vacated, modified (without the express written consent of the Agent as set forth hereinbefore), reversed, or stayed, and (iii) no appeal from said order has been filed in which the Agent's or the Lenders' lack of good faith has been raised.

"**Final Financing Order Date**" means the date (which shall take place as soon as practicable but no later than February [9], 2015) on which the Final Financing Order has been duly entered by the Bankruptcy Court.

"**Financial Advisor**" has the meaning set forth in Section 8.14.

"**Full Payment**" means, with respect to any Lender Debt, the full cash payment thereof, including any interest, fees, expenses and other charges payable hereunder.  No Lender Debt will be deemed to have been paid in full until all Lender Debt (other than unasserted contingent indemnification obligations) has been fully paid in cash and all Revolving Commitments have expired or been expressly terminated in writing and a full release provided.

"**Funded Participation Amount**" means the aggregate outstanding amount actually funded by Saint Francis to the Agent pursuant to the Participation Agreement.

"**Funding Date**" means any Business Day during the Term on which a Revolving Advance is made at the request of the Borrower Representative in accordance with provisions of this Agreement.

"**GAAP**" means generally accepted accounting principles in the United States of America.

"**Governmental Entity**" means the United States of America, any state thereof, any political subdivision of a state thereof and any agency or instrumentality of the United States of America or any state or political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.  Payments from Governmental Entities will be deemed to include payments governed under the Social Security Act (42 U.S.C. §§ 1395 et seq.), including payments under Medicare, Medicaid and TRICARE/CHAMPUS, and payments administered or regulated by CMS.

"**Guaranty**" by any Person means any obligation, contingent or otherwise, of such Person directly or indirectly guaranteeing any Debt or other obligation of any other Person and, without limiting the generality of the foregoing, any obligation, direct or indirect, contingent or otherwise, of such Person (1) to purchase or pay (or advance or supply funds for the purchase or payment of) such Debt or other obligation (whether arising by virtue of partnership arrangements, by agreement to keep-well, to purchase assets, goods, securities or services, or to take-or-pay), or (2) entered into for the purpose of

assuring in any other manner the obligee of such Debt or other obligation of the payment thereof or to protect the obligee of such Debt or other obligation of the payment thereof or to protect the obligee against loss in respect thereof (in whole or in part), provided that the term Guaranty shall not include endorsements for collection or deposit in the ordinary course of business. The term "Guaranty" used as a verb has a corresponding meaning.

"**Healthcare Laws**" means all applicable statutes, laws, ordinances, rules, and regulations of any Governmental Entity with respect to regulatory matters primarily relating to patient healthcare, healthcare providers, and healthcare services (including, without limitation:  Section 1128B(b) of the Social Security Act, as amended, 42 U.S.C. § 1320a 7(b) (Criminal Penalties Involving Medicare or State Health Care Programs), commonly referred to as the "Federal Anti-Kickback Statute;" HIPAA (as defined in the Business Associate Agreement; and the Social Security Act, as amended, Section 1877, 42 U.S.C. § 1395nn (Prohibition Against Certain Referrals), commonly referred to as "Stark Statute").

"**HCHS**" has the meaning set forth in the preamble to this Agreement.

"**HF-4**" has the meaning set forth in the preamble to this Agreement.

"**HFG**" has the meaning set forth in the preamble to this Agreement.

"**HFG Web Portal**" has the meaning set forth in Section 13.18.

"**HFG Web Portal Communications**" means, collectively, any communication, information, document, or other material provided through the HFG Web Portal.

"**Hospital**" means Johnson Memorial Hospital, located at 201 Chestnut Hill Road, Stafford Springs, Connecticut 06076.

"**Hospital/Surgery Center Assets**" means the assets and Property of the Borrowers that are subject to purchase and as listed in the Asset Purchase Agreement – H/SC.

"**Hospital/Surgery Center Borrowers**" means JMMC, JMH, HCHS and JHC.

"**Hospital/Surgery Center Sale**" means the sale of the Hospital/Surgery Center Assets by the Hospital/Surgery Center Borrowers to Saint Francis pursuant to the terms of the Asset Purchase Agreement – H/SC or such other party that submits the highest and best offer for the Hospital/Surgery Center Assets.

"**Indemnified Party**" has the meaning set forth in Section 2.5(b).

"**Initial Funding Date**" means, with respect to the Revolving Loan, the date of funding of the initial Revolving Advance.

"**Insolvency Proceeding**" means any case or proceeding commenced by or against a Person under any state, federal or foreign law for, or any agreement of such Person to, (a) the entry of an order for relief under the Bankruptcy Code, or any other insolvency, debtor relief or debt adjustment law; (b) the appointment of a receiver, trustee, liquidator, administrator, conservator or other custodian for such Person or any part of its Property; or (c) an assignment or trust mortgage for the benefit of creditors.

"**Insurer**" means any Person (other than a Governmental Entity) which in the ordinary course of its business or activities agrees to pay for healthcare goods and services received by individuals, including commercial insurance companies, nonprofit insurance companies (such as the Blue Cross, Blue Shield entities), employers or unions which self insure for employee or member health insurance, prepaid health care organizations, preferred provider organizations, health maintenance organizations, commercial hospitals, physicians groups or any other similar Person. "Insurer" includes insurance companies issuing health, personal injury, workers' compensation or other types of insurance but does not include any individual guarantor.

"**Interest Period**" means each one-month period (or shorter period ending on the Maturity Date); provided, that the initial Interest Period shall commence on the Initial Funding Date and shall end on the last calendar day of the month in which the Initial Funding Date occurred.

"**Interim Financing Order**" means the order of the Bankruptcy Court in the form attached hereto as Exhibit VIII or otherwise in form acceptable to the Agent in its sole discretion as such order may be amended, modified or supplemented from time to time with the express written consent of the Agent and the approval of the Bankruptcy Court, which order (i) shall be in full force and effect, (ii) has not been vacated, modified (without the express written consent of the Agent as set forth hereinbefore), reversed, or stayed, and (iii) no appeal from said order has been filed in which the Agent's or the Lenders' lack of good faith has been raised.

"**Interim Financing Order Date**" means January __, 2015, being the date on which each of the following shall have occurred: (i) the Interim Financing Order shall have been duly entered by the Bankruptcy Court and shall be in full force and effect, and (ii) the Agent shall have determined that all conditions set forth in Sections 6.1 and 6.2 shall have been duly satisfied or waived by the Agent.

"**IRC**" means the Internal Revenue Code of 1986, as amended (or any successor statute thereto) and the guidance thereunder.

"**JDF**" means Johnson Development Fund, Inc., a Connecticut not-for-profit corporation.

"**JHC**" has the meaning set forth in the preamble to this Agreement.

"**JMH**" has the meaning set forth in the preamble to this Agreement.

"**JMMC**" has the meaning set forth in the preamble to this Agreement.

"**JMS**" means Johnson Medical Specialists, P.C., a Connecticut professional corporation.

"**Johnson Evergreen**" has the meaning set forth in the preamble to this Agreement.

"**JPA**" has the meaning set forth in the preamble to this Agreement.

"**Last Service Date**" means, with respect to any Eligible Receivable, the date set forth on the related invoice or statement as the most recent date on which services, goods or merchandise were provided by the applicable Borrower to the related patient or customer.

"**Legacy Creditors Subordinated Debt Obligations**" means the debt obligations accrued in connection with the Borrowers' prior bankruptcy case and owing by JMH, Johnson Evergreen and JMMC

to certain of its general creditors and the PBGC and subject to the subordination provisions set forth in the Legacy Creditors Subordination Agreement.

"**Legacy Creditors Subordination Agreement**" means the Collateral Subordination Agreement, dated as of September 17, 2010, by and among the Plan Custodian (on behalf of the general creditors), the PBGC, and HFG, as Pre-Petition Revolving Agent, and acknowledged by JMH, Johnson Evergreen and JMMC.

"**Lender Debt**" means and includes any and all amounts due, whether now existing or hereafter arising, under this Agreement or any other Loan Document in respect of the Revolving Loan, including, without limitation, any and all principal, interest, penalties, fees (including, without limitation, the Facility Fee, the Non-Utilization Fee, the Collateral Monitoring Fee and the Exit Fee), charges, premiums, indemnities and costs owed or owing to the Agent or any Lender by the Borrowers, or any of them, in each instance, whether absolute or contingent, direct or indirect, secured or unsecured, due or not due, arising by operation of law or otherwise, and all interest and other charges thereon, including, without limitation, post-petition interest whether or not such interest is an allowable claim in a bankruptcy proceeding.

"**Lender Group**" means (1) each Lender and the Agent, and (2) each of their respective agents and delegates identified from time to time to effectuate this Agreement.

"**Lender Lockbox**" means each lockbox, whether held in the name of the Agent, any Lender, or any Borrower, located at the address set forth on Schedule III, to receive checks and EOBs with respect to Receivables payable by Insurers and other non-Governmental Entities.

"**Lender Lockbox Account**" means each account at a Lockbox Bank as set forth on Schedule III as associated with a Lender Lockbox and established by one or more of the Borrowers to deposit Collections, including Collections received in any Lender Lockbox and Collections received by wire transfer directly from Insurers and all other Non-Governmental Entities, all as more fully set forth in the applicable Depositary Agreement.

"**Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Liability Event**" means any event, fact, condition, or circumstance or series thereof (1) in or for which any Borrower becomes liable or otherwise responsible for any amount greater than or equal to $25,000 owed or owing to any Medicaid or Medicare program by a provider under common ownership with any Borrower or any provider owned by any Borrower pursuant to any applicable law, ordinance, rule, decree, order, or regulation of any Governmental Entity after the failure of any such provider to pay any such amount when owed or owing; (2) in which Medicaid or Medicare payments to any Borrower can be lawfully set off against payments to that or any other Borrower to satisfy any liability of or for any amount greater than or equal to $15,000 owed or owing to any Medicaid or Medicare program by a provider under common ownership with any Borrower or any provider owned by any Borrower pursuant to any applicable law, ordinance, rule, decree, order, or regulation of any Governmental Entity; (3) in which any other payments from any Obligor other than a Governmental Entity to any Borrower can be lawfully set off against payments to that or any other Borrower to satisfy any liability of or for any amount greater than or equal to $25,000 owed or owing to that Obligor by a provider under common ownership with any Borrower or any provider owned by any Borrower; or (4) any of the foregoing under clauses (1) and (2), in each case pursuant to statutory or regulatory

provisions that are similar to any applicable law, ordinance, rule, decree, order, or regulation of any Governmental Entity referred to in clauses (1) and (2), or any successor provisions thereto.

"**LIBOR**" for any Interest Period, means a rate per annum equal to the greater of (1) 1.25% and (2) the rate per annum, determined by Agent in accordance with its customary procedures, and utilizing such electronic or other quotation sources as it considers appropriate (rounded upwards, if necessary, to the next 1/16%), to be the rate at which 90-day Dollar deposits in the amount of $1,000,000 are offered to major banks in the London interbank market on or about 11:00 a.m. (London time) two (2) Business Days prior to the commencement of such Interest Period, which determination shall be conclusive in the absence of manifest error; provided, that so long as available, Agent will obtain such electronic quotation from the USD column on the Bloomberg Screen, code BBAM (Telerate Successor Page 3750) or such other code as may replace code BBAM in such service for the purposes of display of the interest rates in the London interbank market.

"**Lien**" means any lien, charge, deed of trust, mortgage, security interest, tax lien, pledge, hypothecation, assignment, preference, priority, other charge or encumbrance, or any other type of preferential arrangement of any kind or nature whatsoever by or with any Person (including, without limitation, any conditional sale or title retention agreement), whether arising by contract, operation of law, or otherwise.

"**Liquidity Block**" means $1,000,000.

"**Loan Documents**" means this Agreement, the Notes, the Orders, the Subordination Agreements, the Participation Agreement, the Business Associate Agreement, each Depositary Agreement, each Borrowing Base Report, each Monthly Report, each Weekly Report, the Budget, and each other document or instrument now or hereafter executed or delivered to the Agent or any Lender pursuant to or in connection herewith or therewith (including, without limitation, each other agreement now existing or hereafter created providing collateral security for the payment or performance of any Lender Debt), as each such agreement, document or instrument may be amended, modified or supplemented from time to time.

"**Lockbox Account**" refers to each Borrower Lockbox Account and each Lender Lockbox Account, as the context requires.

"**Lockbox Bank**" means the applicable bank set forth on Schedule III hereto.

"**Lockbox Borrower**" means any of JMH, Johnson Evergreen, HCHS and JPA and any other Borrower (other than JMMC) who becomes a party to a Depositary Agreement.

"**Master Affiliation Agreement**" means that certain Master Affiliation Agreement, dated as of July 12, 2012, among Saint Francis, JMMC, JMH and Johnson Evergreen, as amended by the Saint Francis Interim Financing Agreement, and as may be amended, supplemented, modified or replaced in connection with the Nursing Home Sale with the consent of the Agent in accordance with Section 9.22 hereof.

"**Master Affiliation Agreement Escrow Agent**" means Hinckley, Allen & Snyder, LLP.

"**Material Adverse Effect**" means (1) a change or effect that is materially adverse to the business, Property, capitalization, assets, liabilities, operations, prospects or condition (financial or

other) of the Borrowers and their Subsidiaries taken as a whole, recognizing that the Borrowers have filed the Chapter 11 Cases; (2) the material impairment of the ability of any Borrower to meet its obligations substantially as set forth in the Budget or to otherwise perform its obligations under this Agreement or any of the other Loan Documents; (3) the imposition of any obligation on any Lender or the Agent, compliance with which would materially impair such Person's ability to receive its contemplated economic benefits hereunder; (4) the material impairment of the validity or enforceability of, or the rights, claims, Liens, remedies or benefits available to the Agent or the Lenders under, the Orders, this Agreement or any other Loan Document; or (5) the material impairment of the validity, perfection or priority of any Lien granted in favor of the Agent pursuant to this Agreement or any other Loan Document.

"**Maturity Date**" means the earliest to occur of (1) the Scheduled Maturity Date, (2) the declaration by the Agent or the Required Lenders of the Maturity Date in accordance with Section 11.2(a), (3) the consummation of the Hospital/Surgery Center Sale, and (4) the date on which the Lender Debt is paid in full and the Commitments are terminated.

"**Maximum Permissible Rate**" has the meaning set forth in Section 2.6.

"**McKesson**" means McKesson Technologies, Inc. and its affiliates including, without limitation, McKesson Information Solutions LLC.

"**Medicaid**" means the medical assistance program established by Title XIX of the Social Security Act (42 U.S.C. § 1396 et seq.) and any statutes succeeding thereto.

"**Medicare**" means the health insurance program for the aged and disabled established by Title XVIII of the Social Security Act (42 U.S.C. § 1395 et seq.) and any statutes succeeding thereto.

"**Medicare/Medicaid Reserve**" means, as of any date of determination, an amount, which in the Agent's sole discretion, is equal to the sum of (1) the amount of retroactive settlements estimated to be due and owing to Governmental Entities and (2) without duplication, 100% of those amounts for which payment plans have been established with the appropriate Governmental Entity.

"**Minimum Balance**" means an amount equal to $1,500,000.

"**Misdirected Payment**" means any form of payment in respect of a Receivable made by an Obligor in a manner other than to a Lockbox Account.

"**Monthly Report**" means a report to the Agent (sent by Transmission unless otherwise agreed by the Agent), certified as accurate by the Borrower Representative, containing the following information:  (1) the information contained on Exhibit II for the prior month; (2) electronic download of the transaction files for the prior month; and (3) electronic download of the monthly aged final balance for the prior month.

"**Multiemployer Plan**" means any Employee Benefit Plan of the type described in Section 4001(a)(3) of ERISA.

"**Multiple Employer Plan**" means an Employee Benefit Plan that has two or more contributing sponsors (including a Borrower and any ERISA Affiliate) at least two of whom are not under common control, as such plan is described in Section 4064 of ERISA.

"**Net Cash Flow**" means the net result of cash receipts and disbursements included in the line item "Net Cash Flow" set forth in the Budget.

"**Net Value Factor**" means, initially, the percentages set forth on Schedule IV attached hereto, as such percentages may be adjusted, upwards or downwards, in the sole discretion of the Agent, based on actual collection experience.

"**New Financing Agreement**" means a financing agreement between the Lenders and the Person who is acquiring the Hospital/Surgery Center Assets in connection with the consummation of the Asset Purchase Agreement – H/SC and as part of a transaction that provides for the payment in full of all Lender Debt, which agreement is in form and substance acceptable to the Lenders and the Agent in their sole discretion.

"**Non-Utilization Fee**" has the meaning set forth in Section 2.2(c).

"**Notes**" has the meaning set forth in Section 2.1(h).

"**Notice**" means a notice letter on the Borrowers' corporate letterhead to an Obligor in substantially the form attached hereto as Exhibit IV.

"**Nursing Home**" means Evergreen Health Care Center, located at 205 Chestnut Hill Road, Stafford Springs, Connecticut 06076.

"**Nursing Home Assets**" means the assets and Property of Johnson Evergreen that are subject to purchase and as listed in the Asset Purchase Agreement – NH.

"**Nursing Home Sale**" means the sale of the Nursing Home Assets by Johnson Evergreen to Saint Francis pursuant to the terms of the Asset Purchase Agreement – NH or such other party that submits the highest and best offer for the Nursing Home Assets.

"**Obligor**" means an Insurer, Governmental Entity or other Person, as applicable, who is responsible for the payment of all or any portion of a Receivable.

"**Orders**" means the Interim Financing Order and the Final Financing Order, and any orders of the Bankruptcy Court modifying any of the foregoing in accordance with the Loan Documents.

"**Other Debt Obligations**" means the Legacy Creditors Subordinated Debt Obligations, the People's United Subordinated Debt Obligations, the Saint Francis Interim Financing Obligations, and any other Debt, including purchase money security and equipment lease Debt, set forth on Schedule VI hereto.

"**Other Taxes**" has the meaning set forth in Section 2.4(b).

"**Outstanding Balance**" means, with respect to the Revolving Loan, as of any date of determination, the aggregate outstanding principal balance of the Revolving Loan.

"**Participation Agreement**" has the meaning set forth in the recitals to this Agreement.

"**Patient Consent Form**" means each type of patient consent form, in form and substance satisfactory to the Agent, to be signed by each patient of each Lockbox Borrower for which a Receivable will be created, which authorizes certain demographic and medical information with respect to such patient to be disclosed by such Borrower to its servicing agents and by such servicing agents to any third party obligors thereon.

"**PBGC**" means the Pension Benefit Guaranty Corporation and any successor thereto.

"**Pension Act**" means the Pension Protection Act of 2006, as amended (or any successor statute thereto), and the guidance issued thereunder.

"**Pension Funding Rules**" means the rules of the IRC and ERISA regarding minimum required contributions (including any installment payment thereof) to Plans and set forth in:  (a) with respect to plan years ending prior to the effective date of the Pension Act, Section 412 of the IRC and Section 302 of ERISA, each as in effect prior to the Pension Act; and (b) thereafter, Sections 412, 430, 431, 432, and 436 of the IRC and Sections 302, 303, 304, and 305 of ERISA.

"**People's United**" means People's United Bank, together with its permitted successors and assigns.

"**People's United Restructuring Agreement**" means that certain consent and restructuring letter agreement, dated as of the date hereof, by and between People's United and Saint Francis Care, Inc., as modified by the Orders, and as may be further amended, modified or supplemented from time to time with the consent of the Agent in accordance with its terms.

"**People's United Subordinated Debt Obligations**" means the debt obligations accrued prior to the Filing Date and owing by JMH, Johnson Evergreen and JMMC to People's United, subject to the People's United Restructuring Agreement, and subject to the subordination provisions set forth in the People's United Subordination Agreement.

"**People's United Subordination Agreement**" means the Collateral Subordination Agreement, dated as of September 17, 2010, by and between People's United and HFG, as Pre-Petition Revolving Agent, and acknowledged by JMH, Johnson Evergreen and JMMC, as supplemented by the People's United Confirmation and as modified by the Orders, and as may be further amended, modified or supplemented from time to time with the consent of the Agent in accordance with its terms.

"**People's United Confirmation**" has the meaning set forth in Section 6.1.

"**Permitted Debt**" means (1) the Lender Debt and (2) the Other Debt Obligations.

"**Permitted Liens**" means any of the following Liens recognized by the Bankruptcy Court:

(1)    Liens securing the Lender Debt;

(2)    Liens imposed in connection with the Carveout;

(3)    Valid Pre-Petition Senior Liens;

(4)     Liens related to the purchase money security and equipment lease Debt listed on Schedule VI;

(5)     Liens imposed prior to the Filing Date by law such as Liens of carriers, warehousemen, mechanics, materialmen and landlords, and other similar Liens incurred in the ordinary course of business for sums not constituting borrowed money;

(6)     Liens imposed prior to the Filing Date for taxes, assessments or other governmental charges or statutory obligations; and

(7)     Replacement Liens.

*provided,* in no event shall Permitted Liens include any Lien against the Receivables Collateral except for Permitted Receivables Liens.

"**Permitted Receivables Liens**" means each of the following Liens, to the extent valid, enforceable and non-avoidable as of the Filing Date:

(1)     Liens securing the Lender Debt;

(2)     Liens subject to Subordination Agreements imposed prior to the Filing Date, pursuant to the terms and conditions set forth in the applicable Subordination Agreement and the Orders, which agreement is in full force and effect; and

(3)     Replacement Liens subordinate to the Liens securing the Lender Debt pursuant to the terms and conditions set forth in the Orders or other orders of the Bankruptcy Court.

"**Person**" means an individual, partnership, corporation (including a business trust), limited liability company, joint stock company, trust, unincorporated association, joint venture or other entity, or a Governmental Entity.

"**Plan**" means any Employee Benefit Plan (including a Multiemployer Plan and a Multiple Employer Plan) that is either covered by Title IV of ERISA or is subject to the Pension Funding Rules.

"**Plan Custodian**" means Clifford Zucker, acting as "Plan Custodian" appointed pursuant to certain Borrowers' Amended Joint Plan of Reorganization approved by the Bankruptcy Court on August 9, 2010.

"**Pre-Petition Collateral**" has the meaning set forth in the recitals to this Agreement.

"**Pre-Petition HFG Revolving Facility**" has the meaning set forth in the recitals to this Agreement.

"**Pre-Petition Revolving Agent**" has the meaning set forth in the recitals to this Agreement.

"**Pre-Petition Revolving Lender Parties**" has the meaning set forth in the recitals to this Agreement.

"**Pre-Petition Revolving Lender**" has the meaning set forth in the recitals to this Agreement.

"**Pre-Petition Revolving Loan Agreement**" has the meaning set forth in the recitals to this Agreement.

"**Pre-Petition Revolving Obligations**" means all of the "Lender Debt" outstanding under the Pre-Petition HFG Revolving Facility immediately prior to the Interim Financing Order Date.

"**Pro Rata Share**" means a fraction (expressed as a percentage), the numerator of which is the amount of such Lender's Revolving Commitment and the denominator of which is the Total Revolving Commitment, or if no Revolving Commitments are in effect, a fraction (expressed as a percentage), the numerator of which is the amount of Lender Debt owed to such Lender and the denominator of which is the aggregate amount of the Lender Debt owed to the Lenders.

"**Proceeds**" means, with respect to any asset constituting Collateral, all cash or property that is receivable or received when such asset is collected, sold, liquidated, foreclosed, exchanged or otherwise disposed of, whether such disposition is voluntary or involuntary, and includes all rights to payment with respect to any insurance relating to such asset and any other non-cash proceeds of such asset.

"**Professional Expenses**" means the professional fees and expenses of attorneys, accountants, financial advisors and consultants retained by the Borrowers, any statutory committee appointed in the Chapter 11 Cases, and/or the patient care ombudsman appointed in the Chapter 11 Cases pursuant to sections 327, 328, 333 and 1103 of the Bankruptcy Code in accordance with the Budget.

"**Projected Total Operational Disbursements**" means the projected disbursements set forth in the Budget line item titled "Total Operational Disbursements," which shall reflect the projected operational disbursements to be made in the aggregate.

"**Projected Total Professional Fee Disbursements**" means the projected disbursements set forth in the Budget line item titled "Professional Fee Disbursements," which shall reflect the projected disbursements for Professional Expenses to be made in the aggregate.

"**Property**" means property of all kinds, movable, immovable, corporeal, incorporeal, real, personal or mixed, tangible or intangible (including, without limitation, all rights relating thereto), whether owned or acquired on or after the date of this Agreement.

"**Qualified Sales**" has the meaning set forth in Section 8.18.

"**Qualified Sale Approval Orders**" has the meaning set forth in Section 8.18.

"**Qualified Sale Bidding Procedures Orders**" has the meaning set forth in Section 8.18.

"**Qualified Sale Motion**" has the meaning set forth in Section 8.18.

"**Receivable Information**" means the information listed on Exhibit III hereto (together with any other information relating to the Receivables provided by any Borrower to the Agent from time to time) as such Exhibit may be modified by the Agent in consultation with the Borrowers from time to time.

"**Receivables**" means all accounts, instruments, general intangibles, health-care-insurance receivables and all other obligations for the payment of money and goodwill, whether now existing or hereafter arising, including, without limitation, all payments due from any Receivables including those

based on a cost report settlement or expected settlement, and all Proceeds of any of the foregoing, in each case, including rights of payment arising out of the rendition of medical, surgical, diagnostic or other professional medical services or the sale of medical products by each Borrower in the ordinary course of its business, including all third-party reimbursable portions or third-party directly payable portions of health-care-insurance receivables or general intangibles owing (or in the case of Unbilled Receivables, to be owing) by an Obligor, including all rights to reimbursement under any agreements with and payments from Obligors, patients or other Persons, together with all books, records, ledger cards, data processing records, computer software, and other property at any time used or useful in connection with, evidencing, embodying, referring to, or relating to any of the foregoing.

"**Receivables Collateral**" means the following assets of each Borrower, whether now existing or hereafter acquired, and wherever located:

> (b)     all Receivables, whether now owned or hereafter acquired;

> (c)     to the maximum extent permitted by law, each Lender Lockbox and each Lockbox Account, and amounts held therein;

> (d)     all money and cash;

> (e)     all Records relating to items (a) through (c) above;

> (f)     all payment-related general intangibles and all Contracts necessary for the collection of Receivables, including, without limitation, all Medicare and Medicaid provider agreements and provider numbers, licenses and all rights under all contracts between McKesson and any of the Borrowers; and

> (g)     all proceeds of any kind or nature of the foregoing.

"**Records**" has the meaning set forth in the UCC and shall include all of the Borrowers' present and future books of account of every kind or nature, service and management agreements, invoices, ledger cards, statements, correspondence, memoranda, credit files and other data relating to the Receivables and the other Collateral or any account debtor or Obligor, together with the tapes, disks, diskettes and other data and software storage media and devices, file cabinets or containers in or on which the foregoing are stored (including any rights of the Borrowers with respect to the foregoing maintained with or by any other Person).

"**Related Person**" means any incorporator, equityholder (or immediate family member of an equityholder), Affiliate (other than the Agent), agent, attorney, officer, director, member, manager, employee or partner of any Lender or its members or its equityholders.

"**Replacement Liens**" means Liens granted as adequate protection to a holder of a Permitted Lien under the Orders or in the Chapter 11 Cases consented to by the Agent.

"**Reportable Event**" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30-day notice period has been waived.

"**Required Lenders**" means, at any time, Lenders holding Revolving Commitments representing at least 66-2/3% of the Total Revolving Commitment or, if the Revolving Commitments shall have been terminated, holding at least 66-2/3% of the outstanding Revolving Loan.

"**Revolving Advance**" has the meaning set forth in Section 2.1(a).

"**Revolving Commitment**" means the commitment of each Lender to make Revolving Advances up to the amount set forth below the signature of such Lender on the signature page of this Agreement or as set forth in the applicable Assignment and Assumption.

"**Revolving Loan**" has the meaning set forth in Section 2.1(a).

"**Saint Francis**" has the meaning set forth in the recitals to this Agreement.

"**Saint Francis Agreement**" means the Master Affiliation Agreement or any BPO Sub-Agreement relating to billing and/or collection services and/or related information technology.

"**Saint Francis Confirmation**" has the meaning set forth in Section 6.1.

"**Saint Francis Intercreditor Agreement**" means the Intercreditor Agreement, made as of July 12, 2012 by and between Saint Francis and the Agent, as acknowledged by the Borrowers, as supplemented by the Saint Francis Confirmation and as modified by the Orders, and as may be further amended, modified or supplemented from time to time with the consent of the Agent in accordance with its terms.

"**Saint Francis Interim Financing Agreement**" means the Interim Financing Agreement and Amendment of Master Affiliation Agreement, dated as of May 17, 2013, among Saint Francis, JMMC, JMH and Johnson Evergreen.

"**Saint Francis Interim Financing Obligations**" means the debt obligations accrued prior to the Filing Date and owing by the Borrowers under the Saint Francis Interim Financing Agreement and subject to the subordination provisions set forth in the Saint Francis Intercreditor Agreement.

"**Scheduled Maturity Date**" means January [_], 2016.

"**Specified Accounts**" means the accounts listed on Schedule VII hereto.

"**Subordination Agreements**" means the Saint Francis Intercreditor Agreement, the People's United Subordination Agreement and the Legacy Creditors Subordination Agreement, each as confirmed (and modified) by the Orders, and as they may be further amended, modified or supplemented from time to time in accordance with its terms with the consent of the Agent and the Bankruptcy Court.

"**Subsidiary**" of any Person, means any corporation or entity of which at least a majority of the outstanding shares of stock or other ownership or membership interests having by the terms thereof ordinary voting power to elect a majority of the board of directors (or Persons performing similar functions) of such corporation or entity (irrespective of whether or not at the time, in the case of a corporation, stock of any other class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time directly or indirectly owned or controlled by such Person.

"**Superpriority Administrative Expense Claim**" has the meaning set forth in Section 3.1.

"**Taxes**" has the meaning set forth in Section 2.4(a).

"**Term**" has the meaning set forth in Section 13.6.

"**Total Revolving Commitment**" means (i) prior to the entry of the Final Financing Order, $5,000,000, and (ii) following the entry of the Final Financing Order, $7,000,000.

"**Transmission**" means, upon establishment of a computer interface between the Borrowers and the Agent or an FTP site, in each case in accordance with the specifications established by the Agent, the transmission of Receivable Information, the Budget and other information through such computer interface or FTP site or e-mail communication to the Agent in a manner satisfactory to the Agent.

"**TRICARE/CHAMPUS**" means the Civilian Health and Medical Program of the Uniformed Service, a program of medical benefits covering former and active members of the uniformed services and certain of their dependents, financed and administered by the United States Departments of Defense, Health and Human Services and Transportation and established pursuant to 10 USC §§ 1071-1106, and all regulations promulgated thereunder including without limitation (1) all federal statutes (whether set forth in 10 USC §§ 1071-1106 or elsewhere) affecting TRICARE/CHAMPUS; and (2) all rules, regulations (including 32 CFR 199), manuals, orders and administrative, reimbursement, and other guidelines of all Governmental Entities (including, without limitation, the Department of Health and Human Services, the Department of Defense, the Department of Transportation, the Assistant Secretary of Defense (Health Affairs), and the Office of TRICARE/CHAMPUS, or any Person or entity succeeding to the functions of any of the foregoing) promulgated pursuant to or in connection with any of the foregoing (whether or not having the force of law) in each case as may be amended, supplemented or otherwise modified from time to time.

"**UCC**" means the Uniform Commercial Code as in effect from time to time in effect in the specified or applicable jurisdiction.

"**Unbilled Receivable**" means a Receivable in respect of which the goods have been shipped, or the services rendered, to the relevant customer or patient, rights to payment thereon have accrued, but the invoice has not been rendered to the applicable Obligor.

"**Valid Pre-Petition Senior Liens**" means (to the extent valid, enforceable and non-avoidable) Liens imposed prior to the Filing Date securing Other Debt Obligations in the amounts and securing the assets set forth on Schedule VIII, but not the extension of coverage thereof to any other property or assets; *provided,* in no event shall Valid Pre-Petition Senior Liens include any senior Lien against the Receivables Collateral; and *provided, further,* the Liens on the Receivables Collateral securing the Other Debt Obligations shall be subject to the subordination and intercreditor terms set forth in the Subordination Agreements.

"**Wellcare**" means Wellcare, Inc., a Connecticut business corporation.

"**Weekly Report**" means a report to the Agent (sent by Transmission unless otherwise agreed by the Agent), certified as accurate by the Borrower Representative, containing the Actual Total Operational Disbursements, Actual Total Professional Fee Disbursements and actual Cumulative Net Cash Flow for the applicable Budget Testing Period, together with a variance analysis with respect to

such Actual Total Operational Disbursements, Actual Total Professional Fee Disbursements and actual Cumulative Net Cash Flow for such Budget Testing Period measured against the Budget.

"**Withdrawal Liability**" means, with respect to any Borrower and its ERISA Affiliates at any time, the aggregate liability incurred (whether or not assessed) with respect to all Multiemployer Plans pursuant to Section 4201 of ERISA and with respect to all increases in contributions required to be made pursuant to Section 4243 of ERISA.

1.2     **Other Terms; Rules of Construction.**  All terms used in Article 9 of the UCC in the State of New York, and not specifically defined herein, are used herein as defined in such Article 9.  Any of the terms defined herein may, unless the context otherwise requires, be used in the singular or the plural, depending on the reference.  For avoidance of doubt, a Default or Event of Default will be deemed to exist and be continuing at all times during the period commencing on the date that such Default or Event of Default occurs to the date on which such Default or Event of Default is waived in writing pursuant to the terms of this Agreement or, in the case of a Default, is cured within the period of cure, if any, expressly provided for in this Agreement.  Unless the context otherwise provides to the contrary, the term "month" means a calendar month.  The terms "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Section, paragraph, subdivision, or clause.  Any pronoun used shall be deemed to cover all genders.  In the computation of periods of time from a specified date to a later specified date, "from" means "from and including,", "through" means "through and including," and "to" and "until" each mean "to but excluding,".  The terms "including" and "include" shall mean "including, without limitation" and, for purposes of each Loan Document, the parties agree that the rule of ejusdem generis shall not be applicable to limit any provision.  Section titles appear as a matter of convenience only and shall not affect the interpretation of any Loan Document.  All references to (a) laws or statutes include all related rules, regulations, interpretations, amendments and successor provisions; (b) any document, instrument or agreement include any amendments, restatements, waivers and other modifications, extensions or renewals (to the extent permitted by the Loan Documents); (c) any Section or Article mean, unless the context otherwise requires, a Section or Article of this Agreement; (d) any Exhibits mean, unless the context otherwise requires, Exhibits attached hereto, and any Schedules mean, unless the context otherwise requires, the Schedules attached hereto, all of which are hereby incorporated by reference; and (e) unless otherwise specified, discretion of the Agent or any Lender mean the sole and absolute discretion of such Person. The Borrowers shall have the burden of establishing any alleged negligence, misconduct or lack of good faith by the Agent or any Lender under any Loan Documents.  No provision of any Loan Documents shall be construed against any party by reason of such party having, or being deemed to have, drafted the provision.  Whenever the phrase "to the best of the Borrowers' knowledge", or words of similar import are used in any Loan Documents, it means actual knowledge of an officer of the applicable Borrowers, or knowledge that an officer of the applicable Borrowers would have obtained if he or she had engaged in good faith and diligent performance of his or her duties, including reasonably specific inquiries of employees or agents and a good faith attempt to ascertain the matter to which such phrase relates.

1.3     **Accounting Terms.**  All accounting terms not specifically defined herein shall be construed in accordance with GAAP.  Defined terms and calculations in connection with the covenants and other provisions of this Agreement, including Article 10, shall be based upon and utilize GAAP applied in a manner consistent with that used in preparing the financial statements referred to in Section 7.15.  If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in this Agreement, and the Borrower Representative shall so request, the Agent and the Borrowers shall negotiate in good faith to amend such ratio or requirement to preserve the

original intent thereof in light of such change in GAAP; *provided* that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Borrowers shall provide to the Agent financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.

## ARTICLE 2.

## AMOUNTS AND TERMS OF THE REVOLVING LOAN

2.1    **Revolving Advances**.

(a)    The Lenders agree to lend to the Borrowers, on a joint and several basis with respect to all Borrowers, from time to time during the Term, subject to the Orders and upon the terms and conditions herein set forth, on any Funding Date, such amounts as in accordance with the terms hereof may be requested by the Borrowers from time to time (each such borrowing, a "**Revolving Advance**" and the aggregate outstanding principal balance of all Revolving Advances from time to time, the "**Revolving Loan**"). The parties hereto hereby acknowledge and agree that the initial Revolving Advance includes an amount equal to the Existing Debt, which shall be deemed repaid in full upon the Initial Funding Date and the inclusion of such amount in the initial Revolving Advance.

(b)    The aggregate outstanding principal amount of Revolving Advances made by any Lender shall not at any time exceed the amount of such Lender's Revolving Commitment. The aggregate principal amount of the Revolving Loan outstanding at any time shall not exceed the Adjusted Borrowing Limit.

(c)    Subject to the limitations herein (including, without limitation, the conditions to funding Revolving Advances set forth in Article 6 hereof), the Borrowers may borrow, repay (without premium or penalty, except as expressly set forth in this Agreement) and reborrow Revolving Advances under each Lender's Revolving Commitment. The Revolving Loan shall not exceed, and the Lenders will not have any obligation to make any Revolving Advance which would result in the Revolving Loan being in excess of, the Adjusted Borrowing Limit. If at any time the Revolving Loan exceeds the Adjusted Borrowing Limit, the Borrowers shall immediately eliminate such excess by repaying the Revolving Loan in an amount equal to such excess.

(d)    Each Lender, at its option, may make any Revolving Advance by causing any domestic or foreign branch or Affiliate of such Lender to make such Revolving Advance; provided that any exercise of such option shall not affect the obligation of the Borrowers to repay such Revolving Advance in accordance with the terms of this Agreement.

(e)    Whenever the Borrowers desire a Revolving Advance be made, the Borrowers shall, not later than 2:00 p.m. (New York City time) one Business Day prior to the proposed Funding Date of the proposed Revolving Advance, provide the Agent with a Borrowing Base Report with the amount of the requested advance in line XIX of that Borrowing Base Report, which shall constitute notice (which notice, in each case, shall be irrevocable) of the desire to make a borrowing of a Revolving Advance. Each such Borrowing Base Report shall be signed by an Authorized Officer, and shall specify the date, in that Borrowing Base Report, on which the Borrowers desire to make a borrowing of a Revolving Advance (which in each instance shall be a Business Day) and the requested

amount of the proposed Revolving Advance (which shall not be less than $100,000). Promptly following receipt of such Borrowing Base Report, the Agent shall advise each Lender of the details thereof and of the amount of such Lender's Pro Rata Share of the requested Revolving Advance. In the event that one or more payments in respect of any Lender Debt shall become due and payable, the Borrowers will be deemed to have made an irrevocable request for Revolving Advances in an aggregate amount equal to such payments, and the proceeds of such Revolving Advances shall be applied by the Agent directly to make such payments; provided, however, that if any conditions contained herein to the funding of the aggregate amount of such Revolving Advances shall not have been satisfied, such Revolving Advances shall be made only to the extent that the Lenders have consented thereto.

(f)    Each Lender shall make each Revolving Advance to be made by it hereunder on the proposed Funding Date thereof by wire transfer of immediately available funds by 12:00 noon (New York City time) to the account of the Agent most recently designated by it for such purpose by notice to the Lenders. The Agent will make such Revolving Advances available to the Borrowers by promptly transferring the amount so received, in like funds, to the Borrower Account. The Revolving Advances made by the Lenders on any Funding Date shall be made by the Lenders ratably in accordance with their respective Revolving Commitments. The failure of any Lender to make any Revolving Advance or portion thereof required to be made by it shall not relieve any other Lender of its obligations hereunder; provided that the Revolving Commitments of the Lenders are several and no Lender shall be responsible for any other Lender's failure to make Revolving Advances as required.

(g)    On the Maturity Date, each Lender's Revolving Commitment shall terminate automatically. Upon such termination, the Revolving Loan (together with all other Lender Debt) shall become, without further action by any Person, immediately due and payable together with all accrued interest thereon plus any fees, premiums, charges or costs provided for hereunder with respect thereto.

(h)    The Revolving Loan may but need not be evidenced by one or more promissory notes (the "**Notes**"), but in no event will the manner in which the Revolving Loan is evidenced limit or otherwise affect the obligation of the Borrowers to repay the Revolving Loan or any other Lender Debt, and that obligation, howsoever evidenced, is and will remain a continuing obligation of the Borrowers under this Agreement. Each Revolving Advance and each payment by the Borrowers thereon will be evidenced by the account or accounts maintained by each Lender pursuant to Section 2.4(e) and the register maintained by the Agent pursuant to Section 2.4(f).

2.2    **Interest and Fees**.

(a)    The Borrowers shall pay to the Agent, for the account of each Lender, in arrears: (1) interest on the average daily Outstanding Balance of the Revolving Loan during the prior month on the first Business Day of each month, and (2) all accrued and unpaid interest on the Outstanding Balance of the Revolving Loan on the Maturity Date (whether by acceleration or otherwise), in each case, at an interest rate per annum equal to LIBOR plus 5.25%. If the average daily Outstanding Balance of the Revolving Loan during any month is less than the Minimum Balance, then the Borrowers shall pay to the Agent on the earlier of the first Business Day of the following month and the Maturity Date, a fee in an amount equal to the interest rate per annum stated in the immediately preceding sentence multiplied by the amount by which the Minimum Balance exceeded the average daily Outstanding Balance of the Revolving Loan during that prior month.

(b)     Notwithstanding anything to the contrary contained herein, at all times following the occurrence of any Default or Event of Default, without notice to the Borrowers, interest on the Revolving Loan shall accrue, at the Agent's discretion, at a rate per annum equal to 2.5% in excess of the rate then otherwise applicable to such Loan.   Interest accrued pursuant to this Section 2.2(b) shall be payable on the earlier of (1) the next date for payment of interest pursuant to Sections 2.2(a) above, and (2) the date on which Agent shall make demand therefor.

(c)     The Borrowers shall pay to the Agent, for the account of each Lender, in arrears, on the first Business Day of each month and the Maturity Date, a fee (the "**Non-Utilization Fee**") equal to 0.50% per annum on the average amount, calculated on a daily basis, by which the Revolving Commitment of such Lender exceeded the greater of (1) the aggregate amount of Revolving Advances made by such Lender that were outstanding during the prior month, and (2) the Minimum Balance.

(d)     The Borrowers shall pay to the Agent, for its own account, the following fees:

(1)     a facility fee (the "**Facility Fee**") equal to 1.50% of the Aggregate Committed Amount, which Facility Fee shall be fully earned, due and payable in full on the Closing Date;

(2)     a collateral monitoring fee (the "**Collateral Monitoring Fee**") for each month commencing with the month in which the Closing Date occurs equal to $2,500 per month, which shall be due and payable in full for each month in arrears on the first Business Day of the following month; and

(3)     an exit fee (the "**Exit Fee**") equal to 1.00% of the Aggregate Committed Amount, which Exit Fee shall be fully earned as of the Closing Date and shall be due and payable in full on the earlier to occur of (i) the Maturity Date, and (ii) an Event of Default; *provided*, that, if the Agent and the Lenders are entering into a New Financing Agreement, the Agent agrees that the amount of the Exit Fee actually paid hereunder shall be applied against any facility fee payable in connection with such New Financing Agreement.

2.3     **Computation of Interest; Payment of Fees**.

(a)     Interest on the Revolving Loan and fees and other amounts calculated on the basis of a rate per annum shall be computed on the basis of actual days elapsed over a 360-day year.

(b)     Whenever any payment to be made hereunder or under any other Loan Document shall be stated to be due and payable on a day which is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall in such case be included in computing interest on such payment.

(c)     All fees owed by the Borrowers under this Agreement are, and will be deemed hereunder for all purposes to be, fully earned and non-refundable on the due date thereof.

2.4     **Procedures for Payment**.

(a)     Each payment hereunder and under the other Loan Documents shall be made not later than 12:00 noon (New York City time) on the day when due in lawful money of the United States of America without counterclaim, defense, offset, claim or recoupment of any kind and free and clear of, and without deduction for, any present or future withholding or other taxes, duties, levies,

imposts, deductions, charges or other liabilities of any nature imposed on such payments or prepayments by or on behalf of any Governmental Entity, except for taxes upon or determined by reference to a Lender's net income imposed by the jurisdiction in which such Lender is organized or has its principal or registered lending office (all such nonexcluded taxes, levies, imposts, deductions, charges, withholdings and liabilities hereinafter referred to as "**Taxes**"). If any such Taxes are so levied or imposed on any payment to any Lender, the Borrowers will make additional payments in such amounts as may be necessary so that the net amount received by such Lender, after withholding or deduction for or on account of all Taxes, including deductions applicable to additional sums payable under this Section 2.4, will be equal to the amount provided for herein or in the other Loan Documents. Whenever any Taxes are payable by the Borrowers with respect to any payments hereunder, the Borrowers shall furnish promptly to the Agent information, including certified copies of official receipts (to the extent that the relevant governmental authority delivers such receipts), evidencing payment of any such Taxes so withheld or deducted. If the Borrowers fail to pay any such Taxes when due to the appropriate taxing authority or fails to remit to the Agent the required information evidencing payment of any such Taxes so withheld or deducted, the Borrowers shall indemnify the Agent and each Lender for any incremental Taxes, interest or penalties that may become payable by the Agent or such Lender as a result of any such failure.

(b)       Notwithstanding anything to the contrary contained in this Agreement, the Borrowers shall pay any present or future stamp or documentary taxes, any intangibles tax or any other sales, excise or property taxes, charges or similar levies now or hereafter assessed that arise from and are attributable to any payment made hereunder or from the execution, delivery or performance of; or otherwise with respect to, this Agreement or any other Loan Documents and any and all recording fees relating to any Loan Documents securing any Lender Debt ("**Other Taxes**").

(c)       The Borrowers shall indemnify the Agent and each Lender for the full amount of any and all Taxes and Other Taxes (including, without limitation, any Taxes and Other Taxes imposed by any jurisdiction on amounts payable under this Section 2.4) paid or payable by the Agent or such Lender (whether or not such Taxes or Other Taxes were correctly or legally asserted) and any liability (including penalties, interest and expenses) arising therefrom or with respect thereto. Indemnification payments due to the Agent or any Lender under this Section 2.4 shall be made within 10 days from the date the Agent or such Lender makes written demand therefor.

(d)       Without prejudice to the survival of any other agreement of the Borrowers hereunder, the agreements and obligations of the Borrowers contained in this Section 2.4 shall survive the Full Payment of all Lender Debt hereunder and any termination of the Revolving Commitments.

(e)       Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrowers to such Lender resulting from each Revolving Advance, as applicable, owing to such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder. In furtherance thereof, each Lender agrees that before disposing of the Note held by it (if applicable), or any part thereof (other than by granting participations therein), such Lender will make a notation thereon of all Revolving Advances, principal payments previously made thereon and of the date to which interest thereon has been paid; provided that the failure to make (or any error in the making of) any notation under the Note shall not limit or otherwise affect the obligations of the Borrowers hereunder or under such Note with respect to the unpaid portion of the Lender Debt.

(f)      The register maintained by the Agent with respect to the Revolving Loan shall include accounts for each Lender, in which accounts (taken together) shall be recorded (1) the rate and amount of each Revolving Advance made hereunder, (2) the amount of each Lender's Revolving Commitment and the terms of each Assignment and Assumption delivered to and accepted by it, (3) the amount of any principal or interest due and payable or to become due and payable from the Borrowers to each Lender hereunder, and (4) the amount of any sum received by the Agent from the Borrowers hereunder and each Lender's share thereof.  The parties hereto acknowledge and agree that the entries made by the Agent as provided in this Section 2.4(f) shall be conclusive and binding for all purposes, absent manifest error.

2.5      **Indemnities**.

(a)      The Borrowers hereby agree to indemnify the Agent and each Lender on demand against any loss or expense which the Agent or such Lender or a branch or an Affiliate of such Person may sustain or incur as a consequence of any of the following:  (1) any default in payment or prepayment of the principal amount of the Revolving Loan or any portion thereof or interest accrued thereon, as and when due and payable (at the due date thereof, by irrevocable notice of payment or prepayment, or otherwise); (2) the effect of the occurrence of any Default or Event of Default upon the Revolving Loan or any portion thereof; or (3) the failure by the Borrowers to accept the Revolving Loan or any portion thereof after the Borrowers have requested such borrowing; in each case including, but not limited to, any loss or expense sustained or incurred in liquidating or employing deposits from third parties acquired to effect or maintain the Revolving Loan or any portion thereof.  The Agent or such Lender, as applicable, shall provide to the Borrowers a statement, supported when applicable by documentary evidence, explaining the amount of any such loss or expense it incurs, which statement shall be conclusive absent manifest error.

(b)      The Borrowers hereby agree to indemnify and hold harmless the Agent, the Lenders, and each of their respective Affiliates, directors, officers, agents, representatives, counsel and employees and each other Person, if any, controlling them or any of their respective Affiliates within the meaning of either Section 15 of the Securities Act of 1933, as amended, or Section 20(a) of the Exchange Act (each, an "**Indemnified Party**"), from and against any and all losses, claims, damages, costs and expenses (including reasonable counsel fees and disbursements) and liabilities which may be incurred by or asserted against such Indemnified Party with respect to or arising out of the Chapter 11 Cases, the Revolving Commitments hereunder, the Revolving Loan contemplated hereby, the Loan Documents, the Collateral (including, without limitation, the use thereof by any of such Persons or any other Person, the exercise by any Indemnified Party of rights and remedies or any power of attorney with respect thereto, and any action or inaction of any Indemnified Party under and in accordance with any Loan Documents), the use of proceeds of any financial accommodations provided hereunder, any investigation, litigation or other proceeding (pending or threatened) relating thereto, or the role of any such Person or Persons in connection with the foregoing whether or not they or any other Indemnified Party is named as a party to any legal action or proceeding ("**Claims**").  The Borrowers will not, however, be responsible to any Indemnified Party hereunder for any Claims to the extent that a court having jurisdiction shall have determined by a final nonappealable judgment that any such Claim shall have arisen out of or resulted solely from (1) actions taken or omitted to be taken by such Indemnified Party by reason of its bad faith, willful misconduct or gross negligence, or (2) a successful claim by the Borrowers, or any of them, against such Indemnified Party ("**Excluded Claims**").  Further, should any employee of an Indemnified Party, in connection with such employee's employment by such Indemnified Party, be involved in any legal action or proceeding in connection with the transactions

contemplated hereby (other than relating to an Excluded Claim), the Borrowers hereby agree to pay to such Indemnified Party such reasonable per diem compensation as such Indemnified Party shall request for each employee for each day or portion thereof that such employee is involved in preparation and testimony pertaining to any such legal action or proceeding.  Each Indemnified Party shall give the Borrowers prompt notice of any Claim with respect to which such Indemnified Party is seeking indemnification hereunder, setting forth a description of those elements of the Claim of which such Indemnified Party has knowledge.  The Indemnified Party shall be permitted hereunder to select counsel to defend such Claim at the expense of the Borrowers.  The Indemnified Parties and the Borrowers and their respective counsel shall cooperate with each other in all reasonable respects in any investigation, trial and defense of any such Claim and any appeal arising therefrom.  The Agent also agrees to use commercially reasonable efforts to permit the Borrowers to participate in the defense of such Claim (at the Borrowers' expense); provided that the Agent shall be entitled to control such defense and any failure by the Agent to permit such participation shall not affect the Borrowers' indemnification obligations under this Section.

2.6     **Maximum Interest.**  No provision of this Agreement shall require the payment to any Lender or permit the collection by any Lender of interest in excess of the maximum rate of interest from time to time permitted (after taking into account all consideration which constitutes interest) by laws applicable to the Lender Debt and binding on such Lender (such maximum rate being such Lender's **"Maximum Permissible Rate"**).   If the amount of interest (computed without giving effect to this Section 2.6) payable to any Lender in respect of any interest computation period would exceed the amount of interest computed in respect of such period at such Lender's Maximum Permissible Rate, the amount of interest payable to such Lender in respect of such period shall be computed at such Lender's Maximum Permissible Rate and any excess shall be applied to reduce any Lender Debt (other than interest) then owing to such Lender in such order as it shall determine.

2.7     **Use of Proceeds of Revolving Loan.**  The Borrowers shall use the proceeds of the Revolving Loan solely (i) for operating expenses, working capital and general corporate purposes consistent with the Budget and the Orders, (ii) to fund the costs and expenses of administering the Chapter 11 Cases consistent with the Budget and the Orders, (iii) to repay the Existing Debt and (iv) for Capital Expenditures consistent with the Budget and the Orders.

## ARTICLE 3.

## SECURITY

3.1     **Superpriority Administrative Expense Claim.**  The Lender Group shall have, with respect to the Lender Debt, a superpriority administrative expense claim pursuant to Section 364(c)(1) of the Bankruptcy Code ("**Superpriority Administrative Expense Claim**") having priority over any and all administrative expenses, whether heretofore or hereafter incurred, of any kind or nature specified in sections 503(b) and 507(b) of the Bankruptcy Code, subject only to the Carveout.

3.2     **Grant of Security Interests.**  (a) As collateral security for the Borrowers' obligations to pay the Lender Debt when due and payable, including their indemnification obligations to the Lender Group hereunder, each Borrower hereby grants to the Agent for the benefit of the Lender Group subject only to (x) the Carveout, and (y) the Valid Pre-Petition Senior Liens, a first priority Lien on and security interest in, pursuant to Sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, and right of setoff against any and all assets of such Borrower other than real property, whether now existing or

hereafter acquired, and wherever located (all such assets and all of the following, together with all other collateral provided by the Borrowers under the other Loan Documents as security for the Lender Debt, the "**Collateral**") including the following:

(1)     all Receivables, whether now owned or hereafter acquired;

(2)     to the maximum extent permitted by law, the Specified Accounts and all other deposit accounts of such Borrower, including, without limitation, the Lockbox Accounts, and amounts held therein;

(3)     all money and cash, including all cash collateral;

(4)     all general intangibles and payment intangibles, and any other rights to payment of every kind and description, and any contract rights, chattel paper, documents and instruments relating to the Receivables and all of such Borrower's rights and remedies with respect to the Receivables (including the creation, enforcement and collection of the Receivables) or the obligation of any Obligor with respect thereto;

(5)     all other general intangibles (other than Receivables and rights under Contracts), including franchise rights, licenses, patents, patent applications, trade names and trademarks and Federal, state and local tax refund claims of all kinds and other payments from Governmental Entities;

(6)     all goods, including without limitation all machinery, equipment, fixtures, computer equipment, goods, supplies and all other tangible personal property, as well as all of such types of property leased and all rights and interests with respect thereto under such leases (including, without limitation, options to purchase), together with all present and future additions and accessions thereto, replacements therefor, component and auxiliary parts and supplies used or to be used in connection therewith, and all substitutes for any of the foregoing, and all manuals, drawings, instructions, warranties and rights with respect thereto;

(7)     all inventory and documents of title relating thereto;

(8)     all Contracts, to the extent not included in the definition of Receivables;

(9)     all instruments, investment property, securities, security entitlements, securities accounts; goodwill and investment property (as that term is defined in the UCC), including, without limitation, all securities, whether certificated or uncertificated, security entitlements, securities accounts, commodity contracts and commodity accounts;

(10)    all Avoidance Actions (following entry of the Final Financing Order);

(11)    all membership rights, privileges and interests in any Person, including, without limitation, (A) the right to receive distributions at any time in cash or other property and (B) the right to any specific property of such Person;

(12)    all tax and other types of refunds, deposits, returned and unearned insurance premiums, rights and claims under insurance policies, and computer programs, information, software, records and data;

(13)    all Records relating to items (1) through (12) above; and

(14)    all Proceeds of any kind or nature of the foregoing.

This Agreement will be deemed to be a security agreement within the meaning of the UCC.

(b)    The Borrowers acknowledge that, pursuant to the Orders, the Liens in favor of Agent for the benefit of the Lender Group in all of the Collateral shall be perfected without the filing of any statements, taking of possession or assignments.

(c)    The Borrowers agree to execute, and hereby authorize the Agent to file, the Orders, financing statements or continuation statements or amendments thereto or assignments thereof in respect of the Lien created pursuant to this Section 3.2 which may at any time be required or, in the opinion of the Agent, be desirable, and to do so without the signature of any Borrower where permitted by law.

## ARTICLE 4.

## PAYMENT MECHANICS

4.1    **Payment Mechanics**.

(a)    The Lockbox Borrowers, JMMC, the Agent, and each Lockbox Bank have entered into a Depositary Agreement and the Lockbox Borrowers and JMMC shall have caused the Lockbox Banks to establish or continue to maintain the Lender Lockboxes and all Lockbox Accounts, and the Lockbox Borrowers and JMMC shall continue to observe and perform their obligations under the Depositary Agreement.

(b)    The Borrowers shall prepare, execute and deliver to (or, in the case of Notice to an Insurer, provide to the Agent for delivery to) each Obligor (or, in the case of a Governmental Entity, its fiscal intermediary) who is proposed to be a payor of Receivables, with copies to the Agent, on or prior to the Closing Date, a Notice, which Notice shall state the following:  (1) that all present and future Receivables owing to the Lockbox Borrowers, or any of them, are subject to the Lien of the Agent; (2) in the case of any Notice to an Insurer, that all checks and EOBs from such Insurer on account of Receivables shall be sent to a designated Lender Lockbox and all wire transfers from such Insurer on account of Receivables shall be wired directly into a designated Lender Lockbox Account; and (3) in the case of any Notice to a Governmental Entity, that all wire transfers on account of Receivables shall be wired directly into the applicable Borrower Lockbox Account.

(c)    Each Lockbox Borrower covenants and agrees that, on and after the Closing Date, all invoices (and, if provided by the Lockbox Borrowers, return envelopes) to be sent to Obligors shall set forth the following:  (1) in the case of Insurers, only the address of a designated Lender Lockbox as a return address for payment of Receivables by check and delivery of EOBs, and only a Lender Lockbox Account with respect to wire transfers for payment of Receivables; and (2) in the case of Governmental Entities, only the designated Borrower Lockbox Account with respect to wire transfers for payment of Receivables.  Each Lockbox Borrower hereby further covenants and agrees to instruct and notify each of the members of its accounting and collections staff to provide identical information in communications with Obligors with respect to payment of Receivables, wire transfers and EOBs.

(d)       Each Borrower shall maintain each of its Borrower Lockbox Accounts solely and exclusively for the receipt of payments on account of Receivables from Governmental Entities.  The Borrowers shall take all actions necessary to ensure that no payments from any Person other than a Governmental Entity are deposited in the Borrower Lockbox Accounts.

(e)       Notwithstanding the provisions of subsections (b) and (c) of this Section 4.1, and solely with respect to Receivables owed to JPA by Insurers, the parties agree that remittances by check may be directed to JPA's billing agent, and JPA shall cause its billing agent to deposit such checks promptly, but in any event within five (5) Business Days, into the Lender Lockbox Account for JPA. Borrowers agree that if an aggregate of at least 80% of all Receivables owed to JPA are not received directly from the Obligors thereof by wire transfer or electronic funds transfer in either of the Lockbox Accounts for JPA within a reasonable time as determined by Agent, then JPA will direct all Insurers that remit payments of Receivables owed to JPA by check to remit such payments directly to a Lender Lockbox to be established for JPA and Schedule III shall be updated accordingly.

4.2       **Misdirected Payments; EOBs.**

(a)       In the event that any Borrower receives an EOB or a Misdirected Payment in the form of a check, such Borrower shall immediately send such EOB or check to the Lender Lockbox.  In the event that any Borrower receives a Misdirected Payment in the form of cash or wire transfer, such Borrower shall immediately wire transfer the amount of such Misdirected Payment directly into the appropriate Lender Lockbox Account.  All Misdirected Payments shall be sent promptly upon receipt thereof, and in no event later than the close of business on the first Business Day after receipt thereof.

(b)       Each Borrower shall take such actions as are reasonably necessary or as are reasonably requested by the Agent to ensure that future payments from any Obligor of a Misdirected Payment shall be made in accordance with any Notice previously delivered to such Obligor or, in the case of any Person which is an Insurer and has not previously been sent a Notice, to a designated Lender Lockbox, in the case of checks and EOBs, or a designated Lender Lockbox Account, in the case of wire transfers, including, without limitation, (1) delivering to such Obligor a new Notice in form and substance satisfactory to the Agent, and (2) contacting such Obligor by telephone to convey new directions for payment or to confirm the instructions previously set forth in any Notice to such Obligor. If such Borrower does not promptly (and in any event, within two Business Days from the Agent's request) take such actions or such similar actions as the Agent may request, then the Agent, its assigns or designees, or any member of the Lender Group, may, to the maximum extent permitted by law, execute and deliver such Notices, contact such Obligors to convey such instructions or directions, or take such similar actions as the Agent, its assigns or designees or any member of the Lender Group may, in its discretion, deem appropriate.

4.3       **No Rights of Withdrawal.**  No Borrower shall have any rights of direction or withdrawal with respect to amounts held in the Lender Lockbox Accounts.

## ARTICLE 5.

## COLLECTION AND DISTRIBUTION

5.1       **Collections on the Receivables; Distributions.**  The Agent, for the account of the Lenders, may (1) receive and hold as collateral all Receivables, deposits, and all Collections on Receivables in accordance with the terms of the Depositary Agreements; and (2) have and exercise any

and all rights, to the extent permitted by, and in a manner consistent with, all applicable laws and regulations, to collect, record, track and, during the continuance of an Event of Default, take all actions to obtain Collections with respect to all Receivables. Each Borrower hereby consents to the distribution by the Agent of all Collections and Proceeds of Collateral in accordance with this Article 5 and hereby authorizes and directs the Agent to distribute all Collections and Proceeds of Collateral in accordance with this Article 5.

5.2    **Distribution of Funds to the Lenders.**  On each Business Day (provided, with respect to distributions made prior to the Maturity Date and so long as no Event of Default exists, that the Borrowers shall have successfully sent by Transmission to the Agent all Receivable Information required with respect to the Receivables), the Agent shall distribute any and all cash Collections in the Collection Account (provided, with respect to distributions made prior to the Maturity Date and so long as no Event of Default exists, that such Collections were deposited in the Collection Account prior to 12:00 p.m. (New York City time) on the immediately preceding Business Day), and all other proceeds or other amounts with respect to the Collateral, as follows:  FIRST, to the Agent, an amount in cash equal to expenses incurred with respect to the administration, service and maintenance of the Agent's Lien on the Collateral and all fees and collection costs that are due and payable, if any, as set forth in Sections 2.2, 2.5 and 13.5 until such amounts have been paid in full; SECOND, to the Agent, for the account of the Lenders, an amount in cash equal to fees, interest and expenses that are due and payable to the Lenders as of such Business Day and have not otherwise been paid in full by the Borrowers, if any, until such amounts have been paid in full; THIRD, to the Agent, for the account of the Lenders, an amount equal to the principal amount of the Revolving Loan, until such amount has been paid in full; FOURTH, to the Agent, for the account of the Agent or any applicable Lenders, an amount in cash equal to the aggregate amount of any other Lender Debt due and payable on such Business Day, if any, until such amount has been paid in full; and FIFTH, to the Borrowers, all remaining amounts of Collections, as requested.

5.3    **Servicing Receivables.**

(a)    Subject to the review and authority of the Agent, the Borrowers shall administer and service the Receivables (1) in compliance at all times with all legal requirements and the terms and conditions of this Agreement, (2) in accordance with industry standards for servicing receivables of the type included in the Collateral to the extent that such standards do not conflict with the terms and conditions of this Agreement, (3) in a manner consistent in all respects with the Credit and Collection Policy, and (4) until such time as a successor servicer shall be designated and shall accept appointment pursuant to this Section 5.3.  The Borrowers shall establish and maintain electronic data processing services for monitoring, administering and collecting the Receivables in accordance with the foregoing standards and shall, within three Business Days of the deposit of any checks, other forms of cash deposits, EOBs or other written matter into the Lender Lockbox, post such information to its electronic data processing services.

(b)    The Borrowers shall not change in any material respect their existing policies and procedures with respect to the administration and servicing of accounts receivable (including, without limitation, the amount and timing of write-offs) without the prior written consent of the Agent.

(c)    If the Borrowers determine that a payment with respect to a Receivable has been received directly by a patient or any other Person, the Borrowers shall promptly advise the Agent,

and demand that such patient or other Person remit and return such funds.  If such funds are not promptly received by the Borrowers, the Borrowers shall take all reasonable steps to obtain such funds.

(d)     Upon the occurrence of an Event of Default, (1) the Agent may terminate the Borrowers' performance of servicing responsibilities with respect to the Receivables and appoint another Person to succeed the Borrowers in the performance of such servicing responsibilities (which replacement may be effectuated through the outplacement to a third-party collection firm obligated to use commercially reasonable efforts to maximize collections in accordance with the provisions of Article 9 of the UCC), in which event the Borrowers shall immediately transfer to any successor servicer designated by the Agent all records, computer access and other information as shall be necessary or desirable, in the judgment of any such successor servicer, to perform such responsibilities; and (2) at the Required Lenders' request, all enforcement and collection proceedings with respect to the Receivables shall, unless prohibited by applicable law, be instituted and prosecuted in the name of the Agent.  The Borrowers shall otherwise cooperate fully with such successor servicer.

(e)     The members of the Lender Group and the Borrowers shall comply with the requirements of the Business Associate Agreement.

5.4     **Distributions Generally**.

(a)     All remaining amounts of the Collections pursuant to Article 5 as requested by Borrowers shall be deposited in the Borrower Account.

(b)     All distributions to Lenders under this Article 5 shall be made in accordance with their respective Pro Rata Shares.

(c)     Notwithstanding anything to the contrary contained herein, each Lender agrees that any amount of principal, interest, fees or other amounts received by the Agent for the account of a Defaulting Lender shall be applied by the Agent:  FIRST, to the reimbursement or payment of any amounts owing by that Defaulting Lender to the Agent hereunder; SECOND, to the funding of the Revolving Loan which such Defaulting Lender has failed to fund; and THIRD, to a non interest bearing cash collateral account dedicated to the funding of future Revolving Advances of such Defaulting Lender.

## ARTICLE 6.

### CONDITIONS PRECEDENT

6.1     **Conditions Precedent to Closing.**  The effectiveness of this Agreement on the Closing Date and the obligation of each Lender to make the initial Revolving Advance on the Initial Funding Date is subject to satisfaction of the following conditions precedent:

(1)     The Interim Financing Order shall have been entered by the Bankruptcy Court, such order shall have been entered within two Business Days of the Filing Date, and such order shall be in full force and effect and shall not have been reversed, vacated, modified, amended or stayed, except for modifications and amendments approved by the Agent;

(2)     The Agent shall have received (A) payment of the Facility Fee and (B) payment of closing costs and expenses of the Agent, including attorneys' fees;

(3)     The Agent has received evidence satisfactory to the Agent (A) that except as set forth on Schedule II, that no material litigation has been initiated or is ongoing involving any Borrower, whether relating to this Agreement or the transactions contemplated hereby or otherwise, and (B) that no judgment, order, injunction, or other similar restraint prohibiting any of the transactions contemplated hereby has been issued or is in effect;

(4)     The Agent has received evidence satisfactory to the Agent that except as otherwise set forth herein, each Borrower is in compliance in all material respects with all applicable laws and regulations, and has obtained all licenses, consents and approvals necessary to operate its respective business and shall have obtained all material and appropriate approvals pertaining to all applicable governmental, ERISA, retiree health benefits, workers' compensation, and other requirements, regulations, and laws;

(5)     The Agent shall have received a Budget dated the Closing Date for the period from the Closing Date through the end of 13 weeks from the Closing Date;

(6)     The Agent shall have received copies of the Asset Purchase Agreements, together with a certificate of an Authorized Officer, certifying that each Asset Purchase Agreement (i) is in full force and effect, (ii) has not been terminated, (iii) has not become void or unenforceable, and (iv) has not been modified, supplemented or amended in any manner (other than technical matters that have no impact on the economic and business terms set forth therein) other than with the prior written consent of the Agent;

(7)     Filing Date Cash plus Availability (after consideration of the initial Revolving Advance), plus the Liquidity Block, shall equal not less than $2,200,000.

(8)     Saint Francis shall have executed and delivered the Participation Agreement and shall have shall have funded to the Agent the participation amount required pursuant to the terms set forth therein.

(9)     The Agent shall have received executed copies of this Agreement, the Business Associate Agreement and the other Loan Documents existing on or prior to the Closing Date, and originals or copies (as specified by the Agent) of all of the other documents listed on the Closing Document Checklist attached hereto as Exhibit VI;

(10)    The Agent shall have received a confirmation and acceptance from People's United acknowledging the continued force and effect of the Existing Depositary Agreement, all in form and substance satisfactory to the Agent, in the form attached hereto as Exhibit IX (the "**Depositary Bank Confirmation**");

(11)    The terms of any proposed or agreed-to restructuring, modification, supplement or amendment of any Other Debt Obligations shall be in form and substance satisfactory to the Agent;

(12)    The Agent shall have received a confirmation and acceptance from Saint Francis acknowledging the continued force and effect of the Saint Francis Intercreditor Agreement existing on such date with respect to the Lender Debt and the Liens securing the Lender Debt, in form and substance satisfactory to the Agent, in the form attached hereto as Exhibit X (the "**Saint Francis Confirmation**");

62404953

(13)   The Agent shall have received a confirmation and acceptance from People's United acknowledging the continued force and effect of the People's United Subordination Agreement existing on such date with respect to the Lender Debt and the Liens securing the Lender Debt, in form and substance satisfactory to the Agent, in the form attached hereto as Exhibit XI (the "**People's United Confirmation**");

(14)   The Agent shall have received copies of the Borrowers' "first-day" motions and orders which shall be in form and substance acceptable to the Agent, and the orders entered by the Bankruptcy Court in respect of the "first day" orders shall be in form and substance acceptable to the Agent; and

(15)   The Agent shall have received evidence of insurance coverage required hereunder, including (i) evidence of endorsements of the Agent as named insureds or loss payees thereunder as the Agent may request and providing that such policy may be terminated or canceled (by the insurer or the insured thereunder) only upon 30 days' prior written notice to the Agent and the Lenders and (ii) a statement from the Borrowers' insurance broker that, in its judgment, the policies of insurance, together with the endorsements thereto, (A) are in such amounts and cover such perils as is customarily provided for by Persons engaged in the same or similar business as the Borrowers, and (B) are placed with insurers of recognized reputation and responsibility and the Borrowers' insurance coverage otherwise shall be in form and substance satisfactory to the Agent.

6.2   **Conditions Precedent to all Funding Dates.**  The making of a Revolving Advance on a Funding Date (including the initial Revolving Advance on the Initial Funding Date), will be subject to satisfaction of the following conditions precedent:

(1)   at least one Business Day prior to the applicable Funding Date, the Borrowers shall have delivered to the Agent a Borrowing Base Report and such other information as requested by the Agent, in form and substance satisfactory to the Agent;

(2)   To the extent that an updated to date Budget had not previously been delivered for the Budget Testing Period of the requested Revolving Advance, the Borrower Representative shall have delivered to the Agent a revised and updated "to date" Budget in accordance with Section 8.5(1), which updated Budget shall demonstrate (except as to matters previously approved by the Agent) that the Borrowers are in material conformity with the prior Budget, the expenditures to be made by the Borrowers are consistent with the prior Budget, and the availability hereunder remains sufficient to fund the cash flow needs of the Borrowers, as demonstrated by and as set forth in such updated Budget and shall otherwise meet the requirements of the definition of "Budget";

(3)   Saint Francis shall have funded to the Agent its participation amount as required under the Participation Agreement, if any;

(4)   Each Asset Purchase Agreement (i) is in full force and effect, (ii) has not been terminated, be or become void or unenforceable, and (iii) has not been modified, supplemented or amended in any manner (other than technical matters that have no impact on the economic and business terms set forth therein) other than with the prior written consent of the Agent;

(5) On that Funding Date the following statements are true and correct both immediately prior to and after giving effect to the making of the applicable Revolving Advance on such Funding Date (and acceptance of the proceeds of the applicable Revolving Advance will be deemed a representation and warranty by each Borrower that those statements are then true and correct):

(A) the representations and warranties contained in Article 7 hereof and Exhibit I hereto are true and correct in all material respects (except any representation or warranty that expressly indicates that it is qualified by materiality or Material Adverse Effect, in which case such representation or warranty is true and correct in all respects after giving effect to any such qualification) on and as of the date of such Revolving Advance as though made on and as of such date (except any representation or warranty that expressly indicates that it is being made as of a specified date, in which case each such representation or warranty is true and correct as of that specified date); and

(B) no event has occurred and is continuing, or would result from such Revolving Advance or any actions connected therewith, that constitutes a Default or an Event of Default;

(6) The Interim Financing Order (if prior to the Final Financing Order Date), or the Final Financing Order (if after the Final Financing Order Date), as the case may be, is in form and substance satisfactory to the Agent, shall be in full force and effect and shall not have been reversed, appealed for good faith, stayed, modified or amended, except for such modifications, and amendments mutually agreed to by the Agent; and

(7) The Agent shall have received such additional approval, opinions or documents as it may reasonably request.

## ARTICLE 7.

## REPRESENTATIONS AND WARRANTIES

Each Borrower hereby makes, and will be deemed to have made, on the Closing Date, on the Initial Funding Date, on each subsequent Funding Date, and upon delivery of each Borrowing Base Report, the following representations and warranties to the Agent and each Lender:

7.1 **Organization; Good Standing and Qualification.** Each Borrower is duly formed and organized, validly existing and in good standing under the laws of the state of its organization (as indicated on Schedule II hereto) and is duly qualified to do business, and is in good standing, in every jurisdiction where the nature of its business requires it to be so qualified.

7.2 **Authority; No Conflict.** Subject to the Orders and except as otherwise required under applicable Connecticut law, and, in connection with transfer of any membership interests in Tolland Imaging Center, LLC, Connecticut Occupational Medicine Partners, LLC and Connecticut Hospital Laboratory Network LLC, except as otherwise provided in the operating agreements of such entities, the execution, delivery and performance by each Borrower of the Loan Documents to which it is a party and any other documents to be delivered by it thereunder (1) are within its corporate powers; (2) have been duly authorized by all necessary corporate, limited liability company or partnership action, as applicable; (3) do not contravene (A) its organizational documents, (B) any law, rule, or regulation applicable to it (including, without limitation, laws, rules and regulations relating to usury, truth in lending, fair credit

billing, fair credit reporting, equal credit opportunity, fair debt collection practices, licensing, and privacy), (C) except as disclosed on Schedule II, any contractual restriction binding on or affecting it or its Property, or (D) any order, writ, judgment, award, injunction or decree binding on or affecting it or its Property; (4) do not result in or require the creation of any Lien upon or with respect to any of its Properties, other than the security interests created by this Agreement and the other Loan Documents; and (5) do not and will not result in any default, noncompliance, suspension, revocation, impairment, forfeiture or non-renewal of any permit, license, authorization or approval applicable to its operations or any of its Properties.

7.3    **Compliance with Certain Material Agreements.**   Except for any violations arising directly as a result of filing for bankruptcy or as disclosed on Schedule II, no Borrower is in violation of any material term, including, but not limited to, payment obligations, of any material agreement or instrument binding on or otherwise affecting it or any of its Properties, including, but not limited to, any Borrower's agreement with McKesson for accounting or claims management software.

7.4    **Burdensome Agreements.**   Except as set forth on Schedule II and subject to the Orders, no Borrower (1) is a party or subject to any contract, agreement, or restriction under its organizational documents that could reasonably be expected to have a Material Adverse Effect or (2) is a party or subject to any contract or agreement (other than this Agreement and the other Loan Documents) that conditions or restricts the right of that Borrower to incur or repay Debt, to declare or make Distributions, or to modify, extend, or renew any agreement evidencing any Debt.

7.5    **Certain Fees.**   Except as expressly set forth in the Orders, no investment banking, brokerage, finders' or similar fees are payable to any Person (other than to the Agent under the Loan Documents) in connection with the execution, delivery and performance of this Agreement, the other Loan Documents or the transactions contemplated hereby or thereby, other than breakup fees payable to Saint Francis contemplated by the Asset Purchase Agreements.

7.6    **Valid and Binding Obligation; Enforceability.**   Each of the Loan Documents to which any Borrower is a party constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, except as limited by bankruptcy, insolvency, moratorium, fraudulent conveyance or other laws relating to the enforcement of creditors' rights generally and general principles of equity (regardless of whether enforcement is sought at equity or law);

7.7    **Permits, Licenses, and Other Approvals.**   Subject to the Orders or except as set forth on Schedule II, each Borrower has all power and authority, and has all permits, licenses, accreditations, certifications, authorizations, approvals, consents and agreements of all Obligors, Governmental Entities, accreditation agencies and other Persons (including, without limitation, (1) accreditation by the appropriate Governmental Entities and industry accreditation agencies, (2) accreditation and certifications as a provider of healthcare services eligible to receive payment and compensation and to participate under Medicare, Medicaid, TRICARE/CHAMPUS, Blue Cross/Blue Shield and other equivalent programs, and (3) valid provider identification numbers and licenses to generate the Receivables) necessary or required for it (A) to own the assets (including Receivables) that it now owns, (B) to carry on its business as now conducted, (C) to execute, deliver and perform the Loan Documents to which it is a party, and (D) if applicable, to receive payments from the Obligors in the manner contemplated in this Agreement and the other Loan Documents.

7.8     **Healthcare Laws.** Except as disclosed on Schedule II, each Borrower has maintained all material records required to be maintained by the Joint Commission on Accreditation of Healthcare Organizations, the Food and Drug Administration, the Drug Enforcement Agency, the State Boards of Pharmacy, and the federal and state Medicare and Medicaid programs as required by Healthcare Laws, and, to the best knowledge of each Borrower, there are no presently existing circumstances which likely would result in material violations of any Healthcare Laws.

7.9     **Liability Event.** All Liability Events have been considered in the calculation of the Borrowing Base and in any event, all Liability Events occurring under clauses (1), (2) or (4) of the definition thereof do not exceed $1,000,000 in the aggregate and all Liability Events occurring under clause (3) of the definition thereof do not exceed $1,250,000 in the aggregate.

7.10    **Certain Reports; Claims; Reviews.** Each Borrower has timely filed or caused to be filed all material cost and other reports of every kind required by law, agreement or otherwise. Except as set forth on Schedule II, there are no material claims, actions or appeals pending before any commission, board or agency or other Governmental Entity, including, without limitation, any intermediary or carrier, the Provider Reimbursement Review Board, or the administrator of CMS, with respect to any material state or federal Medicare or Medicaid cost reports or material claims filed by any Borrower, or any disallowance by any commission, board or agency or other Governmental Entity in connection with any audit of such cost reports. No validation review or program integrity review related to any Borrower, the consummation of the transactions contemplated by this Agreement, or the Collateral have been conducted by any commission, board, or agency or other Governmental Entity in connection with the Medicare or Medicaid programs, and, except as set forth on Schedule II, to the knowledge of each Borrower, no such reviews are scheduled, pending, or threatened against or affecting any of the providers, any of the Collateral or the consummation of the transactions contemplated by this Agreement.

7.11    **Rescission and Renewal of Permits, Licenses, and Other Approvals.** Subject to the Orders or except as set forth on Schedule II, no Borrower has been notified by any Governmental Entity, accreditation agency or any other Person, during the immediately preceding 24-month period, that such Person has rescinded or not renewed, or is reasonably likely to rescind or not renew, any permit, license, accreditation, certification, authorization, approval, consent or agreement granted to it or to which it is a party and no other condition exists or event has occurred which, in itself or with the giving of notice or lapse of time or both, would result in the suspension, revocation, impairment, forfeiture or non-renewal of any permit, license, authorization, approval, entitlement or accreditation, and to the best of each Borrower's knowledge, there is no claim that any thereof is not in full force and effect.

7.12    **Subsidiaries; Capitalization.** Schedule II sets forth the full and complete organizational structure of the Borrowers as of the Closing Date, including in the case of JPA, the names of all equityholders, the nature and terms of each equity interest, and the capital account or number of shares of each equityholder. All of the issued and outstanding Equity Interests in JPA have been validly issued and are fully paid and nonassessable, and the holders thereof are not entitled to any preemptive, first refusal or other similar rights. Except as indicated on Schedule II, all such Equity Interests are owned by the holder thereof free and clear of all Liens other than Permitted Liens. Except as set forth on Schedule II, there are no outstanding Debt or equity securities of JPA and no outstanding obligations of JPA, or any of them, convertible into or exchangeable for, or warrants, options or other rights for the purchase or acquisition from JPA, or other obligations of JPA to issue, directly or indirectly, any Equity Interests. Schedule II sets forth the Person(s) having the power to appoint the governing body of each

62404953                                   - 39 -

Borrower.  The Borrowers have no Subsidiaries who are not Borrowers hereunder other than JDF, Wellcare and JMS.

7.13    **Real Property**.  Schedule II contains a correct and complete list (indicating the location of such real property by street address and state) of all real property owned or leased by each Borrower.

7.14    **Conditions Precedent**.  As of the Initial Funding Date, all conditions precedent set forth in Article 6 have been fulfilled or waived in writing by the Agent, and as of each Funding Date, all conditions precedent set forth in Section 6.2 shall have been fulfilled or waived in writing by the Agent.

7.15    **Financial Statements and Other Information**.  Except as set forth on Schedule II, all of the financial statements of the Borrowers which have been furnished to the Agent, fairly present the consolidated financial condition of the Borrowers as of the dates referred to therein and the results of the operations of the Borrowers for the periods ended on such dates, all in accordance with GAAP, and since November 30, 2014, other than as expressly set forth in the Orders, there has been no change which has had or resulted in, or is reasonably likely to have or result in, a Material Adverse Effect.  All information provided in the application for the financing effectuated by this Agreement, and each other document, report and Transmission provided by or on behalf of any Borrower to the Lender Group is or shall be true and accurate in all material respects as of its date and as of the date so furnished; provided that, with respect to projected financial information in the Budget, each Borrower represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.  Each Borrower has disclosed to the Agent all agreements, instruments and corporate or other restrictions to which it is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to have or result in a Material Adverse Effect, and, as of the Closing Date, there exists no contingent liability or other fact or circumstance that could reasonably be expected to have or result in a Material Adverse Effect which has not been set forth on Schedule II hereto.

7.16    **Litigation**.  Except as disclosed on Schedule II hereto, there is no pending or, to the Borrowers' knowledge, threatened action or proceeding or investigation, injunction, writ or order affecting any Borrower before or by any court, Governmental Entity or arbitrator which purports to affect the legality, validity or enforceability of this Agreement or any other Loan Document.

7.17    **Ownership of Collateral; Liens**.  Each Borrower is the legal and beneficial owner of the Collateral and upon the execution of the Loan Documents and the entry of the Orders, the Agent will hold a valid, perfected and continuing first priority Lien in the Collateral as security for the Lender Debt, senior in priority to all Liens other than Valid Pre-Petition Senior Liens and the Carveout, and free and clear of any Lien other than Permitted Liens.  Except with respect to the Permitted Receivables Liens, no effective financing statement or other instrument similar in effect covering the Receivables is on file in any recording office other than those in favor of the Agent relating to this Agreement, and no competing notice or notice inconsistent with the transactions contemplated in this Agreement has been sent to any Obligor.

7.18    **Locations**.  Each Borrower's exact name, principal place of business and chief executive office, and the office where it keeps its data, books, and records concerning the Receivables and other Collateral, and where Receivables and payments thereon are processed, are located at the addresses referred to on Schedule I hereto and, as of the Closing Date, except as disclosed on Schedule II hereto, there have been no other such locations for the four immediately prior months.  Except as disclosed on Schedule II hereto, it has not changed its principal place of business or chief executive office in the last

five years.  Except as disclosed on Schedule II hereto, it has not used and does not now use any fictitious or trade name during the five years immediately prior to the date of this Agreement and, as of the Closing Date, it has not changed its name in the last 24 months.

7.19    **Notices**.  All required Notices have been prepared and delivered to each of its Obligors which are Insurers or Governmental Entities, and all invoices now bear only the appropriate remittance instructions for payment direction to the Lender Lockbox or the Lockbox Accounts, as the case may be.

7.20    **Taxes**.  Each Borrower has filed on a timely basis all tax returns (federal, state, and local) required to be filed and has paid, or made adequate provision for payment of, all taxes, assessments and other governmental charges due from it.  No tax Lien has been filed and is now effective against any Borrower or any of their respective Properties except any Lien in respect of taxes and other charges not yet due or contested in good faith by appropriate proceedings.  To its best knowledge, and except as disclosed on Schedule II hereto, there is no pending investigation by any taxing authority nor any pending but unassessed tax liability relating to it.

7.21    **Lockbox and Lockbox Accounts**.  Each Lockbox Borrower maintains only the Borrower Lockbox Accounts described on Schedule III hereto for Receivables the Obligors with respect to which are Governmental Entities.  The Lender Lockboxes are the only post office boxes and the Lender Lockbox Accounts are the only lockbox accounts maintained for Lockbox Borrower Receivables, the Obligors with respect to which are not Governmental Entities.  No direction is in effect directing Obligors to remit payments on Receivables other than to the applicable Lender Lockbox and Lockbox Account, each as described on Schedule III.

7.22    **ERISA Matters**.

(a)    No Borrower nor any ERISA Affiliate makes or is obligated to make contributions (or during the preceding five years has made or been obligated to make contributions) to a Multiemployer Plan or a Multiple Employer Plan.  No Borrower nor any ERISA Affiliate maintains or must contribute to any Plan.  Except as set forth on Schedule II, with respect to each of the Employee Benefit Plans, each Employee Benefit Plan has complied with and been administered in accordance with its terms and is in compliance in all material respects with all applicable laws including ERISA and the IRC.  No Borrower nor any ERISA Affiliate has any material unpaid liability for any Employee Benefit Plan.  Schedule II separately identifies as of the date hereof (1) all Employee Benefit Plans and (2) all material consulting agreements, executive employment agreements, executive compensation plans, deferred compensation agreements, employee stock purchase and stock option plans and severance plans of each Borrower.

(b)    Except as set forth on Schedule II, each Employee Benefit Plan that is intended to be a qualified plan under Section 401(a) of the IRC has received a favorable determination letter or is relying on a favorable opinion letter from the Internal Revenue Service to the effect that the form of such Employee Benefit Plan is qualified under Section 401(a) of the IRC and the trust related thereto has been determined by the Internal Revenue Service to be exempt from federal income tax under Section 501(a) of the Code, or an application for such a letter is currently being processed by the Internal Revenue Service.  To the best knowledge of the Borrowers, and each ERISA Affiliate nothing has occurred that would prevent or cause the loss of such tax-qualified status.

(c)    No Borrower or any ERISA Affiliate has incurred any liability to the PBGC other than as part of the Legacy Creditors Subordinated Debt Obligations.

- 41 -

(d)     Except as set forth on Schedule II, there are no pending actions, claims or lawsuits that have been asserted or instituted against any of the Employee Benefit Plans, the assets of any of the trusts under such plans, the plan sponsor, the plan administrator or any fiduciary of any such plan (other than routine benefit claims), and, to the knowledge of each Borrower and all ERISA Affiliates, there are no facts which could form the basis for any such action, claim or lawsuit.  There are no investigations or audits by any Governmental Entity of any of the Employee Benefit Plans, any trusts under such plans, the plan sponsor, the plan administrator or any fiduciary of any such plan that have been instituted or threatened, and, to the knowledge of each Borrower and all ERISA Affiliates, there are no facts that could form the basis for any such investigation or audit.

(e)     No Borrower or any ERISA Affiliate maintains or contributes to, or has any unsatisfied obligation to contribute to, or liability under, any active or terminated Plan, other than as part of the Legacy Creditors Subordinated Debt Obligations.

7.23    **Patient Consent Forms.**  Patient Consent Forms are being obtained from each patient and customer receiving services or products.  The Patient Consent Forms are the only forms being used by the Lockbox Borrowers.

## ARTICLE 8.

## AFFIRMATIVE COVENANTS

Until the Full Payment of all Lender Debt and the termination of the Total Revolving Commitment hereunder, each Borrower agrees to perform and cause each of the other Borrowers to perform all covenants in this Article 8.

8.1     **Compliance with Laws.**  Each Borrower shall comply in all material respects with all applicable laws (including, without limitation, all applicable Healthcare Laws and Environmental Laws), rules, regulations and orders.  Each Borrower shall obtain, maintain and preserve and take all necessary action to timely renew, all permits, licenses, authorizations, approvals, entitlements and accreditations which are necessary or useful in the proper conduct of its business.  Each Borrower shall timely file all Medicaid and Medicare cost reports.

8.2     **Offices, Records and Books of Account, Names.**  Each Borrower shall keep its principal place of business and chief executive office and the offices where it keeps its records concerning the Collateral at its address set forth on Schedule I.  Each Borrower shall maintain proper books and accounts in which full, true and correct entries in conformity with GAAP are made of all dealings and transactions in relation to its business and activities and shall not make any notation on its books and records, including any computer files, that is inconsistent with the assignment of the Collateral to the Agent as collateral security.  Each Borrower shall maintain and implement administrative and operating procedures (including, without limitation, an ability to recreate records evidencing Receivables and related contracts and pertinent documentation with respect to all other Collateral in the event of the destruction of the originals thereof), and keep and maintain all documents, books, records and other information reasonably necessary or advisable for collecting all Receivables (including, without limitation, records adequate to permit the daily identification of each Receivable and all Collections of and adjustments to each existing Receivable) and for providing the Receivable Information.

8.3     **Performance and Compliance with Contracts and Credit and Collection Policy**.  Each Borrower shall, at its expense, timely and fully perform and comply with all material provisions,

covenants and other promises required to be observed by it under all contracts related to the Receivables and other Collateral. Each Borrower shall timely and fully comply in all material respects with the Credit and Collection Policy in regard to the Collateral, including each Receivable and the related contract, and it shall maintain, at its expense, in full operation each of the bank accounts and lockboxes required to be maintained under this Agreement, including the Lockbox Accounts and the Lender Lockbox. Each Borrower shall do nothing, nor suffer or permit any other Person, to impede or interfere with the collection by the Agent, or any other Person designated by the Agent or on its behalf, of the Collateral, including the Receivables.

8.4   **Audits; Appraisals.** Each Borrower shall, at any time and from time to time during regular business hours as requested by the Agent, permit the Agent (who may be accompanied by any members of the Lender Group) or its representatives (including third party auditors), subject to compliance with applicable law in the case of review of patient/customer information, to do any of the following: (1) on a confidential basis, examine and make copies of and abstracts from all books, records and documents (including, without limitation, computer tapes and disks) in such Borrower's possession or under its control relating to the Collateral and the financial condition and operations of the Borrowers, including, without limitation, the related contracts; (2) visit such Borrower's offices and properties for the purpose of discussing financial condition, performance and operations of the Borrowers, and examining and auditing such materials described in clause (1) above; and (3) discuss accounting, operational, performance, financial and general business matters relating to the Borrowers, matters relating to the Collateral or Contracts relating to the Collateral, or matters relating to such Borrower's performance under the Loan Documents with any of such Borrower's officers or employees having knowledge of such matters. The Borrower Representative will make available to the Agent at such time as reasonably requested by the Agent, the chief executive officer and chief financial officer of the Borrower Representative to discuss the presentation and preparation of reports provided by the Borrowers, and to review and explain the assumptions and conclusions contained in such reports.

8.5   **Reporting Requirements.** The Borrowers shall provide to the Agent (in multiple copies, if requested by the Agent) the following:

(1)   on the fourth Business Day of every eleventh week of the most recent Budget delivered pursuant to Section 6.1(5) or this Section 8.5(1), as applicable (beginning with the eleventh week following execution of this Agreement), by Transmission (unless otherwise agreed by the Agent), an updated 13-week Budget for the 13-week period following the final week of the most recent Budget delivered, in form and substance satisfactory to, and approved in writing by, the Agent, and following such approval by the Agent, such updated and revised budget shall become the "Budget" hereunder;

(2)   on the second Business Day of each week, beginning with the second full week following the Filing Date, by Transmission (unless otherwise agreed by the Agent), a Weekly Report, together with a Compliance Certificate stating that the Borrower is in compliance (or if not in compliance, stating the nature of such non-compliance and the steps being taken to address such non-compliance) with this Agreement including Section 10.3(a), the Budget and the Orders (in form and substance reasonably satisfactory to the Agent);

(3)   on the second Business Day following the final day of each calendar month, by Transmission (unless otherwise agreed by the Agent), a report of the average daily census for the Hospital and Nursing Home for such monthly period, together with a Compliance Certificate stating that the

Borrower is in compliance (or if not in compliance, stating the nature of such non-compliance and the steps being taken to address such non-compliance) with Section 10.3(b);

(4)    on the fourth Business Day following the final day of each calendar month, by Transmission (unless otherwise agreed by the Agent), an updated 13-week cash flow projection, updated on a rolling basis as of the last Business Day of the prior week;

(5)    on the twenty-fifth day following the final day of each calendar month, by Transmission (unless otherwise agreed by the Agent), the Monthly Report for the prior month, certified by an Authorized Officer;

(6)    on or prior to the 30th day of each month, for the prior month, consolidated and consolidating balance sheets, income statements and statements of changes in cash flow of the Borrowers as of the end of such month, together with a Compliance Certificate setting forth the calculation of the financial covenants set forth in Sections 10.1, 10.2 and 10.3 and stating that no Default or Event of Default is continuing as of the date of such Compliance Certificate;

(7)    as soon as available and in any event within (x) 180 days following the fiscal year ending December 31, 2014, and (y) 120 days following the end of each fiscal year thereafter, for the prior fiscal year, a copy of the audited consolidated and consolidating audited consolidated and consolidating financial statements (together with explanatory notes thereon) and the auditor's report letter for such year for the Borrowers, containing financial statements for such year audited by independent certified public accountants of recognized standing acceptable to the Agent and a copy of any management letter or written report submitted to the Borrowers by independent certified public accountants with respect to the business, condition (financial or otherwise), operations, prospects, or Properties of the Borrowers;

(8)    promptly and in any event within two Business Days after the occurrence of each Default or any Event of Default, notice of such event with together with a statement of an Authorized Officer setting forth details of such Default or Event of Default, and the action that the Borrowers have taken and propose to take with respect thereto;

(9)    promptly following the distribution or filing thereof, (A) one copy of each financial statement, cost report, or other material report sent by any Borrower to any Governmental Entity, including the Bankruptcy Court, and (B) all press releases and other statements made available by any Borrower to the public concerning developments in its business;

(10)    promptly after the furnishing thereof, copies of any statement or report furnished by the Borrower to any statutory committee appointed in the Chapter 11 Cases, People's United, Saint Francis, the PBGC or any other party under any Other Debt Obligations not otherwise required to be furnished by the Borrowers pursuant to this Agreement;

(11)    promptly and in any event within two Business Days after receipt of a notice of default or termination under any Saint Francis Agreement, any other agreement subject of a Subordination Agreement, any Subordination Agreement or any Other Debt Obligations, a copy of such notice together with a statement of an Authorized Officer setting forth details of such default or termination, and the action that the Borrowers have taken and propose to take with respect thereto;

62404953

(12)     promptly, and in any event within two Business Days after becoming aware of the occurrence thereof, written notice of any matter that would have a Material Adverse Effect;

(13)     immediately (and in no event later than two Business Days after actual knowledge or notice thereof is obtained or received), notice in reasonable detail, of any notice of any investigations or audits (including cost reports or similar audits regarding the valuation of receivables payments and audits relating to qualification of Employee Benefit Plans as tax-exempt) of any Borrower being conducted by any federal, state or county Governmental Entity or its agents or designees (including the Medicare recovery audit contractors), and the results thereof, when known;

(14)     on each Funding Date, and more frequently if requested by the Agent, estimates of amounts of Receivables which are subject to offset by any Governmental Entity;

(15)     if adjusted from the prior month's value, internally prepared cost report settlement estimates with respect to Governmental Entities;

(16)     promptly (and in no event later than two Business Days following its obtaining actual knowledge thereof) notify the Agent of the following:  (A) any breach by any Borrower of any covenants or representations and warranties hereunder or under any other Loan Document, including, without limitation, upon discovery of a breach of the Eligibility Criteria; and (B) the occurrence of any Default or any Event of Default, such notice to be accompanied by a statement of an Authorized Officer setting forth details of such Default or Event of Default, and the action that the Borrowers have taken and/or propose to take with respect thereto;

(17)     promptly and in any event within 10 days after any Borrower or any ERISA Affiliate knows or has reason to know that any ERISA Event has occurred, a written statement of an Authorized Officer describing such ERISA Event or waiver request and the action, if any, the Borrowers and ERISA Affiliates propose to take with respect thereto and a copy of any notice filed with the PBGC or the IRS pertaining thereto and (B) simultaneously with the date that any Borrower or any ERISA Affiliate files a notice of intent to terminate any Plan, if such termination would require material additional contributions in order to be considered a standard termination within the meaning of Section 4041(b) of ERISA, copies of each such notice;

(18)     immediately (and in no event later than two Business Days after actual knowledge or notice thereof is obtained or received), written notice in reasonable detail, of the following:  (A) any Lien asserted or claim made against a Receivable or any Lien asserted or claim made against any other Collateral other than a Permitted Lien; and (B) the occurrence of any damage in the Collateral in excess of $75,000 or any other event which could reasonably be expected to materially adversely affect the value of the Collateral or the interest of the Agent therein;

(19)     promptly, and in any event within two Business Days after becoming aware of the occurrence thereof, notice in reasonable detail of (A) any material reduction to any rate for reimbursement under any agreement with any Obligor, (B) any material system charge master change that would affect the Estimated Net Value of Eligible Receivables of any Obligor, or (C) any matter that could reasonably be expected to have an adverse effect on (i) any Borrower's rights to reimbursement under any agreement with, and the amount of any related payments from, any Obligor or (ii) the Estimated Net Value of Eligible Receivables of any Borrower;

(20)    promptly, and in any event within two Business Days after becoming aware of the occurrence thereof, notice of any change in any director of reimbursement or similar senior executive with respect to the billing and collections personnel of any Borrower;

(21)    promptly, copies of all pleadings filed in the Chapter 11 Cases;

(22)    as soon as available, (A) copies of each financial statement, report, notice or proxy statement sent by any Borrower to its stockholders or members generally, (B) copies of each press release or other statement made available by any Borrower to the public concerning developments in the business of the such Borrower including, but not limited to, Form 990s or comparable statements filed with the Internal Revenue Service, and (C) copies of any statement or report furnished by any Borrower to any other party pursuant to the terms of any indenture, loan, or credit or similar agreement and not otherwise required to be furnished to the Agent or any Lender pursuant to this Agreement;

(23)    upon request by the Agent, daily census reports for JMH and Johnson Evergreen;

(24)    promptly, and in any event within two Business Days after becoming aware of the occurrence thereof; notice that any Borrower has suffered the loss, revocation or termination of any material license, permit, lease or agreement necessary to its business;

(25)    promptly, and in any event within two Business Days after becoming aware of the occurrence thereof, notice in reasonable detail regarding any material activities and developments regarding the Borrowers' efforts to consummate a sale or other restructuring transaction, including with respect to any sale of the Hospital/Surgery Center Assets or the Nursing Home Assets;

(26)    promptly following the receipt or sending thereof by a Borrower, copies of all proposals, term sheets and other correspondence and documentation regarding any sale or other restructuring transaction, including any sale of the Hospital/Surgery Center Assets or the Nursing Home Assets;

(27)    promptly (and in no event later than two Business Days following its obtaining actual knowledge thereof) notify the Agent of any material communication to or from any Governmental Entity;

(28)    promptly, and in any event within two Business Days after becoming aware of the occurrence thereof, notice that any Borrower has been enjoined, restrained or in any way prevented by the order of any court or any Governmental Entity from conducting all or any material part of its business;

(29)    promptly, and in any event within two Business Days after becoming aware of the occurrence thereof, notice of any change in the professional engagements or outsourcing of services by the Borrowers; and

(30)    promptly, and if practicable, within one Business Day of such request, such other information respecting the Receivables, the equipment, inventory, real property or other assets of each Borrower or the other Collateral or the condition or operations, financial or otherwise, of any Borrower, or the Budget or any line items reflected in the Budget, as the Agent or any of the Lenders may from time to time reasonably request.

62404953

8.6     **Notice of Proceedings; Overpayments.**  The Borrowers shall promptly notify the Agent (and modify the next Borrowing Base Report to be delivered hereunder to reflect same) in the event of any action, suit, proceeding, dispute, set-off, deduction, defense or counterclaim for an amount in excess of $10,000 that is asserted by an Obligor with respect to any of their Receivables.  The Borrowers shall make all payments to the Obligors necessary to prevent the Obligors from offsetting any earlier overpayment by the Obligors in excess of $10,000 against any amounts the Obligors owe on any Receivables.

8.7     **Taxes.**

(a)     Each Borrower shall, and shall cause each of its Subsidiaries to do the following: (1) file when due all federal, national and state income and other tax returns and other reports which it is required to file; and (2) subject to the other terms of this Section 8.7, pay, or provide for the payment, when due, of all taxes (including, without limitation, sales taxes), fees, assessments and other governmental charges against it or upon its Property, income or franchises, including taxes relating to the transactions contemplated under this Agreement, make all required withholding and other tax deposits, and establish adequate reserves for the payment of all such items, and provide to the Agent, upon request, satisfactory evidence of its timely compliance with the foregoing.

(b)     So long as the Borrowers have notified the Agent in writing, the applicable Borrower will not be required under this Section 8.7 to pay an amount referred to in clause (2) of Section 8.7(a) if (1) the applicable Borrower is contesting that amount in good faith by appropriate proceedings diligently pursued; (2) the applicable Borrower has established proper reserves as provided in GAAP with respect to that amount; and (3) no Lien (other than a Permitted Lien) results from non-payment of that amount.

(c)     Except pursuant to any tax sharing agreement disclosed in Schedule II hereto, no Borrower shall have any obligation under any tax sharing agreement.

8.8     **Preservation of Existence; Dissolution of Non-Active Entities.**  Each Borrower shall continue in all material respects to operate the business and provide the services of the Borrowers as in effect prior to the Filing Date, including to perform and preserve its rights and privileges under all applicable leases, contract and agreements to the extent failure to do so would have or result in a Material Adverse Effect, preserve and maintain its existence, rights, franchises and privileges in the jurisdiction of its organization, and qualify and remain qualified in good standing as a foreign corporation in each jurisdiction where the failure to maintain such qualification would have or result in a Material Adverse Effect.  Each of JDF, Wellcare and JMS shall liquidate, wind up and dissolve no later than March 31, 2015, and each such entity shall transfer its assets (or the proceeds thereof), if any, according to applicable law in connection with such liquidation, winding up and dissolution.

8.9     **Loan Documents.**  Each Borrower shall, at its sole expense, timely and fully perform and comply with all provisions, covenants and other promises required to be observed by it under the Loan Documents, maintain the Loan Documents in full force and effect, enforce each Loan Document in accordance with its terms, take all such action to such end as may be from time to time reasonably requested by the Agent and make upon any Person such demands and requests for information and reports or for action as such Borrower is required to make hereunder and under the Orders and as may be from time to time reasonably requested by the Agent.  Each Borrower shall not permit any waiver,

modification or amendment of any Loan Document, except as may be requested by the Agent or Lenders.

8.10    **Invoices**.  Each Borrower shall take all reasonable steps to ensure that all invoices rendered or dispatched on or after the Closing Date contain only the remittance instructions required under Article 4 of this Agreement.

8.11    **ERISA Compliance**.  Each Borrower shall, and shall cause its ERISA Affiliates to, make all required contributions to each Plan and shall not, nor shall it permit any ERISA Affiliate to, cause or permit to occur:  (1) an event that could result in the imposition of a lien under Section 430 of the IRC or Section 303 or 4068 of ERISA, (2) an ERISA Event that would have a Material Adverse Effect in the aggregate, (3) the adoption of a new Plan or the amendment of an existing Plan, or an agreement to contribute to any Multiemployer Plan or Multiple Employer Plan.

8.12    **Equipment**.  Each Borrower shall, in accordance with sound business practices, maintain all equipment and other Properties used by it in its business (other than obsolete or worn-out equipment) in good repair, working order and condition (normal wear and tear and immaterial impairments of value and damage by the elements excepted) and make all necessary repairs, renewals, replacements and improvements thereof so that the value and operating efficiency thereof shall at all times be maintained and preserved.

8.13    **Insurance**.  Each Borrower shall keep insured by financially sound and reputable insurers all Property of a character usually insured by corporations engaged in the same or similar business similarly situated, including without limitation, all Collateral, against loss or damage of the kinds and in the amounts customarily insured against by such corporations and carry such other insurance as is usually carried by such corporations conducting a similar business in similar locales.  Each policy referred to in this Section 8.13 shall provide that it will not be canceled, amended, or reduced except after not less than 30 days' prior notice to the Agent and shall also provide that the Agent (and/or its designees and assigns) shall be named as loss (or co-loss) payee and additional insured, as applicable and as its interests may appear, and such interests shall not be invalidated by any act or negligence of any Borrower.  The Borrowers shall advise the Agent promptly of any policy cancellation, reduction, or amendment.  Each insurance policy for property, casualty, liability and business interruption coverage for any Borrower shall name the Agent as lender loss payee (as its interests may appear) or an additional insured, as appropriate.

8.14    **Financial Advisors**.  The Borrowers shall continue to engage financial consultants and other advisors, reasonably acceptable to the Agent, for a scope of services reasonably acceptable to the Agent (a "**Financial Advisor**"). The Agent acknowledges that Deloitte Transactions & Business Analytics LLP is an acceptable Financial Advisor.

8.15    **Collections Services**.  The Borrowers shall (i) maintain and retain adequate management, staffing and third party consultants, and shall have developed a satisfactory plan to oversee and implement the billing and collection of Receivables in a manner reasonably acceptable to the Agent, including approval by the Agent of any significant "bulk" compromises on receivables; (ii) consult with the Agent regarding any significant changes to the personnel engaged in the billing, collection and reporting of Receivables, outside consultants and advisers and outsource firms; and (iii) if required by Agent, engage a "hot" backup servicer for Receivables (acceptable to the Agent with instructions to communicate with and provide information directly to the Agent upon its request) and

have such backup servicer in place and in a position to perform full collection functions if requested to do so.

8.16    **The Budget**. The Borrowers shall make payments and expenditures, including from the Filing Date Cash and the proceeds of the Revolving Advances, solely (except as may be approved by the Agent in its sole discretion) to make payments to the Persons set forth in and consistent with both the Budget and the Orders, and in the amounts set forth in and consistent with both the Budget and the Orders, subject to such variances that are in compliance with Section 10.3(a).

8.17    **The Orders**. Each Borrower shall comply with the Orders and take all actions necessary or appropriate to ensure that:

(1)    The Liens granted to the Agent and the Lenders shall be deemed valid and perfected by entry of the Interim Financing Order and the Final Financing Order, as the case may be;

(2)    The Liens, lien priorities, administrative expense claim priorities and other rights and remedies granted to the Agent pursuant to this Agreement, the Interim Financing Order, the Final Financing Order or the other Loan Documents (specifically including, but not limited to, the existence, perfection and priority of the Agent's Superpriority Administrative Expense Claim and Lien provided for herein and therein, and the administrative expense claim priority provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of debt by the Borrowers (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by dismissal or conversion to cases under chapter 7 of the Bankruptcy Code of the Chapter 11 Cases, or by any other act or omission whatsoever. Without limiting the generality of the foregoing, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act or omission:

(3)    except to the extent that the Carveout has priority over the Lender Debt, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases or any conversion of the same to cases under chapter 7 of the Bankruptcy Code or in any other proceedings related thereto, and no priority claims, are or will be prior to or on a parity with any claim of the Agent or the Lender against the Borrowers in respect of any Lender Debt; and

(4)    the Liens granted to the Agent and the Lenders shall constitute valid and perfected first priority Liens on all of the Collateral of the Borrowers, subject only to Valid Pre-Petition Senior Liens and the Carveout, as to which the Liens granted to the Agent shall be subordinate and junior, and shall be prior to all other Liens, now existing or hereafter arising.

8.18    **Qualified Sales**.

(a)    Within one business day of the Filing Date (or upon such later date as agreed in writing between the Borrowers and the Agent), the Borrowers shall have filed motions with the Bankruptcy Court to establish bidding procedures for and to approve the Hospital/Surgery Sale and the Nursing Home Sale which motions shall be in form and substance reasonably acceptable to the Lender Group (such motions, collectively, the "**Qualified Sale Motion**").

(b)    The Borrowers shall take all actions necessary or appropriate to ensure that the Bankruptcy Court shall have entered orders (1) approving bidding procedures for (i) the Hospital/Surgery Sale by no later than 35 days after the Filing Date, and (ii) the Nursing Home Sale by

no later than 35 days after the Filing Date, which orders shall be in form and substance reasonably acceptable to the Agent (the "**Qualified Sale Bidding Procedures Orders**"), and (2) approving (i) the Hospital/Surgery Sale by no later than 150 days after the Filing Date, and (ii) the Nursing Home Sale by no later than 150 days after the Filing Date, in each case, to the entity that submits the highest and best offer for such Hospital/Surgery Center Assets and such Nursing Home Assets, respectively, and pursuant to the terms set forth in the Asset Purchase Agreements (with such changes approved in writing by the Agent) or on such other terms reasonably acceptable to the Agent (collectively, the "**Qualified Sales**"), which orders (i) with respect to the Hospital/Surgery Center Assets, shall provide for the payment in full of all Lender Debt (or the Lenders shall have agreed to enter into a New Financing Agreement), (ii) with respect to the Nursing Home Assets, shall provide for the payment of at least that portion of the Lender Debt equal to the Estimated Net Value of all Receivables of Johnson Evergreen outstanding as of the closing date of the Nursing Home Sale, and (iii) shall otherwise be in form and substance reasonably acceptable to the Lender Group (collectively, the "**Qualified Sale Approval Orders**").

        (c)    The Borrowers shall take all actions necessary or appropriate to ensure that all necessary regulatory approvals shall have been obtained (1) for the Qualified Sale of the Hospital/Surgery Center Assets on or prior to the Scheduled Maturity Date, and (2) for the Qualified Sale of the Nursing Home Assets on or before the Scheduled Maturity Date.

**ARTICLE 9.**

**NEGATIVE COVENANTS**

Until the Full Payment of all Lender Debt and the termination of the Total Revolving Commitment hereunder, each Borrower agrees to perform all covenants in this Article 9.

9.1    **Corporate Documentation**.  No Borrower shall modify, amend or alter its organizational documents in any manner that is adverse to the interests of the Agent or any Lender or in any other material manner.

9.2    **Debt**.  No Borrower shall incur, assume suffer to exist or otherwise have outstanding any Debt following the Filing Date other than (i) the Lender Debt, and (ii) Permitted Debt.  No Borrower shall, directly or indirectly at any time pay any amount of principal or interest or prepay, defease, purchase or redeem any Debt, including any Permitted Debt, other than the Lender Debt, except for any adequate protection payments consented to by the Agent in its sole discretion, but specifically including interest payments to People's United of up to $42,000 per month, to the extent approved by the Bankruptcy Court.

9.3    **Subordination**.  No Borrower shall, directly or indirectly at any time pay any amount of principal or interest or prepay, defease, purchase or redeem any Debt (including, Other Debt Obligations), except in a manner consistent with this Agreement, the Budget, the Subordination Agreements, the Orders and the Bankruptcy Code.

9.4    **Liens**.  No Borrower shall create, incur or suffer to exist any Liens upon or with respect to any of the Collateral or assign any right to receive income in respect thereof, except Permitted Liens.

9.5    **Lease Obligations**.  No Borrower shall enter into, or suffer to exist, any lease of real or personal Collateral as lessee or sublessee other than leases in existence on the Filing Date and leases

expressly contemplated in the Budget.   No Borrower shall enter into any material amendments, modifications or extensions of such leases without the written consent of the Agent.

9.6    **Asset Sales; Sale/Leaseback Transaction; Etc**.  No Borrower shall sell, assign (by operation of law or otherwise), transfer, lease, sublease, liquidate or otherwise dispose of (including, without limitation, pursuant to any sale/leaseback transaction) any of its Receivables or material assets, or assign any right to receive income in respect thereof, other than the following (which shall exclude any such actions with respect to the Receivables):

(1)    the consummation of the Qualified Sales in a manner consistent with this Agreement and the Orders;

(2)    sales of inventory in the ordinary course of its business;

(3)    the liquidation, winding up and dissolution of JDF, Wellcare or JMS; and

(4)    replacement and disposition of worn out and obsolete equipment in the ordinary course of business.

9.7    **Change in Business**.  No Borrower shall engage in any business other than the business engaged in by it on the Closing Date.  Each of JDF, Wellcare and JMS shall not engage in any business activities other than business activities directly related to the liquidation, winding up and dissolution of such entity.

9.8    **Change in Credit and Collection Policy**.  No Borrower shall make any material change in the Credit and Collection Policy without the prior written consent of the Agent.

9.9    **Change in Payment Instructions**.  No Borrower shall terminate, or suffer or permit the termination of, any Lender Lockbox, any of the Lockbox Accounts, or any Depositary Agreement, or make any change or replacement (1) in the instructions contained in any Notice or otherwise, (2) regarding payments with respect to Receivables to be made to the Lender Lockbox or the Lockbox Accounts, (3) in the Standing Revocable Instruction referred to in the Depositary Agreements or otherwise, or (4) regarding payments to be made to the Agent, except upon the prior and express written direction of the Agent.

9.10    **Deviation from Terms of Receivable**.  Except in accordance with the Credit and Collection Policy, no Borrower shall, without the prior written consent of the Agent:

(1)    compromise, adjust, extend, satisfy, subordinate, rescind, set off, waive, amend, or otherwise modify, or permit or agree to any deviation from, the terms and conditions of any Receivable or materially or adversely modify or waive any term or condition of any contract related thereto;

(2)    amend, modify, supplement or delete in any way or to any extent any provision for uncollectible accounts and free care applicable to any Receivable, or (B) amend, modify or supplement in any way or to any extent any financial category or change in any way or to any extent the manner in which any financial category is treated or reflected in its records;

(3)    alter or modify its claims processing system or its third-party billing system, as applicable (except for technical changes of an immaterial nature); or

(4)      change, modify, or rescind any direction contained in any invoice or previously delivered Notice.

9.11      **Mergers and Acquisitions; Dissolutions**.  No Borrower shall consummate or enter into any transaction or agreement which results or is intended to result in a merger, acquisition, dissolution or wind-up, other than in connection with the consummation of the Qualified Sales.

9.12      **No "Instruments"**.  No Borrower shall take any action which would allow, result in or cause any Eligible Receivable to be evidenced by an "instrument" within the meaning of the UCC of the applicable jurisdiction.

9.13      **Margin Loan Restrictions**.  No portion of the proceeds of any borrowing hereunder shall be used in any manner that might cause the borrowing or the application of such proceeds to violate Regulation U, T, or X of the Board of Governors of the Federal Reserve System or any other regulation of such .

9.14      **Loans or Investments**.  Except with respect to loans and investments set forth on Schedule II, no Borrower shall enter into an agreement to, make any loans to or investments in any Person, other than:  (a) loans and advances to physicians and key employees for reasonable travel, relocation and business expenses in the ordinary course of business, so long as the aggregate outstanding amount of all such loans and advances does not exceed $200,000 at any time outstanding during the term of this Agreement; (b) loans relating to guarantees of physician income; (c) other loans and advances in an aggregate amount not to exceed $25,000; and (d) loans to and investments in other Borrowers, in each case, as expressly contemplated in the Budget.

9.15      **Transactions with Affiliates**.  Except as set forth on Schedule II, no Borrower shall sell, transfer, distribute, or pay any money or property, including, but not limited to, any fees or expenses of any nature (including, but not limited to, any fees or expenses for management services), to any Affiliate, or lend or advance money or property to any Affiliate, or invest in (by capital contribution or otherwise) or purchase or repurchase any equity interest or indebtedness, or any Property, of any Affiliate, or become liable under any Guaranty for the obligations of any Affiliate.

9.16      **Distributions**.  No Borrower shall make, or enter into any agreement to make, or enter into any transaction or agreement which results or is intended to result in, any dividends or other Distributions of any kind being paid to any Person.

9.17      **Deviation from Patient Consent Form**.  No Lockbox Borrower shall, without the prior written consent of the Agent, substitute, alter, modify or change in any way the Patient Consent Form.

9.18      **Equity Interests; Subsidiaries**.  Except as set forth on Schedule II, no Borrower shall issue any Equity Interests.  Each of JDF, Wellcare and JMS shall liquidate, wind up and dissolve no later than March 31, 2015 and each such entity shall transfer its assets (or the proceeds thereof), if any, according to applicable law in connection with such liquidation, winding up and dissolution.  No Borrower other than JMMC shall maintain, suffer to exist, create or acquire any Subsidiaries.  JMMC shall not maintain, suffer to exist, create or acquire any Subsidiaries other than the Borrowers, JDF, Wellcare and JMS.

9.19    **Interim Financing Order; Final Financing Order; Administrative Expense Claim Priority; Lien Priority; Payments**.

(1)    The Borrowers shall not at any time seek, consent to or suffer to exist any modification, stay, vacation or amendment of any of the Orders, as the case may be, except for modifications and amendments agreed to by the Agent; and

(2)    The Borrowers shall use their best efforts to ensure that the Final Financing Order Date shall take place as soon as practical, and in all events no later than 25 days after the entry of the Interim Financing Order.

9.20    **Prohibition on Priming of Liens of the Lender**.  Except with respect to the Valid Pre-Petition Senior Liens and the Carveout, the Borrowers shall not permit any person to surcharge the Collateral under § 506(c) of the Bankruptcy Code or to obtain a Lien with respect to the Collateral which is equal or senior to the Lien of the Agent and the Lenders hereunder.  Except as expressly provided in this clause, the prohibition on surcharging or priming of Liens of the Agent and the Lenders on the Collateral will survive the termination of this Agreement.  Upon the termination of this Agreement, the Borrowers agree that the Bankruptcy Court will retain jurisdiction over the Collateral for the limited purpose of enforcing this clause.

9.21    **Press Releases**.  No Borrower shall make any press release or public announcement concerning this Agreement, the Lenders or the Agent without the prior consent of the Agent to the contents thereof, unless a press release or public announcement is required by law or order of the Bankruptcy Court.

9.22    **Modification of Saint Francis Agreements**.  No Borrower shall modify, amend or alter any Saint Francis Agreement without the approval of the Agent in its sole discretion. No Borrower shall enter into any BPO Sub-Agreement relating to billing and/or collection services and/or related information technology without the approval of the Agent in its sole discretion. If the Agent fails to respond to any request of the Borrower Representative under this Section 9.22 to modify, amend or alter any Saint Francis Agreement, or to enter into any BPO Sub-Agreement relating to billing and/or collection services and/or related information technology, within fifteen (15) Business Days of the Agent's receipt of such request, the Agent's approval of such request shall be deemed to have been given as of the end of such fifteen (15) Business Day period.

**ARTICLE 10.**

**FINANCIAL COVENANTS**

Until the Full Payment of all Lender Debt and the termination of the Total Revolving Commitment hereunder, the Borrowers agree to perform all covenants in this Article 10.

10.1    **Minimum Liquidity**.  The sum of (i) Availability, (ii) the Liquidity Block and (iii) cash on hand in those Specified Accounts that are being monitored by the Agent on-line and in real-time shall not be less than $2,200,000 at any time.

10.2    **Minimum EBIDA**.  EBIDA of the Borrowers on a consolidated basis and calculated on a monthly basis for the trailing period identified below (including such month) shall not be less than the amount set forth below opposite such period:

| Cumulative Period | EBIDA |
|---|---|
| Trailing four month period ended January 31, 2015 | $981,069 |
| Trailing five month period ended February 28, 2015 | $1,119,197 |
| Trailing six month period ended March 31, 2015 | $1,301,648 |
| Trailing seven month period ended April 30, 2015 | $1,578,336 |
| Trailing eight month period ended May 31, 2015 | $1,933,050 |
| Trailing nine month period ended June 30, 2015 | $2,318,180 |
| Trailing ten month period ended July 31, 2015 | $2,786,975 |
| Trailing eleven month period ended August 31, 2015 | $3,105,779 |
| Trailing twelve month period ended September 30, 2015 | $3,398,705 |
| Trailing twelve month period ended October 31, 2015 | $3,400,000 |
| Trailing twelve month period ended November 30, 2015 | $3,400,000 |
| Trailing twelve month period ended December 31, 2015 | $3,400,000 |

10.3    **Budget Variances**. (a) <u>Financial Variances</u>. For any Budget Testing Period, as reported in the most recent Budget delivered pursuant to Section 6.1(5) or 8.5(1), as applicable, (i) the Actual Total Operational Disbursements shall not exceed the percentage indicated in the table below for such period of the Projected Total Operational Disbursements set forth in the Budget for such period; (ii) the Actual Total Professional Fee Disbursements shall not exceed the percentage indicated in the table below for such period of the Projected Total Professional Fee Disbursements set forth in the Budget for such period; and (iii) the sum of actual Net Cash Flow for each week in such Budget Testing Period ("**Cumulative Net Cash Flow**"), (x) if a negative value, shall not be less than (1) 115% of the projected Cumulative Net Cash Flow set forth in the Budget and (2) $250,000 less than the projected Cumulative Net Cash Flow set forth in the Budget, and (y) if a positive value, shall not be less than (1) 85% of the projected Cumulative Net Cash Flow set forth in the Budget and (2) $250,000 less than the projected Cumulative Net Cash Flow set forth in the Budget.

| Cumulative Period | Percentage |
|---|---|
| Budget Testing Period of one week | 115% |
| Budget Testing Period of two weeks | 115% |
| Budget Testing Period of three weeks | 115% |
| Budget Testing Period of four weeks | 115% |
| Budget Testing Period of five weeks | 112.5% |
| Budget Testing Period of six weeks | 111% |
| Budget Testing Period of seven weeks | 110% |
| Budget Testing Period of eight weeks | 110% |
| Budget Testing Period of nine weeks | 107.5% |
| Budget Testing Period of ten weeks | 108% |
| Budget Testing Period of eleven weeks | 106% |
| Budget Testing Period of twelve weeks | 105% |
| Budget Testing Period of thirteen weeks | 105% |

(b)    <u>Minimum Average Census</u>. For each monthly period ending on the last day of each month (with the first measurement period ending on January 31, 2015), (i) the average daily census for the Hospital shall not be less than 39 and (ii) the average daily census for the Nursing Home shall not be less than 134.

## ARTICLE 11.

### EVENTS OF DEFAULT

11.1   **Events of Default**. Each of the following will constitute an "**Event of Default**":

(1)   The Borrowers fail to pay any principal or interest hereunder or under any of the other Loan Documents on the Maturity Date or on any other date when and as the same shall become due and payable, whether at maturity, by acceleration or otherwise.

(2)   A Borrowing Base Deficiency shall occur and is continuing for a period of three consecutive Business Days.

(3)   The Borrower Representative shall have failed to deliver a revised proposed Budget by the fourth Business Day following the day on which the Budget is to be delivered pursuant to Section 8.5(1) or the Agent shall have failed to approve a revised proposed Budget by the eighth Business Day following receipt of such proposed Budget.

(4)   The Borrowers shall default in the due and punctual payment of any other payment, fee or expense owing to the Agent or any Lender pursuant to any of the Loan Documents, when such payment, fee or expense shall become due and payable, and such default shall continue unremedied for two Business Days.

(5)   This Agreement or any other Loan Document shall terminate, be terminated or become void or unenforceable by the Agent or any Lender party thereto for any reason whatsoever without the prior written consent of the Agent.

(6)   Either (A) Saint Francis or any Borrower shall have breached any material term of any Asset Purchase Agreement, or (B) any Asset Purchase Agreement (i) shall terminate, be terminated or become void or unenforceable by any party thereto for any reason whatsoever without the prior written consent of the Agent, or (ii) shall have been modified, supplemented or amended in any manner (other than technical matters that have no impact on the economic and business terms set forth therein) without the written consent of the Agent.

(7)   Either (i) the Participation Agreement shall terminate, be terminated or become void or unenforceable against Saint Francis for any reason whatsoever without the prior written consent of the Agent, (ii) Saint Francis seeks to modify, supplement or amend the Participation Agreement in any manner without the written consent of the Agent, or (iii) Saint Francis terminates, fails to fund its participation or breaches any other material term under the Participation Agreement.

(8)   Saint Francis fails to comply in any material respect with or breaches in any material respect any of the terms or conditions of the Saint Francis Intercreditor Agreement or shall deny or disaffirm in writing its obligations thereunder.

(9)   Any party to any Subordination Agreement (other than the Agent) fails to comply in any material respect with or breaches in any material respect any of the terms or conditions thereof or any such party shall deny or disaffirm in writing its obligations thereunder.

(10)    This Agreement shall for any reason fail or cease to create or fail or cease to be a valid and perfected security interest in favor of the Agent in the Receivables, the Collections with respect thereto and the other Collateral, senior and prior to all Liens other than Valid Pre-Petition Senior Liens and the Carveout, and free and clear of all Liens other than Permitted Liens.

(11)    Any Borrower shall default in the performance or observance of any covenant, agreement or provision contained in (a) Section 8.5, 8.6, 8.7, 8.8, or 8.9 or Article 4, 5, 9, or 10, for which no grace period shall apply; or (b) any other Section or Article of this Agreement or any other Loan Document or in any other instrument or document evidencing or creating any obligation, guaranty or Lien in favor of the Agent in connection with or pursuant to this Agreement or any Lender Debt, and, in the case of any default referred to in this clause (b), that default continues for a period of 10 days after the earlier of (i) the date on which notice of such default is sent to the Borrower Representative by the Agent or any Lender, and (ii) the date on which any Borrower discovers such default.

(12)    A Revocation Order (as defined in the Depositary Agreement) shall have been sent or any change or replacement shall have been made in the Standing Revocable Instruction (as defined in each of the Depositary Agreements), any bank (including the Lockbox Bank) at which any deposit account, blocked account, or lockbox account (including the Lockbox Accounts) is maintained shall fail to comply with any of the terms of any deposit account, blocked account, lockbox account or similar agreement (including any Depositary Agreement) to which such bank is a party, or any Borrower shall fail to comply with any of the terms of any Depositary Agreement, in each case, without obtaining the prior written consent of the Agent.

(13)    Any representation or warranty made or deemed made by any Borrower (other than with respect to the eligibility of Receivables as Eligible Receivables hereunder) under or in connection with this Agreement or any other Loan Document or any information or report delivered by any Borrower pursuant to this Agreement or any other Loan Document shall prove to have been incorrect or untrue in any material respect when made or deemed made or delivered.

(14)    An event or condition exists with respect to any Other Debt Obligation or any other Debt, or an Order has been submitted in the Bankruptcy Court, under which any such Debt shall be, or shall be required to be, prepaid (other than by a regularly scheduled required prepayment), redeemed, purchased or defeased, or an offer to repay, redeem, purchase or defease such Debt shall be required to be made, in each case prior to the stated maturity thereof, without the prior written consent of the Agent.

(15)    As of any date of determination, any Borrower is found to have been overpaid by any Governmental Entity during any period covered by an audit conducted by CMS or any other Governmental Entity, or any Governmental Entity otherwise asserts that the Borrower has been overpaid, and (i) such overpayment is not repaid within fifteen days of its due date or reserved for in a manner reasonably acceptable to the Agent, or any Governmental Entity takes action on account of such overpayment (including through an offset or recoupment) or (ii) such Governmental Entity asserts an offset or recoupment of such overpayment or other amounts in an amount greater than $1,000,000.

(16)    There shall have occurred any event, or any condition shall exist, which has had or resulted in a Material Adverse Effect.

(17)   Except in connection with the consummation of a Qualified Sale, any Borrower shall have entered into any transaction or agreement which could reasonably be expected to result in a Change of Control; or a Change of Control shall have occurred.

(18)   Any Borrower sells, leases, assigns, transfers or otherwise disposes of any of its Receivables or other Collateral, except as permitted or contemplated under the Agreement.

(19)   Any Borrower declares or makes any Distribution.

(20)   Any Borrower fails to maintain, keep and preserve any material portion of the Collateral in good repair and condition (ordinary wear and tear excepted).

(21)   An ERISA Event shall have occurred that, when taken together with all other ERISA Events that have occurred, could reasonably be expected to have or result in liability in the aggregate in excess of $50,000, or any Borrower or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to any Withdrawal Liability in an aggregate amount in excess of $50,000.

(22)   Any Borrower is unable to maintain the Transmission interface described in Exhibit V to the commercially reasonable satisfaction of the Agent, or the electronic information servicing capabilities of any Borrower is not functioning, in either case, for a period of more than three consecutive Business Days; or any Borrower has sent multiple Transmissions to the Agent in a manner that is not in compliance with the specifications set forth in Exhibit V hereof; or the Borrower Representative or any other Borrower has sent multiple Transmissions to the Agent in a manner that is not in compliance with the specifications set forth in Exhibit V hereof.

(23)   The Borrowers fail to maintain reasonably proper books of record and account of all dealings and transactions in relation to its business and activities.

(24)   There shall be a breach or default including, but not limited to, a breach of the exclusivity provisions of Section 4 of the Master Affiliation Agreement, or a Saint Francis Agreement shall terminate, or Saint Francis or a Borrower shall provide notice to the other party that it intends to terminate a Saint Francis Agreement.

(25)   The Final Financing Order Date shall not have occurred within 25 calendar days after the Interim Financing Order Date.

(26)   The Qualified Sale Motion (i) with respect to the Hospital/Surgery Center Assets shall not have been filed with the Bankruptcy Court within one Business Day of the Filing Date, or (ii) with respect to the Nursing Home Assets shall not have been filed with the Bankruptcy Court within one Business Day of the Filing Date.

(27)   The Qualified Sale Bidding Procedures Order (i) with respect to the Hospital/Surgery Center Assets shall not have been entered by the Bankruptcy Court within 25 days of the Filing Date, or (ii) with respect to the Nursing Home Assets shall not have been entered by the Bankruptcy Court within 25 days of the Filing Date.

(28)   The Qualified Sale Approval Order (i) with respect to the Hospital/Surgery Center Assets shall not have been entered by the Bankruptcy Court within 120 days of the Filing Date, or (ii) with

respect to the Nursing Home Assets shall not have been entered by the Bankruptcy Court within 120 days of the Filing Date.

(29)   The Qualified Sale (i) of the Hospital/Surgery Center Assets shall not have been consummated, or (ii) of the Nursing Home Assets shall not have been consummated prior to the Scheduled Maturity Date.

(30)   An order shall be entered by the Bankruptcy Court with respect to the Chapter 11 Cases (i) appointing a chapter 11 trustee under section 1104 of the Bankruptcy Code or an examiner with enlarged powers (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code, or (ii) appointing an examiner with enlarged powers relating to the operation of the Borrowers' business beyond those set forth in subsections 1106(a)(3) and 1106(a)(4) of the Bankruptcy Code.

(31)   An order shall be entered by the Bankruptcy Court converting the Chapter 11 Cases to a case or cases under chapter 7 of the Bankruptcy Code.

(32)   An order shall be entered by the Bankruptcy Court amending, supplementing, staying, vacating, revoking, reversing or otherwise modifying this Agreement and the rights of the Agent and Lenders hereunder or the Orders, without the prior written consent of the Agent and the Lenders.

(33)   An order shall be entered by the Bankruptcy Court that subjects the Collateral to assessment pursuant to section 506(c) of the Bankruptcy Code.

(34)   Any Borrower makes payment on, makes an application to make payment on or supports, directly or indirectly, or does not actively contest in good faith any application by another Person to make payment on, any material prepetition claim (other than ordinary course expenses as provided for in the Budget and approved by the Bankruptcy Court) without the prior written consent of the Agent and the Lenders.

(35)   An order shall be entered by the Bankruptcy Court granting any creditor material relief from the automatic stay to exercise rights with respect to property of the estate having a value of more than $50,000 or which has a material effect on the ability of any Borrower to operate the business consistent with current practice.

(36)   Revolving Advances or the Carveout are utilized to prosecute actions, claims, demands or causes of action against the Agent or the Lenders or to object to or contest in any manner or to raise any defense in any pleading to the validity, perfection, priority or enforceability of the Lender Debt or of the rights, claims, liens and security interests granted to the Agent and the Lenders hereunder or under the Orders.

(37)   Revolving Advances or the Carveout are utilized to prosecute actions, claims, demands or causes of action against the Pre-Petition Revolving Agent or the Pre-Petition Revolving Lender or to object to or contest in any manner or to raise any defense in any pleading to the validity, perfection, priority or enforceability of the Existing Debt or of the rights, claims, liens and security interests with respect thereto granted to the Agent and the Lenders hereunder or under the Orders; *provided, however*, up to $10,000 of such Revolving Advances and the Carveout may be used to inquire into and investigate these matters.

(38)    An order shall be entered by the Bankruptcy Court dismissing any part of the Chapter 11 Cases.

(39)    An order with respect to the Chapter 11 Cases shall be entered without the express prior written consent of the Agent (i) to revoke, vacate, reverse, stay, modify, supplement or amend this Agreement, any Loan Document, the Interim Financing Order or the Final Financing Order, as the case may be, or (ii) to permit any claim against or obligation of the Borrowers (now existing or hereafter arising, of any kind or nature whatsoever) to have priority equal or superior to the priority of the Agent and the Lenders in respect of the Lender Debt, except for the Carveout and the Valid Pre-Petition Senior Liens.

(40)    An application for any of the orders described in clauses (31) through (42) above shall be made by any Person, including any statutory committee appointed in the Chapter 11 Cases, and such application either (x) is supported, directly or indirectly, by any of the Borrowers or any Affiliate of the Borrowers, (y) is not being actively contested by the Borrowers in good faith, or (z) is granted by the Bankruptcy Court.

### 11.2    Events of Default; Remedies.

(a)    If any Event of Default shall occur and be continuing, the Agent may, and at the request of the Required Lenders with respect to the Revolving Loan, shall, by notice to the Borrower Representative, subject only to the Orders, take any of the following actions: (1) declare the Maturity Date to have occurred with respect to the Revolving Loan and, subject to the Orders, all Lender Debt related thereto, shall become immediately due and payable in full; (2) reduce the amount of the Borrowing Base used in computing availability hereunder; (3) restrict the amount of or refuse to make Revolving Advances, (4) terminate in full or reduce the Revolving Commitments, (5) continue to apply collections on Receivables and other Collateral to the Lender Debt, (6) without limiting any rights hereunder and subject to applicable law, replace the Borrower Representative and the Borrowers in their performance of any or all of its servicing responsibilities with respect to the Receivables and any other Collateral; (7) require that any of the Borrowers who are not Lockbox Borrowers enter into a Depositary Agreement; and (8) exercise any and all rights and remedies available to it and the Lenders with respect to the Collateral which it may have under the Loan Documents or applicable law. In the event that the Agent exercises its rights pursuant to Section 11.2(a)(7), Schedule III hereto shall be amended by the parties to add the appropriate information. Upon any such declaration or designation, the Agent and the Lenders shall have, in addition to the rights and remedies which it may have under this Agreement, all other rights and remedies provided after default under the Orders, under the UCC and under other applicable law, which rights and remedies shall be cumulative. Each Lender agrees that it will not have any right individually to enforce or seek to enforce this Agreement or any other Loan Document or to realize upon any Collateral for the Lender Debt, it being understood and agreed that such rights and remedies may be exercised only by the Agent in its discretion granted hereunder or at the direction of the applicable Lenders as set forth hereunder.

(b)    Each Borrower hereby irrevocably authorizes and instructs the Agent and each Lender to set-off the full amount of any Lender Debt due and payable against any Collections, any other Proceeds of Collateral, or the principal amount of any Revolving Advance requested on or after such due date, subject in each case to any Valid Pre-Petition Senior Liens. No further notification, act or consent of any nature whatsoever is required prior to the exercise by the Agent or any Lender of such right of set off.

11.3   **Attorney-in-Fact**. Each Borrower hereby irrevocably designates and appoints the Agent, for the benefit of the Lenders, to the extent permitted by applicable law and regulation, as that Borrower's attorney-in-fact, which irrevocable power of attorney is coupled with an interest, with authority, during the continuance of an Event of Default (and to the extent not prohibited under applicable law and regulations) to do any of the following: (1) endorse or sign such Borrower's name to remittances, invoices, assignments, checks (other than, absent a court order, payments from Governmental Entities), drafts or other instruments or documents in respect of the Receivables; (2) notify Insurers to make payments on the Receivables directly to the Agent; and (3) bring suit in such Borrower's name and settle or compromise such Receivables as the Agent or Lenders may, in their discretion, deem appropriate.

## ARTICLE 12.

### THE AGENT

12.1   **Agency Provisions**.

(a)   Each of the Lenders hereby irrevocably appoints HFG as its administrative and collateral agent and authorizes the Agent to take such actions on behalf of such Lender and to exercise such powers as are delegated to the Agent by the terms hereof and the other Loan Documents, together with such actions and powers as are reasonably incidental thereto.

(b)   Each Lender authorizes and directs the Agent to enter into this Agreement and the other Loan Documents, for the benefit and obligation (subject to this Agreement) of the Agent and the Lenders. Each Lender agrees that any action taken by the Agent in accordance with the terms of this Agreement or the other Loan Documents, and the exercise by the Agent of its powers set forth herein or therein, together with such other powers that are reasonably incidental thereto, shall be authorized by and binding upon all of the Lenders. Without limiting the generality of the foregoing, the Agent shall have the sole and exclusive authority to (a) act as the disbursing and collecting agent for the Lenders with respect to all payments and collections arising in connection with the Loan Documents; (b) execute and deliver as Agent each Loan Document, including any intercreditor or subordination agreement, and accept delivery of each Loan Document from any Borrower or other Person; (c) act as collateral agent for the Lender Group for purposes of perfecting and administering Liens under the Loan Documents, and for all other purposes stated therein; (d) manage, supervise or otherwise deal with Collateral; and (e) exercise any rights or remedies with respect to any Collateral under the Loan Documents, applicable law or otherwise. Agent alone shall be authorized to determine whether any Receivables constitute Eligible Receivables, or whether to impose or release any reserve, and to exercise its discretion in connection therewith, which determinations and exercise of discretion, if exercised in good faith, shall exonerate the Agent from liability to any Lender or other Person for any error in judgment.

(c)   Each Person serving as an agent hereunder or under the other Loan Documents shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an agent and each such Person and its respective Affiliates may accept deposits from, lend money to and generally engage in any kind of business with any Borrower or any Guarantor or other Affiliate thereof as if it were not an agent hereunder or under the other Loan Documents.

(d)      The duties of the Agent shall be ministerial and administrative in nature, and the Agent shall not have any duties or obligations except those expressly set forth herein or in the other Loan Documents.  Without limiting the generality of the foregoing, (1) the Agent will not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (2) the Agent will not be required to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by any other Loan Document that the Agent is required to exercise pursuant to written instructions by the Required Lenders (or such other number or percentage as shall be necessary under the circumstances as provided in Section 13.1), and (3) except as expressly set forth herein, the Agent will not be required to disclose, and will not be liable for any failure to disclose, any information relating to any Borrower or any of the Guarantors that is communicated to or obtained by any of them serving as an agent or any of their respective Affiliates in any capacity.

(e)      The Agent will not be liable for any action taken or not taken by it (1) with respect to the Revolving Loan, with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 13.1); or (2) in the absence of its own gross negligence or willful misconduct.  The Agent may request instructions from the Required Lenders with respect to any act (including the failure to act) in connection with any Loan Documents, and may seek assurances to its satisfaction from Lenders of their indemnification obligations under Section 12.1(n) against all Claims that could be incurred by any Agent Indemnitees (as defined below) in connection with any act.  Agent shall be entitled to refrain from any act until it has received such instructions or assurances, and Agent shall not incur liability to any Person by reason of so refraining.  In no event shall the Agent be required to take any action that, in its opinion, is contrary to applicable law or any Loan Documents or could subject any Agent Indemnitee to personal liability.

(f)      The Agent shall not be liable to Lenders for any action taken or omitted to be taken under the Loan Documents, except for losses directly and solely caused by the Agent's gross negligence or willful misconduct.  The Agent does not assume any responsibility for any failure or delay in performance or any breach by any Borrower or Lender of any obligations under the Loan Documents.  The Agent will not be deemed to have knowledge of any Default unless and until notice thereof is given to the Agent by the Borrowers or a Lender, and the Agent will not be responsible for, or be required to ascertain or inquire into, any of the following:  (1) any statement, warranty or representation made in or in connection with this Agreement; (2) the contents of any certificate, report or other document delivered hereunder or in connection herewith; (3) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein; (4) the validity, enforceability, effectiveness or genuineness of this Agreement or any other agreement, instrument or document; (5) the genuineness, enforceability, collectability, value, sufficiency, location or existence of any Collateral, or the validity, extent, perfection or priority of any Lien therein; (6) the validity, enforceability or collectability of any Lender Debt; (7) the assets, liabilities, financial condition, results of operations, business, creditworthiness or legal status of any Borrower or Obligor; or (8) the satisfaction of any condition set forth in Article 6 or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Agent.

(g)      The Agent may rely upon, and will not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper Person.  The Agent also may rely upon any statement made to it orally or by telephone or by other means and believed by it to have been made

by the proper Person, and shall not incur any liability for relying thereon. The Agent may consult with legal counsel (who may be counsel for the Borrowers), accountants, appraisers, auditors, business valuation experts, environmental engineers or consultants, turnaround consultants, and other professionals and experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or other professionals or experts. The Agent shall not be responsible for the negligence or misconduct of any such professionals or experts selected by it with reasonable care.

(h)     The Agent may perform any and all of its duties and exercise its rights and powers by or through any one or more sub agents appointed by the Agent. The Agent and any such sub agent may perform any and all its duties and exercise its rights and powers through its respective Related Persons. The exculpatory provisions of the preceding paragraphs shall apply to any such sub agent and to the Related Persons of the Agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as the Agent.

(i)     With respect to the release of Collateral, the Lenders hereby irrevocably authorize the Agent to release any Lien granted to or held by it upon any Property covered by this Agreement or the other Loan Documents (1) upon termination or expiration of the Total Revolving Commitment and the Full Payment of all Lender Debt; (2) if any such Property constitutes Property being sold or disposed of in compliance with the provisions of the Loan Documents (and the Agent may rely in good faith conclusively on any certificate stating that the Property is being sold or disposed of in compliance with the provisions of the Loan Documents, without further inquiry); (3) that does not constitute a material part of the Collateral; or (4) with the written consent of all Lenders. The Lenders authorize the Agent to subordinate its Liens to any purchase money Lien permitted hereunder. The Agent will not be required to execute any release on terms which, in the Agent's opinion, would expose the Agent to liability or create any obligation or entail any consequence other than the release of such Liens without recourse or warranty. No release of Collateral authorized under this Section 12.1(i) will in any manner discharge, affect, or impair any Liens upon all interests retained, all of which will continue to constitute part of the Property covered by the Loan Documents. The Agent shall have no obligation to assure that any Collateral exists or is owned by a Borrower, or is cared for, protected or insured, nor to assure that the Agent's Liens have been properly created, perfected or enforced, or are entitled to any particular priority, nor to exercise any duty of care with respect to any Collateral.

(j)     With respect to perfecting security interests in Collateral which, in accordance with Article 9 of the UCC or any comparable provision of any Lien perfection statute in any applicable jurisdiction, can be perfected only by possession, each Lender hereby appoints each other Lender and the Agent as its agent for the purpose of perfecting such interest. Should any Lender obtain possession of any such Collateral, such Lender shall notify the Agent, and, promptly upon the Agent's request, shall deliver such Collateral to the Agent or in accordance with the Agent's instructions.

(k)     The Agent may forward to each Lender, when complete, copies of any field audit, examination or appraisal report prepared by or for the Agent with respect to any Borrower or Collateral. Each Lender agrees (a) that neither HFG nor the Agent makes any representation or warranty as to the accuracy or completeness of any Report, and shall not be liable for any information contained in or omitted from any such report; (b) that such reports are not intended to be comprehensive audits or examinations, and that the Agent or any other Person performing any audit or examination will inspect only specific information regarding Lender Debt or the Collateral and will rely

significantly upon the Borrowers' books and records as well as upon representations of the Borrowers' officers and employees; and (c) to keep all such reports confidential and strictly for such Lender's internal use, and not to distribute any such report (or the contents thereof) to any Person (except to such Lender's participants, attorneys and accountants) or use any Report in any manner other than administration of the Loans and other Lender Debt.  Each Lender agrees to indemnify and hold harmless the Agent and any other Person preparing a report from any action such Lender may take as a result of or any conclusion it may draw from any report, as well as from any Claims arising as a direct or indirect result of the Agent furnishing a report to such Lender.

(l)     Each Lender agrees that, except as otherwise provided in any Loan Documents or with the written consent of the Agent and the Required Lenders, it will not take any action to enforce any Lender Debt or Loan Documents or to realize upon any Collateral (whether by judicial action, self-help, notification of Obligors, exercise of setoff or recoupment, or otherwise), accelerate any Lender Debt, or exercise any right that it might otherwise have under the Orders or under applicable law to credit bid at foreclosure sales, UCC sales or other similar dispositions of Collateral in the Chapter 11 Cases.

(m)     If any Lender shall obtain any payment or reduction of any Lender Debt, whether through set-off or otherwise, in excess of its Pro Rata Share, such Lender shall (1) immediately notify the Agent of such fact and (2) immediately purchase (for cash at face value) from the other Lenders such participations in the affected Lender Debt as are necessary to cause the purchasing Lender to share the excess payment or reduction on a pro rata basis.  If any of such payment or reduction is thereafter recovered from the purchasing Lender, the purchase shall be rescinded and the purchase price restored to the extent of such recovery, but without interest.

(n)     EACH LENDER SHALL INDEMNIFY AND HOLD HARMLESS THE AGENT AND ITS AFFILIATES, DIRECTORS, OFFICERS, AGENTS, REPRESENTATIVES, COUNSEL AND EMPLOYEES AND EACH OTHER PERSON, IF ANY, CONTROLLING THEM OR ANY OF THEIR RESPECTIVE AFFILIATES WITHIN THE MEANING OF EITHER SECTION 15 OF THE SECURITIES ACT OF 1933, AS AMENDED, OR SECTION 20(A) OF THE EXCHANGE ACT (COLLECTIVELY, "**AGENT INDEMNITEES**"), TO THE EXTENT NOT REIMBURSED BY LOAN PARTIES (BUT WITHOUT LIMITING THE INDEMNIFICATION OBLIGATIONS OF THE LOAN PARTIES UNDER ANY DOCUMENTS), ON A PRO RATA BASIS, AGAINST ALL CLAIMS THAT MAY BE INCURRED BY OR ASSERTED AGAINST ANY AGENT INDEMNITEE, PROVIDED THE CLAIM RELATES TO OR ARISES FROM AN AGENT INDEMNITEE ACTING AS OR FOR AGENT (IN ITS CAPACITY AS AGENT).  In the Agent's discretion, it may reserve for any such Claims made against an Agent Indemnitee, and may satisfy any judgment, order or settlement relating thereto, from Proceeds of Collateral prior to making any distribution of Collateral Proceeds to Lenders.  If the Agent is sued by any receiver, bankruptcy trustee, debtor-in-possession or other Person for any alleged preference or fraudulent transfer, then any monies paid by the Agent in settlement or satisfaction of such proceeding, together with all interest, costs and expenses (including attorneys' fees) incurred in the defense of same, shall be promptly reimbursed to the Agent by each Lender to the extent of its Pro Rata Share.

(o)     Subject to the appointment and acceptance of a successor agent as provided in this Section 12.1(o), the Agent may resign at any time by notifying the Lenders and the Borrower Representative and the Bankruptcy Court, but unless that resignation is accepted by the Lenders, that resignation will not become effective until the appointment of a successor Agent pursuant to the terms of this Section 12.1(o).  Upon any such notice of resignation, the Required Lenders shall have the right to appoint a successor for the Agent.  If no successor shall have been so appointed by the Required

Lenders and shall have accepted such appointment within 30 days after the Agent gives notice of its resignation, then the Agent may, on behalf of the Lenders, appoint a successor Agent.  Upon the acceptance of its appointment as the Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations hereunder.  The fees payable by the Borrowers to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed in writing between the Borrowers and such successor.  After any Agent's resignation hereunder, the provisions of this Article 12 and Sections 2.5 and 13.5 shall continue in effect for the benefit of such retiring Agent, its sub agents and their respective Agent Indemnitees in respect of any actions taken or omitted to be taken by any of them while it was acting as the Agent.  Any successor to HFG by merger or acquisition shall continue to be the Agent hereunder without further act on the part of the parties hereto, unless such successor resigns as provided above.

(p)    Each Lender acknowledges that it has, independently and without reliance upon the Agent or any Related Person thereof or any other Lender, and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender further acknowledges and agrees that the other Lenders and the Agent have made no representations or warranties concerning any Borrower, any Collateral, or the legality, validity, sufficiency or enforceability of any Loan Documents or Lender Debt.  Each Lender also acknowledges that it will, independently and without reliance upon the Agent, or any Related Person thereof or any other Lender, and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any related agreement or any document furnished hereunder or thereunder.

12.2    **No Third Party Beneficiaries**.  This Article 12 is an agreement solely among the Lenders and the Agent, and shall survive Full Payment of the Lender Debt.  This Article 12 does not confer any rights or benefits upon Borrowers or any other Person.  As between Borrowers and the Agent, any action that the Agent may take under any Loan Documents or with respect to any Lender Debt shall be conclusively presumed to have been authorized and directed by the Lenders.

### ARTICLE 13.

### MISCELLANEOUS

13.1    **Amendments**.

(a)    Subject to the other terms of this Section 13.1, no amendment or waiver of any provision of this Agreement or consent to any departure therefrom by a party hereto will be effective unless in a writing signed by the Agent, the Required Lenders and the Borrowers, and then such amendment, waiver, or consent will be effective only in the specific instance and for the specific purpose for which given.  In addition, the following provisions apply to the effectiveness of any amendment, waiver, or consent with respect to this Agreement:

(1)    No amendment will be effective to increase the Revolving Commitment of any Lender without the written consent of that Lender.

(2)     No amendment will be effective to reduce the principal amount of the Revolving Loan or reduce the rate of interest thereon, or reduce any fees payable hereunder, without the written consent of each Lender directly affected thereby.

(3)     No amendment will be effective to postpone the Maturity Date of the Revolving Loan without the written consent of each Lender affected thereby.

(4)     No amendment will be effective (A) to increase the Advance Rate Percentage, or (B) to modify any of the Eligibility Criteria, in any such case without the written consent of each Lender.

(5)     No amendment will be effective to release all or a material portion of the Collateral without the consent of the Agent and each Lender.

(6)     No amendment will be effective to change any of the provisions of this Section 13.1 or the definition of "Required Lenders" or any other provisions hereof specifying the number or percentage of Lenders required to waive, amend, or modify any rights hereunder or make any determination or grant any consent hereunder, without the written consent of each Lender affected thereby.

(7)     No agreement will be effective to amend, modify, or otherwise affect the rights or duties of the Agent hereunder without the prior written consent of the Agent.

(8)     Material amendments shall be subject to the prior approval of the Bankruptcy Court.

(b)     No failure on the part of the Agent or any Lender or the Borrowers to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right.

(c)     Subject to the terms of this Section 13.1, each Lender agrees that any action taken by the Required Lenders, in accordance with the terms of this Agreement or the other Loan Documents, and the exercise by the Required Lenders of their respective powers set forth herein or therein, together with such other powers that are reasonably incidental thereto, shall be binding upon all of the Lenders.

13.2    **Notices**.  All notices and other communications hereunder shall, unless otherwise stated herein, be in writing (which may include email, facsimile and telephone calls followed by hard copy or facsimile communication and, if directed by Agent, any notice of a borrowing may be submitted through the HFG Web Portal) and shall be delivered to each applicable party, at the address set forth under its name on Schedule I hereto or at such other address as shall be designated by such party in a notice to the other parties hereto.  All notices by the Borrowers to the Agent shall be delivered by an Authorized Officer.  Notices and communications by email and facsimile or submitted through the HFG Web Portal shall be effective when sent (and shall be immediately followed by hard copy sent by regular mail), and notices and communications sent by other means shall be effective when received.  Without in any way limiting the Borrowers' obligation to confirm in writing any telephonic notice of a borrowing or any notice of a borrowing submitted through the HFG Web Portal, the Agent may act without liability upon the basis of telephonic notice or any notice of a borrowing submitted through the HFG Web Portal believed by the Agent in good faith to be from an Authorized Officer prior to receipt of separate written confirmation.

13.3    **Assignments; Participations.**

(a)    This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and permitted assigns; provided, that no Borrower may assign any of its rights or obligations hereunder or any interest herein without the prior written consent of the Agent and Lenders.

(b)    Subject to the conditions set forth in Section 13.3(c), each Lender may assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its commitments and the advances or loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld) of the Agent, provided that no consent of the Agent shall be required for an assignment to an assignee that is a Lender immediately prior to giving effect to such assignment or to any Affiliate or branch of any Lender, or to any trust or special purpose funding vehicle, whether or not the Agent maintains any interest in such trust or special purpose funding vehicle. The Agent shall notify the Borrower Representative of any such assignment; provided, however, that failure to so notify the Borrower Representative shall not affect the validity of such assignment. In the event that, as a result of one or more assignments pursuant to this Section 13.3(b), there shall be more than one Lender hereunder, then the commitment of each Lender to make the Revolving Advances hereunder shall be several and not joint.

(c)    Assignments (other than assignments of all or any portion of the Revolving Loan to any Affiliate of HFG) shall be subject to the following additional conditions:

(1)    the assignee shall be an Eligible Assignee with the financial ability to perform as a Lender under this Agreement;

(2)    with respect to assignments of the Revolving Commitments, except in the case of an assignment to a Lender or an Affiliate of a Lender or an assignment of the entire amount of the assigning Lender's Revolving Commitment or Revolving Advances, the amount of the Revolving Commitment or Revolving Advances of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Agent) shall not be less than $1,000,000 unless the Agent otherwise consents; and

(3)    the parties to each assignment shall execute and deliver to the Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500; provided that such fee shall not apply to an assignment to another Lender or an Affiliate of the assigning Lender.

(d)    Subject to acceptance by the Agent, as the case may be, pursuant to Section 13.3(e) with respect to assignments of any portion of the Revolving Loan, from and after the effective date specified in each Assignment and Assumption the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and shall be bound by the terms of each of the other Loan Documents, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement and the other Loan Documents (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.5 and 13.5). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 13.3 shall

be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 13.3(f).

(e)    Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee and the processing and recordation fee referred to in clause (3) of Section 13.3(c), if applicable, and any written consent to such assignment required by Section 13.3(b), the Agent shall accept such Assignment and Assumption.

(f)    Any Lender may, without the consent of the Borrowers, any other Lender or the Agent, sell participations to one or more banks or other entities (a "**Participant**") in all or a portion of such Lender's rights and obligations under this Agreement (including, if applicable, all or a portion of its Revolving Commitments and the related portions of the Revolving Loan and Revolving Advances owing to it); provided that the Borrowers, the other Lenders and the Agent shall continue to deal solely and directly with such Lender in connection with all of such Lender's rights and obligations under this Agreement.  Each Borrower agrees, to the fullest extent permitted under applicable law, that each Participant shall be entitled to the benefits of Section 2.5 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 13.3(b).  A Participant shall not be entitled to receive any greater payment under Section 2.5 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrowers' prior written consent.

(g)    Any Lender may at any time pledge or assign a security interest in all or any portion of its rights (and subject to the consent of the Agent, the Collateral) under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section 13.3 shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

13.4    **Further Assurances**.  Each Borrower shall at such Borrower's expense, promptly execute and deliver all further instruments and documents, and take all further action that the Agent or any Lender may request, from time to time, as may be necessary or proper in the reasonable opinion of the Agent or such Lender to carry out more effectively the provisions and purposes of this Agreement and the other Loan Documents, in order to perfect, protect or more fully evidence the assignment as security of the Receivables and the other Collateral, or to enable the Agent and Lenders to exercise or enforce their respective rights hereunder, under the Orders and under the other Loan Documents.

13.5    **Costs and Expenses; Collection Costs**.

(a)    Each Borrower agrees to pay on demand (1) all reasonable costs and expenses (including reasonable counsel fees and expenses) of the Agent and the Lenders in connection with the preparation, execution, delivery and administration of this Agreement and the Loan Documents the administration of the Revolving Advances and Revolving Commitments, the perfection and maintenance of the Liens securing the Collateral and otherwise in connection with this Agreement and the other Loan Documents including, reasonable fees and expenses in connection with audit, consultant, servicing and financial advisors for the Agent and the Lenders, all in connection with the transactions contemplated hereby and the administration of the Chapter 11 Cases, (2) all reasonable costs and out-of-pocket expenses, if any (including reasonable counsel fees and expenses), of the Agent

in connection with any waiver, modification, supplement, or amendment of this Agreement, the Loan Documents and the Orders, or any action to collect, enforce, protect, maintain, preserve or foreclose its interests with respect to any Loan Document or Collateral, and (3) any and all wire fees for each wire initiated by Agent or any Lender to or for the benefit of any Borrower.

(b)  Each Borrower further agrees to pay on the Closing Date and thereafter on demand (1) all reasonable costs and expenses incurred by the Agent or any Lender in connection with periodic audits of the Collateral (including the Receivables, books and records, accounting, financial and general business matters of each Borrower), (2) all reasonable costs and expenses incurred by the Agent to accommodate any significant coding or data system changes made by any Borrower that would affect the transmission or interpretation of data received through the interface, (3) all reasonable costs and expenses incurred by the Agent resulting from a lack of either cooperation or responsiveness of any Borrower to agreed-upon protocol and schedules; provided, that such Borrower has been informed of the alleged lack of cooperation or responsiveness and has been provided the opportunity to correct such problems, and (4) all successor and substitute servicing costs.

(c)  Without limiting the generality of the foregoing, the expenses, costs, charges and fees referred to in this Section 13.5 may include the following:  recording costs, appraisal costs, paralegal fees, costs and expenses; accountants' fees, costs and expenses; court costs and expenses; photocopying and duplicating expenses; court reporter fees, costs and expenses; long distance telephone charges; air express charges; telegram charges; telecopier charges; secretarial overtime charges; and expenses for travel, lodging and food.

(d)  Each member of the Lender Group hereby agrees to, and shall take reasonable steps to cause each other member of the Lender Group to, comply with all applicable laws (including the provisions set forth in the Business Associate Agreement) regarding confidential patient information, if any, it receives in connection with the transactions described in this Agreement.

13.6  **Term and Termination; Fees**.

(a)  This Agreement shall have a term commencing on the Interim Financing Order Date and expiring on the Scheduled Maturity Date (the "**Term**").

(b)  The obligations of the Lenders under this Agreement shall continue in full force and effect from the Closing Date until the Maturity Date.

(c)  The termination of this Agreement shall not affect any rights of the Agent or any Lender or any obligations of the Borrowers arising on or prior to the effective date of such termination, and the Borrowers' duties and obligations hereunder shall continue to be fully operative until the Full Payment of all Lender Debt (including, without limitation, all Lender Debt incurred on or prior to such termination).

(d)  The Liens and rights granted to the Agent hereunder for the benefit of the Lenders shall continue in full force and effect, notwithstanding the termination of this Agreement, until the Full Payment of all Lender Debt.  Upon the termination of all commitments and obligations of the Lenders and the Full Payment of all Lender Debt in cash, the Borrowers shall execute and deliver in favor of the Agent and Lenders a termination and release agreement prepared by counsel to the Agent and the Agent, at the Borrowers' sole cost and expense, shall execute and deliver such documents as the Borrower Representative shall reasonably request to evidence such termination.

(e)    All indemnities of each Borrower contained herein shall survive termination hereof unless otherwise provided. In furtherance and not in limitation of the foregoing, if after receipt of any payment of all or any part of the Lender Debt, the Agent or any Lender is for any reason compelled to surrender such payment to any Person or entity because such payment is determined to be void or voidable as a preference, an impermissible setoff, a diversion of trust funds or for any other reason, this Agreement shall continue in full force (except that the Revolving Commitment shall have been terminated), and each Borrower shall be liable to, and shall indemnify and hold the Agent and each Lender harmless for the amount of such payment surrendered until the Full Payment to the Lenders and the Agent. The provisions of the foregoing sentence shall be and remain effective notwithstanding any contrary action which may have been taken by the Agent or any Lender in reliance upon such payment, and any such contrary action so taken shall be without prejudice to the Agent's and Lenders' rights under this Agreement and will be deemed to have been conditioned upon such payment having become final and irrevocable.

13.7    **No Liability.** Neither this Agreement nor any document executed in connection herewith shall constitute an assumption by the Agent or any Lender of any obligation to any Obligor or any patient or customer of any Borrower. Notwithstanding any other provision herein, no recourse under any obligation, covenant, agreement or instrument of the Agent or any Lender contained herein or with respect hereto shall be had against any Related Person whether arising by breach of contract, or otherwise at law or in equity (including any claim in tort), whether express or implied, it being understood that the agreements and other obligations of the Agent and each Lender herein and with respect hereto are solely its corporate obligations; provided, however, nothing herein shall operate as a release of any liability which may arise as a result of such Related Person's gross negligence or willful misconduct.

13.8    **Entire Agreement; Severability.** This Agreement, including all exhibits and schedules hereto and the other Loan Documents, embody the entire agreement and understanding of the parties concerning the subject matter contained herein. This Agreement supersedes any and all prior agreements and understandings between the parties, whether written or oral. If any provision of this Agreement shall be declared invalid or unenforceable, the parties hereto agree that the remaining provisions of this Agreement shall continue in full force and effect.

13.9    **Governing Law.** EXCEPT TO THE EXTENT GOVERNED BY THE BANKRUPTCY CODE, THIS AGREEMENT, AND ALL MATTERS ARISING OUT OF OR RELATING TO THIS AGREEMENT, SHALL, IN ACCORDANCE WITH SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK, BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY CONFLICTS OF LAWS PRINCIPLES THEREOF THAT WOULD CALL FOR THE APPLICATION OF THE LAWS OF ANY OTHER JURISDICTION, EXCEPT TO THE EXTENT: (A) THAT THE VALIDITY OR PERFECTION OF THE SECURITY INTERESTS GRANTED HEREUNDER, OR REMEDIES RELATED THERETO, IN RESPECT OF ANY PARTICULAR COLLATERAL ARE GOVERNED BY THE LAWS OF A JURISDICTION OTHER THAN THE STATE OF NEW YORK; AND (B) THE BANKRUPTCY COURT SHALL HAVE JURISDICTION OVER THIS AGREEMENT, IN WHICH CASE THE LAW OF THE STATE OF NEW YORK SHALL APPLY WITH REGARD TO ANY CONFLICTS OF LAWS PRINCIPLES.

13.10    **Waiver of Jury Trial, Jurisdiction, Venue and Other Rights.** EACH OF THE PARTIES HERETO HEREBY WAIVES ALL RIGHTS TO A TRIAL BY JURY IN THE EVENT OF ANY LITIGATION WITH RESPECT TO ANY MATTER RELATED TO THIS AGREEMENT, AND HEREBY IRREVOCABLY CONSENTS TO THE JURISDICTION OF THE BANKRUPTCY COURT SO LONG AS THE CHAPTER 11 CASES HAVE NOT BEEN

DISMISSED, CLOSED OR REOPENED AND THEREAFTER OF THE STATE AND FEDERAL COURTS LOCATED IN NEW YORK CITY, NEW YORK COUNTY, NEW YORK, IN CONNECTION WITH ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT. IN ANY SUCH LITIGATION, EACH OF THE PARTIES HERETO WAIVES PERSONAL SERVICE OF ANY SUMMONS, COMPLAINT OR OTHER PROCESS AND AGREES THAT SERVICE THEREOF MAY BE MADE BY CERTIFIED OR REGISTERED MAIL DIRECTED TO THE PARTIES HERETO AT THEIR ADDRESSES SET FORTH ON SCHEDULE I HERETO. FURTHER, NOTWITHSTANDING THE PROVISIONS OF SECTION 13.9 HEREOF, TO THE EXTENT PERMISSIBLE UNDER CONNECTICUT LAW OR OTHER APPLICABLE LAW, THE BORROWERS HEREBY WAIVE: (A) THEIR RIGHT TO NOTICE, HEARING OR PRIOR COURT ORDER WITH RESPECT TO ANY PREJUDGMENT REMEDY WHICH THE AGENT OR ITS SUCCESSORS OR ASSIGNS MAY DESIRE TO USE; AND (B) ALL RIGHTS TO REQUEST THAT THE AGENT POST A BOND, WITH OR WITHOUT SURETY, TO PROTECT THE BORROWERS AGAINST DAMAGES THAT MAY BE CAUSED BY ANY PREJUDGMENT REMEDY SOUGHT OR OBTAINED BY THE AGENT.

13.11   **Execution in Counterparts.** This Agreement may be executed in counterparts, each of which when so executed will be deemed to be an original and all of which when taken together will constitute one and the same agreement. Delivery of an executed counterpart of this Agreement by facsimile or electronic mail shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by facsimile or electronic mail also shall deliver an original executed counterpart of this Agreement to Agent but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.

13.12   **No Proceedings.** Each Borrower hereby agrees that it will not institute an Insolvency Proceeding against any Lender so long as any senior indebtedness issued by such Lender shall be outstanding or there shall not have elapsed one year plus one day since the last day on which any such senior indebtedness shall have been outstanding.

13.13   **Confidentiality and Notices.** Each Borrower hereby grants the Agent the right to place one or more advertisements in newspapers and journals, on its website and in its other materials (all, at its own expense) that recites the transaction hereunder, the amount of such transaction and utilizes the corporate logo of the Borrowers.

13.14   **Accounting Information.** Each Borrower hereby authorizes the Agents and the Lenders to discuss the financial condition of the Borrowers, or any of them, with their independent public accountants and agrees that such discussion or communication shall be without liability to such Person or the independent public accountants.

13.15   **USA PATRIOT Act.** Each Borrower acknowledges and consents that, in accordance with the reporting requirements of the USA PATRIOT Act (Title III of Pub. L. 10756 (signed into law October 26, 2001)) (the "**Act**"), the Lenders may require, obtain, verify and record information that identifies such Borrower, which information includes the name and addresses of such Borrower and its principals, as well as any other information that will allow the Agent and the Lenders to identify such Borrower and its principals in accordance with, and otherwise comply with the requirements of, the Act.

13.16   **Nature and Extent of Each Borrower's Liability.**

(a)   <u>Joint and Several Liability.</u> Each Borrower agrees that it is jointly and severally liable for, and absolutely and unconditionally guarantees to the Agent and the Lenders the prompt Full Payment of all Lender Debt and the prompt performance of all agreements under the Loan Documents.

Each Borrower agrees that its obligations hereunder constitute continuing obligations, that such obligations shall not be discharged until the Full Payment of all Lender Debt, and that such obligations are absolute and unconditional, irrespective of, and will not be discharged, impaired, or affected by: (i) the genuineness, validity, regularity, enforceability, subordination or any future modification of, or change in, any Lender Debt or Loan Document, or any other document, instrument or agreement to which any Borrower is or may become a party or be bound, or the power or authority or lack thereof of any other Borrower to incur its obligations; (ii) the absence of any action to enforce this Agreement (including this Section 13.16) or any other Loan Document, or any waiver, consent or indulgence of any kind by the Agent or any Lender with respect thereto; (iii) the existence, value or condition of, or failure to perfect a Lien or to preserve rights against, any security or guaranty for the Lender Debt or any action, or the absence of any action, by the Agent or any Lender in respect thereof (including the release of any security or guaranty); (iv) the insolvency of any Borrower; (v) the payment in full of all of the Lender Debt at any time or from time to time, except the Full Payment of all Lender Debt; (vi) the existence or non-existence of any Borrower as a legal entity; (vii) any transfer by any Borrower of all or any part of any Collateral; (viii) any statute of limitations affecting the liability of any other Borrower hereunder or under any of the other Loan Documents or the ability of the Agent or the Lenders to enforce this Agreement, this Section 13.16, or any other provision of any Loan Document; (ix) any right of offset, counterclaim or defense of any Borrower, including those that have been waived by the Borrowers pursuant to this Section 13.16; (x) any election by the Agent or any Lender in a bankruptcy proceeding for the application of Section 1111(b)(2) of Title 11 of the United States Code; (xi) any borrowing or grant of a Lien by any other Borrower, as debtor-in-possession under Section 364 of Title 11 of the United States Code or otherwise; (xii) the disallowance of any claims of the Agent or any Lender against any Borrower for the repayment of any Lender Debt under Section 502 of Title 11 of the United States Code or otherwise; or (xiii) any other action or circumstances that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, except Full Payment of all Lender Debt.

(b)    Permitted Actions.    Except as otherwise expressly provided by this Agreement and subject to the Orders, the Agent and Lenders may from time to time, in their sole discretion and without notice to any Borrower, take any or all of the following actions: (i) retain or obtain a Lien in any asset of any Borrower or any other Person to secure any of the Lender Debt; (ii) retain or obtain the primary or secondary obligation of any obligor or obligors, in addition to the Borrowers, with respect to any of the Lender Debt; (iii) extend or renew for one or more periods (whether or not longer than the original period), or, with the agreement of the Borrowers, alter or exchange any of the Lender Debt; (iv) waive, ignore, or forbear from taking action or otherwise exercising any of its default rights or remedies with respect to any default by the Borrowers under the Loan Documents; (v) release, waive, or compromise any obligation of the Borrowers hereunder or any obligation of any nature of any other obligor primarily or secondarily obligated with respect to any of the Lender Debt; (vi) release Agent's Liens in, or surrender, release or permit any substitution or exchange for, all or any part of the Collateral now or hereafter securing any of the Lender Debt or any obligation hereunder, or extend or renew for one or more periods (whether or not longer than the original period) or release, waive, compromise, alter or exchange any obligations of any nature of any Borrower with respect to any such property; and (vii) demand payment or performance of any of the Lender Debt from any Borrower at any time or from time to time, whether or not the Agent or any Lender has exercised any of its rights or remedies with respect to any property securing any of the Lender Debt or any obligation hereunder or proceeded against any other Borrower or other Person primarily or secondarily liable for payment or performance of any of the Lender Debt.

(c)   Waivers.

(i)   Each Borrower expressly waives, to the extent not prohibited by applicable law, and except to the extent otherwise expressly required pursuant to this Agreement: (1) all rights to revoke its joint and several obligations pursuant to this Section 13.16 at any time; (2) notice of the acceptance by the Agent and the Lenders; (3) notice of the existence, creation, payment, nonpayment, performance or nonperformance of all or any of the Lender Debt; (4) presentment, demand, notice of dishonor, protest, notice of protest and all other notices whatsoever with respect to the payment or performance of the Lender Debt or the amount thereof or any payment or performance by the Borrowers hereunder; (5) all diligence in collection or protection of or realization upon the Lender Debt or any thereof, any obligation hereunder or any security for or guaranty of any of the foregoing; (6) any right to direct or affect the manner or timing of the Agent's enforcement of its rights or remedies; (7) any and all defenses that would otherwise arise upon the occurrence of any event or contingency described in Sections 13.16(a) or (b) or upon the taking of any action by the Agent or Lenders permitted hereunder; and (8) all other principles or provisions of law, if any, that conflict with the terms of this Section 13.16, including the effect of any circumstances that may or might constitute a legal or equitable discharge of a guarantor or surety;

(ii)   Each Borrower expressly waives all rights that it may have now or in the future under any statute, at common law, in equity or otherwise, to compel the Agent or Lenders to marshal assets or to proceed against any Borrower, other Person or security for the payment or performance of any Lender Debt before, or as a condition to, proceeding against such Borrower.

(iii)   The Agent and Lenders may, in their discretion subject to the Orders pursue such rights and remedies hereunder, under the other Loan Documents and under applicable law as they deem appropriate, including realization upon Collateral by judicial foreclosure or non-judicial sale or enforcement, without affecting any rights and remedies under this Section 13.16.   If, in the exercise of any rights or remedies, the Agent or any Lender forfeits any of its rights or remedies, including its right to enter a deficiency judgment against any Borrower or any other Person, whether because of any applicable laws pertaining to "election of remedies" or otherwise, each Borrower consents to such action by the Agent or such Lender and waives any claim based upon such action, even if the action may result in loss of any rights of subrogation that any Borrower might otherwise have had but for such action.

**13.17   Appointment of Borrower Representative**.

(a)   Each Borrower hereby designates Borrower Representative as its representative and agent on its behalf for the purposes of issuing Borrowing Base Reports, and giving instructions with respect to the disbursement of the proceeds of the Revolving Advances, giving and receiving all other notices and consents hereunder or under any of the other Loan Documents and taking all other actions (including in respect of compliance with covenants) on behalf of any Borrower or Borrowers under the Loan Documents.   Borrower Representative hereby accepts such appointment.   Notwithstanding anything to the contrary contained in this Agreement, no Borrower other than Borrower Representative shall be entitled to take any of the foregoing actions.   The proceeds of each Revolving Advance made hereunder shall be advanced to or at the direction of Borrower Representative; provided, however, at no time shall Borrower Representative or any other Borrower permit the outstanding Revolving Advances actually advanced to a Borrower and used in its business to exceed the Eligible Receivables of such Borrower (other than in the case of Johnson Evergreen).

(b)      Agent and each Lender may regard any notice or other communication pursuant to any Loan Document from Borrower Representative as a notice or communication from all Borrowers, and may give any notice or communication required or permitted to be given to any Borrower or all Borrowers hereunder to Borrower Representative on behalf of such Borrower or all Borrowers. Each Borrower agrees that each notice, election, representation and warranty, covenant, agreement and undertaking made on its behalf by Borrower Representative will be deemed for all purposes to have been made by such Borrower and shall be binding upon and enforceable against such Borrower to the same extent as if the same had been made directly by such Borrower.

13.18   **HFG Web Portal**.  The Agent may, but will not be required to, establish and make available to the Borrowers, and each Borrower hereby authorizes the Agent to establish make available to the Borrowers, a secure website, FTP site, or other Internet interface accessible only by the Agent and the Borrowers (and separate from the computer interface or FTP site used for Transmissions) through which Borrower may access certain account information relating to the Loans and this Agreement (that secure website, FTP site, or other Internet interface, the **"HFG Web Portal"**).  The HFG Web Portal, if established and made available to the Borrowers, will be provided "as is" and "as available." The Agent does not warrant the adequacy of the HFG Web Portal for any particular purpose and expressly disclaims liability for errors or omissions in any information provided through the HFG Web Portal.  No warranty of any kind, express, implied, or statutory, including, without limitation, any warranty of merchantability, fitness for a particular purpose, non-infringement of third-party rights, or freedom from viruses or other code defects, is made by the Agent in connection with the HFG Web Portal.  In no event will the Agent or any of its Related Persons have any liability to any Borrower or any other Person for damages of any kind, including, without limitation, direct or indirect, special, incidental, or consequential damages, losses, or expenses (whether in tort, contract, or otherwise) arising out of the Agent's establishing the HFG Web Portal or making the HFG Web Portal available to the Borrowers or out of the Borrower's use of the HFG Web Portal.  All information provided through the HFG Web Portal, including, without limitation, all HFG Web Portal Communications, shall remain subject in all respects to the terms and conditions of this Agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

The parties are signing this Debtor-in-Possession Revolving Loan and Security Agreement as of the date stated in the preamble.

BORROWERS:

JOHNSON MEMORIAL MEDICAL CENTER, INC., as a debtor and a debtor-in-possession under chapter 11 of the Bankruptcy Code

By: _____
Name:  Stuart E. Rosenberg
Title:  Chief Executive Officer

JOHNSON MEMORIAL HOSPITAL, INC., as a debtor and a debtor-in-possession under chapter 11 of the Bankruptcy Code

By: _____
Name:  Stuart E. Rosenberg
Title:  Chief Executive Officer

THE JOHNSON EVERGREEN CORPORATION, as a debtor and a debtor-in-possession under chapter 11 of the Bankruptcy Code

By: _____
Name:  Stuart E. Rosenberg
Title:  Chief Executive Officer

HOME & COMMUNITY HEALTH SERVICES, INC., as a debtor and a debtor-in-possession under chapter 11 of the Bankruptcy Code

By: _____
Name:  Stuart E. Rosenberg
Title:  Chief Executive Officer

JOHNSON HEALTH CARE, INC., as a debtor and a debtor-in-possession under chapter 11 of the Bankruptcy Code

By: _____
Name:  Stuart E. Rosenberg
Title:  Chief Executive Officer

SIGNATURE PAGE TO DEBTOR-IN-POSSESSION REVOLVING LOAN AND SECURITY AGREEMENT

JOHNSON PROFESSIONAL ASSOCIATES, P.C., as a debtor and a debtor-in-possession under chapter 11 of the Bankruptcy Code

By: _____

    Name:  Stuart E. Rosenberg
    Title:  Chief Executive Officer

SIGNATURE PAGE TO DEBTOR-IN-POSSESSION
REVOLVING LOAN AND SECURITY AGREEMENT

AGENT:

HEALTHCARE FINANCE GROUP, LLC,
as the Agent

By: _____

Name:
Title:

LENDER:

HFG HEALTHCO-4 LLC, as a Lender

By: Master Healthco LLC, a Member

By: _____

Name:
Title:

Revolving Commitment:                $7,000,000

Address for Notices:

c/o Healthcare Finance Group, LLC
199 Water Street, 31st Floor
New York, New York  10038
Attention:      Chief Credit Officer and
                National Portfolio Manager
        cc:     General Counsel
Tel:    (212) 785-8500
Fax:    (212) 785-8501

SIGNATURE PAGE TO DEBTOR-IN-POSSESSION
REVOLVING LOAN AND SECURITY AGREEMENT

**SCHEDULE VIII**

**Pre-Petition Liens**

Notwithstanding anything to the contrary in the UCC financing statements referenced here, the agreement(s) granting the underlying security interests, or otherwise, for purposes of identifying the Valid Pre-Petition Senior Liens, the Liens described here shall not include any senior Lien against the Receivables Collateral.

| | DEBTOR | SECURED PARTY | UCC FILING NUMBER | FILING DATE | COLLATERAL | AMOUNT OUTSTANDING |
|---|---|---|---|---|---|---|
| 1. | Johnson Evergreen Corporation, The | People's United Bank | 2475790 | 8/30/2007 | All construction and architect's contracts, all governmental or other permits, all agreements, licenses, consents, leases, concessions, and other documents to which Debtor is now or may hereafter be a party, relating to the construction, development, maintenance, furnishing, rental, ownership, occupancy, management and/or operation of the premises known as 205 Chestnut Hill Road, Stafford, Connecticut. | $14,212,697 |
| 2. | Johnson Evergreen Corporation, The | People's United Bank | 2475791 | 8/30/2007 | All properties, assets and rights of Debtor, together, in each instance, with the renewals, substitutions, replacements, additions, rental payments, products and proceeds thereof, wherever located, whether now owned or hereafter acquired or arising, including all personal and fixture property of every kind | See #1 |

1

and nature, including without limitation, all goods (including inventory, equipment and any accessions thereto), instruments (including promissory notes), documents, accounts (including health-care-insurance receivables), chattel paper (whether tangible or electronic), deposit accounts, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), commercial tort claims, securities and all other investment property, supporting obligations, any other contract rights or rights to the payment of money, insurance claims and proceeds, tort claims, and all general intangibles including, without limitation, all payment intangibles, patents, patent applications, trademarks, trademark applications, trade names, copyrights, copyright applications software, engineering drawings, service marks, customer lists, goodwill, and all licenses, permits, agreements of any kind or nature pursuant to which Debtor possesses, uses or has authority to possess or use property (whether tangible or intangible) of other or others, and all recorded data of any

2

| | | | | | | |
|---|---|---|---|---|---|---|
| 3. | Johnson Evergreen Corporation, The | Zucker, Clifford A. | 2776287 | 10/1/2010 | All of the current and non-current properties, assets and rights of Debtor including, without limitation, all of the following described collateral, wherever located, whether now owned or hereafter acquired and all proceeds and products thereof (all of the same being hereinafter called the "Collateral"): all personal and fixture property of every kind and nature including, without limitation, all goods (including, but not limited to, inventory, equipment and any accessions thereto), instruments (including, but not limited to, promissory notes), documents, accounts (including, without limitation, all accounts receivable and health-care-insurance receivables), chattel paper (whether tangible or electronic), deposit accounts, bank accounts, credits, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), commercial tort claims, securities and all other investment property, any kind or nature, regardless of the medium of recording, including, without limitation, all software, writings, plans, specifications and schematics ("Collateral"). | $212,123 |

3

| # | Debtor | Creditor | Number | Date | Collateral | Amount |
|---|--------|----------|--------|------|-----------|--------|
| 4. | Johnson Evergreen Corporation, The | Pension Benefit Guaranty Corporation | 2776427 | 10/1/2010 | contract rights (including, without limitation, for the payment of money and insurance claims and proceeds), all general intangibles (including, without limitation, all payment intangibles), all moneys and property of any kind, now or at any time or times hereafter, in the possession or under the control of Secured Party or a bailee of Secured Party, all accessions to, substitutions for and all replacements, proceeds of insurance policies insuring the Collateral described above e including, without limitation, proceeds of insurance policies insuring the Collateral and all books and records, computer programs, software, printouts, and other computer records pertaining to any of the foregoing, but excluding all protected health information of patients covered by any applicable federal or state law. | $0 |
| 5. | Johnson Health Care, Inc. | First American Commercial Bancorp, Inc.The Huntington | 2356157 | 10/17/2005 | All assets of the Debtor, wherever located, whether now owned or existing or hereafter acquired or arising, together with all proceeds thereof. Leased computer equipment (Equipment/Lease No: 22206, Schedule 3) | $1,542 payment per |

| # | Debtor | Secured Party | UCC # | Date | Collateral | Amount |
|---|--------|---------------|-------|------|-----------|--------|
| 6. | Johnson Memorial Medical Center, Inc. | National Bank / People's United Bank | 2286413 | 8/26/2004 | All assets of Debtor, including, without limitation, all tangible and intangible personal property, all accounts, chattel paper, contracts, documents, equipment, general intangibles, instruments and inventory, and all products and proceeds thereof. | $2,940,000 |
| 7. | Johnson Memorial Medical Center, Inc. | People's United Bank | 2286414 | 8/26/2004 | All furniture, furnishings, fixtures and equipment and personal property of any nature or description, now or hereafter installed or stored on the premises known as Johnson Medical Park, Hazard Avenue, Enfield, Connecticut ("Premises"), and all appurtenances thereto, thereon or therein (excluding, however, any such items of property which are owned by tenants and which, according to the terms of any applicable lease, may be removed by such tenants at the expiration of the lease) now or hereafter in, on, or use in, the enjoyment, rental, operation, development and/or maintenance of the Premises. | See #6 |
| 8. | Johnson Memorial Medical Center, Inc. | People's United Bank | 2475792 | 8/30/2007 | All furniture, furnishings, fixtures and equipment, now or hereafter owned by Debtor, wherever located, all | See #6 |

| | | | | | |
|---|---|---|---|---|---|
| 9. | Johnson Memorial Medical Center, Inc. | People's United Bank | 2775985 | 9/29/2010 | appurtenances thereto, thereon or therein, and all products and proceeds thereof. All furniture, furnishings, fixtures and equipment, and personal property of any nature or description, now or hereafter installed or stored on the premises known as Johnson Medical Park, Hazard Avenue, Enfield, Connecticut ("Premises"), and all appurtenances thereto, thereon or therein (excluding, however, any such items of property which are owned by tenant and which, according to the terms of any applicable lease, may be removed by such tenants at the expiration of the lease) now or hereafter in, on, or use in, the enjoyment, rental, operation, development and/or maintenance of the Premises. | See #6 |
| 10. | Johnson Memorial Medical Center, Inc. | Zucker, Clifford A. | 776285 | 10/1/2010 | All of the current and non-current properties, assets and rights of Debtor including, without limitation, all of the following described collateral, wherever located, whether now owned or hereafter acquired and all proceeds and products thereof (all of the same being hereinafter called the "Collateral"): all personal and fixture property of every | $0 |

kind and nature including, without limitation, all goods (including, but not limited to, inventory, equipment and any accessions thereto), instruments (including, but not limited to, promissory notes), documents, accounts (including, without limitation, all accounts receivable and health-care-insurance receivables), chattel paper (whether tangible or electronic), deposit accounts, bank accounts, credits, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), commercial tort claims, securities and all other investment property, any contract rights (including, without limitation, for the payment of money and insurance claims and proceeds), all general intangibles (including, without limitation, all payment intangibles), all moneys and property of any kind, now or at any time or times hereafter, in the possession or under the control of Secured Party or a bailee of Secured Party, all accessions to, substitutions for and all replacements, proceeds of insurance policies insuring the Collateral described above e including, without limitation,

7

| # | Debtor | Secured Party | Number | Date | Description | Amount |
|---|--------|---------------|--------|------|-------------|--------|
| | | | | | proceeds of insurance policies insuring the Collateral and all books and records, computer programs, software, printouts, and other computer records pertaining to any of the foregoing, but excluding all protected health information of patients covered by any applicable federal or state law. | $0 |
| 11. | Johnson Memorial Medical Center, Inc. | Pension Benefit Guaranty Corporation | 2776425 | 10/1/2010 | All assets of the Debtor, wherever located, whether now owned or existing or hereafter acquired or arising, together with all proceeds thereof. | |
| 12. | Johnson Memorial Medical Center, Inc. | Xerox Financial Services | 2867471 | 3/28/2012 | Long list of serial (or other type of) numbers...."This filing is for protective purposes only. Nothing contained in the financing statement, nor the filing thereof, shall be deemed to construe the lease, or the leasing of the equipment thereunder, as a conditional sale or installment sale agreement, a lease in the nature of a security agreement or anything other than a true lease of personal property." | $13,730 payment per month |
| 13. | Johnson Memorial Hospital, Inc. | First American Commercial Bancorp, Inc. The Huntington National Bank | 2307522 | 12/30/2004 | Leased equipment (Master lease 97108 Schedule #27) | $0 |
| 14. | Johnson Memorial Hospital, Inc. | First American | 2371512 | 1/12/2006 | Leased equipment (Master | $0 |

8

| | | | | | | |
|---|---|---|---|---|---|---|
| 15. | Johnson Memorial Hospital, Inc. | Commercial Bancorp, Inc. The Huntington National Bank | | | lease 97108 Schedule #s 33 and 34) | $106,376 |
| | | Key Government Finance, Inc. | 2408262 | 8/7/2006 | Equipment, general intangibles, software per Master Financing Agreement, including Paragon Information System | |
| 16. | Johnson Memorial Hospital, Inc. | People's Bank | 2412613 | 9/1/2006 | All construction equipment and materials, all furniture, furnishings, fixtures and equipment, and personal property of any nature or description, wherever located, now or hereafter owned by Debtor, and all appurtenances thereto, thereon or therein (excluding, however, any such items of property which are owned by tenants of premises known as 201 Chestnut Hill Road and 13 and 15 Magauran Drive, Stafford, Connecticut ("Premises") and which, according to the terms of any applicable lease, may be removed by such tenants at the expiration of the lease) now or hereafter in, on, or used in, the construction, enjoyment, rental, operation, development and/or maintenance of the Premises. | $5,993,750 |

| # | Debtor | Secured Party | Number | Date | Collateral | Amount |
|---|--------|---------------|--------|------|-----------|--------|
| 17. | Johnson Memorial Hospital, Inc. | People's Bank | 2412614 | 9/1/2006 | All construction and architect's contracts, all governmental or other permits, licenses, consents, leases, concessions, and other documents to which Debtor is now or may hereafter be a party, relating to the construction, development, maintenance, furnishing, rental, ownership, occupancy, management and/or operation of the premises known as 201 Chestnut Hill Road and 13 and 15 Magauran Drive, Stafford, Connecticut. | See #16 |
| 18. | Johnson Memorial Hospital, Inc. | Somerset Capital Group, Ltd. | 2457797 | 5/23/2007 | Leased equipment per Schedule No. 3 to Master Lease Agreement dated as of 4/12/2007. This filing is for informational purposes and does not create or evidence a security interest under the UCC). [Located at 201 Chestnut Hill Road, Stafford Springs, CT 06076] | $0 |
| 19. | Johnson Memorial Hospital, Inc. | Somerset Leasing Corp. | 2475570 | 8/29/2007 | Leased equipment (Master Lease 4/12/07 - Schedule #1) | $0 |
| 20. | Johnson Memorial Hospital, Inc. | People's United Bank | 2475789 | 8/30/2007 | All furniture, furnishings, fixtures and equipment, and personal property of any nature or description, now or hereafter installed or stored on the premises known as 205 Chestnut Hill Road, Stafford Springs, Connecticut ("Premises"), and all appurtenances thereto, | See #16 |

10

| No. | Debtor | Secured Party | Filing No. | Date | Description | Value |
|---|---|---|---|---|---|---|
| | | | | | thereon or therein (excluding, however, any such items of property which are owned by tenants and which, according to the terms of any applicable lease, may be removed by such tenants at the expiration of the lease) now or hereafter in, on, or used in the enjoyment, rental, operation, development and/or maintenance of the Premises. | |
| 21. | Johnson Memorial Hospital, Inc. | Somerset Leasing Corp. XIV | 2636176 | 5/27/2008 | Leased equipment (Master Lease 4/12/07 - Schedule #6) | $0 |
| 22. | Johnson Memorial Hospital, Inc. | Republic Bank and Med One Capital Funding, LLC | 2704636 | 7/15/2009 | Numerous Alaris pump modules with software licenses (Leased) | $0 |
| 23. | Johnson Memorial Hospital, Inc. | People's United Bank | 2775984 | 9/29/2010 | All fixtures now or hereafter installed on the premises known as 201 Chestnut Hill Road, Stafford Springs, Connecticut ("Premises"), and all appurtenances thereto, thereon or therein. | See #16 |
| 24. | Johnson Memorial Hospital, Inc. | Zucker, Clifford A. | 2776289 | 10/1/2010 | All of the current and non-current properties, assets and rights of Debtor including, without limitation, all of the following described collateral, wherever located, whether now owned or hereafter acquired and all proceeds and products thereof (all of the same being hereinafter called the "Collateral"): all personal and fixture property of every kind and nature including, without limitation, all goods | $2,812,540 |

(including, but not limited to, inventory, equipment and any accessions thereto), instruments (including, but not limited to, promissory notes), documents, accounts (including, without limitation, all accounts receivable and health-care-insurance receivables), chattel paper (whether tangible or electronic), deposit accounts, bank accounts, credits, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), commercial tort claims, securities and all other investment property, any contract rights (including, without limitation, for the payment of money and insurance claims and proceeds), all general intangibles (including, without limitation, all payment intangibles), all moneys and property of any kind, now or at any time or times hereafter, in the possession or under the control of Secured Party or a bailee of Secured Party, all accessions to, substitutions for and all replacements, proceeds of insurance policies insuring the Collateral described above e including, without limitation, proceeds of insurance policies insuring the Collateral and all

| No. | Debtor | Secured Party | Filing No. | Date | Collateral Description | Amount |
|---|---|---|---|---|---|---|
| 25. | Johnson Memorial Hospital, Inc. | Pension Benefit Guaranty Corporation | 2776426 | 10/1/2010 | books and records, computer programs, software, printouts, and other computer records pertaining to any of the foregoing, but excluding all protected health information of patients covered by any applicable federal or state law. All assets of the Debtor, wherever located, whether now owned or existing or hereafter acquired or arising, together with all proceeds thereof. | $2,927,339 |
| 26. | Johnson Memorial Hospital, Inc. | Somerset Leasing Corp. VIII | 2779635 | 10/22/2010 | Leased equipment per Schedule No. 6 to Master Lease Agreement dated as of 4/12/2007. This filing is for informational purposes and does not create or evidence a security interest under the UCC). [Located at 201 Chestnut Hill Road, Stafford Springs, CT 06076] | $0 |
| 27. | Johnson Memorial Hospital, Inc. | Bankwell Bank | 2779924 | 10/25/2010 | Shimadzu "DR" FluoroSpeed300 RF System and leased equipment per Schedule No. 6 to Master Lease Agreement dated as of 4/12/2007. [Located at 201 Chestnut Hill Road, Stafford Springs, CT 06076] | $0 |
| 28. | Johnson Memorial Hospital, Inc. | Somerset Leasing Corp. VIII | 2794350 | 1/19/2011 | Leased equipment per Schedule No. 7 to Master Lease Agreement dated as of 4/12/2007. This filing is for informational purposes and does not create or evidence a | $0 |

13

| # | Debtor | Secured Party | Filing No. | Date | Description | Amount |
|---|---|---|---|---|---|---|
| 29. | Johnson Memorial Hospital, Inc. | Bankwell Bank | 2795853 | 1/28/2011 | security interest under the UCC). [Located at 148 Harvard [sic] Avenue, Enfield, CT 06082] Leased equipment per Schedule No. 7 to Master Lease Agreement dated as of 4/12/2007. This filing is for informational purposes and does not create or evidence a security interest under the UCC. [Located at 148 Harvard [sic] Avenue, Enfield, CT 06082] | $0 |
| 30. | Johnson Memorial Hospital, Inc. | Olympus America, Inc. | 2821357 | 6/14/2011 | Long list of serial (or other type of) numbers...."This filing is filed for notice purposes only & the filing thereof shall not be deemed evidence of any intention to create a security interest under the UCC." | $8,968.57 payment per month |
| 31. | Johnson Memorial Hospital, Inc. | Olympus America, Inc. | 2853988 | 1/6/2012 | Long list of serial (or other type of) numbers...."This filing is filed for notice purposes only & the filing thereof shall not be deemed evidence of any intention to create a security interest under the UCC." | See #30 |
| 32. | Johnson Memorial Hospital, Inc. | General Electric Capital Corporation | 2874063 | 5/1/2012 | see Equipment Schedule attached to filing. | $0 |
| 33. | Johnson Memorial Hospital, Inc. | General Electric Capital Corporation | 2885562 | 7/5/2012 | One Direct Supply Alma Soprano Xli Diode Laser System | $0 |
| 34. | Johnson Memorial Hospital, Inc. | Total Communications, Inc. | 2894559 | 9/5/2012 | List of serial (or other) numbers | $0 |
| 35. | Johnson Memorial Hospital, Inc. | Somerset Leasing Corp. VII Somerset Capital Group, Ltd. | 2895378 | 9/10/2012 | Leased equipment per Schedule No. 8 to Master Lease Agreement dated as of 4/12/2007. [Located at 201 Chestnut Hill Road, Stafford | $0 |

14

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | Springs, CT 06076] |
| 36. | Johnson Memorial Hospital, Inc. | Somerset Leasing Corp. XVIII Somerset Capital Group, Ltd. | 2917365 | 1/25/2013 | Leased equipment per Schedule No. 3 R.1 to the Master Lease Agreement dated as of 4/12/2007. [Located at 201 Chestnut Hill Road, Stafford Springs, CT 06076] | $3,700 payment per month |
| 37. | Johnson Memorial Hospital, Inc. | Somerset Leasing Corp. XII | 2918071 | 1/28/2013 | Leased equipment per Schedule No. 4 R to the Master Lease Agreement dated as of 4/12/2007. [Located at 201 Chestnut Hill Road, Stafford Springs, CT 06076] | $3,946 payment per month |
| 38. | Johnson Memorial Hospital, Inc. | Farnam Street Financial, Inc. | 2949935 | 7/29/2013 | Lease Agreement No. JO061413 | $637,618 |

On May 8, 2014, Dr. Renee Prince obtained a judgment against JMH in the amount of $202,644 (the "Judgment"). On or about August 20, 2014, Dr. Renee Prince filed on the Town of Stafford, Connecticut, land records an attachment to secure the Judgment. Subsequent to that date, Dr. Prince filed a judgment lien.

Leasehold Mortgage Deed and Security Agreement from Johnson Evergreen to People's United Bank in the original principal amount of $1,000,000.00 dated August 28, 2007 and recorded on August 30, 2007 in Volume 536, Page 227 of the Stafford Land Records (205 Chestnut Hill Road, Stafford).

Construction Leasehold Mortgage Deed and Security Agreement from Johnson Evergreen to People's United Bank in the original principal amount of $14,200,000.00 dated August 28, 2007 and recorded on August 30, 2007 in Volume 536, Page 261 of the Stafford Land Records(205 Chestnut Hill Road, Stafford).

Construction Mortgage Deed and Security Agreement from JMH to People's Bank in the original principal amount of $13,700,000.00 dated August 30, 2006 and recorded in Volume 518 at Page 514 of the Stafford Land Records (201 Chestnut Hill Road, Stafford; 13 and 15 Magauran Drive, Stafford).

Mortgage Deed and Security Agreement to Secure Guaranty from JMH to People's United Bank in the original principal amount of $1,000,000.00 dated August 28, 2007 and recorded in Volume 536 at Page 298 of the Stafford Land Records (205 Chestnut Hill Road, Stafford).

15

Open-End Mortgage and Security Agreement to Secure Guaranty from JMH to People's United Bank in the original principal amount of $14,200,000.00 dated August 28, 2007 and recorded in Volume 536 at Page 334 of the Stafford Land Records (205 Chestnut Hill Road, Stafford).

Mortgage Deed and Security Agreement from JMMC to People's Bank in the original principal amount of $4,500,000.00 dated August 24, 2004 and recorded in Volume 1911, Page 49 of the Enfield Land Records; as partially released by Partial Release dated September 28, 2004 and recorded in Volume 1944, Page 262 of the Enfield Land Records; as modified by Mortgage Modification Agreement dated as of September 28, 2004 and recorded in Volume 1944, Page 263 of said Land Records; and as further modified by Mortgage Modification Agreement dated as of August 30, 2006 and recorded in Volume 2212, Page 60 of said Land Records (140-148 Hazard Avenue, Enfield).

Open End-Mortgage Deed and Security Agreement from JMH in favor of the Plan Custodian dated as of September 27, 2010 (201 Chestnut Hill Road, Stafford; 13 and 15 Magauran Drive, Stafford).

Open End-Mortgage Deed and Security Agreement from JMMC in favor of the Plan Custodian dated as of September 27, 2010 (140-148 Hazard Avenue, Enfield).

Leasehold Open-End Mortgage Deed and Security Agreement from Johnson Evergreen in favor of the Plan Custodian dated as of September 27, 2010 (205 Chestnut Hill Road, Stafford).

Open-End Mortgage Deed and Security Agreement from JMMC in favor of the Plan Custodian dated as of September 27, 2010 (241 Chestnut Hill Road, Stafford; 55 and 68 Galbraith Road, Stafford).

Open End-Mortgage Deed and Security Agreement from JMH in favor of the PBGC dated as of September 27, 2010 (201 Chestnut Hill Road, Stafford; 13 and 15 Magauran Drive, Stafford).

Open End-Mortgage Deed and Security Agreement from JMMC in favor of the PBGC dated as of September 27, 2010 (140-148 Hazard Avenue, Enfield).

Leasehold Open-End Mortgage Deed and Security Agreement from Johnson Evergreen in favor of the PBGC dated September 27, 2010 (205 Chestnut Hill Road, Stafford).

Open-End Mortgage Deed and Security Agreement from JMMC in favor of the PBGC dated September 27, 2010 (241 Chestnut Hill Road, Stafford; 55 and 68 Galbraith Road, Stafford).

16

**ADDITIONAL EXHIBITS AND SCHEDULES TO REVOLVING LOAN AND
SECURITY AGREEMENT ARE NOT ATTACHED AND ARE AVAILABLE UPON
REQUEST TO DEBTOR'S COUNSEL:**

**Eric Henzy, Esq.
Reid and Riege, P.C.
One Financial Plaza
Hartford, CT  06103
(860) 240-1081
ehenzy@rrlawpc.com**