## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT
## HARTFORD DIVISION

| | |
|---|---|
| In re:<br><br>JOHNSON MEMORIAL MEDICAL CENTER, INC.,<br>JOHNSON MEMORIAL HOSPITAL, INC.,<br>HOME & COMMUNITY HEALTH SERVICES, INC.,<br>JOHNSON HEALTH CARE, INC.,<br>THE JOHNSON EVERGREEN CORPORATION, and<br>JOHNSON PROFESSIONAL ASSOCIATES, P.C.,<br><br>                    Debtors. | Chapter 11<br><br>Case No. 15-20056<br><br>Case No. 15-20057<br>Case No. 15-20060<br><br>Case No. 15-20061<br>Case No. 15-20062<br><br>Case No. 15-20063<br><br>(Joint Administration Requested) |
| JOHNSON MEMORIAL MEDICAL CENTER, INC.,<br>JOHNSON MEMORIAL HOSPITAL, INC.,<br>HOME & COMMUNITY HEALTH SERVICES, INC., and<br>JOHNSON HEALTH CARE, INC.,<br><br>                    Movants,<br><br>vs.<br><br>PEOPLE'S UNITED BANK,<br>THE PENSION BENEFIT GUARANTY CORPORATION,<br>CLIFFORD A. ZUCKER, and<br>DR. RENEE PRINCE,<br><br>                    Respondents. | Contested Matter No. |

**MOTION OF JOHNSON MEMORIAL MEDICAL CENTER, INC., JOHNSON MEMORIAL HOSPITAL, INC., HOME & COMMUNITY HEALTH SERVICES, INC., AND JOHNSON HEALTH CARE, INC., PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 363 AND 365 AND BANKRUPTCY RULES 2002, 6004 AND 6006, FOR**

**(I) AN ORDER (A) APPROVING BIDDING PROCEDURES AND BIDDER
PROTECTIONS IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF
THEIR ASSETS, (B) APPROVING PROCEDURES FOR THE ASSUMPTION AND
ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED
LEASES IN CONNECTION THEREWITH AND (C) SCHEDULING A FINAL SALE
HEARING AND APPROVING THE FORM AND MANNER OF NOTICE THEREOF;
AND (II) AN ORDER (A) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF
THEIR ASSETS, FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND
ENCUMBRANCES AND (B) GRANTING CERTAIN RELATED RELIEF**

Johnson Memorial Medical Center, Inc. ("JMMC"), Johnson Memorial Hospital, Inc.

("JMH"), Johnson Health Care, Inc. ("JHC"), and Home and Community Health Services, Inc.

("HCHS"; together with JMMC, JMH and JHC, the "Seller Debtors"), for their motion pursuant

to Bankruptcy Code sections 105, 363 and 365 and Federal Rules of Bankruptcy Procedure 2002,

6004 and 6006, for (1) an order (a) approving bidding procedures and bidder protections in

connection with the sale of substantially all of the Seller Debtors' assets, (b) approving

procedures for the assumption and assignment of certain executory contracts and unexpired

leases in connection therewith, and (c) scheduling a final sale hearing and approving the form

and manner of notice thereof, and (2) an order (a) authorizing the sale of substantially all of the

Seller Debtors' assets, free and clear of liens, claims, interests and encumbrances and (b)

granting certain related relief, respectfully state:

Preliminary Statement

1.      On January 14, 2015, (the "Petition Date"), the Seller Debtors, The Johnson

Evergreen Corporation ("JEC"), and Johnson Professional Associates, P.C. ("JPA"; together

with JEC and the Seller Debtors, the "Debtors"), filed voluntary petitions for reorganization

under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §101 et seq. (the "Bankruptcy

Code"). Since the Petition Date, the Debtors have continued in possession and management of

2

their businesses and properties as a debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

2.      Confronted with the reality that due to market and government regulatory forces in the health care industry, lack of capital, reduced government reimbursement rates, low census and an unsustainable level of debt, continuing to operate as independent, stand alone entities would be extremely difficult, the Seller Debtors commenced their cases to sell their assets, without delay, pursuant to Bankruptcy Code section 363.  Such sales will preserve and maximize the going concern value of the Seller Debtors' property, preserve and provide jobs for the Seller Debtors' employees, and allow for the continued delivery of healthcare services to residents of North Central Connecticut.  The Seller Debtors believe that the proposed sale is the best available alternative to accomplish the foregoing in all of the facts and circumstances.

3.      The path to the proposed sale has been a long and difficult one.  Over a period of years, the Seller Debtors have engaged in a number of attempts to find an acquirer, a merger partner or an affiliation partner with a number of entities both within and outside of Connecticut. Since prior to 2008, the Seller Debtors have faced significant financial operating deficits and struggled to maintain financial stability, especially in light of national trends of shrinking reimbursement levels, lower investment returns, and the need for hospitals generally to make ongoing and substantial investments in new medical and information technologies and facilities.

4.      In October 2008, JMMC, JMH and JEC commenced chapter 11 bankruptcy cases after entering into an asset purchase agreement with Eastern Connecticut Health Network ("ECHN").  This followed discussions with and the performance of certain diligence by Hartford Hospital, ECHN and Saint Francis *Care* ("Saint Francis").  The purpose of the 2008 chapter 11 cases was to effectuate a sale of substantially all of JMMC's, JMH's and JEC's assets to ECHN

3

pursuant to Bankruptcy Code section 363.  On March 5, 2009, ECHN terminated the asset

purchase agreement.  During the course of the 2008 bankruptcy cases, potential other acquisition

or affiliation transactions were considered, but no viable strategic partner was identified.

Without a sale partner, the only way for JMMC, JMH and JEC to exit the 2008 bankruptcy cases

was through a plan of reorganization.  Over a period of approximately one year, JMMC, JMH

and JEC and their creditors were able to negotiate a consensual chapter 11 plan of reorganization

that resulted in JMMC's, JMH's and JEC's emergence from chapter 11 in August 2010 as a

stand-alone, independent health care organization.

5.    After their emergence from chapter 11, JMMC, JMH and JEC continued to face

financial difficulties and had difficulty serving their remaining debt.  JMMC, JMH and JEC

emerged from the 2008 bankruptcy case with nearly $30,000,000 of debt to People's United

Bank ("People's") and over $10,000,000 of debt to its legacy unsecured creditors, including the

Pension Benefit Guaranty Corporation.

6.    Recognizing that it would be extremely difficult to remain viable as stand-alone

entities, in May, 2011, the Debtors initiated discussions with Saint Francis, Hartford Hospital,

ECHN, Mercy Hospital and Baystate Health with regard to potential affiliation opportunities and

sent requests for proposal to those entities on June 1, 2011.  The Debtors selected those five

entities because they are the five large health systems that are in geographic proximity to the

Debtors, and they are the natural merger/affiliation partners for the Debtors in terms of

geography, strategic sense and potential ability and resources for an affiliation.  On June 24,

2011, Mercy Hospital informed the Debtors that it was not interested in pursuing a transaction.

By a letter dated June 30, 2011, Baystate Health communicated to the Debtors that it was not

going to pursue a transaction.  On July 26, 2011, Hartford Hospital and ECHN made a joint

4

presentation to the Debtors that primarily involved acquisition of JMMC's property located in

Enfield, Connecticut.  On July 27, 2011, the Debtors elected to enter into exclusive negotiations

with Saint Francis.

7.      The negotiations between the Debtors and Saint Francis led to the creation of a

formal arrangement between the two organizations entered into on July 12, 2012, the terms of

which are set forth in a Master Affiliation Agreement, under which Saint Francis provided

certain financial support to the Debtors; a Clinical Affiliation Agreement, under which Saint

Francis provides certain clinical services and support to the Debtors; and a Business Process

Outsourcing Agreement, under which Saint Francis provides certain business services and

support to the Debtors.  Since entering into the affiliation with the Debtors, Saint Francis has

provided clinical and management support to the Debtors, resulting in improved operating

results.  In addition, Saint Francis has paid the Debtors more than $2 million pursuant to the

Master Affiliation Agreement, which has been used to make payments under JMMC's, JMH's

and JEC's chapter 11 plan confirmed in 2010.  Saint Francis has also provided direct financial

support to Johnson in the form of loans and deferred accounts payable, which have allowed

Johnson to operate through a particularly difficult financial period.  However, despite these

efforts, the Debtors reported a net loss of $4,622,272 and current liabilities that exceeded current

assets by $14,836,839 on its audited financial statements for year ending September 30, 2013.

8.      After working under these affiliation agreements for over a year, the Debtors and

Saint Francis determined that more financial restructuring would be necessary and that this could

best be achieved by an acquisition by Saint Francis of the assets of the Seller Debtors.  JEC also

has concluded that the sale of substantially all of its assets in a separate transaction is the best

alternative available for ensuring fair treatment of its creditors, preservation of jobs, and the

continued viability of its operations, and JEC will file a separate motion in its case seeking the

Court's authority for such sale.  After negotiations extending for more than one year, the Seller

Debtors, Saint Francis, and the Seller Debtors' largest secured creditor, People's, have negotiated

the terms and conditions of Saint Francis's acquisition of substantially all of the Seller Debtors'

assets as described herein.  These negotiations included the United States Department of

Agriculture, the guarantor of certain of the debt owed to People's, and the Federal Mortgage

Acquisition Corporation , the holder of a portion of the debt owed to People's.  In addition, the

Debtors were able to negotiate debtor in possession financing with their senior secured revolving

credit lender, Healthcare Finance Group, LLC ("HFG").

9.      The proposed sale is fair and appropriate and by far the most viable alternative for

maximizing value to all of the Seller Debtors' stakeholders, preserving jobs, and preserving

healthcare services in the communities served by the Seller Debtors.  Under the proposed sale,

the Seller Debtors would become part of a much larger healthcare organization, making available

to the Seller Debtors the financial and clinical resources of that larger organization.

Background

10.      JMMC, JMH, JEC, HCHS and JHC are private, not for profit corporations.

JMMC is the parent corporation of JMH, JEC, JHC and HCHS.  JMMC also owns real estate in

Enfield, Connecticut, including two medical office buildings.  JMMC's revenue in 2014 was

approximately $1.2 million.

11.      JMH owns and operates a ninety-two bed, acute care hospital located in Stafford

Springs, Connecticut.  JMH also leases space in the Enfield property from JMMC, where JMH

operates a surgery center, an advanced wound care center, and an infusion center.  JMH offers a

comprehensive array of inpatient and outpatient services, including medical and surgical,

obstetrics and gynecology, pediatrics, behavioral health, intensive/coronary care, infusion and

chemotherapy, rehabilitation and emergency care.  JMH has approximately 607 employees and

its revenue in 2014 was approximately $67 million.

12.    JEC owns and operates a 180 bed skilled nursing facility located in Stafford,

Connecticut.  JEC leases the land on which the nursing facility is located from JMH.  Services

provided by JEC include skilled nursing care, palliative/hospice care, physical medicine and

rehabilitation, occupational therapy, speech therapy, restorative nursing, wound management,

pain management and nutritional education.  JEC has approximately 281 employees and its 2014

revenue was approximately $16.6 million.

13.    HCHS provides home health and hospice care to residents of North Central

Connecticut.  Services provided by HCHS include skilled nursing, behavioral health, wound

care, hospice, bereavement, palliative care, physical, occupational and joint replacement therapy,

cancer care rehabilitation, cardio/respiratory rehabilitation, health screenings, flu clinics and

health education programs.  HCHS has approximately 67 employees and its revenue in 2014 was

approximately $5.64 million.

14.    JHC provides occupational medicine services.  JHC works exclusively with

businesses, and offers, among other services, effective management of workers' compensation

cases and return to work programs.  Services provided by JHC include physical exams, drug

screenings, rehabilitation, worksite assistance focused on safety and productivity, ergonomic

evaluations, medical surveillance exams, travel immunizations, and educational programs,

clinics and presentations.  JHC has approximately six employees and annual revenue of

approximately $525,000.

15.     JPA is a multi-specialty physician group with offices in Stafford Springs and Enfield.  JPA is an affiliate of the other Debtors.  Services provided by JPA include family medicine, orthopedics, wound care and oncology.  JPA has approximately fourteen providers and eleven employees and its revenue in 2014 was approximately $3.3 million.

16.     The Debtors' pre-petition debts include—

a.     Loan in the original amount of $4,500,000 (the "Surgery Center Loan") from People's to JMMC, guaranteed by JMH. The current principal balance of the Surgery Center Loan is approximately $2,940,000. The Surgery Center Loan is secured by, among other things, a mortgage on JMMC's real property located in Enfield, Connecticut.

b.     Loan in the original amount of $13,700,000 (the "Hospital Loan") from People's to JMMC and JMH. The current principal balance of the Hospital Loan is approximately $11,987,500. The Hospital Loan is secured by, among other things, a mortgage on JMH's Johnson Memorial Hospital property (including the portion of land that is the Evergreen Property) located in Stafford Springs, Connecticut, and some additional undeveloped land owned by JMMC and JMH.

c.     Loan in the original amount of $15,200,000 (the "Evergreen Loan") from People's to JEC and JMMC.  JMH granted People's a non-recourse guarantee as to the portion of its land leased to JEC and where JEC's nursing home property is located. The current principal balance of the Evergreen Loan is approximately $14,213,967. The Evergreen Loan is secured by, among other things, mortgages on JEC's property and the portion of JMH's land leased to JEC and where JEC's nursing home property is located.

d.     Loan in the current principal amount of approximately $4,500,000 by Healthcare Finance Group, LLC ("HFG"), to the Debtors, secured by the personal property of the Debtors (the "HFG Loan").

e.     Debt in the approximate amount of $6,000,000 owed to the Pension Benefit Guaranty Corporation ("PBGC") and the unsecured creditors from the 2008 bankruptcy case.  These debt obligations are secured by, among other things, mortgages granted to the PBGC and Clifford A. Zucker, as Plan Custodian for the unsecured creditors from the 2008 bankruptcy case (the "Plan Custodian"), on JMMC's, JMH's and JEC's real property.

Relief Requested

17.     After months of negotiations that included major creditor constituencies, the Seller Debtors have executed an Asset Purchase Agreement, annexed hereto as Exhibit A (the

"APA"), with Saint Francis.  If the transaction contemplated by the APA is consummated, Saint

Francis will acquire and operate the Seller Debtors properties and businesses and will employ

essentially all of the Seller Debtors' employees.  The Seller Debtors believe that the transaction

contemplated by the APA is the most viable option to assure the long term viability of the Seller

Debtors' businesses, employment of the Seller Debtors' employees, and provision of health care

services to the people now served by the Seller Debtors.

18.     Time is of the essence.  HFG has required that that the Seller Debtors obtain this

Court's approval of the sale in not more than 150 days after the Petition Date.  In addition, in

particular given the previous chapter 11 of JMMC, JMH and JEC, the Seller Debtors are

concerned that a lengthy, uncertain sale process may damage the Seller Debtors' businesses.  The

confidence of employees, doctors, and patients in the areas served  could be affected by a long

process.  Further, suppliers and service providers, many of whom were creditors of JMMC, JMH

and JEC in the 2008 bankruptcy case, could lose confidence in the Seller Debtors and/or refuse

to do business with the Seller Debtors.  For the forgoing reasons, a lengthy sale process could

negatively impact the Seller Debtors' viability.

19.     By this Motion, pursuant to Bankruptcy Code sections 105, 363 and 365 and

Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006, the Seller Debtors hereby seek the

following.  First, at a hearing (the "Bidding Procedures Hearing") to be held as soon as

practicable but not more than 35 days after the Petition date, the Seller Debtors request entry of

an order in substantially the form attached hereto as Exhibit B (the "Bidding Procedures Order"),

among other things:

a.       scheduling a hearing (the "Sale Hearing") not more than 150 days after the

Petition Date to consider approval of the sale of substantially all of the Seller Debtors' assets to

Saint Francis or to any other Successful Bidder (as such term is defined in the Bidding

Procedures; Saint Francis or any such other Successful Bidder, the "Purchaser") if any qualifying

competing bids are received;

b.      authorizing and approving the Seller Debtors' proposed procedures for the

assumption and assignment of executory contracts and unexpired leases to the Purchaser in

connection with the proposed sale, as set forth in Exhibit 3 to the Proposed Bidding Procedures

Order; and

c.      authorizing and approving (i) the Seller Debtors' proposed procedures for the

submission and consideration of competing bids for their assets (the "Bidding Procedures"), as

set forth in Exhibit 1 to the proposed Bidding Procedures Order and incorporated herein in its

entirety by reference, and (ii) the form and manner of notice of these matters, including the

notice of Sale Hearing in the form attached as Exhibit 2 to the Proposed Bidding Procedures

Order to be served on parties in interest.

20.     Second,  upon conclusion of the Sale Hearing, the Seller Debtors request the entry

of an order substantially in the form attached hereto as Exhibit C (the "Sale Order"), authorizing

(a) the sale of substantially all of their assets free and clear of all liens, claims, encumbrances and

interests of any kind or nature whatsoever, other than Assumed Liabilities (as defined in the

APA).

The Asset Purchase Agreement

21.     The APA is the product of months of arms-length negotiations between the Seller

Debtors, Saint Francis and certain of the Seller Debtors' major creditors.  Consideration for the

sale proposed under the APA consists of the assumption by Saint Francis of a substantial portion

of the Seller Debtors' debts as more particularly described in the APA.  In addition, Saint Francis

has agreed to hire all or substantially all of the employees of the Seller Debtors.  CREDITORS

AND PARTIES IN INTEREST ARE URGED TO REVIEW THE APA ANNEXED HERETO

AS EXHIBIT A FOR FURTHER DETAILS CONCERNING THE PROPOSED SALE.

DESCRIPTIONS OF THE APA IN THIS MOTION ARE QUALIFIED IN THEIR ENTIRETY

BY REFERENCE TO SUCH AGREEMENT ITSELF.  Key provisions of the APA include:

     a.     Section 1.2--Assets sold and contracts assigned—substantially all assets of the Seller Debtors to be sold and substantially all contracts to be assigned.  Charitable assets or beneficial interests in trusts to be transferred.

     b.     Sections 1.4 and 1.6—Purchase price--the consideration for the purchases includes:

- Assumption of approximately $10,500,000 of indebtedness owed by JMMC and JMH to People's United Bank.
- Payment of past due interest owed by JMMC and JMH to People's.
- Assumption of up to $7,000,000 of indebtedness owed by Seller Debtors to Healthcare Finance Group, LLC.
- Assumption of employee obligations (payroll, paid time off, and similar obligations).
- Assumption of trade payables.
- Assumption of up to $2,000,000 of workers' compensation insurance liabilities.
- Payment of up to $500,000 to cure defaults under contracts of the Seller Debtors.
- Payment of up to $300,000 of transfer taxes resulting from the sale of the assets.
- Assumption of JMH's collective bargaining agreement.
- Payment of an additional $1,250,000 in cash to satisfy administrative expenses and certain other claims.
- Payment of the aggregate amount of premiums to obtain tail insurance for the sellers.
- Assumption of equipment financed with purchase money security interests and/or capital leases/financing in the approximate amount of $2,300,000.

     c.     Section 1.7--In addition, Saint Francis anticipates spending up to $13,000,000 within the first three (3) years following the closing on investments in technology, capital improvements, expanded services and routine replacements.

     d.     Section 1.14—Deposit--$750,000

     e.     Section 5.7—Debtors to obtain tail insurance, to be paid for by Saint Francis.

     f.     Section 6.1—APA subject to Bankruptcy Court approval.

     g.     Section 6.2--Sale Procedures—timeline; $750,000 break-up fee and an expense reimbursement to Saint Francis; requirements for competing bids; bid increments.

h.      Section 9.1—Saint Francis shall offer employment to substantially all
Seller Debtor employees, with wages at least equal to and benefits substantially similar to
what employees now have.

i.      Section 9.2—Assumption of collective bargaining agreement.

j.      Section 11.1—Termination provisions.

k.      Section 11.3—Effect of termination.

l.      Section 11.4—Payment of break-up fee and an expense reimbursement to
Saint Francis.

22.      In addition to being subject to approval by this court, the APA is subject certain

regulatory approvals.  In particular, Saint Francis and the Seller Debtors must obtain a Certificate

of Need from the Connecticut Office of Healthcare Access.

Proposed Bid Procedures

23.      The Seller Debtors crafted the bidding procedures to permit an expedited sale

process necessitated by the circumstances faced by the Seller Debtors, while simultaneously

fostering an orderly and fair sale process that will confirm that Saint Francis's bid is the highest

and best bid for the Seller Debtors' assets or promptly identify any other higher and better

alternatives.  The Bidding Procedures are set forth in detail in Exhibit 1 to the Bidding

Procedures Order annexed hereto as Exhibit B.  CREDITORS AND PARTIES IN INTEREST

ARE URGED TO REVIEW EXHIBIT 1 TO THE BIDDING PROCEDURES ORDER FOR

FURTHER DETAILS CONCERNING THE PROPOSED BIDDING PROCEDURES.

DESCRIPTIONS OF THE BIDDING PROCEDURES IN THIS MOTION ARE QUALIFIED

IN THEIR ENTIRETY BY REFERENCE TO EXHIBIT 1 ITSELF.  The Bidding Procedures

include the following provisions:

a.      Participation Requirements.  Any person desiring to submit a bid for the
all or part of the Seller Debtors' assets (a "Potential Bidder") will be required to deliver
(unless previously delivered) to the Seller Debtors on or before the Bid Deadline (as
defined below), the following in addition to the other materials required hereby
(collectively, the "Participation Requirements"): (i)  an executed confidentiality
agreement in form and substance satisfactory to the Seller Debtors; and (ii) satisfactory
written evidence of available funds or a firm, irrevocable and unconditional commitment

for financing sufficient for the Potential Bidder to consummate the Sale Transaction. The financial information and credit-quality support of any Potential Bidder must demonstrate the financial capability of the Potential Bidder to timely consummate the Sale Transaction pursuant to a Qualified Bid (as defined below).

      b.      Due Diligence. The Seller Debtors will afford any Potential Bidder who satisfies the Participation Requirements such due diligence access or additional information as the Seller Debtors, in their business judgment, determine to be reasonable and appropriate; provided, however, that the same access and information must also be made available to Saint Francis. Additional due diligence will not be provided after the Bid Deadline.

      c.      Bid Deadline. A Potential Bidder that desires to make a bid must deliver written copies of its bid by hand and email to the following parties so as to be received no later than 5:00 p.m. (prevailing Eastern Time) on [_____] (the "Bid Deadline"): by (i) counsel for the Debtor, Reid and Riege, P.C., One Financial Plaza, Hartford, CT 06103 (Attn: Eric Henzy (ehenzy@reidandriege.com), Jon P. Newton (jnewton@rrlawpc.com, and Mark X. Ryan (mryan@rrlawpc.com)); (ii) counsel for Saint Francis, Hinckley, Allen & Snyder LLP, 20 Church Street, Hartford, CT 06103, (Attn: William S. Fish, Jr. (wfish@hinckleyallen.com), Thomas S. Marrion (tmarrion@hinckleyallen.com), and Sarah M. Lombard (slombard@hinckleyallen.com)); (iii) the Office of the United States Trustee for the District of Connecticut; (iv) People's United Bank, c/o Neubert, Pepe & Monteith, P.C., 195 Church Street, New Haven CT, 06510 (Attn: Douglas S. Skalka (dskalka@npmlaw.com)); (v) Healthcare Finance Group, LLC, c/o Kaye Scholer LLP, 250 West 55th Street, New York, New York 10019-9710 (Attn: Benjamin Mintz (benjamin.mintz@kayescholer.com)) and Robinson & Cole LLP, 280 Trumbull Street, Hartford, Connecticut 06103 (Attn: Michael Enright (menright@rc.com)); and (vi) counsel for any Official Committee of Unsecured Creditors appointed in this case.

      d.      Bid Requirements. Each bid must be a written offer from a Potential Bidder, not contingent on any event not provided for in the APA, including any due diligence investigation, receipt of financing or receipt of further approvals (other than customary regulatory approvals), that (i) is received in accordance with the time deadlines and in the form provided for herein; (ii) offers to consummate the sale transaction on terms no less favorable to the Seller Debtors than those set forth in the APA; (iii) provides that such Potential Bidder shall assume the Reimbursement Obligation (as such term is defined in the APA) directly attributable to the Seller Debtors and the Workers' Compensation Liabilities (as such term is defined in the APA) directly attributable to Seller Debtors or provide a substitute guaranty and letter of credit substantially similar to the Credit Support (as such term is defined in the APA) and acceptable to the Hartford Fire Insurance Company and sufficient to release Saint Francis from any obligations thereunder; (iv) provides adequate assurances that such Potential Bidder will provide services equivalent to those provided by Saint Francis under the Affiliation Agreements (as such term is defined in the APA) between the date of Bankruptcy Court approval and the closing date for the applicable Alternative Transaction and continue to operate the Seller Debtors' businesses following the closing of the Alternative Transaction; (v) includes a marked copy of the APA to show any proposed amendments thereto (the "Modified Purchase Agreement") and a clean and executed Modified Purchase Agreement; (vi) includes a statement that there are no

conditions precedent to the Potential Bidder's ability to enter into a definitive agreement and that all necessary internal and shareholder approvals have been obtained prior to the bid; (vii) states that such offer is binding and irrevocable until the consummation of the sale transaction; (viii) offers to pay a purchase price that is greater than the purchase price contained in the APA, including all cash, non-cash consideration and Assumed Liabilities, plus the Break-Up Fee in cash ($750,000), plus the Expense Reimbursement (in an amount in cash not to exceed $200,000), plus $250,000, and otherwise on terms at least as favorable to the Seller Debtors as those set forth in the APA (the "Initial Bid Increment"); provided, however, after such Initial Bid Increment, all further overbids must be in increments of at least $100,000; provided, further, that if such overbid is made against a bid last made by Saint Francis, then such overbid must be at least $100,000 more than the last Saint Francis bid plus the Break-Up Fee in cash ($750,000) plus the Expense Reimbursement (in an amount in cash not to exceed $200,000), and the Seller Debtors shall, in their discretion, have determined that such overbids satisfy such bidding increment requirement; (ix) discloses the identity of each entity that will be bidding or otherwise participating or investing in connection with such bid including their affiliates, and the complete terms of any such participation; (x) includes the names and contact information of members of the Potential Bidder who will be available to answer questions regarding the offer; (xi) includes the names of the Potential Bidder's external advisors including financial, legal and accounting firms, as well as industry consultants or other resources; (xii) provides adequate assurances that it will offer employment to the Seller Debtors' employees as provided for in the APA; (xiii) contains a description of (A) how the Potential Bidder intends to comply with regulations or licensing, or the ability to do so through management or ownership of similar facilities, required for the operation of the Facilities (as such term is defined in the APA), and (B) relevant experience owning and/or operating health care facilities similar to the Facilities; (xiv) identifies with particularity which executory contracts and unexpired lease the Potential Bidder wishes to take assignment of and provides details of the Potential Bidder's proposal to pay any related cure costs (subject to the Potential Bidder's right to make changes consistent with the APA or the Sale Order); (xv) contains sufficient information concerning the Potential Bidder's ability to provide adequate assurance of performance with respect to executory contracts and unexpired leases to be assumed and assigned; (xvi) provides adequate assurances that it is able to pay each of the Break-Up Fee and Expense Reimbursement to Saint Francis in cash; (xvii) contains all other information reasonably requested by the Seller Debtors; and (xviii) provides a statement acknowledging that the Potential Bidder (other than the Buyer) is not entitled to any break-up fee, termination fee, expense reimbursement or similar payment.

e.      Bids must be accompanied by (i) a wire transfer to the Seller Debtors of an amount in immediately available funds equal to at least $1,500,000 (the "Good Faith Deposit"), and (ii) written evidence of available cash or a firm, irrevocable and unconditional commitment for financing and such other evidence of ability to consummate the transaction as the Seller Debtors may reasonably request. To the extent any Potential Bidder proposes to include non-cash consideration in its bid (other than assumption of debt), such non-cash consideration must be freely marketable and such bid must be accompanied by the form of note or other type of instrument in connection with such non-cash consideration.

f.      Qualified Bids and Bidders.  A bid received from a Potential Bidder that meets the requirements set forth in the preceding three paragraphs will be considered a "Qualified Bid" if the Seller Debtors, in consultation with their advisors and with HFG and People's, reasonably believe that such bid is higher or otherwise better than the bid set forth in the APA and would be reasonably expected to be consummated if selected as the Successful Bid (as defined below).  The Seller Debtors will review each bid received from a Potential Bidder and, following consultation with People's and HFG, determine whether it meets the requirements of a Qualified Bid.  A Potential Bidder making a Qualified Bid who has also satisfied the Participation Requirements will be deemed a "Qualified Bidder."  The APA is a Qualified Bid and Saint Francis is a Qualified Bidder for all purposes and requirements of the Bid Procedures at all times.  In determining whether a bid is a Qualified Bid, the Seller Debtors will consider factors such as (i) the amount of such bid, (ii) the risks and timing associated with consummating such bid, (iii) the risks associated with any non-cash consideration in such bid, (iv) the ability of the Potential Bidders to obtain appropriate regulatory approvals on a timely basis, (v) any excluded assets or executory contracts and leases, and (vi) any other factors deemed relevant by the Seller Debtors in their reasonable discretion.  In addition, the Seller Debtors may, following consultation with People's and HFG, reject any bid that (i) is on terms that are more burdensome or conditional than the terms of the APA, (ii) includes non-cash consideration which is not freely marketable, (iii) is subject to any due diligence, financing condition or other contingencies or conditions that are not included in the APA, or (iv) is received after the Bid Deadline.  The Good Faith Deposits of all Qualified Bidders shall be held by an escrow agent in a separate account for the Seller Debtors' benefit.  If a Successful Bidder fails to consummate an approved sale of the Assets because of a breach of a failure to perform on the part of such Successful Bidder, such Successful Bidder's Good Faith Deposit will be forfeited to the Seller Debtors as provided for in the APA.  Subject to other provisions of these Bid Procedures, the Seller Debtors will, no later than 5:00 p.m. (prevailing Eastern Time) on [_____ __, 20__], advise each Potential Bidder that submits a bid whether its bid is a Qualified Bid.

g.      Auction Participation.  Unless otherwise agreed to by the Seller Debtors, only Qualified Bidders, People's, HFG and their legal or financial professionals are eligible to attend or participate at the Auction (as defined below).  Subject to the other provisions of these Bid Procedures, if the Seller Debtors do not receive any Qualified Bids other than the APA or if no Qualified Bidder other than Saint Francis has indicated its intent to participate in the Auction, the Seller Debtors will not hold an auction and Saint Francis will be named the Successful Bidder.

h.      Auction.  If more than one Qualified Bid has been received and more than one Qualified Bidder has indicated its intent to participate in the Auction, the Seller Debtors will conduct an auction (the "Auction") for the sale of all or substantially all of the Seller Debtors' assets.  Each Qualified Bidder participating at the Auction will be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale transaction.  Prior to the Auction, the Seller Debtors will select, in their sole reasonable discretion, the Qualified Bid that represents the then-highest or otherwise best value to the Seller Debtors (the "Baseline Bid") to serve as the starting point for the Auction.  The Auction shall take place at 12:00 noon (prevailing Eastern Time) on [_____ __, 20__] at the offices of Reid and Riege, P.C., One Financial Plaza, 21st

Floor, Hartford, CT 06103.  At the Auction, only Saint Francis and other Qualified
Bidders will be permitted to increase their bids or make any subsequent bids.  The
bidding will start at the purchase price and terms proposed in the Baseline Bid and after
the Initial Bid Increment will continue in increments of at least $100,000 in cash or cash
equivalents; provided, however, that if such overbid is made against a bid last made by
Saint Francis, then such overbid must be at least $100,000 more than such Saint Francis
bid plus the Break-Up Fee in cash ($750,000) plus the Expense Reimbursement (in an
amount in cash not to exceed $200,000).  Qualified Bidders may participate in person or
by representative.  Based upon the terms of the Qualified Bids received, the number of
Qualified Bidders participating in the Auction and such other information as the Seller
Debtors reasonably determine is relevant, the Seller Debtors may conduct the Auction in
the manner they reasonably determine, in their business judgment and following
consultation with People's and HFG, will promote the goals of the bid process, will
achieve the maximum value for all parties in interest and is not inconsistent with any of
the provisions of these Bid Procedures, the Bankruptcy Code or any order of the
Bankruptcy Court entered in connection herewith.  All bidders at the Auction shall be
deemed to have consented to these Bidding Procedures and to the core jurisdiction of the
Bankruptcy Court and waived any right to a jury trial in connection with any disputes
relating to the Auction and the construction and enforcement of the APA.

24.     As part of the Bidding Procedure, the Seller Debtors are seeking approval of the

provisions of the Asset Purchase Agreement regarding the payment to Saint Francis of a breakup

fee of $750,000 and expense reimbursement of up to $200,000, which would be paid to Saint

Francis if, among other things, the Court enters an order selecting a successful bidder other than

the Saint Francis.  Saint Francis appropriately is the recipient of the proposed breakup fee

because it has pursued and funded many aspects of the proposed transaction and has agreed to

substantial commitments to continue to support the Seller Debtors' operations through the sale

process.

Proposed Procedures For The Assumption And Assignment of Executory Contracts

25.     The proposed procedures to govern the assumption and assignment of executory

contracts and unexpired leases are set forth in detail in Exhibit 3 to the Bidding Procedures Order

annexed hereto as Exhibit B.  CREDITORS AND PARTIES IN INTEREST ARE URGED TO

REVIEW EXHIBIT 3 TO THE BIDDING PROCEDURES ORDER FOR FURTHER DETAILS

CONCERNING THE PROPOSED ASSUMPTION AND ASSIGNMENT PROCEDURES.

DESCRIPTIONS OF THE ASSUMPTION AND ASSIGNMENT PROCEDURES IN THIS

MOTION ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO EXHIBIT 3

ITSELF.  The proposed assumption and assignment procedures include the following provisions:

a.    Not less than thirty days prior to the Closing (as defined in the APA), the Purchaser shall provide to the Seller Debtors (i) documentation identifying all Contracts the Purchaser wishes to be assumed by the Seller Debtors and assigned by the Seller Debtors to the Purchaser at the Closing (the "Transferred Contracts"); (ii) documentation identifying all Contracts that the Purchaser may, at a later date, wish to be assigned by the Seller Debtors (the "Designated Contracts"); and (c) all Contracts that the Purchaser will not be seeking to be assigned by the Seller Debtors (the "Excluded Contracts").

b.    At any time between the Closing and the 10th day following the Closing, the Purchaser may re-designate any Designated Contract as either a Transferred Contract or an Excluded Contract.  If the Purchaser does not re-designate any Designated Contract by the 10th day following the Closing, such Designated Contract shall be deemed an Excluded Contract as of such date.  The Seller Debtors agree not to reject any Contract on or before the 10th day following the Closing except for Excluded Contracts.

c.    The Seller Debtors shall seek the Court's authority to reject Excluded Contracts.

d.    Within five Business Days of receiving documentation from the Purchaser designating a Contract as a Transferred Contract, the Seller Debtors shall serve a notice (the "Assignment Notice") by overnight delivery service on each non-debtor counterparty to such contract that the Seller Debtors intend to assume and assign such contract to the Purchaser.  Such notice shall include the Seller Debtors' calculation of any cure costs related to such contract.

e.    Objections, if any, to the proposed cure costs or to the proposed assumption and assignment of a Transferred Contract, including, but not limited to, objections related to adequate assurance of future performance or objections relating to whether applicable law excuses the non-debtor counterparty from accepting performance by, or rendering performance to, the Purchaser, must be in writing and filed with the Court and served on the Seller Debtors and the Purchaser so as to be received not later than ten days after receipt of an Assignment Notice.

f.    Any non-debtor counterparty to a Transferred Contract who fails to timely file an objection to the proposed Cure Costs or the proposed assumption and assignment of a Transferred Contract by the Objection Deadline will be deemed to have consented to such Cure Costs and the assumption and assignment of such Transferred Contract, and such party shall forever be barred from objecting to the Cure Costs and from asserting any additional cure or other amounts against the Seller Debtors, their estates or the Purchaser.

h.    If the non-debtor counterparty to a Transferred Contract fails to timely object to the assumption and assignment of a Transferred Contract or the proposed Cure Costs relating thereto by the Objection Deadline, or upon the resolution of any timely

objection by agreement of the parties or order of the Court approving an assumption and assignment, such Transferred Contract shall be deemed to be assumed and assigned to the Purchaser and the proposed Cure Costs related to such Transferred Contract shall be established and approved in all respects, subject to the conditions set forth below.

      i.      The Seller Debtors' decision to assume and assign the Transferred Contracts is subject to Court approval and consummation of the sale of the Seller Debtors' assets to the Purchaser. Accordingly, the Seller Debtors shall be deemed to have assumed and assigned each of the Transferred Contracts as of the date and effective only upon the Closing Date, and absent such closing, each of the Transferred Contracts shall neither be deemed assumed nor assigned and shall in all respects be subject to subsequent assumption or rejection by the Debtors under the Bankruptcy Code.

Approval of the Bidding Procedures and the Form of the APA

26.     The APA is the result of extended arms-length negotiations, is fair to the Seller Debtors, Saint Francis or any other proposed buyer, and creditors and other parties in interest, and includes provisions that are common and customary for such transactions. The Seller Debtors have determined, in the exercise of their business judgment and in the context of the financial difficulties they face, that entering into and selling substantially all of their assets pursuant to the APA is in the best interests of the Seller Debtors and their creditors.

27.     The Seller Debtors request that the Court approve the form and provisions of the APA as fair and reasonable. The APA shall, however, be subject to higher and better bids at the Auction to be held and to further order of the Court authorizing the sale of the Seller Debtors assets pursuant to this motion.

28.     The Seller Debtors need an approved form of APA to market their assets in a meaningful way. The Seller Debtors must be able to inform other bidders of the specifics of Saint Francis's offer and what form of agreement has been entered into by the Seller Debtors and approved by the Court, so that bidders may formulate their bids with the provisions of Saint Francis's offer in mind.

29.     In the exercise of their sound business judgment, the Seller Debtors believe that an orderly sale of their assets is necessary to maximize value for creditors and ensure the viability of their businesses and properties.   The Seller Debtors believe that the Bidding Procedures set forth herein represent the best opportunity to maximize the value of their assets. The Bidding Procedures are designed to foster a competitive bidding process, which the Seller Debtors believe will generate the highest and best offer for their assets.   The implementation of bidding procedures of the type described herein is routinely approved by bankruptcy courts.

30.     Saint Francis has expended, and likely will continue to expend, considerable time, money and energy pursuing the sale and has engaged in extended and lengthy good faith negotiations. The APA is the culmination of these efforts. As noted above, the Seller Debtors have agreed to provide Saint Francis with a break-up fee in the amount of $750,000.00 (the "Break-up Fee") and expense reimbursement of up to $200,000.00.   Such Break-Up Fee and expense reimbursement provide Saint Francis with reasonable protection and compensation in consideration of (a) Saint Francis's agreeing to enter into the APA notwithstanding the uncertainties presented by a sale of this magnitude, (b) Saint Francis's expenditure of time, energy and resources, and (c) the benefit to the Seller Debtors' estates of securing a "stalking horse" or minimum bid.   Saint Francis has indicated that the Court's approval of the proposed break-up fee is a material condition to its offer for the Seller Debtors' assets.   Such Break-Up Fee, as negotiated with Saint Francis, was necessary to ensure that Saint Francis would enter into the APA.   As reasonable and necessary inducements to Saint Francis to proceed with its offer to purchase the Seller Debtors' assets pursuant to the APA, the Seller Debtors request that the Court approve such Break-Up Fee.

31.     The Break-Up Fee shall be payable in the event that the Seller Debtors consummate a sale of their assets to an entity other than Saint Francis, in which case the Break-Up Fee shall be paid to Saint Francis at the time of the closing of such sale from the proceeds of such sale, and in certain other circumstances as provided in the APA.

32.     Bidding incentives such as the Break-Up Fee encourage a potential purchaser to invest the requisite time, money and effort to conduct due diligence and sale negotiations with a debtor despite the inherent risks and uncertainties of the chapter 11 process. E.g., In re S.N.A. Nut Co., 186 B.R. 98, 101 (Bankr. N.D. Ill. 1995) (stating that "[a]greements to provide breakup fees or reimbursement of fees and expenses are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers"). The Seller Debtors submit that break-up fees are a normal, and oftentimes necessary, component of sales outside the ordinary course of business under Bankruptcy Code section 363. In re Integrated Resources. Inc., 147 B.R. 650, 660 (S.D.N.Y. 1992) (noting that break-up fees may be legitimately necessary to convince a "white knight" to offer an initial bid by providing some form of compensation for the expenses such bidder incurs, and the risks such bidder faces by having its offer held open, subject to higher and better offers).

33.     In this case, the proposed Break-Up Fee is of substantial benefit to the Seller Debtors and their creditors. The Break-Up Fee is approximately 3% of Saint Francis's bid, an amount routinely permitted by bankruptcy courts. Moreover, the Break-Up Fee is reasonable and appropriate in light of the size and nature of the proposed sale and the efforts that have been and will be expended by Saint Francis.

34.     Saint Francis, over a period of many months, has invested considerable resources and conducted extensive work in formulating its initial bid represented by the APA. Other

entities bidding to purchase the Seller Debtors' assets will have the benefit of such extensive

work and will not incur similar expenses because they must bid on the existing APA.  As a

result, it is fair to compensate Saint Francis if it is not the successful bidder.

35.    Finally, the Break-Up Fee is necessary to ensure that Saint Francis will continue

to pursue its proposed acquisition of the Seller Debtors' assets.  Accordingly the Seller Debtors

believe that the Break-Up fee should be approved.

Sale Approval

36.    The Seller Debtors seek the Court's authority to sell substantially all of their

assets free and clear of certain liens, interests and encumbrances to Saint Francis or to such other

entity or entities constituting a "Qualified Bidder" and submitting a Bid deemed by the Court to

be the highest and best offer for the Seller Debtors assets.  Bankruptcy Code section 363(b)

provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the

ordinary course of business, property of the estate . . . ."  A court may authorize the sale of all or

a substantial portion of a chapter 11 debtor's assets pursuant to Bankruptcy Code section 363

prior to approval of a plan where the debtor provides an articulated business justification for such

a sale.  Committee of Equity Security Holders v. The Lionel Corporation (In re The Lionel

Corporation), 722 F.2d 1063, 1070 (2nd Cir. 1983).  In determining whether there is such an

articulated business justification, a court may consider all salient factors pertaining to the

proposed sale, including the proportionate value of the asset to the estate as a whole, the

likelihood that a plan will be proposed and confirmed, the effect of the proposed sale on the

debtor's ability to file a plan, the proceeds to be obtained from the disposition relative to the

value of the property, and whether the assets are increasing or decreasing in value.

37.    The Seller Debtors believe that the proposed sale of their assets satisfies the

standards set forth by the Second Circuit for the sale of substantially all of a debtor's assets

outside of a plan of reorganization.  If the sale proposed herein is approved and completed, a

substantial portion of the Seller Debtors' secured debt will be assumed, current trade payables

will be assumed, and all employee obligations will be paid.  In addition, certain other claims

against the Seller Debtors will be satisfied.

38.    The Seller Debtors believe that the proposed sale will obtain the maximum going

concern value for their assets.  Because of the nature of the Seller Debtors' businesses, the

market of potential buyers for their assets is limited.  The Seller Debtors believe that they

approached all realistic potential buyers for their assets.  The proposal made by Saint Francis was

the most attractive.  In addition, the sale to Saint Francis is subject to the  Bidding Procedures

Order, which sets forth a procedure for obtaining higher and better offers subject to bidding

guidelines designed to maximize and obtain the highest value for the Seller Debtors' estates.

39.    The Seller Debtors believe that any alternative to the proposed sale will be very

difficult.  The Seller Debtors' operating funds are limited, and the Seller Debtors' have almost no

ability to make critical capital investments in their properties and businesses.  In addition, Saint

Francis's clinical and business operations support have become critical components of the Seller

Debtors' operations.  If the sale does not go forward as proposed and Saint Francis terminated

such support, the Seller Debtors would have a very difficult time sustaining their operations at

the current level.  Accordingly, if the Seller Debtors are not able to sell their assets via

Bankruptcy Code section 363, the Seller Debtors' assets may begin to suffer a rapid drop in

value.

40.    If the sale proposed herein is approved and consummated, the Seller Debtors

believe that they will shortly thereafter be able to file a confirmable chapter 11 plan.  As noted,

the sale will address much of the Seller Debtors' secured debt as well as provide for

administrative claims, priority claims and certain unsecured claims.  The Seller Debtors believe

that after the sale they will be able to treat any other allowed claims in a fair and expeditious

manner from their remaining assets.

41.    All of the foregoing weighs heavily in favor of this Court approving the sale of

substantially all of the Seller Debtors' assets pursuant to this motion.

42.    Bankruptcy Code section 363(m) provides: "The reversal or modification on

appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property

does not affect the validity of a sale or lease under such authorization to an entity that purchased

or leased such property in good faith, whether or not such entity knew of the pendency of the

appeal, unless such authorization and such sale or lease were stayed pending appeal."  While the

Bankruptcy Code does not define "good faith", courts have found that "[t]he requirement that a

purchaser act in good faith. . . speaks to the integrity of his conduct in the course of the sale

proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a

judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or

an attempt to take grossly unfair advantage of other bidders."  In re Andy Frain Services. Inc.,

798 F .2d 1113, 1125 (7th Cir. 1986) (emphasis omitted, quoting In re Rock Indus. Mach. Com..

572 F.2d 1195, 1198 (7th Cir. 1978) (interpreting Bankruptcy Rule 805, the precursor of § 363

(m)).

43.    As set forth above, the APA came as a result of arms-length negotiations and was

not tainted by fraud, collusion or bad faith.  The APA will benefit all parties in interest, as well

as the Seller Debtors' employees and the communities the Seller Debtors serve.  Accordingly,

the Seller Debtors request that the Court make a finding that the proposed purchase is entitled to

the protections of Bankruptcy Code section 363(m).

44.    Bankruptcy Code section 363(f) provides, among other things, that a debtor may sell property free and clear of any interest in such property if applicable nonbankruptcy law permits the sale of such property free and clear of such interest; such interest consents; such entity could be compelled to accept a money satisfaction of such interest; or such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property.  Most of the Seller Debtors' property that is subject to liens will be sold subject to such liens, i.e., the debt associated with such liens will be assumed by Saint Francis. The holders of such debt either have or, the Seller Debtors believe will, consented to the sale. The Selling Debtors believe that they may sell free and clear of any other interests pursuant to subsection (1), (3) or (5) of Code section 363(f).  Accordingly, the Court should authorize the sale free and clear of any such liens, claims, encumbrances or interests.

WHEREFORE, the Seller Debtors respectfully request that this Court (1) enter an order (a) approving the Bidding Procedures, (b) approving the proposed procedures for the assumption and assignment of certain executory contracts and unexpired leases in connection the sale of substantially all of the Seller Debtors' assets as provided herein, and (c) scheduling a final sale hearing and approving the form and manner of notice thereof, (2) after such final sale hearing, enter an order authorizing the sale of substantially all of the Seller Debtors' assets, free and clear of certain interests, on the terms and conditions described herein and pursuant to the terms of the APA, and (3) grant the Seller Debtors such other and further relief as this Court deems just and proper.

Dated at Hartford, Connecticut this 15th day of January, 2015.

<div style="margin-left:40%">

JOHNSON MEMORIAL MEDICAL CENTER,
INC., JOHNSON MEMORIAL HOSPITAL, INC.,
JOHNSON HEALTH CARE, INC., and HOME
AND COMMUNITY HEALTH SERVICES, INC.


By_____/s/_____
       Eric Henzy
       Federal Bar No. ct12849
       Jon P. Newton
       Federal Bar No. ct03376
       Reid and Riege, P.C.
       One Financial Plaza
       Hartford, CT 06103-2600
       (860) 278-1150
       Fax (860) 240-1002
       ehenzy@reidandriege.com
       jnewton@rrlawpc.com

</div>