# EXHIBIT A

## ASSET PURCHASE AGREEMENT

THIS **ASSET PURCHASE AGREEMENT** (this "Agreement"), made as of the 14th day of January, 2015 (the "Execution Date"), by and among Saint Francis Care, Inc., a Connecticut corporation (the "Buyer"), on the one hand, and the entities executing this Agreement as "Sellers" on the signature page hereof (each a "Seller," and collectively, the "Sellers"), on the other hand.

### WITNESSETH:

WHEREAS, Sellers have filed or will file voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the Bankruptcy Court (the date on which such petitions are filed hereinafter referred to as the "Petition Date"); and

WHEREAS, subject to the entry of the Sale Order, this Agreement provides for the sale by Sellers to Buyer of substantially all of the assets, real and personal, tangible and intangible, associated with owning, leasing, managing and operating the Facilities (collectively, the "Business") and having Buyer assume certain liabilities of Sellers, in accordance with sections 105, 363, 365, 1123 and/or 1129 of the Bankruptcy Code, as applicable;

NOW, THEREFORE, for and in consideration of the foregoing premises and the agreements, covenants, representations and warranties hereinafter set forth, and for other good and valuable consideration, the receipt and adequacy of all of which are acknowledged and agreed, the parties hereto agree as follows:

1.     SALE OF ASSETS AND CERTAIN RELATED MATTERS.

1.1     Definitions. Unless otherwise indicated in this Agreement, the following terms shall have the following meanings:

"Accrued Employee Liabilities" shall have the meaning set forth in Section 1.4(a).

"Administrative Expenses" shall have the meaning set forth in Section 1.6(b)(v).

"Affiliate" shall mean, as to the entity in question, any person or entity that, directly or indirectly, Controls, is Controlled by or is under common Control with the entity in question.

"Affiliation Agreements" shall mean that certain (a) Clinical Affiliation Agreement between Buyer and JMMC, JMH and JEC dated as of July 12, 2012, including all sub-agreements thereto, and (b) Business Process Outsourcing Agreement between Buyer and JMMC, JMH and JEC dated as of July 12, 2012, including all sub-agreements thereto, each as amended, supplemented and modified from time to time.

"Agreement" shall have the meaning set forth in the introduction.

"Alternative Transaction" shall mean the sale, transfer, lease or other disposition, directly or indirectly, including through an asset sale, stock sale, merger or other transaction, of some or all of the Assets in one or more transactions with one or more persons other than the Buyer.

1

"Assets" shall have the meaning set forth in Section 1.2.

"Assignment and Assumption Agreement" shall have the meaning set forth in Section 1.4(b).

"Assumed Contracts" shall have the meaning set forth in Section 1.2(h).

"Assumed Leases" shall mean, collectively, the Sellers' Real Property Expense Leases and the Sellers' Real Property Income Leases.

"Assumed Liabilities" shall have the meaning set forth in Section 1.4(a).

"Avoidance Actions" means any action that could be brought by any Seller, the trustee in the Bankruptcy Case or any other party in interest in the Bankruptcy Case under Section 544, 545, 547, 548, 549, 550, 551 or 553 of the Bankruptcy Code.

"Bankruptcy Case" means, collectively, the cases instituted by Sellers under the Bankruptcy Code.

"Bankruptcy Code" means title 11 of the United States Code.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Connecticut.

"Benefit Plans" shall mean all "employee benefit plans" as defined in Section 3(3) of ERISA, all specified fringe benefit plans as defined in Section 6039D of the Code, and all other pension, profit sharing, stock bonus, stock option, deferred compensation, or other retirement plans; welfare benefit plans, including group health and group insurance plans; cafeteria, flexible benefit or tuition assistance plans; executive compensation, bonus, or incentive plans; severance plans; salary continuation plans, programs, or arrangements; vacation, holiday, sick-leave, paid-time-off, or other employee compensation plans, procedures, programs, payroll practices, policies, agreements, commitments, contracts, or understandings; or any annuity contracts, custodial agreements, trusts, escrows or other funding arrangements related thereto, whether oral or written, qualified or nonqualified, funded or unfunded, and all employment agreements, programs, policies or other arrangements (i) that are currently, or have been within the past six (6) years, sponsored, maintained or contributed to by Sellers or any Affiliate thereof; (ii) with respect to which any Seller or any Affiliate thereof has any Liability to any current or former officer, employee or service provider, or the dependents of any thereof, or (iii) which could result in the imposition of Liability of any kind or nature, whether accrued, absolute, contingent, direct, indirect, perfected or inchoate or otherwise, and whether or not now due or to become due, on Sellers or any Affiliate thereof.

"Bill of Sale" shall have the meaning set forth in Section 2.2(c).

"Break-Up Fee" shall have the meaning set forth in Section 6.2(a).

"Business" shall have the meaning set forth in the recitals.

2

"Buyer" shall have the meaning set forth in the introduction.

"Cash Payment" shall have the meaning set forth in Section 1.6(a)(iv).

"Casualty Assets" shall have the meaning set forth in Section 1.13(b).

"Casualty Notice" shall have the meaning set forth in Section 1.13(a).

"Certificate of Need" shall mean a certificate of need issued by OHCA pursuant to Connecticut General Statutes Sections 19a-638 *et seq.*

"Charitable Assets" shall have the meaning set forth in Section 1.2.

"Closing" shall have the meaning set forth in Section 2.1.

"Closing Date" shall have the meaning set forth in Section 2.1.

"CMS" shall mean Centers for Medicare and Medicaid Services.

"CMS Investigation" shall mean the matters related to a survey conducted by the Department of Health with respect to Sellers on August 5, 2014 and subsequent re-surveys conducted based on the initial August 5, 2014 survey, the last of which was conducted on November 25, 2014.

"COBRA" shall mean the Consolidated Omnibus Budget Reconciliation Act of 1985, as set forth in Title 42 U.S.C., Section 300bb or, as applicable, Title I, Part 6, of ERISA.

"Code" shall mean the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.

"Collective Bargaining Agreement" means that certain collective bargaining agreement among JMH, the Johnson Memorial Hospital Registered Nurses, Local 5046, AFT Healthcare and AFT Connecticut dated October 1, 2013 to September 30, 2016.

"Competing Bid" shall have the meaning set forth in Section 6.2(a).

"CON" means a Certificate of Need issued by OHCA.

"Contract" means any written or oral agreement, arrangement, lease, license, sublicense, promissory note, binding arrangement or understanding, mortgage, contract, covenant, commitment or instrument.

"Control" means possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of any entity, whether through the ownership of voting securities, by contract or otherwise.

"Credit Support" shall mean the credit support in the amount of up to $2,000,000 provided by Buyer to JMMC in respect of JMMC's workers' compensation insurance policy

3

issued by The Hartford, including without limitation a guaranty provided by Buyer to The Hartford, secured by a letter of credit issued by Bank of America, N.A.

"Cure Costs" means all monetary liabilities and obligations of each Seller that must be paid or otherwise satisfied to cure all of such Seller's defaults under the Assumed Contracts and the Assumed Leases at the time of the assumption thereof and assignment to Buyer as provided hereunder, all in the amounts set forth in specific orders of the Bankruptcy Court.

"DEA Power of Attorney" shall have the meaning set forth in Section 2.2(k).

"Department of Health" shall mean the State of Connecticut Department of Public Health.

"Deposit" shall have the meaning set forth in Section 1.14.

"Deposit Escrow" shall have the meaning set forth in Section 1.14.

"Deposit Escrow Holder" shall have the meaning set forth in Section 1.14.

"Designated Contracts" shall have the meaning set forth in Section 10.5.

"Designated Lock Box Account" shall have the meaning set forth in Section 1.12.

"DIP Financing Agreement" means that certain Debtor In Possession Revolving Loan and Security Agreement, dated January 14, 2015, among the Sellers, Johnson Professional Associates, P.C., JEC, HFG and HFG Healthco-4 LLC.

"Effective Time" shall have the meaning set forth in Section 2.1.

"Estimate" shall have the meaning set forth in Section 1.13(a).

"Employee" shall include individuals rendering personal services to Sellers with respect to the Business or the Facilities as employees, including individuals who are treated as "leased employees" under Code Section 414(n).

"Environmental Laws" means the applicable federal, state (including specifically, but not by way of limitation, the State of Connecticut), and local environmental or health laws, regulations, ordinances, rules and common law in effect on the Execution Date and the Closing Date governing the use, refinement, handling, treatment, removal, storage, production, manufacture, transportation or disposal, emission, discharge, release or threatened release of Materials of Environmental Concern, or otherwise governing protection of the environment (including, without limitation, air, surface water, ground water, land surface or subsurface strata), as the same may be amended or modified as of the Execution Date and the Closing Date, including, without limitation, the statutes listed below:

> (a)     Federal Resource Conservation and Recovery Act of 1976, 42 U.S.C. Section 6901, et seq.;

4

(b)     Federal Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. Section 9601, et seq.;

(c)     Federal Clean Air Act, 42 U.S.C. Section 7401, et seq.;

(d)     Federal Water Pollution Control Act, Federal Clean Water Act of 1977, 33 U.S.C. Section 1251, et seq.;

(e)     Federal Insecticide, Fungicide, and Rodenticide Act, Federal Pesticide Act of 1978, 7 U.S.C. Section 136, et seq.;

(f)     Federal Hazardous Materials Transportation Act, 48 U.S.C. Section 1801, et seq.;

(g)     Federal Toxic Substances Control Act, 15 U.S.C. Section 2601, et seq.; and

(h)     Federal Safe Drinking Water Act, 42 U.S.C. Section 300f, et seq.

"ERISA" shall mean, collectively, the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"Escrow Agreement" shall have the meaning set forth in Section 1.14.

"Evergreen Ground Lease" means the lease between JMH and JEC dated as of January 7, 2015.

"Excluded Assets" shall have the meaning set forth in Section 1.3.

"Excluded Contracts" shall have the meaning set forth in Section 10.5.

"Excluded Liabilities" shall have the meaning set forth in Section 1.5.

"Execution Date" shall have the meaning set forth in the introduction.

"Exemption Certificate" shall mean a written statement from the Department of Health or other applicable Governmental Entity stating that a health care project is not subject to the Certificate of Need requirements under applicable state law.

"Expense Reimbursement" shall have the meaning set forth in Section 11.4.

"Facilities" (each, individually a "Facility") shall mean Johnson Memorial Hospital, Johnson Surgery Center, Advanced Wound Center, Community Cancer Center, Home & Community Health Services, Johnson Memorial Cancer Center and Karen Davis Krzynowek Infusion Center and certain real property owned by each Seller as set forth on Schedule 1.2(a).

"Final Order" means an order of the Bankruptcy Court (a) as to which the time to appeal shall have expired and as to which no appeal shall then be pending, or (b) if an appeal shall have been filed or sought, either (i) no stay of the order shall be in effect or (ii) if such a stay shall

5

have been granted by the Bankruptcy Court, then (A) the stay shall have been dissolved or (B) a final order of a court having jurisdiction to hear such appeal shall have affirmed the order and the time allowed to appeal from such affirmance or to seek review or rehearing thereof shall have expired and the taking or granting of any further hearing, appeal or petition for certiorari shall not be permissible, and if a timely appeal of such court order or timely motion to seek review or rehearing of such order shall have been made, any court of appeals having jurisdiction to hear such appeal or motion (or any subsequent appeal or motion to seek review or rehearing) shall have affirmed the court's (or lower appellate court's) order upholding the order of the Bankruptcy Court and the time allowed to appeal from such affirmance or to seek hearing, appeal or petition for certiorari shall not be permissible; provided, however, that Buyer in good faith in its reasonable discretion shall have the right to determine that any order for which an appeal, motion to seek review, motion to seek rehearing, or any similar motion is pending is not a Final Order, notwithstanding that such order is not then subject to stay.

"Governmental Entity" means any government or any agency, bureau, board, commission, court, department, official, political subdivision, tribunal or other instrumentality of any government, whether federal, state or local, domestic or foreign.

"Government Patient Receivables" shall mean all accounts receivable arising from the rendering of services and provision of medicine, drugs and supplies to patients by any Seller up to the Effective Time and relating to Government Reimbursement Programs, billed and unbilled, recorded or unrecorded, accrued and existing, and other claims of any Seller for the provision of goods or services to patients due from beneficiaries or governmental third party payors which by law may not be assigned.

"Government Reimbursement Programs" shall mean Medicare, Medicaid and TRICARE and any other federal or state healthcare programs.

"Hazardous Substances" means any toxic or hazardous waste, pollutants or substances, including without limitation asbestos, PCBs, petroleum products and byproducts, substances defined or listed as "hazardous substance," "toxic substance," "toxic pollutant," or similarly identified substance or mixture, in or pursuant to any Environmental Law.

"Healthcare Reimbursement Obligation" means, collectively, Sellers' reimbursement obligations to their (a) self-paying patients and (b) insurance companies, in each case for any overpayments, duplicate payments or payments in error received by any Seller.

"HFG" means Healthcare Finance Group, LLC and its successors and assigns.

"HFG Debt" means the indebtedness of the Sellers and JEC to HFG, as agent, HFG Healthco-4 LLC, as lender, and the Buyer under the DIP Financing Agreement.

"HIPAA" means the Health Insurance Portability and Accountability Act of 1996 and its implementing regulations as amended by the Health Information Technology for Economic and Clinical Health Act.

"Hospital" shall mean Johnson Memorial Hospital, located in Stafford Springs, Connecticut.

6

"Hospital Loan" shall mean that certain loan from People's to JMMC and JMH in the original principal amount of $13,700,000, dated August 30, 2006, as evidenced by the Hospital Loan Documents.

"Hospital Loan Documents" shall mean all those certain agreements, documents and instruments executed in connection with the Hospital Loan by and among People's, JMMC and JMH.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder, and any successor to such statute, rules or regulations.

"Intercompany Obligations" means all intercompany loans, advances, payables and receivables between any Seller and any other Seller or Johnson Professional Associates, P.C., which were made or arose out of transactions occurring prior to the Closing.

"IRS" shall mean the Internal Revenue Service.

"Inventories" shall have the meaning set forth in Section 1.2(c).

"JEC" shall mean The Johnson Evergreen Corporation, a Connecticut corporation.

"JEC Transaction" shall mean the contemplated sale by JEC of substantially all of its assets to a third party.

"JMH" shall mean Johnson Memorial Hospital, Inc., a Connecticut corporation.

"JMMC" shall mean Johnson Memorial Medical Center, Inc., a Connecticut corporation.

"JMH Real Estate" shall mean the fee simple interest of JMH in all real property it owns as identified and set forth in Schedule 1.2(a).

"Justice Department" shall mean the United States Department of Justice.

"Liability" means any debt, loss, damage, adverse claim, fine, penalty, liability or obligation (whether direct or indirect, known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, matured or unmatured, determined or determinable, liquidated or unliquidated, or due or to become due, and whether in contract, tort, strict liability or otherwise), and all costs and expenses relating thereto including all fees, disbursements and expenses of legal counsel, experts, engineers and consultants and costs of investigation.

"Lien" means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, claim, lease, charge, option, right of first refusal, interest, put, call, easement, servitude, proxy, covenant, hypothecation, voting trust or agreement and transfer restriction under any agreement, against or with respect to tangible or intangible property or rights, whether imposed by agreement, understanding, law, equity or otherwise.

7

"Material Adverse Effect" shall mean an event, occurrence, condition, change or effect or a series of events, occurrences, conditions, changes or effects that, individually or in the aggregate, is or may be reasonably expected to be materially adverse to the business, financial condition, operations or properties of the person or businesses which has suffered such event, occurrence, condition, change or effect, including, but not limited to (i) the loss or revocation of any provider number or (ii) changes in law or regulations that impose additional burdens or obligations or requirements applicable to operations of not for profit hospitals in Connecticut; provided, however, that Material Adverse Effect shall exclude any changes or conditions as and to the extent such changes or conditions relate to or result from general economic conditions in the United States of America and/or such other conditions that affect the healthcare industry generally.

"Material Loss" shall have the meaning set forth in Section 1.13(b).

"Materials of Environmental Concern" shall mean chemicals, pollutants, contaminants, wastes, toxic substances, petroleum and petroleum products, including Hazardous Substances.

"Medical Records Custody Agreement" shall have the meaning set forth in Section 12.8(a).

"Name Amendments" shall have the meaning set forth in Section 10.2.

"Net Working Capital" shall mean, as of any balance sheet date, an amount equal to (i) the value of Sellers' current assets, including without limitation, all of Sellers' cash and cash equivalents, accounts receivables, prepaid expenses, inventories and other current assets, less (ii) Sellers' accounts payable, accrued payroll and benefits, other accrued expenses and accounts receivable credits due to third parties, unapplied cash, the outstanding amount due from Sellers under the DIP Financing Agreement reduced by any cash payment received by JEC for its receivables and paid to HFG pursuant to the JEC Transaction, in each case determined from Sellers' balance sheet as of the date thereof on a consolidated basis in accordance with the accounting principles applied by Sellers consistently applied. For purposes of this calculation, other accrued expenses shall exclude accrued interest on any debt which is not being assumed by Buyer pursuant to this Agreement. The applicable line items for this calculation, including numbers attributable to the various line items have been previously provided by Sellers to Buyer.

"OHCA" means the Office of Health Care Access, a division of the Department of Health.

"PCBs" shall mean polychlorinated biphenyls.

"People's" means People's United Bank.

"People's Debt" shall mean the Hospital Loan and the Surgery Center Loan together with and as evidenced by the Hospital Loan Documents and the Surgery Center Loan Documents.

"Permits and Licenses" shall have the meaning set forth in Section 1.2(d).

"Permitted Designee" shall have the meaning set forth in Section 1.2.

8

"Permitted Liens" shall mean Real Property Permitted Encumbrances, liens securing the Restructured People's Debt, liens securing the HFG Debt if the Buyer and HFG agree that the Buyer will assume the HFG Debt, and the Liens listed in Schedule 1.4(a)(ix).

"Petition Date" shall have the meaning set forth in the recitals.

"Prepaid Expenses" shall have the meaning set forth in Section 1.2(j).

"Purchase Price" shall have the meaning set forth in Section 1.6(a).

"Purchase Price Allocation" shall have the meaning set forth in Section 12.10.

"Qualified Beneficiaries" shall have the meaning set forth in Section 10.1.

"Real Property" shall mean, collectively, the Sellers' Owned Real Property and the Sellers' Leased Real Property.

"Real Property Permitted Encumbrances" shall mean all of the following: (a) zoning and building laws, ordinances, resolutions and regulations, and land use regulations; (b) real property taxes and assessments for public improvements not due and payable on or before the Closing; (c) such other exceptions as the Title Company shall commit to insure over, without any additional cost to Buyer, whether such insurance is made available in consideration of payment, bonding, or otherwise (but excluding indemnity of Sellers); (d) those encumbrances approved by Buyer, in its sole and absolute discretion; and (e) with respect to the JMH Real Estate, the Evergreen Ground Lease.

"Reimbursement Obligation" shall mean the reimbursement obligations of JMMC, JMH and JEC to Buyer in respect of the Credit Support, as set forth in the Amended and Restated Seventh Amendment to Master Affiliation Agreement dated as of July 14, 2014, among Buyer, JMMC, JMH and JEC, as the same may be amended from time to time.

"Reorganization Plan" means a plan of reorganization under Chapter 11 of the Bankruptcy Code.

"Restructured People's Debt" shall mean the People's Debt, as restructured on terms mutually satisfactory to Buyer and People's, in their sole and absolute discretion, providing for among other things, the assumption of (a) the entire principal balance of the Surgery Center Loan and (b) Seven Million Four Hundred Thousand Dollars ($7,400,000) of the principal balance of the Hospital Loan.

"Sale Motion" shall have the meaning set forth in Section 6.2.

"Sale Order" means an order of the Bankruptcy Court in form and substance satisfactory to Buyer, in its sole discretion, with such changes as may be made by Buyer (for the avoidance of doubt, including all exhibits and schedules thereto), that, among other things, finds and provides that: (i) this Agreement is the winning bid; (ii) the Assets and Facilities sold to Buyer pursuant to this Agreement shall be transferred to Buyer free and clear of all Liens (other than Permitted Liens) and all Liabilities, causes of action, demands, guaranties, rights, restrictions,

remedies, and matters of any kind or nature whatsoever, whether at law or in equity, including, without limitation, free and clear of any rights or claims based on theories of transferee or successor liability under any applicable law, statute, rule, regulation, common law or equitable principle, including, without limitation, any Environmental Laws, labor or employment laws (such as unemployment compensation), ERISA, the Code, and COBRA, of any Governmental Entity, including, without limitation, the Pension Benefit Guaranty Corporation, the IRS, state and local taxing authorities and any Governmental Entity, whether arising before or after the commencement of the Bankruptcy Case and whether imposed by agreement, understanding, law, equity, regulation, custom or otherwise, including, without limitation, the Benefit Plans, save and excepting only those Liabilities expressly assumed by Buyer in writing pursuant to this Agreement; (iii) the Bankruptcy Court shall retain jurisdiction over any claims that are not Assumed Liabilities hereunder; (iv) this Agreement was negotiated, proposed and entered into by the parties without collusion, in good faith and from arm's length bargaining positions; (v) this Agreement and the transactions contemplated hereby may be specifically enforced against and binding upon, and not subject to rejection or avoidance by, Sellers or any Chapter 7 or Chapter 11 trustee of Sellers appointed pursuant to the Bankruptcy Code or other representative of their respective estates; and (vi) the Assumed Contracts and the Assumed Leases shall be properly assigned to and assumed by Buyer pursuant to the procedure set forth in <u>Section 10.5</u> hereof, with only such exceptions as Buyer may agree in writing.

"Sale Procedures Order" shall have the meaning set forth in <u>Section 6.2</u>.

"Second Deposit Account" shall have the meaning set forth in <u>Section 1.12</u>.

"Seller" and "Sellers" shall have the meanings set forth in the introduction.

"Sellers' Leased Real Property" shall have the meaning set forth in <u>Section 1.2(b)</u>.

"Sellers' Owned Intellectual Property" shall have the meaning set forth in <u>Section 1.2(m)</u>.

"Sellers' Owned Real Property" shall have the meaning set forth in <u>Section 1.2(a)</u>.

"Sellers' Real Property Expense Leases" shall have the meaning set forth in <u>Section 1.2(b)</u>.

"Sellers' Real Property Income Leases" shall have the meaning set forth in <u>Section 1.2(g)</u>.

"Surgery Center Loan" shall mean that certain loan from People's to JMMC in the original principal amount of $4,500,000, dated August 24, 2004, guaranteed by JMH, as evidenced by the Surgery Center Loan Documents.

"Surgery Center Loan Documents" shall mean those certain agreements, documents and instruments executed in connection with the Surgery Center Loan by and among People's, JMMC and JMH.

"Taxes" or "Tax" shall mean all taxes, fees, levies or other assessments, however denominated, including any interest, penalties or other additions to taxes that may become payable in respect thereof, imposed by any federal, territorial, state, local or foreign

Governmental Entity, which taxes shall include, without limiting the generality of the foregoing, all income or profits taxes (including, but not limited to, federal income taxes and state income taxes), unrelated business income taxes, payroll and employee withholding taxes, unemployment insurance, social security taxes, sales and use taxes, ad valorem taxes, excise taxes, taxes under Code Section 4958, franchise taxes, gross receipts taxes, business license taxes, occupation taxes, property taxes, stamp taxes, environmental taxes, transfer taxes, workers' compensation, alternative or add-on minimum estimated or other taxes, levies or assessments for unclaimed property under applicable escheat or unclaimed property laws and other obligations having the same nature or a nature similar to any of the foregoing.

"Tax Return" or "Tax Returns" shall mean any report, return, declaration, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto and including any amendment thereof.

"The Hartford" shall mean Hartford Fire Insurance Company.

"Third Party Payments" shall have the meaning set forth in Section 1.6(b)(v).

"Title Company" shall mean the title company Buyer selects to issue as of the Closing Date one or more ALTA owner's policies of title insurance (Form 2006), with extended coverage and zoning endorsements and such other endorsements as Buyer shall reasonably require.

"Trade Payables" shall mean accounts payable owed to vendors for goods sold and services rendered, in each case in the ordinary course of business, incurred within the three month period prior to the Petition Date or incurred after the Petition Date, but excluding indebtedness for borrowed money.

"Transfer Taxes" shall have the meaning set forth in Section 1.6(a)(vii).

"Transferred Contracts" shall have the meaning set forth in Section 10.5.

"Transferred Employees" shall have the meaning set forth in Section 9.1(a).

"WARN Act" shall have the meaning set forth in Section 9.1(c).

"Workers' Compensation Liabilities" shall mean the Liability of the Sellers and JEC under their workers' compensation insurance policy with The Hartford for the period May 31, 2014 to the Closing Date.

1.2    Sale of Assets. At the Closing, each Seller shall sell, transfer, convey, assign and deliver to Buyer all of such Seller's respective right, title and interest in, to and under the assets, properties and business of every kind and description that are owned or held by each Seller or used by each Seller in connection with the operation of the Facilities and the Business, except the Excluded Assets (collectively, the "Assets"), including, without limitation, the following assets and properties listed in this Section 1.2. Pursuant to the Sale Order, the Assets shall be sold and conveyed to Buyer free and clear of all Liens (other than Permitted Liens) and Liabilities (other than Assumed Liabilities), including any and all claims that Buyer is a successor, transferee or

11

continuation of Sellers or the Business. The Assets include, without limitation, the following, except as included among the Excluded Assets:

(a)     all real property owned by any Seller, as more specifically described on Schedule 1.2(a), together with all buildings, improvements and fixtures located thereupon, all easements, rights of way, and other appurtenances thereto (including appurtenant rights in and to public streets), all architectural plans or design specifications relating to the development thereof and all construction in progress (collectively, the "Sellers' Owned Real Property");

(b)     to the extent elected by Buyer pursuant to Section 10.5 hereof, the real property leasehold or sub-leasehold estates described on Schedule 1.2(b) (collectively, the "Sellers' Leased Real Property;" the leases under which Sellers hold a leasehold or sub-leasehold estate in the Sellers' Leased Real Property are collectively referred to herein as the "Sellers' Real Property Expense Leases");

(c)     (i) all tangible personal property used in the operation of the Business as of the Effective Time, including, without limitation, all major, minor or other equipment, furniture, fixtures, machinery, office furnishings and instruments, Sellers' most recent (as of the Execution Date) depreciation list previously provided to Buyer, (ii) all vehicles identified on Schedule 1.2(c)(ii) which continue to be owned by a Seller at the Effective Time, or acquired by a Seller between the Execution Date and the Effective Time and owned at the Effective Time and (iii) all inventories of supplies, non-expired drugs, food, janitorial and office supplies and other disposables and consumables existing at the Effective Time and located at any Facility, or owned or purchased by any Seller for use in connection with the Business (the "Inventories");

(d)     to the extent assignable or transferable, all licenses, Certificates of Need, Exemption Certificates, franchises, accreditations and registrations and other licenses or permits issued by a Governmental Entity or pending for issuance by a Governmental Entity in connection with the Business, including without limitation those described in Schedule 1.2(d) as the same may be renewed from time to time following the Execution Date (collectively, the "Permits and Licenses");

(e)     all claims, causes of action and judgments in favor of Sellers relating to the physical condition or repair of the Assets, all insurance proceeds due to Buyer under Section 1.13 and, to the extent assignable, all warranties (express or implied) and rights and claims assertable by (but not against) Sellers related to the Assets;

(f)     all financial, patient, medical staff, personnel (after obtaining any requisite employee consents) and other records relating to the Business or the Assets, including, without limitation, all accounts receivable records, equipment records, medical and administrative libraries, medical records, patient billing records, documents, construction plans and specifications, catalogs, books, records, files, operating manuals and current personnel records, including any electronic data relating to such records and information stored in any computer, computer server or computer equipment relating to or used in connection with the Business;

(g)     to the extent elected by Buyer pursuant to Section 10.5 hereof, all lease agreements pursuant to which any Seller, as landlord, has leased to a third party, as tenant, all or some portion of the Sellers' Owned Real Property or the Sellers' Leased Real Property, including without limitation those described on Schedule 1.2(g) to the extent still in effect at the Effective Time or entered into by a Seller between the Execution Date and the Effective Time and in effect at the Effective Time (collectively, the "Sellers' Real Property Income Leases");

(h)     all rights of any Seller under those Contracts, commitments and agreements and leases (including, without limitation, any design, engineering and construction contracts for planned, pending or ongoing construction projects) described on Schedule 1.2(h) (collectively, the "Assumed Contracts");

(i)     all goodwill associated with the operation of the Business and the Assets;

(j)     any deposits, other current assets, other assets, escrows, prepaid taxes or other advance payments relating to any expenses of the Business, including without limitation items of the type previously provided to Buyer (collectively, the "Prepaid Expenses");

(k)     other than the Government Patient Receivables and any other Excluded Assets, and subject to the Healthcare Reimbursement Obligation, all notes, accounts receivable and other rights to receive payment for goods and services provided by Sellers in connection with the Business or otherwise arising from the operation of the Business, billed or unbilled, recorded or unrecorded, including, without limitation, any such notes, reimbursement credit balances, accounts receivable or other rights that have been charged off as bad debt, and all other notes receivable from patients and notes receivable from physicians as identified in a list previously provided to Buyer to the extent not satisfied prior to the Effective Time, and further including, without limitation, any of the same constituting Intercompany Obligations;

(l)     the right to receive an amount of cash equal to the value of the Government Patient Receivables actually collected by Sellers as evidenced by statements provided to Buyer from time to time upon Buyer's request;

(m)     the names used in connection with the Business, including, without limitation, Johnson Memorial Hospital, Johnson Surgery Center, Advanced Wound Center, Community Cancer Center, Home & Community Health Services, Johnson Memorial Cancer Center and Karen Davis Krzynowek Infusion Center together with all variations thereof, and the goodwill associated therewith, and all patents, trademarks, tradenames, service marks, domain names, trade secrets, copyrights, software (to the extent owned by Sellers), computer programs (to the extent owned by Sellers) and other intellectual property rights of Sellers (to the extent transferable) used in connection with the Business, including without limitation those described on Schedule 1.2(m) hereto (collectively, the "Sellers' Owned Intellectual Property");

(n)     if elected by Buyer prior to Closing, each Seller's Medicare or Medicaid and other government healthcare program and commercial payor provider numbers and agreements to the extent assignable, including those items previously provided to Buyer to the extent still in effect as of the Effective Time, and rights of Sellers to settlement and retroactive adjustments, if any, for open cost reporting periods ending on or prior to the Closing Date

13

(whether open or closed) arising from or against the U.S. Government under the terms of the
Medicare program or TRICARE and against any state under its Medicaid program and against
any third-party payor program that settles on a cost report basis, together with depreciation
"recapture", whether recorded as a current or long-term asset;

(o)    all nondisclosure or confidentiality, non-compete, or non-solicitation
agreements with employees and agents of any Seller or with third parties to the extent relating to
the Business or the Assets (or any portion thereof) and which are in favor of such Seller,
including those set forth on Schedule 1.2(o) hereto to the extent still in effect as of the Effective
Time;

(p)    to the extent transferable, all of any Seller's rights under or pursuant to all
warranties, representations and guarantees made by suppliers, manufacturers and contractors to
the extent affecting any other Asset, other than any warranties, representations and guarantees
pertaining to any Excluded Assets;

(q)    all of Sellers' cash, cash equivalents, and short-term investments;

(r)    all of Sellers' bankruptcy estates' interest in any and all Avoidance
Actions;

(s)    all equity interests in Tolland Imaging Center, LLC and all non-stock
corporation membership interests and/or equity ownership interests in Northeast Regional
Radiation Oncology Network, Inc. or any successor entity thereto; and

(t)    except as expressly excluded in Section 1.3 below, all other property
owned by Sellers, whether tangible or intangible, located at any Facility or used in connection
with the Business, and any claims in favor of any Seller, whether known or unknown, contingent
or otherwise.

The foregoing assets, together with the Excluded Assets, comprise substantially all of the
property and assets used in the conduct and operation of the Business as of the Execution Date.
Unless otherwise specified herein, the "Assets" also include all assets acquired by or leased by
any Seller for use in connection with the Business between the Execution Date and the Effective
Time.

The parties agree that Sellers have from time to time received or been made the
beneficiaries of charitable gifts, transfers, trusts and bequests, and that these monies or any
interest therein (the "Charitable Assets") are subject to the oversight of the Office of the
Attorney General of Connecticut. It is the intention of the parties that, subject to the intentions of
the donors and the approval of the Attorney General and the courts, if necessary, for Charitable
Assets owned by any of the Sellers, the Charitable Assets will be transferred to the Buyer or an
entity selected by the Buyer, to be used for the same charitable purposes for which they were
donated, and for purposes thereof included among the Assets.  To the extent they cannot be so
transferred, they will constitute Excluded Assets, anything in this Agreement to the contrary
notwithstanding.  Further, it is the intention of the parties that, for Charitable Assets as to which
any of the Sellers may be designated as beneficiary, Buyer or an entity selected by the Buyer will
be designated as the successor beneficiary thereof in place of the applicable Seller(s).

14

Notwithstanding any provision of this Agreement identifying Buyer as the purchaser of the Assets, from time to time, prior to Closing, Buyer may designate one or more subsidiaries or Affiliates of Buyer which are entities formed for not-for-profit purposes entitling them to exemption under Section 501(c)(3) of the Code to be the transferee(s) of some or all of the Assets (any such subsidiary or Affiliate being referred to herein as a "Permitted Designee"). Each Permitted Designee shall be bound by all of the terms and conditions of this Agreement affecting Buyer as if such Permitted Designee were a signatory to this Agreement. In the event of any such designation, Buyer shall guarantee the obligations of such Permitted Designee(s) hereunder.

AS IS/WHERE IS.      THE ASSETS SHALL BE TRANSFERRED "AS IS" AND "WHERE IS." EACH SELLER MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND OR NATURE (EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT). NO STATUTORY OR OTHER WARRANTIES AS TO THE CONDITION OF THE ASSETS OR THE MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE ASSETS SHALL BE IMPLIED, AND EACH SELLER HEREBY EXPRESSLY DISCLAIMS ANY REPRESENTATION OR WARRANTY AS TO THE CONDITION OF THE ASSETS OR THEIR MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

1.3     Excluded Assets; Non-Assignable Contracts.

(a)     The following items are not intended by the parties to be a part of the purchase and sale of assets hereunder and are excluded from the Assets (collectively, the "Excluded Assets"): (i) the corporate record books, minute books and Tax records of each Seller; (ii) all Inventories disposed of in the ordinary course of business prior to the Closing and all accounts receivable collected in the ordinary course of business prior to the Closing; (iii) subject to the terms of Section 1.2(l), the Government Patient Receivables; (iv) except if Buyer elects pursuant to Section 1.2(n) to accept assignment of each Seller's Medicare and Medicaid provider number and provider agreements, rights of Sellers to settlement and retroactive adjustments, if any, for open cost reporting periods ending on or prior to the Closing Date (whether open or closed) arising from or against the U.S. Government under the terms of the Medicare program or TRICARE and against any state under its Medicaid program and against any third-party payor program that settles on a cost report basis, together with depreciation "recapture", whether recorded as a current or long-term asset; (v) rights of any Seller arising pursuant to this Agreement; (vi) all executory contracts or unexpired leases, whether oral or written, to which any Seller is a party which are not Assumed Contracts or Assumed Leases, and all assets leased, licensed or otherwise held pursuant thereto; (vii) personnel records to the extent the employees subject of such records have not consented in writing to the transfer of such records to the extent required by applicable law; (viii) all rights with respect to attorney-client privilege, attorney work product, accountant-client privilege and similar privileges and doctrines; (ix) all claims, counterclaims, rights and defenses of any Seller with respect to any other Excluded Asset and/or any Excluded Liability; and (x) any other assets as identified in a list previously provided to Buyer.

(b)     Notwithstanding anything to the contrary in this Agreement, and subject to the provisions of this Section 1.3, to the extent that the assignment or transfer, or attempted

15

assignment or transfer, to Buyer of any Assumed Contract or Assumed Lease would result in a violation of applicable law, or would require the consent, authorization, approval or waiver of a person who is not a party to this Agreement or an Affiliate of a party to this Agreement (including any Governmental Entity), and such consent, authorization, approval or waiver shall not have been obtained prior to the Closing, this Agreement shall not constitute an assignment, or transfer, or an attempted assignment or transfer, thereof; *provided, however,* that, subject to the satisfaction or waiver of the conditions contained in Articles VII and VIII, the Closing shall occur notwithstanding the foregoing without any adjustment to the Purchase Price on account thereof. Following the Closing, Sellers and Buyer shall use commercially reasonable efforts, and shall cooperate with each other, to obtain any such required consent, authorization, approval or waiver, or any release, substitution or amendment required to novate all Liabilities under any and all Assumed Contracts and Assumed Leases or to obtain in writing the unconditional release of all parties to such arrangements, so that, in any case, Buyer shall be solely responsible for such Liabilities from and after the Closing Date; *provided, however,* that neither Sellers nor Buyer shall be required to pay any consideration therefor. Once such consent, authorization, approval, waiver, release, substitution or amendment is obtained, Sellers shall be deemed, to have assigned and transferred to Buyer the relevant Assumed Contract or Assumed Lease to which such consent, authorization, approval, waiver, release, substitution or amendment relates for no additional consideration retroactive to the Effective Time, without need for further action of any Person, except as may be required by the Bankruptcy Court.

(c)     To the extent that any Assumed Contract or Assumed Lease cannot be transferred to Buyer following the Closing, Buyer and Sellers shall use commercially reasonable efforts to enter into such arrangements (such as subleasing, sublicensing or subcontracting) to provide to the parties the economic and, to the extent permitted under applicable law, operational equivalent of the transfer of such Assumed Contract or Assumed Lease to Buyer as of the Closing and the performance by Buyer of its obligations with respect thereto. To the extent that Buyer is receiving such economic and operational benefit, Buyer shall, as agent or subcontractor for Sellers, pay, perform and discharge fully the Liabilities of Sellers thereunder from and after the Closing Date. To the extent permitted under applicable law, Sellers shall, at Buyer's expense, hold in trust for and pay to Buyer promptly upon receipt thereof, such Assumed Contract or Assumed Lease and all income, proceeds and other monies received by Sellers to the extent related to such Assumed Contract or Assumed Lease in connection with the arrangements under this Section 1.3.

1.4     Assets Free and Clear; Assignment and Assumption Agreement.

(a)     Notwithstanding any other provision hereof to the contrary, the Assets shall be sold and transferred to Buyer free and clear of all Liabilities and Liens, except (i) subject to the terms of Section 1.6(b)(i), the HFG Debt and the Liens securing the HFG Debt; (ii) the Restructured People's Debt in an amount not to exceed Ten Million Five Hundred Thousand Dollars ($10,500,000) of principal plus all outstanding and accrued interest on the Restructured People's Debt and the Liens securing the Restructured People's Debt; (iii) the Trade Payables; (iv) the Reimbursement Obligation directly attributable to the Sellers, in the event Buyer designates a Permitted Designee, and the Workers' Compensation Liabilities directly attributable to the Sellers in an amount not to exceed Two Million Dollars ($2,000,000); (v) the accrued and unpaid obligations of any Seller with respect to payroll, paid-time-off, incentive compensation

16

and expense reimbursements as of the Effective Time (the "Accrued Employee Liabilities"); (vi) the obligations described in subsection (b) below; (vii) obligations of any Seller which are Intercompany Obligations; (viii) Real Property Permitted Encumbrances and other Permitted Liens;    (ix) the Liabilities of Sellers, and Liens relating thereto, if any, set forth on Schedule 1.4(a)(ix); (x) the Healthcare Reimbursement Obligation in an amount not to exceed Two Million Two Hundred Thousand Dollars ($2,200,000); and (xi) only if Buyer elects to accept assignment of each Seller's Medicare and Medicaid provider number and provider agreements pursuant to Section 1.2(n), all Liabilities under Sellers' Medicare and Medicaid provider numbers and agreements (collectively, the "Assumed Liabilities").

(b)    Buyer shall expressly assume the Assumed Liabilities and all of Sellers' obligations with respect to events or periods on and after the Effective Time under the Assumed Contracts and the Assumed Leases, including without limitation the Collective Bargaining Agreement, pursuant to the Assignment and Assumption Agreement (the "Assignment and Assumption Agreement") in substantially the form attached hereto as Exhibit 1.4(b).

(c)    Except for the Assumed Liabilities, obligations with respect to events or periods on and after the Effective Time under the Assumed Contracts and obligations with respect to events or periods on and after the Effective Time under the Assumed Leases, Buyer is not assuming, and shall not be deemed to have assumed, any other Liability of any Seller, or any of their Affiliates, fixed or contingent, disclosed or undisclosed, recorded or unrecorded, currently existing or hereafter arising, or otherwise.

(d)    With respect to any indebtedness secured by a Lien on the Assets, if the indebtedness is not expressly assumed by Buyer, any such Lien shall attach to the proceeds of sale.

1.5    Excluded Liabilities.  Other than the Assumed Liabilities, Buyer shall not assume and shall not be liable for any Liabilities of any Seller (all Liabilities of any Seller that are not Assumed Liabilities are referred to collectively as the "Excluded Liabilities").

1.6    Purchase Price.

(a)    Subject to the terms and conditions hereof, in consideration for the Assets, the Buyer agrees to assume the Assumed Liabilities and pay an amount equal to or assume the obligations as follows:

(i)    the aggregate amount of (A) the Restructured People's Debt assumed by Buyer in an amount of up to Ten Million Five Hundred Thousand Dollars ($10,500,000) of principal plus all outstanding and accrued interest on the People's Debt and (B) the HFG Debt, which will be assumed or paid in full by Buyer as described below;

(ii)    the Cure Costs under all Assumed Leases and Assumed Contracts in an amount up to Five Hundred Thousand Dollars ($500,000);

(iii)    without duplication, the aggregate amount of the Reimbursement Obligation directly attributable to the Sellers and assumed by Buyer and the aggregate amount of

17

the Workers' Compensation Liabilities directly attributable to the Sellers and assumed by Buyer in an amount up to Two Million Dollars ($2,000,000);

(iv)     One Million Two Hundred Fifty Thousand Dollars ($1,250,000) (such amount being referred to herein as the "Cash Payment");

(v)     the aggregate amount of Trade Payables assumed by Buyer;

(vi)     the Accrued Employee Liabilities;

(vii)     the aggregate amount of any transfer taxes, fees or similar assessments resulting from the sale of the Assets pursuant hereto and paid by Buyer in an amount up to Three Hundred Thousand Dollars ($300,000) (the "Transfer Taxes");

(viii)     the Healthcare Reimbursement Obligation in an amount up to Two Million Two Hundred Thousand Dollars ($2,200,000); and

(ix)     the aggregate amount of any premiums to obtain the insurance described in Section 5.7 hereof (the items in (i) through (viii) are, together with the assumption of the Assumed Liabilities, collectively, the "Purchase Price").

(b)     The Purchase Price shall be payable as follows:

(i)     the HFG Debt will be paid in full or assumed by Buyer on terms and conditions mutually acceptable to the Buyer and HFG;

(ii)     the accrued and outstanding interest on the People's Debt shall be paid at Closing and the Restructured People's Debt shall be payable over time as set forth in and pursuant to their respective terms;

(iii)     the Cure Costs under the Assumed Leases and Assumed Contracts shall be payable as mutually agreed to by Sellers and Buyer;

(iv)     the Reimbursement Obligation shall be paid by the applicable Permitted Designee, if any, in the ordinary course of business and the Workers' Compensation Liabilities shall be payable as and when due, provided that if Buyer does not appoint a Permitted Designee and in fact purchases the Assets directly, the Reimbursement Obligation shall be forgiven;

(v)     the Cash Payment shall be payable as more specifically set forth in Schedule 1.6(b)(v), such Schedule to be completed by Buyer prior to Closing and to include list negotiated payments to certain identified third parties (collectively, the "Third Party Payments") and other categories of expense (collectively, the "Administrative Expenses") (Sellers shall have the right to approve the Administrative Expenses set forth in such Schedule, in their reasonable discretion, but Sellers shall not have the right to approve the Third Party Payments);

(vi)     the payment of the premium for the "tail" or other insurance required by Buyer pursuant to Section 5.7 to the applicable insurance carrier;

(vii)    the Trade Payables shall be assumed by Buyer;

(viii)   the Accrued Employee Liabilities shall be paid to or for the benefit of the applicable employees of Sellers in accordance with applicable law;

(ix)    any Transfer Taxes shall be paid by Buyer to the appropriate Governmental Entity on the Closing Date; and

(x)    the Healthcare Reimbursement Obligation and any other Assumed Liabilities shall be paid by Buyer in the ordinary course of business.

1.7    Additional Investment.    In addition to the Purchase Price, Buyer anticipates spending up to Thirteen Million Dollars ($13,000,000) within the first three (3) years following the Closing on investments in technology, capital improvements, expanded services and routine replacements for the Facilities.

1.8    Taxes.    Subject to the last sentence of Section 1.9 hereof, each Seller shall pay all Taxes, if any, applicable to such Seller, but not including any Transfer Taxes resulting from the sale of the Assets pursuant hereto. Buyer shall pay all Taxes, if any, applicable to Buyer, and all Transfer Taxes payable on account of the transactions contemplated by this Agreement.

1.9    Tax Obligations.    To the extent necessary to transfer Assets to Buyer free and clear of Liens (other than Permitted Liens) and Liabilities (except Assumed Liabilities), each Seller shall be responsible for and shall pay any Taxes arising or resulting from or in connection with its ownership and/or operation of the Assets for taxable periods (i) ending before the Effective Time or (ii) for those portions up to the Effective Time of a taxable period that begins prior to, but ends after, the Effective Time. Buyer shall be responsible for and shall pay all Taxes in connection with the ownership of the Assets for taxable periods or portions thereof beginning as of the Effective Time. Notwithstanding the foregoing, prior to the Effective Time, each Seller shall pay when due any and all provider taxes and, after the Effective Time, the Buyer shall pay when due any and all provider taxes regardless of whether such taxes are attributable to taxable periods ending before the Effective Time.

1.10    Cooperation With Respect to Taxes.    The parties to this Agreement shall reasonably cooperate, including without limitation during times of audit by taxing authorities and in preparation of Tax Returns, to avoid payment of duplicate or inappropriate Taxes, and each party shall furnish, at the reasonable request of the other, proof of payment of any such Taxes or any other documentation that is a prerequisite to avoiding payment of a duplicate or inappropriate Tax. Such cooperation shall include, without limitation, furnishing information regarding prior years' Tax Returns and related work papers, rulings and determinations by any tax authority.

1.11    Reserved.

1.12    Lock Box.    Each Seller hereby appoints, from and after the Closing Date, Buyer, and Buyer agrees to act, as its collection agent with respect to its Government Patient Receivables. In connection therewith, on or before the Closing Date, Buyer shall establish on each Seller's behalf (and with such Seller's tax identification number) a "lock box" at a financial

institution selected by Buyer (subject to such Seller's approval, which shall not be unreasonably withheld), or alternatively Buyer and such Seller may agree to designate and use an existing "lock box" bank account owned by Seller (the "Designated Lock Box Account"), and after the Closing, Buyer, as agent for such Seller and on such Seller's behalf, shall deposit in such designated lock box all cash, checks, drafts or other similar items of payment of such Government Patient Receivables. Each Seller shall provide standing instructions in writing to the financial institution at which such account is maintained directing all proceeds deposited in the Designated Lock Box Account be swept out on a daily basis to another deposit account at the financial institution owned by such Seller (the "Second Deposit Account"). Such Seller shall assign all such amounts deposited on its behalf into the Second Deposit Account to Buyer in full satisfaction of its obligation to transfer to Buyer an amount equal to the value of its Government Patient Receivables actually collected, as set forth in Section 1.2(l). Each Seller's agreement with the financial institution shall require such Seller to provide at least ten (10) days prior written notice to the bank and obtain approval from the Bankruptcy Court before any change to these standing instructions shall become effective and shall require the bank to notify the Buyer of any change to these standing instructions at least five (5) days before becoming effective. Any change in the standing instructions not agreed to in writing in advance by Buyer shall constitute a material breach of the applicable Seller's obligations under this Agreement. The provisions of this Section 1.12 shall be subject to the rights of HFG as it relates to the Government Patient Receivables and in the event the Buyer assumes the HFG Debt, the lock box arrangement must be satisfactory to HFG.

## 1.13   Casualty and Condemnation Loss Provision.

(a)      The risk of loss or damage to any of the Assets shall remain with Sellers until the Effective Time, and Sellers shall maintain their insurance policies covering the Assets and all other property through the Effective Time. If any material part or portion of the Assets is damaged, lost or destroyed (whether by fire, theft or other casualty event) prior to the Effective Time, Sellers shall notify Buyer ("Casualty Notice") as soon as possible of such damage, loss or destruction. The Casualty Notice shall set forth Sellers' good faith, reasonable estimate of the fair market value of the cost to repair, replace or restore (as applicable) such damage, loss or destruction (the "Estimate").

(b)      In the event that there is damage, loss or destruction to the Assets (collectively, the "Casualty Assets") and (i) it can reasonably be anticipated that such damage, loss or destruction will prevent Buyer from providing a material service at any Facility for more than sixty (60) days after the Closing Date and so as to cause a Material Adverse Effect; or (ii) the Estimate is greater than $3,000,000 in excess of any applicable insurance recovery (either (i) or (ii), a "Material Loss"), Buyer may, within ten (10) days after receipt of the Estimate, by written notice to Sellers, terminate this Agreement.

(c)      If, prior to the Effective Time, any part or portion of the Assets is destroyed, lost or damaged (i) to an extent that does not result in a Material Loss or (ii) to an extent that there is a Material Loss and Buyer chooses not to terminate this Agreement, Buyer and Sellers shall consummate the transactions contemplated in this Agreement, subject to the other terms and conditions of this Agreement, and, at the Effective Time, Sellers shall deliver possession of the Assets to Buyer in such physical condition as the same may then exist;

20

provided that, in such event, Sellers shall assign to Buyer the right to receive any net insurance proceeds for the property loss or damage to the Assets and reduce the cash portion of the Purchase Price by an amount equal to any deductible or other reduction below fair market value of the applicable Assets of the net insurance proceeds received in connection therewith. For purposes of effecting this <u>Section 1.13</u>, Buyer will be a named additional insured on Sellers' property insurance.

(d)     If, prior to the Effective Time, any Seller becomes aware that any condemnation proceeding is threatened or filed in respect of any Real Property, Sellers shall give prompt written notice thereof to Buyer, in which event Sellers agree to negotiate in good faith with Buyer regarding the effect, if any, such a proceeding shall have on the transactions contemplated herein. In the event that the condemnation proceeding relates to a material portion of any Facility as determined by Buyer in good faith, Buyer shall have the option to terminate this Agreement or proceed with Closing, provided, that Buyer shall be entitled to receive the entire condemnation award. Buyer shall have the right to approve or disapprove any proposed settlement concerning any filed or threatened condemnation proceeding relating to any of the Assets.

(e)     The provisions of this Section 1.13 shall be subject to the rights of People's under the Hospital Loan Documents and the Surgery Center Loan Documents.

1.14     <u>Deposit</u>. Concurrently with the execution of this Agreement Buyer is depositing into an escrow (the "Deposit Escrow") with the Title Company as escrow agent (the "Deposit Escrow Holder"), an amount equal to Seven Hundred Fifty Thousand Dollars ($750,000.00) (together with interest earned thereon, the "Deposit") in immediately available, good funds, pursuant to joint instructions to be delivered to the Deposit Escrow Holder. Upon receipt of such funds, the Deposit Escrow Holder shall immediately deposit the Deposit into an interest-bearing account. The Deposit shall be held pursuant to an Escrow Agreement (the "Escrow Agreement") being entered into by the parties and Deposit Escrow Holder concurrently with the execution of this Agreement. At Closing, the Deposit shall be paid over to Sellers. If this Agreement terminates for any reason, the Deposit shall be paid over to Sellers or returned to Buyer, as set forth in <u>Section 11.3</u> and the Escrow Agreement. In the event that Buyer fails to deposit the Deposit into escrow as set forth herein, Sellers shall have the right, in their sole and absolute discretion, to proceed against Buyer to seek such Deposit.

2.     CLOSING.

2.1     <u>Closing</u>. The consummation of the purchase and sale of the Assets (the "Closing") shall take place at the offices of Hinckley, Allen & Snyder LLP or such other agreed upon location, at 10:00 A.M. local time on the last business day of the month in which all of the conditions precedent thereto have been satisfied, except those that are to be satisfied at the time of the Closing, or at such other time as the parties hereto may mutually designate in writing (the "Closing Date"), but in no event later than January 14, 2016, or such other date as the parties may agree in writing. The Closing shall be effective for all purposes at 12:01 A.M. on the first calendar day of the next succeeding month or at such other point in time as the parties may agree in writing (the "Effective Time").

2.2 <u>Actions of Sellers at Closing</u>. At the Closing, each Seller shall deliver, or cause to be delivered, to Buyer the following (each Seller hereby acknowledges and agrees that the agreements described in this <u>Section 2.2</u> shall expressly provide that the Assets shall be delivered free and clear of all Liens (other than Permitted Liens) and Liabilities (other than Assumed Liabilities)):

(a) One or more quitclaim deeds or deeds in transferable and recordable form, reasonably acceptable to each of Buyer and the Title Company, executed by a duly appointed duly authorized officer and/or representative of such Seller, conveying to Buyer all of such Seller's right and interest to the Sellers' Owned Real Property, subject only to the applicable Real Property Permitted Encumbrances that affect any such parcel;

(b) An Assignment and Assumption Agreement executed by a duly authorized officer and/or representative of such Seller;

(c) A general bill of sale and assignment substantially in the form attached hereto as <u>Exhibit 2.2(c)</u> (the "Bill of Sale") executed by a duly authorized officer and/or representative of such Seller;

(d) The applicable Name Amendments for filing with the Office of the Connecticut Secretary of the State;

(e) A secretary's certificate, including copies of resolutions duly adopted by its board of directors or other governing body authorizing and approving the performance of each of the transactions contemplated hereby and the execution and delivery of this Agreement and the documents described herein, together with certificates of incumbency, certified as true and of full force as of the Closing by an appropriate officer of such Seller;

(f) A certificate of the respective President or a Vice President of such Seller, certifying that the conditions set forth in <u>Sections 7.1</u>, <u>7.3</u> (as it relates to Sellers), <u>7.4</u> and <u>7.6</u> have been satisfied;

(g) A certificate of existence of such Seller from the Office of the Connecticut Secretary of the State dated not more than ten (10) days prior to Closing;

(h) A title insurance affidavit substantially in the form of <u>Exhibit 2.2(h)</u> hereto as requested by the Title Company;

(i) Reserved;

(j) Copies of insurance policies and certificates of insurance evidencing the insurance described in <u>Section 5.7</u>;

(k) JMH shall deliver a Drug Enforcement Administration limited power of attorney fully executed by a duly authorized officer of JMH (the "DEA Power of Attorney"), substantially in the form attached hereto as <u>Exhibit 2.2(k)</u>;

(l)     A certificate of non-foreign status, dated as of the Closing Date, executed by a duly authorized officer of such Seller, in form and substance required under the Treasury Regulations pursuant to Section 1445 of the Code, substantially in the form of Exhibit 2.2(l) hereto;

(m)     Reserved;

(n)     The Medical Records Custody Agreement; and

(o)     Such other instruments and documents as Buyer reasonably deems necessary to effectuate the transactions contemplated hereby.

Simultaneously with the delivery of the foregoing items and as reasonably required at any time thereafter, each Seller will take all steps as may reasonably be required to put Buyer in actual possession and operating control of the Assets following the Closing.

2.3     Actions of Buyer at Closing.   At the Closing, Buyer shall deliver, or cause to be delivered, to Sellers or their representatives:

(a)     Payment of the Purchase Price less the Deposit as determined in accordance with and payable pursuant to Section 1.6 hereof;

(b)     The Assignment and Assumption Agreement, all executed by a duly authorized officer of Buyer;

(c)     Reserved;

(d)     The Medical Records Custody Agreement;

(e)     A copy of resolutions duly adopted by the board of directors of Buyer authorizing and approving Buyer's performance of the transactions contemplated hereby and the execution and delivery of the documents described herein, certified as true and of full force as of the Closing by an appropriate officer of Buyer;

(f)     A certificate, dated as of the Closing Date, of an appropriate officer of Buyer certifying that the conditions set forth in Sections 8.1 and 8.2 (as it relates to Buyer) have been satisfied;

(g)     A certificate of incumbency, dated as of the Closing Date, for the officers of Buyer making certifications for Closing or executing this Agreement, the Assignment and Assumption Agreement, or any other documents, agreements or certificates contemplated by the terms hereof to be executed and delivered by Buyer; and

(h)     A certificate of existence of Buyer from the Office of the Connecticut Secretary of the State dated not more than ten (10) days prior to Closing.

23

3.      REPRESENTATIONS AND WARRANTIES OF SELLERS.

As of the Execution Date and as of the Closing Date, Sellers hereby jointly and severally represent and warrant to Buyer the following:

3.1      Existence and Capacity.  Each Seller is a nonstock corporation, duly organized, validly existing and in good standing under the laws of the State of Connecticut with all requisite corporate power and authority to own, operate and lease its properties, including, without limitation, the Assets.

3.2      Binding Agreement.  This Agreement constitutes the valid, legal and binding obligation of each Seller, enforceable against such Seller in accordance with its terms.  Upon the execution and delivery by each Seller of such other agreements as may be required pursuant to Section 2.2, such agreements will constitute valid, legal and binding obligations of such Seller, enforceable against such Seller in accordance with their terms.

3.3      Powers; Consents; Absence of Conflicts With Other Agreements.  The execution, delivery, and performance of this Agreement by each Seller and all other agreements referenced herein, or ancillary hereto, to which such Seller is a party, and the consummation of the transactions contemplated herein by such Seller:

(a)      are within such Seller's authority and power, are not in contravention of law or of the terms of such entity's organizational documents and have been duly authorized by all appropriate action of such Seller;

(b)      except as set forth on Schedule 3.3, do not require any approval or consent of, or filing with, any Governmental Entity bearing on the validity of this Agreement which is required by law or the regulations of any such Governmental Entity, assuming the accuracy of Buyer's representation and warranty set forth in Section 4.6; and

(c)      assuming the accuracy of Buyer's representation and warranty set forth in Section 4.6, will not violate any statute, law, ordinance, rule or regulation of any Governmental Entity to which any Seller or the Assets may be subject; and will not violate any judgment, decree, order, writ or injunction of any court or Governmental Entity to which any Seller, or the Assets may be subject.

3.4      Sufficiency of Assets.  Except for the Excluded Assets, the Assets constitute, in the aggregate, all the assets, interests, rights and property used by Sellers in connection with the operation of the Business as currently conducted.

3.5      Title to Tangible Personal Property.  Seller has good and valid title to, or a valid leasehold interest in, all tangible personal property included in the Assets.

3.6      Real Property.  Schedule 1.2(a) sets forth the Sellers' Owned Real Property. Seller has good and marketable fee simple title to the Sellers' Owned Real Property.  Schedule 1.2(b) sets forth the Sellers' Leased Real Property.  No Seller has received any written notice of existing, pending or threatened (i) condemnation proceedings affecting the Sellers' Owned Real Property or Sellers' Leased Real Property, or (ii) zoning, building code or other moratorium

24

proceedings, or similar matters which would reasonably be expected to materially and adversely affect the ability to operate the Sellers' Owned Real Property or Sellers' Leased Real Property as currently operated. Neither the whole nor any material portion of any Sellers' Owned Real Property or Sellers' Leased Real Property has been damaged or destroyed by fire or other casualty.

4.      REPRESENTATIONS AND WARRANTIES OF BUYER.

As of the Execution Date and as of the Closing Date, Buyer hereby represents and warrants to Sellers the following:

4.1     Existence and Capacity. Buyer is a nonstock corporation duly organized, validly existing and in good standing under the laws of the State of Connecticut with all requisite corporate power and authority to own, operate and lease its properties.

4.2     Binding Agreement. This Agreement constitutes the valid, legal and binding obligation of Buyer enforceable against Buyer in accordance with its terms. Upon the execution and delivery by Buyer of such other agreements as may be required pursuant to Section 2.3 herein, such agreements will constitute valid, legal and binding obligations of Buyer enforceable against Buyer in accordance with their terms.

4.3     Powers; Consents; Absence of Conflicts With Other Agreements. The execution, delivery, and performance of this Agreement by Buyer and the execution, delivery and performance by Buyer of all other agreements referenced herein, or ancillary hereto, to which Buyer is a party, and the consummation of the transactions contemplated herein by Buyer: are within Buyer's corporate powers, are not in contravention of law or of the terms of Buyer's organizational or governing documents and have been duly authorized by all appropriate action; except as set forth on Schedule 4.3, do not require any approval or consent of, or filing with, any Governmental Entity bearing on the validity of this Agreement which is required by law or the regulations of any such Governmental Entity; will not conflict with, require consent under or result in any breach or contravention of, or the creation of any Lien under, any indenture, agreement, lease, instrument or understanding to which Buyer or its Affiliates is a party or by which any of them is bound or any of their assets is subject; will not violate any statute, law, ordinance, rule or regulation of any Governmental Entity to which Buyer or its Affiliates may be subject; and will not violate any judgment, decree, order, writ or injunction of any court or Governmental Entity to which Buyer or its Affiliates may be subject.

4.4     Continuation of Sellers' business. It is the present intention of Buyer to continue the historic business lines and services of Sellers.

4.5     Wherewithal to Perform Obligations. Buyer has sufficient funds, personnel, property, assets and other resources to undertake and perform its obligations under this Agreement.

4.6     HSR Act. The Board of Directors of the "ultimate parent entity" of the "acquiring person" of which Buyer is a part for purposes of the HSR Act has determined that the fair market value of the Assets and the assets to be sold pursuant to the JEC Transaction is less than $75,900,000.

25

5.    COVENANTS PRIOR TO CLOSING.

5.1    Operations.  Between the Execution Date and the earlier of the Effective Time or the termination of this Agreement, with respect to the ownership and operation of the Assets and Facilities and subject to the terms of the Affiliation Agreements, each Seller will:

(a)    carry on the Business in substantially the same manner as it has been heretofore conducted, and not make any material change in personnel or operations and not make any change in its finance or accounting policies or practices;

(b)    maintain the Assets in substantially as good working order and condition as at present, ordinary wear and tear excepted;

(c)    perform in all respects their obligations under agreements relating to or affecting the Assets, including, without limitation, stay current on all executory contracts to which it is a party;

(d)    keep in full force and effect present insurance policies or other comparable insurance coverage;

(e)    keep current in payment of its wages and maintenance of its benefits to its employees;

(f)    continue to timely dispose of any expired drugs and pharmaceuticals in the ordinary course of business and as required by applicable law; and

(g)    use commercially reasonable efforts to maintain and preserve its business organization intact, to retain its present employees, to maintain its relationships with suppliers, physicians, patients and others having business relations with any Facility and to maintain all Permits and Licenses in full force and effect.

5.2    Performance Under Affiliation Agreements.  Until the earlier of the Closing Date and the date that is fifteen (15) days following the date of termination of this Agreement, Saint Francis will continue to be a party to and perform its obligations under the Affiliation Agreements, subject to the terms of those agreements.

5.3    Efforts to Close.  Each party hereto shall use commercially reasonable efforts to proceed toward the Closing and to cause the other parties' conditions to Closing to be met as soon as practicable and consistent with the other terms contained herein. Each party hereto shall notify the other parties as soon as practicable of any event or matter which comes to such party's attention which may reasonably be expected to prevent the conditions to such party's obligations being met.

5.4    Consents.  Each party hereto will use its respective commercially reasonable efforts to obtain all permits, approvals, authorizations and consents of all third parties necessary or desirable for the purpose of (i) consummating the transactions contemplated hereby or (ii) enabling Buyer to operate the Business in the ordinary course after the Closing. Each Seller agrees to cooperate reasonably with Buyer in Buyer's efforts (A) to make any required filings

and to obtain any third party consents or governmental approvals necessary in order to consummate the transactions contemplated hereby, (B) to respond to any governmental investigation of such transactions, and (C) to defend any legal or administrative proceedings challenging such transactions. Each Seller will, upon reasonable request, cooperate with Buyer and its representatives and counsel, in the preparation of any document or other material which may be required by any Governmental Entity as a predicate to or result of the transactions herein contemplated. Buyer's and Sellers' obligations pursuant to filings with Governmental Entities shall be controlled by Section 5.9.

5.5     Notice; Efforts to Remedy.  Prior to the Closing, each party shall promptly give written notice to the other parties hereto upon becoming aware of the impending occurrence of any event which would cause or constitute a breach of any such party's representations, warranties or covenants in this Agreement or cause a Material Adverse Effect. Prior to the Closing, each party shall use its commercially reasonable efforts to prevent or promptly remedy any breach of its representations, warranties or covenants contained in this Agreement.

5.6     Termination of Employees.  Effective as of the Closing Date, Sellers shall take appropriate action to terminate the employment of all Employees and to remove such Employees from their payrolls, with Buyer responsible for all Accrued Employee Liabilities as an Assumed Liability.

5.7     Tail Insurance.    Sellers shall obtain "tail" or other insurance, in form and substance acceptable to Buyer, in its commercially reasonable discretion, to insure against Liabilities of the Facilities, Employees (including without limitation professional employees) and the Business relating to all periods prior to the Effective Time.

5.8     Evergreen Ground Lease.  Buyer agrees to consent to the assignment by JEC and assumption by the purchaser of the assets in the JEC Transaction of the Evergreen Ground Lease, pursuant to an assignment and assumption agreement, in form and substance acceptable to Buyer.

5.9     CON and Other Regulatory Filings.

(a)     Buyer and Sellers shall collaborate on the development and prosecution of a joint certificate of need application to be filed with OHCA for approval of the transactions contemplated by this Agreement. The parties agree that Buyer will prepare the first draft of the CON application, including all documents and exhibits related thereto, which shall be subject to review by the parties and shall be approved by Buyer and Sellers before the final CON application is filed with OHCA. Buyer shall pay for the costs relating to the CON application, including the cost of its financial advisors for the CON, except that each party shall be responsible for its own attorney's fees.

(b)     Each Party hereto shall, as promptly as possible, use its reasonable best efforts to obtain, or cause to be obtained, all consents, authorizations, orders and approvals from all Governmental Entities in addition to the CON Filing and OHCA approval under Section 5.9(a), that may be or become necessary for its execution and delivery of this Agreement and the performance of its obligations pursuant to this Agreement. Each party shall cooperate fully with

27

the other party and its Affiliates in promptly seeking to obtain all such consents, authorizations, orders and approvals. The parties hereto shall not willfully take any action that will have the effect of delaying, impairing or impeding the receipt of any required consents, authorizations, orders and approvals.

(c)     Buyer and Sellers will coordinate all communications with Governmental Entities.    Buyer and Sellers will inform one another of any communication from any Governmental Entity concerning this Agreement and the transactions contemplated herein promptly after receiving such communication.

6.     BANKRUPTCY COURT APPROVALS.

6.1     Bankruptcy Court Approvals, Generally.  This Agreement is subject to approval by the Bankruptcy Court and the consideration by Sellers and the Bankruptcy Court of higher or better Competing Bids with respect to an Alternative Transaction.  Nothing herein shall be construed to prohibit Sellers from soliciting, considering, negotiating, agreeing to, or otherwise taking action in furtherance of, any Alternative Transaction, but only to the extent that Sellers determine in good faith that such actions are permitted or required by the Sale Procedures Order. Sellers will not solicit, consider, negotiate, agree to, or otherwise take action in furtherance of, any Alternative Transaction that does not include provisions contained herein necessary for the continued operation of the Sellers' businesses, including, but not limited to, agreement by a party proposing an Alternative Transaction that it will provide services equivalent to those provided by Buyer under the Affiliation Agreements, agreement by such party to offer employment to Sellers' employees as provided herein, and representation by such party of its intention to continue the Sellers' businesses and provision of services.

6.2     Sale Procedures Order, Sale Order and Reorganization Plan.  Promptly following the Execution Date (and in no event later than two business days following the Execution Date), Sellers shall commence the Bankruptcy Case.  As soon as practicable after the Execution Date, but in no event later than two (2) Business Days after the commencement of the Bankruptcy Case, Sellers shall make a motion (the "Sale Motion") seeking entry of (a) the sale procedures order, in the form attached hereto as Exhibit 6.2(a), or in such other form that is reasonably satisfactory to Buyer (the "Sale Procedures Order") and (b) the sale approval order, in the form attached hereto as Exhibit 6.2(b), or in such other form that is satisfactory to Buyer, in its sole discretion (the "Sale Order").

(a)     Sellers shall use reasonable good faith efforts to obtain entry by the Bankruptcy Court of the Sale Procedures Order as soon as practicable following the filing of the Sale Motion.  The Sale Procedures Order shall  include the following provisions: (i) Buyer will be entitled to receive from Sellers a payment in the amount of Seven Hundred Fifty Thousand Dollars ($750,000.00) (the "Break-Up Fee") in accordance with Section 11.4 hereof; (ii) no offer by a third party for an Alternative Transaction (a "Competing Bid") will be considered unless any such offer (A) is received in accordance with the time deadlines and in the form provided for in the Sale Procedures Order, (B) includes satisfactory evidence of such third party's financial ability to perform its obligations under such offer, (C) provides that such third party shall assume the Reimbursement Obligation and the Workers' Compensation Liabilities directly attributable to the Sellers or provide a substitute guaranty and letter of credit substantially similar to the Credit

28

Support and acceptable to The Hartford and sufficient to release Buyer from any obligations thereunder, (D) provides adequate assurances that such third party will provide services equivalent to those provided by Buyer under the Affiliation Agreements, agreement by such party to offer employment to Sellers' employees as provided herein, and representation by such party of its intention to continue the Sellers' businesses and provision of services between the date of Bankruptcy Court approval and the closing date for the applicable Alternative Transaction; and (iii) (A) the minimum amount of any Competing Bid must be equal to or greater than the sum of (1) the consideration set forth in this Agreement (including all cash, non-cash consideration and Assumed Liabilities), (2) the Break-Up Fee, (3) the Expense Reimbursement and (4) $250,000 and otherwise on terms at least as favorable to Sellers as those set forth in this Agreement, and (B) after any such initial Competing Bid, all further overbids must be in increments of at least $100,000; provided, further, that if such overbid is made against a bid last made by the Buyer, then such overbid must be at least $100,000 more than the Buyer's bid plus the Break-Up Fee in cash ($750,000) plus the Expense Reimbursement (in an amount in cash not to exceed $200,000), and Sellers shall, in Sellers' discretion, have determined that such overbids satisfy such bidding increment requirement. Should overbidding take place, Buyer shall have the right, but not the obligation, to participate in the overbidding and to be approved as the overbidder at the hearing on the Sale Motion based upon any such overbid.

(b)     Sellers shall use reasonable good faith efforts to obtain entry of the Sale Order by the Bankruptcy Court as soon as practicable, and in no event later than June 30, 2015, unless Buyer in its sole discretion agrees to a later date. The Sale Order shall (i) approve the sale of the Assets to Buyer on the terms and conditions set forth in this Agreement and authorize Sellers to proceed with the transactions contemplated herein, (ii) include a specific finding that Buyer or its designee is a good faith buyer of the Assets, and (iii) state that the sale of the Assets to Buyer or its designee shall be free and clear of all Liabilities and Liens whatsoever (other than Assumed Liabilities and Permitted Liens).

6.3     Competing Bids and Alternative Transactions. Buyer acknowledges that Sellers may receive Competing Bids from prospective purchasers with respect to an Alternative Transaction, as provided in the Sale Procedures Order. If Sellers receive any Competing Bids that are in compliance with the Sale Procedures Order, Sellers shall have the right to select and seek final approval by the Bankruptcy Court of the highest and best bid, which will be determined in accordance with the Sale Procedures Order. It is understood that following the date of the Sale Hearing, and only if this Agreement is approved by the Bankruptcy Court, Sellers will not participate in any discussions with, or furnish any information to, any person or entity with respect to any Alternative Transaction regardless of the terms thereof. Notwithstanding the foregoing, it is further understood and agreed that Sellers shall be permitted to participate in discussions with, or furnish any information to, any person or entity with respect to any Bankruptcy Court-approved Alternative Transaction, subject to the terms of this Agreement.

7.     CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER.

The obligations of Buyer to purchase the Assets in accordance with the terms of this Agreement are subject to the satisfaction, on or prior to the Closing Date, of the following conditions unless waived in writing by Buyer:

7.1     Representations/Warranties.  The representations and warranties of each Seller made in this Agreement qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects when made as of the Closing Date as though such representations and warranties had been made on and as of such Closing Date.  Each Seller shall have duly performed, complied with and satisfied all covenants, agreements and conditions required by this Agreement to be performed, complied with or satisfied in all material respects by it prior to the time of the Closing.

7.2     Pre-Closing Confirmations.  Buyer shall have obtained documentation or other evidence confirming the following:

(a)     The Sale Order shall have been issued and have become a Final Order;

(b)     confirmation and effective transfer or reissuance (upon Closing) of the appropriate registration and/or licensure of the Facilities to the extent required by the State of Connecticut for continued operation of the Facilities by Buyer after the Closing;

(c)     if an assignment of the Medicare and Medicaid provider numbers is elected by Buyer pursuant to Section 1.2(n) hereof, confirmation of Medicare and Medicaid certification of the Facilities or if such assignments are not so elected by Buyer, Buyer and Sellers shall have taken all steps necessary and appropriate, including filing of CMS Form 855 and sending notification and any applicable application to the Connecticut Department of Social Services, to apply for and obtain Medicare and Medicaid certification of the Facilities as soon as practicable after the Closing;

(d)     confirmation from the Department of Health as to any necessary registration and licensure matters with respect to the operation by Buyer of the Facilities and all presently authorized services on and after the Closing;

(e)     issuance by OHCA of a CON approving this Agreement and the transactions contemplated herein without the imposition of any condition deemed by Buyer to be materially burdensome, as determined in Buyer's reasonable discretion;

(f)     confirmation of receipt of all other required approvals, licenses, consents, authorizations, and permits from all Governmental Entities required to consummate the transactions herein contemplated and to permit Buyer to operate the Facilities and all presently authorized services on and after the Closing; and

(g)     confirmation of receipt of all required approvals and consents of the Roman Catholic Church approving the transactions contemplated herein.

7.3     Action/Proceeding.  No action, proceeding, investigation or administrative hearing before a court or any other Governmental Entity shall have been instituted or threatened against any Seller or Buyer which seeks injunctive relief in anticipation of the sale of the Assets and may reasonably be expected to prohibit the sale of the Assets to Buyer or seeks damages in a material amount by reason of the consummation of the transactions contemplated hereby.

7.4     Adverse Changes.  A Material Adverse Effect on the Business, the Hospital, the Assets or a Facility shall not have occurred after the date hereof and be continuing as of the Closing Date, a Material Adverse Effect shall not be in existence, or there shall not have occurred any event that with reasonable certainty would constitute or cause a Material Adverse Effect.

7.5     Proceedings and Documents Satisfactory.   Buyer shall have received such certificates, opinions and other documents, including without limitation, those identified in Section 2.2 hereof in order to consummate the transactions contemplated hereby on the terms set forth herein, all of which shall be in form and substance reasonably satisfactory to it and its counsel.   All proceedings in connection with the purchase and sale of the Assets and all certificates and documents delivered to Buyer pursuant to this Agreement shall be reasonably satisfactory in form and substance to Buyer and its counsel acting reasonably and in good faith.

7.6     No Investigation; Satisfactory Resolution of CMS Investigation.   Except as previously disclosed in writing by Sellers to Buyer prior to the Execution Date, no regulatory investigation or proceeding involving CMS, the Justice Department or any other federal or state agency and involving or related to Seller that had or reasonably would have a Material Adverse Effect on Seller shall have been commenced.   Buyer shall be satisfied, in its reasonable discretion, of the resolution of all matters related to the CMS Investigation.

7.7     Sale Order.  The Sale Order shall provide that the Assets shall be conveyed free and clear of all Liens (other than Permitted Liens) and Liabilities (other than Assumed Liabilities) and on the Closing Date shall, in fact, be delivered free and clear of all Liens (other than Permitted Liens) and Liabilities (other than Assumed Liabilities).

7.8     HSR Act.  If a filing is required under the HSR Act on account of the transactions contemplated by this Agreement, the waiting period under the HSR Act shall have expired or been terminated.

7.9     Assumed Liabilities.  Each category of Assumed Liabilities set forth in Section 1.4(a)(i) – (iv), (vii) and (viii) shall not exceed the amounts set forth in such subsections relative to each such Assumed Liability.

7.10     Tail or Other Insurance.  Sellers shall have obtained "tail" or other insurance, in form and substance acceptable to Buyer, in its commercially reasonable discretion as set forth in Section 5.7 hereof.

7.11     HFG Debt.  The aggregate outstanding amount of the HFG Debt shall not exceed Seven Million Dollars ($7,000,000).

7.12     Net Working Capital.   Sellers' Net Working Capital shall be no less than One Million Dollars ($1,000,000) as of the Closing Date.   Not more than five (5) days before the Closing Date, Sellers shall provide the Buyer with their computation of estimated Net Working Capital as of the Closing Date.   Such computation shall be subject to Buyer's review and approval.

31

8.    CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLERS.

The obligations of Sellers to sell the Assets in accordance with the terms of this Agreement are subject to the satisfaction, on or prior to the Closing Date, of the following conditions unless waived in writing by Sellers:

8.1    Representations/Warranties. The representations and warranties of Buyer made in this Agreement qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, when made, as of the Closing Date as though such representations and warranties had been made on and as of such Closing Date. Each and all of the terms, covenants, and conditions of this Agreement to be complied with or performed by Buyer on or before the Closing Date pursuant to the terms hereof shall have been duly complied with and performed in all material respects.

8.2    Action/Proceeding.    No action, proceeding, investigation or administrative hearing before a court or any other Governmental Entity shall have been instituted or threatened against any Seller or Buyer which seeks injunctive relief in anticipation of the sale of the Assets and may reasonably be expected to prohibit the sale of the Assets to Buyer or seeks damages in a material amount by reason of the consummation of the transactions contemplated hereby.

8.3    Proceedings and Documents Satisfactory.    Sellers shall have received such certificates, opinions and other documents, including without limitation, those identified in Section 2.3 hereof in order to consummate the transactions contemplated hereby, all of which shall be in form and substance reasonably satisfactory to them and their counsel.    All proceedings in connection with the purchase and sale of the Assets and all certificates and documents delivered to Sellers pursuant to this Agreement shall be reasonably satisfactory in form and substance to Sellers and their counsel acting reasonably and in good faith.

8.4    Pre-Closing Confirmations. Sellers shall have obtained documentation or other evidence confirming the following:

(a)    The Sale Order shall have been issued and have become a Final Order;

(b)    confirmation and effective transfer or reissuance (upon Closing) of the appropriate registration and/or licensure of the Facilities to the extent required by the State of Connecticut for continued operation of the Facilities by Buyer after the Closing;

(c)    if an assignment of the Medicare and Medicaid provider numbers is elected by Buyer pursuant to Section 1.2(n) hereof confirmation of Medicare and Medicaid certification of the Facilities or if such assignments are not so elected by Buyer, Buyer and Sellers shall have taken all steps necessary and appropriate, including filing of CMS Form 855 and sending notification and any applicable application to the Connecticut Department of Social Services, to apply for and obtain Medicare and Medicaid certification of the Facilities as soon as practicable after the Closing;

(d)    confirmation from the Department of Health as to any necessary registration and licensure matters with respect to the operation by Buyer of the Facilities and all presently authorized services on and after the Closing; and

(e)     issuance by OHCA of a CON approving this Agreement and the transactions contemplated herein; and

(f)     confirmation of receipt of all other required approvals, licenses, consents, authorizations, and permits from all Governmental Entities required to consummate the transactions herein contemplated and to permit Buyer to operate the Facilities and all presently authorized services on and after the Closing.

8.5     HSR Act. If a filing is required under the HSR Act on account of the transactions contemplated by this Agreement, the waiting period under the HSR Act shall have expired or been terminated.

9.      EMPLOYEE MATTERS.

9.1     Transfer of Employment.

(a)     Effective as of the Closing Date, Buyer shall offer at will employment to substantially all employees who are employed by Sellers immediately prior to the Effective Time, who satisfy Buyer's standard policies and conditions for employment, and as otherwise provided herein below (the employees who accept such an offer and commence employment with Buyer are collectively referred to herein as the "Transferred Employees"). Each offer of employment shall provide for base salary or hourly wage rates at least equal to such employee's base salary or hourly wage rate in effect immediately prior to the Closing Date. Buyer shall provide employee benefits that are in the aggregate substantially similar, as reasonably determined by Buyer, to the benefits provided to Sellers' employees immediately prior to the Closing Date. Nothing herein shall be deemed to affect or limit in any way management prerogatives of Buyer with respect to employees, including the right to amend or terminate any employee benefit plans and programs or limit the obligations of Buyer to amend its plans as needed to comply with applicable law.

(b)     As of the Effective Time, Buyer shall take the following actions: (i) waive any eligibility waiting periods under any health and welfare plans maintained for the benefit of the Transferred Employees and, to the extent possible, waive any limitations regarding pre-existing conditions under any welfare plans maintained for the benefit of the Transferred Employees, (ii) provide each Transferred Employee with credit for any co-payments and deductibles paid prior to the Effective Time in satisfying any applicable deductible or out-of-pocket requirements under such health plans, and (iii) for purposes of eligibility, vesting and the allocation of employer contributions under a defined contribution plan (but not for purposes of benefit accrual under a defined benefit plan) under the plans and policies of Buyer, treat all service by the Transferred Employees with Sellers and their Affiliates immediately prior to the Effective Time as service with Buyer. The Buyer shall also recognize accrued but unused paid time off as part of assuming the Accrued Employee Liabilities with respect to the employment period of the Transferred Employees including the Effective Time, and shall credit each Transferred Employee all service by such Transferred Employee with Sellers and their Affiliates immediately prior to the Effective Time as service with Buyer for purposes of determining subsequent entitlement to paid time off.

33

(c)     In respect of notices and payments relating to events occurring prior to the Effective Time, Sellers shall be responsible for all Liability for any and all notices, payments, fines or assessments due to any Governmental Entity, pursuant to any applicable laws, with respect to the employment, discharge or layoff of employees by Sellers prior to the Effective Time, including but not limited to the Worker Adjustment and Retraining Notification Act and any rules or regulations as have been issued in connection with the foregoing (jointly, referred to throughout this Agreement as the "WARN Act"). Likewise, in respect of notices and payments relating to events occurring at or prior to the Effective Time, Buyer shall be responsible and assume (and shall indemnify and hold each Seller harmless from and against) all Liability for any and all notices, payments, fines or assessments due to any Governmental Entity, pursuant to the WARN Act, with respect to the employment, discharge, layoff of employees employed by Buyer at or after the Effective Time.

9.2     Assumption of Collective Bargaining Agreement. Buyer agrees to assume all rights, liabilities and obligations of the Sellers under the Collective Bargaining Agreement.

9.3     No Third Party Beneficiaries. Nothing herein shall be deemed to create or grant to any such employee or Transferred Employee third-party beneficiary rights or claims or causes of action of any kind or nature.

10.     PARTICULAR COVENANTS.

10.1    COBRA Responsibilities. With respect to any current or former employee of Sellers who (including any eligible spouse and dependent thereof) incurs a qualifying event, as defined by Code Section 4980B or Part 6 of Subtitle B of Title I of ERISA, as a result of the transaction contemplated by this Agreement, whether or not hired by Buyer, or who incurred a qualifying event prior to the Effective Time (all such employees together with their spouses and eligible dependents are referred to herein as "Qualified Beneficiaries"), Sellers shall retain the obligation, if any, for providing notices and continuation coverage under COBRA or other similar continuation coverage obligation and shall offer, if required, such Qualified Beneficiaries continuation coverage under the group health, dental or other medical plans of Sellers to the fullest extent required by COBRA. In the event that Sellers and its Affiliates do not maintain a group health plan after the Closing, the Qualified Beneficiaries shall become eligible for COBRA continuation coverage under a group health, dental or other medical plan of Buyer.

10.2    Name Change; Change in Case Caption. Each Seller acknowledges and agrees that Buyer will acquire as part of the Assets the exclusive right to use the names Johnson Memorial Hospital, Johnson Surgery Center, Advanced Wound Center, Community Cancer Center, Home & Community Health Services, Johnson Memorial Cancer Center and Karen Davis Krzynowek Infusion Center and all variations thereof and the goodwill associated therewith and that no Seller will use such name(s) or any derivative thereof subsequent to the Closing, except that Sellers' entity names may include such names on a transitional basis until such time as the Name Amendments described below have been effectuated. Sellers further covenant and agree that, on or before the Closing Date, Sellers will have adopted a resolution changing the names of Sellers to such names as mutually agreed to by the parties (the "Name Amendments"). The resolutions and the amendments shall have an effective date that is not more than thirty (30) days following the Closing Date. As contemplated by Section 2.2, Sellers

34

shall deliver the Name Amendments to Buyer at the Closing, and Buyer is hereby authorized to file the Name Amendments with the office of the Connecticut Secretary of the State at any time following the Closing. Within the later of five (5) days of the entry of the Sale Order or two (2) days following Buyer's notice to Sellers that the Name Amendments have been filed with the office of the Connecticut Secretary of the State, Sellers shall file a motion with the Bankruptcy Court to change the case caption of the Bankruptcy Case and the name of each Seller consistent with the provisions of this Section 10.2.

10.3    Terminating Cost Report. Sellers shall prepare and timely file (and provide Buyer a copy) of all terminating cost reports for the Facilities in respect of the Medicare and Medicaid programs, or any successor governmental program, reflecting consummation of the transactions contemplated hereby no later than one hundred fifty (150) days after the Closing. Buyer, upon reasonable notice from Sellers, during normal business hours, will cooperate with Sellers in regard to the preparation, filing, handling and appeals of Sellers' cost reports related to the Business for periods prior to the Effective Time. After the Effective Time, Buyer agrees to provide Sellers with reasonable access to records of the Business necessary and appropriate for the preparation or appeal of Sellers' cost reports and to provide services of Buyer's employees to Sellers as reasonably necessary and appropriate, subject to Buyer's discretion, in connection with the preparation and/or appeal of such cost reports.

10.4    Required Creditor Notices. Sellers shall provide prompt and timely notice of the proposed sale of the Assets, in form and substance reasonably acceptable to Buyer and in such manner as may be required by applicable law, to each Seller's creditors and all parties entitled to notice of the Sale Motion.

10.5    Transferred Contracts. Not less than thirty (30) days prior to the Closing, Buyer shall provide (a) documentation identifying all Contracts Buyer wishes to be assumed by Sellers and assigned by the Sellers to Buyer at Closing (the "Transferred Contracts"); (b) documentation identifying all Contracts that Buyer may, at a later date, wish to be assigned by the Sellers (the "Designated Contracts"); and (c) all Contracts that Buyer will not be seeking to be assigned by the Sellers (the "Excluded Contracts"). At any time between the Closing and the 10th day following the Closing, Buyer may re-designate any Designated Contract as either a Transferred Contract or an Excluded Contract. If Buyer does not re-designate any Designated Contract by the 10th day following the Closing, such Designated Contract shall be deemed an Excluded Contract as of such date. Sellers agree not to reject any Contract on or before the 10th day following the Closing except for Excluded Contracts. Sellers shall (x) assume in the Bankruptcy Case, any Transferred Contract that is designated by Buyer to Sellers on or before the 10th day following the Closing, provided that Buyer shall pay all cure amounts in connection with such assumption, and (y) assign said Transferred Contracts to Buyer.

10.6    Buyer's Right to Supplement Schedules. Not less than seven (7) days prior to Closing, Buyer shall have the right to supplement the schedules to this Agreement to include any asset acquired by or leased by any Seller after the Execution Date.

11.    TERMINATION.

11.1    Optional Termination.  This Agreement may be terminated at any time prior to the Closing as follows:

(a)    by the mutual written consent of Buyer and Sellers;

(b)    by Buyer, in accordance with the provisions of Section 1.13;

(c)    by Sellers or Buyer, if any court of competent jurisdiction in the United States or other Governmental Entity shall have issued an order, decree or ruling or taken any other action restraining, enjoining or otherwise prohibiting the transactions contemplated hereby and such order, decree, ruling or other action shall have become final and non-appealable;

(d)    by Sellers, if Buyer commits a material breach of any of the terms hereof, which cannot be or has not been cured within twenty (20) days after the giving of written notice to Buyer of such breach;

(e)    by Buyer, if any Seller commits a material breach of any of the terms hereof, which cannot be or has not been cured within twenty (20) days after the giving of written notice to Sellers of such breach;

(f)    by Buyer, if Buyer reasonably determines, at any time, that any of the conditions set forth in Article 7 shall not be satisfied on or before the Closing Date; provided, however, that the right to terminate this Agreement under this subsection shall not be available to Buyer if Buyer's failure to fulfill any obligation under this Agreement shall have been the cause of, or shall have resulted in, the failure of the condition;

(g)    by Sellers or Buyer, if the Closing has not occurred on or prior to January 14, 2016; provided, however, that the right to terminate this Agreement under this subsection shall not be available to a party if such party's failure to fulfill any obligation under this Agreement shall have been the cause of, or shall have resulted in, the failure of the Closing; or

(h)    by Buyer, in the event (i) that Sellers recommend or take any action (other than action approved by Buyer) with respect to, or the Bankruptcy Court approves, an Alternative Transaction; (ii) an appeal of the Sale Order is filed and not resolved to Buyer's satisfaction, in its sole and absolute discretion, by January 14, 2016;  (iii) the Bankruptcy Court orders that an amendment be made to this Agreement or to the schedules or exhibits to this Agreement and such amendment is not acceptable to Buyer, in its sole and absolute discretion; or (iv) a proposed Reorganization Plan is filed by Sellers that is materially inconsistent with the terms of this Agreement.

11.2    Notice of Termination.  In the event of any termination pursuant to Section 11.1, written notice shall forthwith be given to the other parties hereto except with respect to a termination pursuant to Section 11.1(a).

11.3    Effect of Termination.  Upon termination of this Agreement, no party hereto shall have liability hereunder to any other party, all of which is hereby waived and released; provided,

36

however, (a) if this Agreement is terminated by Sellers pursuant to Section 11.1(d), the Deposit, including all interest accrued thereon, if any, shall be paid over to Sellers in accordance with the Escrow Agreement as liquidated damages and shall be the exclusive remedy of Sellers for any termination or breach of this Agreement by Buyer; (b) if this Agreement is terminated, for any reason other than pursuant to Section 11.1(d), the Deposit, including all interest accrued thereon, if any, shall be paid over to Buyer in accordance with the Escrow Agreement; and (c) if this Agreement is terminated by Buyer pursuant to Section 11.1(e), Buyer shall be entitled to exercise any and all rights and remedies available to Buyer at law or in equity or as set forth in Section 11.4. Notwithstanding any provision herein to the contrary, in the event that Buyer is entitled to terminate this Agreement pursuant to Section 11.1(e), Buyer may elect to seek specific performance of Sellers' obligations hereunder in accordance with the terms of this Agreement.

      11.4    Break-Up Fee and Expense Reimbursement.

(a) If this Agreement is terminated pursuant to Section 11.1(h)(i):
- (i) Sellers shall pay to Buyer the Break-Up Fee and Sellers shall reimburse Buyer for all of Buyer's out of pocket costs and expenses in connection with this Agreement and the transactions contemplated herein, not to exceed Two Hundred Thousand Dollars ($200,000) (the "Expense Reimbursement");
- (ii) Seller's obligation to pay the Break-Up Fee and the Expense Reimbursement pursuant to this Section 11.4(a) shall survive the termination of this Agreement and shall constitute a super-priority administrative expense of Seller under Section 503(b) and 507(b) of the Bankruptcy Code, junior to HFG's super-priority claim; and
- (iii) the Break-Up Fee and Expense Reimbursement shall be paid to Buyer out of the cash proceeds from the Alternative Transaction.

(b) If this Agreement is terminated pursuant to Section 11.1(e) or Section 11.1(h)(iv):
- (i) Sellers shall pay to Buyer the Break-Up Fee and Expense Reimbursement; and
- (ii) Seller's obligation to pay the Break-Up Fee and Expense Reimbursement pursuant to this Section 11.4(b) shall survive termination of this Agreement and shall constitute an unsecured claim of the Buyer not entitled to super-priority administrative expense status.

      12.    GENERAL.

      12.1    Additional Assurances. The provisions of this Agreement shall be self-operative and shall not require further agreement by the parties except as may be herein specifically provided to the contrary; provided, however, at the request of either party, the other parties shall execute such additional instruments and take such additional acts as are reasonably necessary to effectuate this Agreement.

      12.2    Consents, Approvals and Discretion. Whenever this Agreement requires any consent or approval to be given by a party or a party must or may exercise discretion, the parties agree that such consent or approval shall not be unreasonably withheld or delayed and such

discretion shall be reasonably exercised, except as otherwise expressly set forth in any particular provision of this Agreement.

12.3 Choice of Law. THE PARTIES AGREE THAT THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF CONNECTICUT WITHOUT REFERENCE TO ANY PRINCIPLES OF CONFLICTS OF LAWS. FURTHER, THE PARTIES AGREE THAT THE FEDERAL AND STATE COURTS LOCATED IN THE STATE OF CONNECTICUT SHALL RETAIN EXCLUSIVE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN THE PARTIES ARISING OUT OF OR RELATED TO THIS AGREEMENT.

12.4 Benefit/Assignment. Subject to the provisions herein to the contrary, this Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective legal representatives, successors and assigns; provided, however, that no party may assign this Agreement without the prior written consent of the other parties. Notwithstanding the foregoing, pursuant to Section 1.2 hereof, Buyer may make any such assignment to any Permitted Designee, without obtaining the written consent of Sellers.

12.5 Finders, Brokerage. Sellers agree to indemnify Buyer from and against all loss, cost, damage or expense arising out of claims for fees or commissions of any advisor, agent or broker employed or alleged to have been employed by Sellers. Buyer agrees to indemnify Sellers from and against all loss, cost, damage or expense arising out of claims for fees or commissions of any advisor, agent or broker employed or alleged to have been employed by Buyer.

12.6 Cost of Transaction. Whether or not the transactions contemplated hereby shall be consummated, the parties agree as follows: (a) Sellers will pay the fees, expenses and disbursements of Sellers and their respective agents, advisers, attorneys and accountants incurred in connection with the subject matter hereof and any amendments hereto; and (b) Buyer shall pay the fees, expenses and disbursements of Buyer and its agents, advisers, attorneys and accountants incurred in connection with the subject matter hereof and any amendments hereto; Buyer shall pay the costs associated with the filing to be made with the Department of Health, if any, and any requisite filing under the HSR Act; and Buyer shall pay all expenses of inspecting the Facilities and Assets, including the cost of any environmental surveys and the cost of establishing the lock box contemplated by Section 1.12.

12.7 Reserved.

12.8 Preservation and Access to Records After the Closing.

(a) With regard to patient records, from and after the Effective Time, Buyer shall use its commercially reasonable efforts to maintain the patient records held at any Facility relating to periods prior to the Effective Time in accordance with applicable state and federal and state law, statutes, regulations and rules, including without limitation HIPAA. Buyer and Sellers shall enter into a Medical Records Custody Agreement in the form attached as Exhibit 12.8 (the "Medical Records Custody Agreement").

38

(b)      Each party hereto acknowledges that, subsequent to the Closing, the other parties may need access to information or documents in the control or possession of such party for the purposes of concluding the transactions contemplated hereby, audits, compliance with governmental requirements and regulations, confirming compliance herewith and the prosecution or defense of third party claims. Accordingly, Sellers and Buyer agree that after the Effective Time, each shall make reasonably available to the other's representatives or agents, independent auditors and/or Governmental Entities, upon written request and at the expense of the requesting party, and subject to applicable law, such documents and information as may be available relating to the Business for periods prior and subsequent to the Closing to the extent necessary to facilitate concluding the transactions herein contemplated, audits, compliance with governmental requirements and regulations, confirming compliance herewith and the prosecution or defense of claims.

12.9     Waiver. The waiver by any party of a breach or violation of any term or provision of this Agreement shall not operate as, or be construed to be, a waiver of any subsequent breach of the same provision by any party or of the breach of any other term or provision of this Agreement. The delay of a party to transmit any written notice hereunder shall not constitute a waiver by such party of any default hereunder or of any other or further default under this Agreement except as may expressly be provided for by the terms of this Agreement.

12.10     Tax Allocation. Buyer shall make an allocation of the Purchase Price (the "Purchase Price Allocation") within 150 days of the Closing Date and shall notify Sellers in writing as to such allocation. Each Seller and Buyer hereby agree that the Purchase Price Allocation shall be used by each of them for all federal and state income tax purposes, and shall be set forth in a statement prepared in accordance with Section 1060 of the Code, which statement shall be prepared in a manner generally consistent with the form of Internal Revenue Service Form 8594. Each party hereto shall file a copy of such statement as required by applicable law.

12.11     Interpretation. Each of the parties has agreed to the use of the particular language of the provisions of this Agreement including all attached Exhibits and Schedules and any questions of doubtful interpretation shall not be resolved by any rule or interpretation against the draftsman but rather in accordance with the fair meaning thereof, having due regard to the benefits and rights intended to be conferred upon the parties hereto and the limitations and restrictions upon such rights and benefits intended to be provided.

12.12     Notice. Any notice, demand or communication required, permitted, or desired to be given hereunder shall be in writing and shall be deemed effectively given when personally delivered or mailed by prepaid certified mail, return receipt requested, addressed as follows:

Sellers:                         Johnson Memorial Medical Center, Inc.
                                 201 Chestnut Hill Road
                                 Stafford Springs, CT 06076
                                 Attn: CEO

| With a copy to: | Eric Henzy and Jon Newton |
| | Reid and Riege, P.C. |
| | One Financial Plaza |
| | Hartford, CT 06103 |
| | |
| Buyer: | Saint Francis Care, Inc. |
| | 114 Woodland Street |
| | Hartford, CT 06105 |
| | Attn.: CEO |
| | |
| With copies to: | Thomas S. Marrion and Sarah M. Lombard |
| | Hinckley, Allen & Snyder LLP |
| | 20 Church Street, 18th Floor |
| | Hartford, CT 06103 |

or to such other address, and to the attention of such other person or officer as any party may designate, with copies thereof to the respective counsel thereof as notified by such party.

12.13 Severability. In the event any provision of this Agreement is held to be invalid, illegal or unenforceable for any reason and in any respect, such invalidity, illegality, or unenforceability shall in no event affect, prejudice or disturb the validity of the remainder of this Agreement, which shall be in full force and effect, enforceable in accordance with its terms, including, without limitation, those terms which contemplate or require the further agreements of the parties. Furthermore, in lieu of such illegal, invalid or unenforceable provision, there shall be added automatically as a part of this Agreement a provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible and still be legal, valid or enforceable.

12.14 Gender and Number. Whenever the context of this Agreement requires, the gender of all words herein shall include the masculine, feminine and neuter, and the number of all words herein shall include the singular and plural.

12.15 Divisions and Headings. The divisions of this Agreement into Sections and subsections and the use of captions and headings in connection therewith are solely for convenience and shall have no legal effect in construing the provisions of this Agreement.

12.16 Survival. All statements made by the parties hereto herein or in the Schedules or in any certificate delivered pursuant hereto shall be deemed representations and warranties of the parties making or delivering the same regardless of any investigation made by or on behalf of the other parties hereto. Furthermore, the representations, warranties, covenants and agreements made by the parties herein shall survive until the Closing Date and then expire, excepting however covenants and agreements which by their terms are to be performed following the Closing.

12.17 Reserved.

12.18  No Third-Party Beneficiaries.  The terms and provisions of this Agreement are intended solely for the benefit of Buyer and Sellers and their respective permitted successors or assigns, and it is not the intention of the parties to confer, and this Agreement shall not confer, third party beneficiary rights upon any other person.

12.19  Entire Agreement/Amendment.  This Agreement supersedes all prior contracts, understandings and agreements, whether written or oral, and constitutes the entire agreement of the parties respecting the within subject matter and no party shall be entitled to benefits other than those specified herein. As between or among the parties, no oral statements or prior written material not specifically included herein shall be of any force and effect; the parties specifically acknowledge that in entering into and executing this Agreement, the parties rely solely upon the representations and agreements contained in this Agreement and no others.  No terms, conditions, warranties, or representations, other than those contained herein and no amendments or modifications hereto, shall be binding unless made in writing and signed by the party to be charged.  The foregoing notwithstanding, this Agreement does not replace or modify that certain Confidentiality Agreement dated as of May 2, 2014 between JMMC and Buyer which remains in full force and effect, provided such Agreement shall terminate without need for further action of any Person upon completion of the Closing.

12.20  Counterparts.  This Agreement may be executed in multiple originals or counterparts, each and all of which shall be deemed an original and all of which together shall constitute but one and the same instrument.

12.21  Risk of Loss.  Notwithstanding any other provision hereof to the contrary, the risk of loss in respect of casualty to the Assets shall be borne by Sellers through the Effective Time and by Buyer thereafter.

12.22  Press Releases.  Except as otherwise required by law, any release to the public of information concerning this Agreement or the transactions contemplated hereby will be made only in the form and manner approved by the parties hereto.  Each party shall furnish the others with drafts of all such releases prior to their publication or dissemination.

12.23  Bankruptcy Court Approval.  As stated herein, this Agreement is expressly subject to the approval of the Bankruptcy Court.

*{signature page follows}*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed in multiple originals by their duly authorized officers as of the day and year first above written.

**BUYER:**

Saint Francis Care, Inc.

By:_____
Name: Christopher M. Dadlez
Title:  President and Chief Executive Officer

**SELLERS:**

Johnson Memorial Medical Center, Inc.


By:_____
Name: Patrick Mahon
Title: Chairperson of the Board


Johnson Memorial Hospital, Inc.


By:_____
Name: Patrick Mahon
Title: Chairperson of the Board


Home & Community Health Services, Inc.


By:_____
Name: Patrick Mahon
Title: Chairperson of the Board

Johnson Health Care, Inc.


By:_____
Name: Patrick Mahon
Title: Chairperson of the Board

[Signature Page to Johnson Asset Purchase Agreement]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed in multiple originals by their duly authorized officers as of the day and year first above written.

**BUYER:**

Saint Francis Care, Inc.

By:_____
Name: Christopher M. Dadlez
Title:  President and Chief Executive Officer

**SELLERS:**

Johnson Memorial Medical Center, Inc.

By:_____
Name: Patrick Mahon
Title: Chairperson of the Board

Johnson Memorial Hospital, Inc.

By:_____
Name: Patrick Mahon
Title: Chairperson of the Board

Home & Community Health Services, Inc.

By:_____
Name: Patrick Mahon
Title: Chairperson of the Board

Johnson Health Care, Inc.

By:_____
Name: Patrick Mahon
Title: Chairperson of the Board

[Signature Page to Johnson Asset Purchase Agreement]

*Execution Copy*

## SCHEDULE 1.2(a)

### Sellers' Owned Real Property

241 Chestnut Hill Road, Stafford Springs CT 06076, owned by JMMC

55 Galbraith Road, Stafford Springs CT 06076, owned by JMMC

68 Galbraith Road, Stafford Springs CT 06076, owned by JMMC

0 Chestnut Hill Road, Stafford Springs CT 06076 (map 33, lots 7 & 8), owned by JMH

201 Chestnut Hill Road, Stafford Springs CT 06076, owned by JMH, known as Johnson Memorial Hospital

Land at 205 Chestnut Hill Road, Stafford Springs CT 06076, owned by JMH; JMH does not own the building at this site, known as Evergreen Health Care Center and such building is not part of the Assets

13 Magauran Drive, Stafford Springs CT 06076, owned by JMH

15 Magauran Drive, Stafford Springs CT 06076, owned by JMH

140 Hazard Avenue, Enfield CT 06082, owned by JMMC, known as the Nirenberg Medical Center

142 Hazard Avenue, Enfield CT 06082, owned by JMMC, known as the Community Cancer Center

148 Hazard Avenue, Enfield CT 06082, owned by JMMC, known as the Johnson Surgery and Outpatient Services Center

Land at 146 Hazard Avenue, Enfield CT 06082, owned by JMMC; JMMC does not own the 13 individual units or building at this site, known as the Johnson Medical Office Association

71, 75, 79, 83 Middle Road, Enfield CT 06082, owned by JMMC

*Execution Copy*

## SCHEDULE 1.2(b)

### Sellers' Real Property Expense Leases

If the Buyer elects to assume the following pursuant to Section 10.5 of the Agreement:

151 Hazard Avenue, Unit 9, Enfield CT 06082 leased by Johnson Health Care, Inc., as Tenant, pursuant to that certain Retail Lease Agreement entered into as of February 22, 1996 by and between AMF Management Corporation and Johnson Health Care, Inc. as amended by that certain Addendum A to Retail Lease Agreement by and between AMF Management Corporation and Johnson Health Care, Inc., as amended by that certain Addendum A to Retail Lease Agreement dated June 18, 2001 by and between Michael Tartsinis and Johnson Health Care, Inc., as amended by Addendum to Lease Agreement dated March 14, 2013 by and between Karios Properties, LLC and JMMC

151 Hazard Avenue, Suites 2 through 6, Enfield CT 06082, leased by Johnson Memorial Corporation, as Tenant, pursuant to that certain Retail Lease Agreement effective October 1, 1997 by and between Michael Tartsinis and Johnson Memorial Corporation, as amended by that certain Addendum A to Retail Lease Agreement dated October 6, 2005 by and between Karios Properties LLC and Johnson Memorial Corporation, as amended by that certain Lease Extension Agreement signed by JMMC on October 25, 2010 by and between Karios Properties LLC and JMMC, as amended by that certain Lease made as of October 3, 2013 by and between Karios Properties LLC and JMMC

15 Palomba Drive, Suite 1, Enfield CT 06076, leased by JMH, as Lessee, pursuant to that certain Lease Agreement, Option to Purchase and Right of First Refusal made as of June 13, 1988 by and between Fred Epstein and Lois L. Epstein, and Edward C. Able and Darlene D. Able, as amended by that certain Amendment to Lease dated March 1998 by and between Fred Epstein and Lois L. Epstein, and Edward C. Able and Darlene D. Able, as amended by that certain Assignment and Assumption Agreement dated June 12, 2006 by and between Edward C. Able and Darlene D. Able and JMH, as amended by that certain Second Amendment to Lease dated June 12, 2006 by and between Fred Epstein and Lois L. Epstein and JMH, as amended by that certain oral agreement between Fred Epstein and Lois L. Epstein and JMH to continue the lease on a month-to-month basis.

139 Hazard Avenue, Unit 15, Enfield CT 06082, leased by JMMC, as Lessee, pursuant to that certain Lease made effective as of January 1, 2013 by and between Denis & Ghyslaine Letourneau and JMMC

101 Phoenix Avenue, Enfield CT 06082, leased by Home & Community Health Services, Inc., as Tenant, pursuant to that certain Lease effective as of December 1, 2011 by and between Phoenix Avenue Realty, LLC and Home & Community Services, Inc.

384L Merrow Road, Tolland CT 06084, leased by JMH, as Tenant, pursuant to that certain Lease Agreement made as of April 23, 2010 by and between T & S of CT, LLC and JMH, as amended

by that certain Assignment and Assumption Agreement effective August 1, 2010 by and between JMH and JMMC

140 Hazard Avenue, Suite 102, Enfield CT 06082 leased by Johnson Health Care, Inc., as Lessee pursuant to that certain Lease Agreement dated November 1, 2009 by and between Johnson Health Care, Inc. and Johnson Memorial Corporation which misidentified the space rented as Suite 101, and which has expired. The parties continue to operate pursuant to an oral lease under which Johnson Health Care, Inc. pays $3,580 per month for the use of the space.

140 Hazard Avenue, Suite 106, Enfield CT 06082 leased by JMH from JMMC pursuant to an oral lease under which JMH pays $3,100 per month for the use of the space

148 Hazard Avenue, Enfield CT 06082 leased by JMH from JMMC pursuant to an oral agreement under which JMH pays $41,249 per month for the use of the space

Remaining rentable space within the Johnson Community Cancer Center at 142 Hazard Avenue, Enfield CT 06082 that is not rented by Northeast Regional Radiation Oncology Network, Inc. leased by JMH from JMMC pursuant to an oral agreement under which JMH pays $6,712 per month for the use of the space

*Execution Copy*

## SCHEDULE 1.2(c)(ii)

### Vehicles

2004 Ford F550 Truck, VIN: 1FDAF57P54EB04183
2007 Chevy Equinox, VIN: 2CNDL73F676243133
2009 Ford F250 Truck, VIN: 1FTNF21529EA28702
2015 Chevy Equinox LS, VIN: 1GNFLEEK2FZ108768

*Execution Copy*

## SCHEDULE 1.2(d)

### Permits and Licenses

This Schedule contains all Permits and Licenses that the Sellers have knowledge of. There may be others that the Sellers do not have knowledge of.

The following are Permits and Licenses that to the Sellers' knowledge are assignable and transferable, subject to the notification, consent, approval and/or other requirements set forth on Schedule 3.3:

1. Clinical Laboratory Improvements Amendment ("CLIA") Certificate of Waiver for Home & Community Health Services, Inc., issued by CMS, 07D0093674 ("**CLIA Certificate 07D0093674**")

2. CLIA Certificate of Accreditation for JMMC Infusion Laboratory at JMH, issued by CMS, 07D2031806 ("**CLIA Certificate 07D2031806**")

3. CLIA Certificate of Accreditation for JMH, issued by CMS, 07D0644540 ("**CLIA Certificate 07D0644540**")

4. CLIA Certificate of Accreditation for JMH Outpatient Laboratory, issued by CMS, 07D0093682 ("**CLIA Certificate 07D0093682**")

5. CLIA Certificate of Accreditation for JMH Advanced Wound Center, issued by CMS, 07D2070749 ("**CLIA Certificate 07D2070749**" collectively with CLIA Certificate 07D0093674, CLIA Certificate 07D2031806, CLIA Certificate 07D0644540, and CLIA Certificate 07D0093682 referred to as "**CLIA Certificates**")

6. Materials License for JMH, issued by U.S. Nuclear Regulatory Commission ("**Materials License**")

7. Certified Mammography Facility for JMMC Outpatient Radiology, issued by the Food and Drug Administration, facility ID 118653 ("**Mammography Facility Certification**")

8. Controlled Substance Registration Certificate for JMH, issued by Drug Enforcement Administration, AC2636681 ("**Controlled Substance Registration AC2636681**")

9. Controlled Substance Registration Certificate for JMH Outpatient Surgery Center, issued by Drug Enforcement Administration, FJ0641274 ("**Controlled Substance Registration FJ0641274**," collectively with Controlled Substance Registration AC2636681, "**Controlled Substance Registrations**")

10. Variance dated June 29, 1989 for JMMC at Route 190, Chestnut Hill, Stafford Springs issued by the Stafford Planning and Zoning Commission

11. Special Use Permit dated August 25, 1991 for JMH at 201 Chestnut Hill Road, Stafford Springs issued by the Stafford Planning and Zoning Commission

12. Variance dated March 13, 2008 for JMH at 201 Chestnut Hill Road, Stafford Springs issued by the Stafford Planning and Zoning Commission

13. Special Use Permit dated July 24, 1997 for Johnson Memorial Corporation at 148 Hazard Avenue, Enfield issued by the Enfield Planning and Zoning Commission

14. Variance dated July 28, 1997 for JMH 148 Hazard Avenue, Enfield issued by the Enfield Zoning Board of Appeals

15. Elevator Operation Certificate for JMH, issued by the State of Connecticut Department of Construction Services Bureau of Elevators, 134-0003 ("**Elevator Operation Certificate 134-0003**")

16. Elevator Operation Certificate for JMH, issued by the State of Connecticut Department of Construction Services Bureau of Elevators, 134-0010 ("**Elevator Operation Certificate 134-0010**")

17. Elevator Operation Certificate for JMH, issued by the State of Connecticut Department of Construction Services Bureau of Elevators, 134-0026 ("**Elevator Operation Certificate 134-0026**," collectively with Elevator Operation Certificate 134-0003 and Elevator Operation Certificate 134-0010, "**Elevator Operation Certificates**")

18. Certificates of Approval issued by the Stafford, Hazardville and Enfield Fire Marshals, including, without limitation, the following:

    a. Certificate of Approval for JMH, Inc./Community Medical Education Center Building at 201 Chestnut Hill Road, Stafford Springs CT, issued by the Stafford Fire Marshal

    b. Certificate of Approval for JMMC at 201 Chestnut Hill Road, Stafford Springs CT, issued by the Stafford Fire Marshal

    c. Certificate of Approval for the Johnson Surgery Center at 148 Hazard Ave, Enfield CT, issued by the Enfield Fire Marshal

    d. Certificate of Approval for Advanced Wound Care at 140 Hazard Ave, Enfield CT, issued by the Enfield Fire Marshal

    e. Certificate of Approval for the Phoenix Cancer Center/Krzynowek Infusion Center at 142 Hazard Ave, Enfield CT, issued by the Enfield Fire Marshal

19. Classification as a community water system for JMH, by Department of Health Drinking Water Section, CT1340032 ("**Community Water System Classification**")

20. Radioactive Material and Industrial X-Ray Device Registration for JMH, issued by the State of Connecticut Department of Energy and Environmental Protection, 0325-2014 ("**Radioactive Material and Industrial X-Ray Device Registration 0325-2014**")

21. Radioactive Material and Industrial X-Ray Device Registration for JMH, issued by the State of Connecticut Department of Energy and Environmental Protection, 0871-2014 ("**Radioactive Material and Industrial X-Ray Device Registration 0871-2014**," collectively with Radioactive Material and Industrial X-Ray Device Registration 0325-2014, the "**Radioactive Material and Industrial X-Ray Device Registrations**")

22. Diagnostic and Therapeutic X-Ray Device Registration for Johnson Memorial Outpatient Center, issued by the State of Connecticut Department of Energy and Environmental Protection, Application No: 201403657, Facility ID No: 2239 ("**Diagnostic and Therapeutic X-Ray Device Registration 201403657**")

23. Diagnostic and Therapeutic X-Ray Device Registration for JMH, issued by the State of Connecticut Department of Energy and Environmental Protection, Application No: 201403655, Facility ID No: 3152 ("**Diagnostic and Therapeutic X-Ray Device Registration 201403655**")

24. Diagnostic and Therapeutic X-Ray Device Registration for JMH, issued by the State of Connecticut Department of Energy and Environmental Protection, Application No: 201412114, Facility ID No: 3152 ("**Diagnostic and Therapeutic X-Ray Device Registration 201412114**," collectively with Diagnostic and Therapeutic X-Ray Device Registration 201403657 and Diagnostic and Therapeutic X-Ray Device Registration 201403655, the "**Diagnostic and Therapeutic X-Ray Device Registrations**")

25. General Permit to Limit Potential to Emit from Major Stationary Sources of Air Pollution issued to JMH, issued by the State of Connecticut Department of Energy and Environmental Protection Bureau of Air Management, 171-0030-GPLPE ("**General Permit to Limit Potential to Emit**")

26. Groundwater Discharge Permit, issued to JMH by the State of Connecticut Department of Energy and Environmental Protection, UI0000191 ("**Groundwater Discharge Permit**")

27. Biomedical Waste Large Quantity Generator Permit, issued to JMH by the State of Connecticut Department of Energy and Environmental Protection, No. 2376, as is evidenced by the invoice for such permit dated May 1, 2014 ("**Biomedical Waste Large Quantity Generator Permit 2376**")

28. Biomedical Waste Large Quantity Generator Permit, issued to JMH by the State of Connecticut Department of Energy and Environmental Protection, No. 2377, as is evidenced by the invoice for such permit dated May 1, 2014 ("**Biomedical Waste Large**

*Execution Copy*

**Quantity Generator Permit 2377,**" collectively with Biomedical Waste Large Quantity Generator Permit 2376, the "**Biomedical Waste Large Quantity Generator Permits**")

The following are Permits and Licenses that to the Sellers' knowledge may not be assignable or transferable (assignability and/or transferability subject to determination prior to Closing) (the Permits and Licenses listed below, collectively, the "**DPH and DPC Licenses**"):

1. Controlled Substance Registration for Practitioner for JMH Pharmacy Dept, issued by the Department of Consumer Protection, CSP0011955

2. Controlled Substance Registration for Practitioner for Karen Davis Krzynowek Infusion Center at JMH, issued by the Department of Consumer Protection, CSP0051951

3. Controlled Substance Registration for Practitioner for JMH Outpatient Surgery at JSC, issued by the Department of Consumer Protection, CSP0042440

4. Home Health Care Agency License for Home & Community Health Services, Inc., issued by the Department of Health, HHC0C80187

5. General Hospital License for JMH, issued by the Department of Health, GH0000033

6. Approved Public Health Laboratory Registration for JMMC at the JMH Outpatient Laboratory, issued by the Department of Health, HP-0278

7. Approved Public Health Laboratory Registration for JMMC at the Johnson Memorial Medical Hospital Laboratory, issued by the Department of Health, HP-0241

8. Approved Public Health Laboratory Registration for JMMC at the JMMC Infusion Laboratory at JMH, issued by the Department of Health, HP-335

9. General Blood Banking Operations Registration for JMMC at JMH Blood Bank, issued by the Department of Health, BB-1042

10. Approved Blood Collection Facility for JMH Laboratory at Tolland Collection Center, issued by the Department of Health, DS-872

11. Approved Blood Collection Facility for JMH Laboratory at JMH Blood Draw Facility, issued by the Department of Health, DS-745

The following are Permits and Licenses that to the Sellers' knowledge are not assignable or transferable and are Excluded Assets (the Permits and Licenses listed below, collectively, the "**Excluded Permits and Licenses**"):

1. Tax-exempt determination letter for Johnson Memorial Corporation dated August 31, 1984, issued by the IRS

2. Tax-exempt determination letter for JMH dated August 31, 1984, issued by the IRS

*Execution Copy*

3. Tax-exempt determination letter for Johnson Health Care, Inc. dated August 31, 1984, issued by the IRS

4. Tax-exempt determination letter for Visiting Nurse Association of Enfield (predecessor to Home & Community Health Services, Inc.) dated April 14, 1942, issued by the IRS

5. Tax Exemption Permit for JMH, issued by the State of Connecticut Department of Revenue Services, No. 0525

6. Tax Exemption Permit for Johnson Memorial Corporation, issued by the State of Connecticut Department of Revenue Services, No. 8954

7. Tax Exemption Permit for Home & Community Health Services, Inc., issued by the State of Connecticut Department of Revenue Services, No. 2645

8. Tax Exemption Permit for Johnson Health Care, Inc., issued by the State of Connecticut Department of Revenue Services, No. 8955

9. Frozen Dessert Retailer License for JMH, issued by the State of Connecticut Department of Consumer Protection, FDR0000654

10. Food Service License for JMH, issued by North Central District Health Department, 1483

11. Bakery License for JMH, issued by the State of Connecticut Department of Consumer Protection, BAK.0002649

12. 14-3197-DTR determining a certificate of need is not required by Tolland Imaging Center, Inc. to restructure the membership

13. 13-31833-CON granting request by Tolland Imaging Center, Inc., established as a demonstration project by 06-30841-CON, to continue delivery of imaging services, issued by OHCA

14. 09-31513-WVR granting waiver to JMH for replacement of existing 1.0 Tesla-Strength MRI Scanner with 1.5 Tesla Strength MRI Scanner at Johnson Surgery Center, issued by OHCA

15. 09-31491-WVR granting waiver to JMH for replacement of CT scanner at the Johnson Surgery Center, issued by OHCA

16. 08-31197-DTR determining a certificate of need is required by Johnson Memorial Corporation and JMH to terminate behavioral health services in Stafford Springs and Enfield, issued by OHCA

17. 08-31091-DTR determining a certificate of need is required by JMH to establish outpatient infusion services in Enfield, issued by OHCA

18. 08-30950-MDF granting request by JMH to modify CON authorization 07-30950-CON, issued by OHCA

19. 07-31066-DTR determining a certificate of need is required by JMH to terminate outpatient chemotherapy/infusion services in Stafford Springs and to establish outpatient chemotherapy/infusion services in Enfield, issued by OHCA

20. 07-30982-DTR determining a certificate of need is not required by JMH and Johnson Health Care, Inc. for a change of ownership of Johnson Surgery Center between two affiliates of Johnson Memorial Corporation, issued by OHCA

21. 07-30939-DTR determining a certificate of need is not required by Johnson Memorial Corporation for the sale of property at 140-148 Hazard Ave and leaseback of the same property to continue existing services, issued by OHCA

22. 07-30950-WVR granting waiver to JMH for replacement of existing CT scanner at JMH, issued by OHCA

23. 06-30841-CON approving, through Agreed Settlement, request by JMH, Manchester Memorial Hospital, Rockville General Hospital, and Windham Community Memorial Hospital for joint establishment of Tolland Imaging Center, issued by OHCA

24. 06-30-780-EXM determining that a certificate of need is not required by JMH to acquire and install a hospital information system, issued by OHCA

25. 05-30573-CON granting proposal by JMH for a three bed expansion of inpatient behavioral health unit, issued by OHCA

26. 05-30434-CON granting request by JMH to replace and expand emergency department, issued by OHCA

27. 03-30186 granting request by JMH to establish a transportable lithotripsy service granted, issued by OHCA

28. 02-559 granting request by JMH and Alliance Imaging, Inc. to establish a mobile PET scanning service at Johnson Memorial Medical Park, issued by OHCA

JMH and Home & Community Health Services, Inc. use the "doing business as" name of "Johnson Health Network" in connection with the Business, as evidenced by the certificate for the name of "Johnson Health Network," issued to JMH, JEC, and Home & Community Health Services, Inc. by the Town Clerk of the Town of Stafford (**"D/B/A Certificate"**). The D/B/A Certificate is an Excluded Asset but, to the Sellers' knowledge, the Buyer may also obtain a "doing business as" certificate for this name by making a filing with, and getting approval from, the Town Clerk of the Town of Stafford.

To the extent requested by the Buyer, prior to Closing the Sellers shall take such actions that are reasonably necessary to assist the Buyer in obtaining a "doing business as" certification for the name evidenced by the D/B/A Certificate.

The Sellers may also have the following Permits and Licenses and which, if they exist, to the Sellers' knowledge are assignable and transferable, subject to the notification, consent, approval and/or other requirements set forth on Schedule 3.3 (the Permits and Licenses listed below, collectively, the "**Undetermined Permits and Licenses**"):

1. Photographic Processing Wastewater Permit, No. GPH000346

2. New Source Permit, No. 171-0014

The Sellers also have the Permits and Licenses as set forth on Schedule 1.2(m).

*Execution Copy*

## SCHEDULE 1.2(g)

### Sellers' Real Property Income Leases

The Evergreen Ground Lease

If the Buyer elects to assume the following pursuant to Section 10.5 of the Agreement:

146 Hazard Avenue, Enfield CT 06082 leased by Johnson Memorial Corporation, as Landlord, to Wellcare, Inc., as Tenant, pursuant to that certain Lease Agreement dated November 13, 1987 by and between Johnson Memorial Corporation and Wellcare, Inc., as amended by that certain First Amendment of Lease dated January 10, 1987 by Johnson Memorial Corporation and Wellcare, Inc., as amended by that certain Subordination, Non-Disturbance and Lease Modification Agreement dated August 8, 1997 by and between Wellcare, Inc., and Fleet National Bank, as amended by that certain Subordination, Non-Disturbance and Attornment Agreement dated August 24, 2004, by and among Johnson Memorial Corporation both as attorney in fact for Wellcare, Inc. or its successors and/or assigns, and as assignee and/or successor in interest to Wellcare, Inc., Johnson Memorial Corporation, and People's, as amended by that an oral agreement between JMMC, Wellcare, Inc., and Johnson Medical Office Association, Inc. that Johnson Medical Office Association, Inc. pays the fees owed by Wellcare, Inc. to JMMC in accordance with the previously mentioned Lease Agreement, as amended, directly to JMMC.

140 Hazard Avenue, Suite 101, Enfield CT 06082 leased by JMMC to Johnson Professional Associates, P.C. pursuant to an oral lease under which Johnson Professional Associates, P.C. pays $5,872 per month for the use of the space

140 Hazard Avenue, Suite 102, Enfield CT 06082 leased by Johnson Memorial Corporation, as Lessor, and Johnson Health Care, Inc., as Lessee, pursuant to that certain Lease Agreement dated November 1, 2009 by and between Johnson Health Care, Inc. and Johnson Memorial Corporation which misidentified the space rented as Suite 101, and which has expired. The parties continue to operate pursuant to an oral lease under which Johnson Health Care, Inc. pays $3,580 per month for the use of the space.

140 Hazard Avenue, Suite 103, Enfield CT 06082 leased by Johnson Memorial Corporation, as Landlord, to Pioneer Valley Nephrology, as Tenant, pursuant to that certain Letter of Agreement dated August 19, 2004 by and between Johnson Memorial Corporation and Pioneer Valley Nephrology, as amended by that certain First Amendment to Lease Agreement effective August 19, 2006 by and between Johnson Memorial Corporation and Pioneer Valley Nephrology

140 Hazard Avenue, Suite 105, Enfield CT 06082 leased by JMMC, as Lessor, to Miri Daly, APRN, D.N.P., as Lessee, pursuant to that certain Lease dated March 16, 2014

140 Hazard Avenue, Suite 106, Enfield CT 06082 leased by leased by JMMC to JMH pursuant to an oral agreement under which JMH pays $3,100 per month for the use of the space

*Execution Copy*

140 Hazard Avenue, Suite 107, Enfield CT 06082 leased by JMMC, as Lessor, to Saint Francis Medical Group, Inc., as Lessee, pursuant to that certain Lease Agreement dated July 1, 2013 by and between JMMC and St. Francis Medical Group, Inc.

6,656 rentable square fee within the Johnson Community Cancer Center at 142 Hazard Avenue, Enfield CT 06082 leased by Johnson Memorial Corporation, as Landlord, to Northeast Regional Radiation Oncology Network, Inc., as Tenant, pursuant to that certain Lease Agreement dated January 8, 1998

Remaining rentable space within the Johnson Community Cancer Center at 142 Hazard Avenue, Enfield CT 06082 that is not rented by Northeast Regional Radiation Oncology Network, Inc. leased by JMMC to JMH pursuant to an oral agreement under which JMH pays $6,712 per month for the use of the space

384L Merrow Road, Tolland CT 06084, subleased by Johnson Memorial Corporation, as Sublessor, to Connecticut Multispecialty Group, P.C., as Sublessee, pursuant to that certain Session Space Sublease effective June 21, 2010 by and between Johnson Memorial Corporation and Connecticut Multispecialty Group, P.C., as amended by that certain Amendment effective September 1, 2010 by and between Johnson Memorial Corporation and Connecticut Multispecialty Group, P.C., as amended by that certain Second Amendment to Session Space Sublease signed on January 12, 2015 by and between JMMC and Connecticut Multispecialty Group, P.C.

384L Merrow Road, Tolland CT 06084, subleased by Johnson Memorial Corporation, as Sublessor, to Lawrence Glaubiger, M.D., as Sublessee, pursuant to that certain Session Space Sublease effective June 4, 2010 by and between Johnson Memorial Corporation and Lawrence Glaubiger, M.D., as amended by that certain Amendment effective September 1, 2010 by and between Johnson Memorial Corporation and Lawrence Glaubiger, M.D., and which has expired. Although the parties have continued follow the terms of the Session Space Sublease, they operate on a month-to-month lease under Connecticut law.

151 Hazard Avenue, Suite 6, Enfield CT 06082, subleased by JMMC, as Sublessor, and Maria C. Renna, MD, LLC, as Sublessee, pursuant to that certain Session Space Sublease effective October 15, 2011 by and between JMMC and Maria C. Renna, MD, LLC, as amended by that certain letter agreement dated October 12, 2014 between JMMC and Maria C. Renna, MD, LLC, and which has expired. Although the parties have continued follow the terms of the Session Space Sublease, they operate on a month-to-month lease under Connecticut law.

148 Hazard Avenue, Enfield CT 06082 leased by JMMC to JMH pursuant to an oral agreement under which JMH pays $41,249 per month for the use of the space

*Execution Copy*

## **SCHEDULE 1.2(h)**

### **Assumed Contracts**

1. The Evergreen Ground Lease; and

2. Other Assumed Leases and Contracts to be determined by the Buyer prior to Closing pursuant to Section 10.5 of the Agreement.

*Execution Copy*

## SCHEDULE 1.2(m)

### Sellers' Owned Intellectual Property

The following domain names and URLs:

1. HOMEANDCOMMUNITY.COM - Registrar: REGISTRATION TECHNOLOGIES, INC., Expiration Date: 21-feb-2015

2. JOHNSONHEALTHNETWORK.COM - Registrar: REGISTRATION TECHNOLOGIES, INC. Expiration Date: 21-feb-2015

3. JOHNSONMEMORIAL.COM  - Registrar: REGISTRATION TECHNOLOGIES, INC. Expiration Date: 21-feb-2015

4. JOHNSONOCCMED.COM - Registrar: REGISTRATION TECHNOLOGIES, INC. Expiration Date: 21-feb-2015

5. JOHNSONSURGERYCENTER.COM  - Registrar: REGISTRATION TECHNOLOGIES, INC. Expiration Date: 21-feb-2015

6. JOHNSONMEMORIALMEDICALCENTER.COM - Registrant Name: Todd Pucci; Expiration Date: 2016-08-24

7. JOHNSONMMC.COM - Registrant Name: Todd Pucci; Expiration Date: 2016-08-24

8. JMMC.COM - Registrant Organization: Johnson Memorial Medical Center; Expiration Date: 2015-7-15

9. EJMMC.COM - Registrant Name: Todd Pucci; Expiration Date: 2015-2-7

10. EVERGREEN-JHN.COM ("**Evergreen Domain**")

Connecticut Registration for JMMC (Stylized), owned by JMMC, registered November 12, 2013, Reg. No. 39463794 ("**Connecticut Service Mark 39463794**")



Connecticut Registration for Johnson Health Network owned by Johnson Memorial Corporation, registered November 15, 2010, Reg. No. 23705 ("**Connecticut Service Mark 23705**")

*Execution Copy*

## JOHNSON
## HEALTH NETWORK

Connecticut Registration for Johnson Surgery Center and Design owned by Johnson Memorial Corporation, registered August 30, 1996, Reg. No. 10016 ("**Connecticut Service Mark 10016**")



Connecticut Registration for Evergreen Health Care Center and Design owned by JMMC, registered April 19, 1996, Reg. No. 9891 ("**Connecticut Service Mark 9891**")



Connecticut Registration for Johnson Surgery Center owned by Johnson Memorial Corporation, registered October 1, 1993 Reg. No. 9088 ("**Connecticut Service Mark 9088**")

Connecticut Registration for JMH Johnson Memorial Hospital owned by Johnson Memorial Corporation, registered April 19, 1996, Reg. No. 9890 ("**Connecticut Service Mark 9890**")

Connecticut Registration for Home & Community Health Services and Design owned by Johnson Memorial Corporation, registered April 15, 1996, Reg. No. 9881 ("**Connecticut Service Mark 9881**," collectively with Connecticut Service Mark 39463794, Connecticut Service Mark 23705, Connecticut Service Mark 10016, Connecticut Service Mark 9088, and Connecticut Service Mark 9890, the "**Connecticut Service Marks**")



Connecticut Service Mark 10016, Connecticut Service Mark 9088, Connecticut Service Mark 9890 and Connecticut Service Mark 9881 (collectively, the "**Expired Marks**") are currently expired. The Sellers shall use commercially reasonable efforts to cause the registrations with the Connecticut Secretary of State of such Expired Marks to be reinstated so that they are in effect as of Closing.

*Execution Copy*

The "doing business as" name evidenced by the D/B/A Certificate is used in connection with the Business. The D/B/A Certificate is an Excluded Assets but, to the Sellers' knowledge, the Buyer may also obtain a "doing business as" certificate for this name by making a filing with, and getting approval from, the Town Clerk of the Town of Stafford.

To the extent requested by the Buyer, prior to Closing the Sellers shall take such actions that are reasonably necessary to assist the Buyer in obtaining a "doing business as" certification for the name evidenced by the D/B/A Certificate.

The Sellers, individually or collectively, may license software from time to time and the Sellers' use of such software is governed by, and subject to, the terms and provisions of any Contract applicable to its use, including any terms regarding transferability.

The following marks are Excluded Assets:

1. The Connecticut Registration for Johnson Professional Associates P.C. and Design set forth below is owned by Johnson Memorial Corporation, registered April 19, 1996, Reg. No. 9886 ("**Connecticut Service Mark 9886**"):



2. Massachusetts Registration for Community and Parish Partnership for Wellness Home & Community Services, Inc.is owned by Johnson Memorial Corporation, registered April 22, 1998, Reg. No. 55790 (the "**Massachusetts Service Mark**").

If the Buyer is not the purchaser in the JEC Transaction, then the Evergreen Domain and Connecticut Service Mark 9891 shall be Excluded Assets.

*Execution Copy*

## SCHEDULE 1.2(o)

## Nondisclosure or Confidentiality, Non-Compete, or Non-Solicitation Agreements in Favor of the Sellers

1. Master Agreement, between JMH and AT & T Corporation, signed by JMH on 6/29/09 (AT&T MA Reference No. 133863UA).

2. Agreement between Bayer HealthCare and JMH (Quote #: 33507), signed by JMH on 11/14/2013.

3. Commercial Services Agreement by and between JMH and Cox Business, signed by JMH on 6/11/09 (the parties to this agreement entered into a HIPAA Business Associate Agreement).

4. Maintenance Agreement, by and between JMH and DatCard Systems, Inc., dated 01/30/2014.

5. Service Agreement, made and entered into the 1st day of October, 2013, by and between Edwards Answering Service Enterprises, Inc., and Home & Community Health Services (the parties to this agreement entered into a HIPAA Business Associate Agreement).

6. Purchase and License Agreement, between Elekta, Inc., and JMH including that certain Addendum, both documents having been signed by JMH on 4/20/10, and including such Software License and Hosting Service Standard Terms and Conditions signed on that same 4/20/10.

7. Fee Agreement, between FSW Community Sign Language Services (CSLS) and JMMC, signed by JMMC on 12/18/2013 (the parties to this agreement entered into a HIPAA Business Associate Agreement).

8. Surgery Service and Support Contract – Comprehensive Protection Plan, between JMH and GE HealthCare, signed on 4/30/13.

9. GE HealthCare Support Summary (Quote # 99991266A), including that certain Addendum to Quotation entered into as of October 25, 2013, by and between JMH, and GE Medical Systems, Ultrasound & Primary Care Diagnostics, LLC, and including the GE Healthcare General Terms and Conditions.

10. Service Quotation (No. 1-2F7BVD7), between JMH, and GE Healthcare, quote date 8/22/2013, with a service start date of 9/1/2013.

11. Service Agreement, between JMH, and Infoshred LLC, signed by JMH on 3/20/12.

12. MedAssets Supply Chain Systems, LLC and The Broadlane Group, Inc. and MModal Services, Ltd. Exhibit H 0 Letter Designation Form, including that certain Exhibit I

*Execution Copy*

Sample MModal Form of LOP – MModal Letter of Participation ("LOP") for the Agreement for Products between MedAssets Supply Chain Systems and MModal Services, Ltd., effective as of May 1, 2008 Expires 10/31/15.

13. Security Service Agreement, dates as of October 1, 2014 between JMH and Murphy Security Service LLC.

14. Purchased Services Agreement for Technical Component of Holter Monitoring Services, made 3/30/04, by and between JMH and Raytel Cardiac Services, Inc.

15. Letter agreement dated April 8, 2014 by and between JMH and Russell Phillips and Associates, LLC.

16. Client Agreement for SHP Data Services, between Strategic Healthcare Programs, LLC and Home & Community Health Services, Inc., signed by Home & Community Health Services, Inc. on 10/14/14 (the parties to this agreement entered into a HIPAA Business Associate Agreement).

17. Product Service Plan Agreement, between Stryker and JMH signed by JMH on 12/10/12.

18. Chancellor Consulting Group, Inc., letter agreement dated 1/9/2013, accepted by JMH and signed on 1/10/13.

19. Consulting Services Agreement, entered into as of April 15, 2014, by and between JMMC, and John Garbarino, M.D.

20. Consulting Services Agreement, entered into as of April 15, 2014, by and between JMMC, and Charles Margarites.

21. Support Services Agreement between Home and Community Health Services, Inc. and Masonic Management Services Corporation, dated 10/31/2013.

22. Consulting Agreement, dated and effective as of 5/20/13, by and between Home & Community Health Services, Inc. and Masonicare Home Health and Hospice (the parties to this agreement entered into a HIPAA Business Associate Agreement).

23. External Peer Review Services Agreement, made by and between JMH and MDReview, LLC, effective 8/8/13 (the parties to this agreement entered into a HIPAA Business Associate Agreement).

24. Consulting Services Agreement, entered into as of 3/19/14, by and between JMMC and Philip Rockwell.

25. Southwest Consulting Associates, letter agreement dated 6/4/09 between Southwest Consulting Associates and JMH.

*Execution Copy*

26. Letter Agreement titled "RE: Revised Agreement to Assist with Part Time Cloverleaf Interface Support," dated 11/28/12, between JMMC and Xerox Consultant Company, Inc. dba ACS Healthcare Solutions (Xerox HCS).

27. Medical Director Agreement, effective as of September 1, 2009, by and between JMH and Richard M. Shoup, M.D, including that certain First Amendment to Medical Director Agreement, effective as of December 1, 2013, and including that certain Business Associate Agreement, made and effective as of September 24, 2013, by and between JMH, and Richard M. Shoup, M.D.

28. Anesthesiology Patient Services Agreement, effective as of 10/1/06, by and among JMH, Johnson Health Care, Inc., and Somers Anesthesiology Associates, LLC.

29. Medical Director Agreement, made and entered into the 1st day of August, by and between JMH and Saint Francis Medical Group, Inc.

30. JMMC Cancer Program Clinical and Administrative Services Agreement, entered into and effective as of the 12th day of March, 2012, by and between JMMC, and Saint Francis Medical Group, Inc., a Connecticut non-stock membership corporation of which Saint Francis *Care*, Inc. is the sole member, including that certain Business Associate Agreement, made as of March 12, 2012, by and between JMMC, and St. Francis Medical Group.

31. Agreement for Physician Services, dated effective May 22, 2012, by and between Saint Francis Medical Group, Inc. and JMMC

32. JMMC Cancer Program – Clinical and Administrative Services Agreement, entered into and effective 3/12/12, by and between JMMC and Saint Francis Medical Group, Inc.

33. Professional Services Agreement, made and entered into 6/10/13, by and between JMMC and Jefferson Radiology, P.C.

34. Emergency Care Services Agreement, effective 4/1/11, between JMH and Northeast Emergency Medicine Specialists, LLC, including that certain Amendment One dated 4/1/11, that certain Amendment 2 entered into as of 9/12/11, that certain Third Amendment dated 12/30/11, and that certain Fourth Amendment entered into 2/25/14.

35. Agreement for Hospice General Inpatient Level of Care in a Skilled Nursing Facility, entered into 10/1/13, by and between Home & Community Health Services, Inc., Hospice and Bickford Health Care Center.

36. Agreement between Clinical EEG/EP Services and JMH, made 1/1/14, by and between Clinical EEG/EP Services and JMH.

37. Hospital Services Agreement, made and entered into as of 7/10/13, between DVA Renal Healthcare, Inc. (a subsidiary of DaVita HealthCare Partners Inc.) and JMH.

38. Agreement for Hospice General Inpatient Level of Care in a Skilled Nursing Facility, entered into as of 10/1/13, by and between Home & Community Health Services, Inc., Hospice, and JEC.

39. Professional Services Agreement, made and entered into as of 8/12/13, by and between JMH, Hartford Cardiology Group, and Joseph Mitchel, DO (this contract is for the provision of cardiology services for JMH patients).

40. Professional Services Agreement, made and entered into as of 8/12/13, by and between JMH, Hartford Cardiology Group, and Joseph Mitchel, DO (this contract is for the provision of EKG "over-reads").

41. Agreement between Home & Community Health Services, Inc. & Hospice Pharmacia (excelleRx, Inc. d/b/a Hospice Pharmacia), signed by Home & Community Health Services, Inc. on 8/10/04 (the parties to this agreement entered into a HIPAA Business Associate Agreement).

42. Mobile MRI Scanner Lease and Operating Agreement, entered into 10/27/10, by and between InSight Health Corp. d/b/a InSight Imaging, and JMH.

43. Professional Services Agreement, made and entered into as of 8/1/13, by and between JMH and Shiba Jhawar, M.D (this contract is for the provision of cardiology services for JMH patients).

44. Professional Services Agreement, made and entered into as of 8/1/13, by and between JMH and Shiba Jhawar, M.D. (this contract is for the provision of EKG "over-reads").

45. Agreement for the Provision of Physician Services, effective 2/1/10, between JMH, and Johnson Professional Associates, P.C.

46. Protocol and Agreement for the Provision of Routine and Respite Hospice Level of Care Services to Residents of St. Joseph Residence, entered into as of 10/1/13, between Home & Community Health Services, Inc., Hospice and St. Joseph Residence.

47. MedNovations, Inc. Standard Base Services Agreement Tele-pharmacy for JMH, entered into as of 2/1/13, by and between MedNovations, Inc., and JMH

48. Professional Services Agreement, made and entered into as of 8/1/13, by and between JMH, Johnson Professional Associates, P.C., and Christopher Morosky, M.D, including that certain First Amendment to the Professional Services Agreement, executed as of 7/17/14.

49. Protocol and Agreement for the Provision of Routine and Respite Hospice Level of Care Services to Residents of Parkway Pavilion Healthcare, entered into as of 10/1/13,

between Home & Community Health Services, Inc., Hospice and Parkway Pavilion Healthcare.

50. Hospice Agreement – Infusion Therapy Products and Services – Durable Medical Equipment and Supplies, made as of 9/1/05, by and between Home & Community Health Services, Inc., and Professional Home Care Services, Inc.

51. Provision of Physician Services Agreement, made 4/1/13, by and between JMH, and Arthur H. Skalski, M.D.

52. Athletic Training Services Agreement, made as of 8/1/13, by and between Somers Board of Education and JMH.

53. Professional Services Agreement, made and entered into as of 8/6/13, by and between JMH and Juan B. Sosa, M.D.

54. Athletic Training Services Agreement, made as of 8/1/13, by and between Stafford Board of Education and JMH.

55. Professional Services Agreement, made and entered into as of 8/1/13, by and between JMH and Jeffrey Thompsen, M.D. (this contract is for the provision of EKG "over-reads").

56. Professional Services Agreement, made and entered into as of 8/1/13, by and between JMH and Jeffrey Thompsen, M.D (this contract is for the provision of cardiology services for JMH patients).

57. Coordination of Hospice Inpatient Care Agreement, entered into the 1st day of July, 2013, by and between Visiting Nurse and Health Services of Connecticut, Inc., and JMH (the parties to this agreement entered into a HIPAA Business Associate Agreement).

58. Confidential Separation Agreement and General Release, between JMMC, JMH, and their respective affiliates and Michelle Urban, dated as of 2/3/14.

59. Non-State Agency Agreement for Sign-Language Interpreting Services, by and between the State of Connecticut, Department of Rehabilitation Services, and JMH, with a term commencing on 1/1/13.

60. Confidential Settlement Agreement, General Release, and Covenant Not to Sue, by and between Scott Ferguson and JMH, signed by JMH on 5/6/14.

61. Agreement for CDMaintain, made and entered into 11/21/14, by and between JMH and the Medical Bureau of Economics, Inc.

62. Subscription Agreement (Agreement #ESCON1011), made and entered into as of November 1, 2011, by and between Allscripts Healthcare, LLC, and JMMC d/b/a

*Execution Copy*

Evergreen Health Care Center and Home & Community Health Services, Inc., including that certain Amendment to Subscription Agreement, signed by JMMC on 9/12/14.

63. Agawam Medical Supply, Corp. & Home & Community Health Services, Inc. & Hospice Durable Medical Equipment Agreement August 20, 2014.

64. The Connecticut Healthcare Research and Education Foundation Patient Safety Organization Participation Agreement, between the Connecticut Healthcare Research and Education Foundation, Incorporated, and JMH, signed by JMH on 8/23/14.

65. Services Agreement, made and entered into this the 22nd day of September, 2014, by and between CBRCC, Inc., doing business as Courtemanche & Associates, Healthcare Synergists, and JMMC.

66. The Master Affiliation Agreement, made as of the 12th day of July, 2012, by and among Saint Francis *Care*, Inc., JMMC, and its affiliates, JMH, and JEC, including that certain: First Amendment to Master Affiliation Agreement and Interim Financing Agreement, dated as of May 17th, 2013; Second Amendment to Master Affiliation Agreement and Interim Financing Agreement, dated as of August 16, 2013; Third Amendment to Master Affiliation Agreement and Interim Financing Agreement, dated as of September 16, 2013; Fourth Amendment to Master Affiliation Agreement and Interim Financing Agreement, dated as of December 20, 2013; Fifth Amendment to Master Affiliation Agreement and Interim Financing Agreement, dated as of February 3, 2014; Sixth Amendment to Master Affiliation Agreement and Interim Financing Agreement, dated as of May 30, 2014; Seventh Amendment to Master Affiliation Agreement and Interim Financing Agreement, dated as of June 5, 2014 (collectively, the "Master Affiliation").

67. Clinical Affiliation Agreement, entered into and effective as of the 12th day of July, 2012, by and among JMMC, on behalf of itself and its affiliates, JMH, JEC, and Johnson Professional Associates, P.C., and Saint Francis *Care*, on behalf of itself and its affiliates, Saint Francis Hospital and Medical Center and Saint Francis Medical Group, P.C. (the "Clinical Affiliation"), including that certain: Clinical Services Sub-Agreement to Clinical Affiliation Agreement – Sub-Agreement Number: B-1, entered into and effective as of the Start Date (as defined therein as August 1, 2012); Clinical Services Sub-Agreement to Clinical Affiliation Agreement – Sub-Agreement Number: B-2, entered into and effective as of the Start Date (as defined therein as September 17, 2012); Clinical Services Sub-Agreement to Clinical Affiliation Agreement – Sub-Agreement Number: B-3, entered into and effective as of the Start Date (as defined therein as May 13, 2013); Clinical Services Sub-Agreement to Clinical Affiliation Agreement – Sub-Agreement Number: B-4, entered into and effective as of the Start Date (as defined therein as September 1, 2013); Clinical Services Sub-Agreement to Clinical Affiliation Agreement – Sub-Agreement Number: B-5, entered into and effective as of the Start Date (as defined therein as September 1, 2013) and that certain First Amendment to the Clinical Services Sub-Agreement to the Clinical Affiliation Agreement – Sub-Agreement Number: B-5, effective as of November 4, 2013; Clinical Services Sub-Agreement to Clinical Affiliation Agreement – Sub-Agreement Number: B-6, entered into and effective as of

the Start Date (as defined therein as September 1, 2013); Clinical Services Sub-Agreement to Clinical Affiliation Agreement – Sub-Agreement Number: B-7, entered into and effective as of the Start Date (as defined therein as April 1, 2014); Clinical Services Sub-Agreement to Clinical Affiliation Agreement – Sub-Agreement Number: B-8, entered into and effective as of the Start Date (as defined therein as January 6, 2014); Clinical Services Sub-Agreement to Clinical Affiliation Agreement – Sub-Agreement Number: B-9, entered into and effective as of the Start Date (a begin date is provided of January 20, 2014); Clinical Services Sub-Agreement to Clinical Affiliation Agreement – Sub-Agreement Number: B-10, entered into and effective as of the Start Date (as defined therein as February 3, 2014).

68. Business Process Outsourcing Agreement, entered into and effective as of the 12th day of July, 2012, by and among JMMC, on behalf of itself and its affiliates JMC, JEC, and Johnson Professional Associates, P.C., and Saint Francis *Care*, on behalf of itself and its affiliates, Saint Francis Hospital and Medical Center and Saint Francis Medical Group, P.C., including that certain: Sub-Agreement to Business Process Outsourcing Agreement – Sub-Agreement Number: B-1 Management Services, enter into and effective as of the Start Date (as defined therein as March 25, 2013); Sub-Agreement to Business Process Outsourcing Agreement – Sub-Agreement Number: B-2, enter into and effective as of the Start Date (as defined therein as August 1, 2013); Sub-Agreement to Business Process Outsourcing Agreement – Sub-Agreement Number: B-3, enter into and effective as of the Start Date (as defined therein as August 1, 2013); Sub-Agreement to Business Process Outsourcing Agreement – Sub-Agreement Number: B-4, enter into and effective as of the Start Date (as defined therein as July 24, 2013); Sub-Agreement to Business Process Outsourcing Agreement – Sub-Agreement Number: B-5, enter into and effective as of the Start Date (as defined therein as August 19, 2013).

69. Certain entities and individuals involved with and/or engaged by the Sellers have executed Business Associate Agreements (as defined by HIPAA regulations) with vendors other than as listed above. These Business Associate Agreements contain regulatory requirements governing the disclosure and use of confidential information by the Sellers' Business Associates (as defined in such Business Associate Agreements).

70. The Sellers' employees, at their time of hiring, are asked to sign "Johnson Memorial Medical Center – Statement of Confidentiality" a form of which has been provided to the Buyer.

71. Physicians who have access to the JMH computer system, are asked to sign "Statement of Confidentiality – Johnson Memorial Corporation," the form of which has been provided to the Buyer.

72. There are additional agreements that contain nondisclosure, confidentiality, non-compete and non-solicitation provisions that are not included here because they prohibit disclosure of either the terms of the agreement or existence of the relationship.

*Execution Copy*

## SCHEDULE 1.4(a)(ix)

### Sellers' Liabilities and Liens

1. Real Property Permitted Encumbrances
2. Liens in favor of HFG associated with the HFG Debt if the Buyer and HFG agree that the Buyer will assume the HFG Debt
3. Liens in favor of People's associated with the Restructured People's Debt
4. The transfer of all equity interests in Tolland Imaging Center, LLC and all non-stock membership interests and/or equity ownership interests in Northeast Regional Radiation Oncology Network, Inc. or any successor entity thereto to Buyer are subject to any notice, consent or approval requirements set forth in the applicable organizational documents and as may be required by law.
5. Purchase money security interests and interests under capital leases to the extent the Buyer elects to assume the collateral they relate to, including the Liens evidenced by the following Lien filings with the Secretary of the State of Connecticut:

| DEBTOR | SECURED PARTY | FILING NO. | FILING DATE | LAPSE DATE | COLLATERAL |
|---|---|---|---|---|---|
| Johnson Health Care, Inc. | First American Commercial Bancorp, Inc. The Huntington National Bank | 2356157 | 10/17/2005 | 10/17/2015 | Leased computer equipment (Equipment/Lease No. 22206, Schedule 3) |
| Johnson Memorial Medical Center, Inc. | Xerox Financial Services | 2867471 | 3/28/2012 | 3/28/2017 | Long list of serial (or other type of) numbers . . . . "This filing is for protective purposes only. Nothing contained in the financing statement, nor the filing thereof, shall be deemed to construe the lease, or the leasing of the equipment thereunder, as a conditional sale or installment sale agreement, a lease in the nature of a security agreement or anything other than a true lease of personal property." |
| Johnson Memorial Hospital, Inc. | First American Commercial Bancorp, Inc. The Huntington National Bank | 2307522 | 12/30/2004 | 12/30/2014 | Leased equipment (Master lease 97108 Schedule #27) |
| Johnson Memorial Hospital, Inc. | First American Commercial Bancorp, Inc. The Huntington National Bank | 2371512 | 1/12/2006 | 1/12/2016 | Leased equipment (Master lease 97108 Schedule #s 33 and 34) |
| Johnson Memorial Hospital, Inc. | Key Government Finance, Inc. | 2408262 | 8/7/2006 | 8/7/2016 | Equipment, general intangibles, software per Master Financing Agreement, including Paragon Information System |

*Execution Copy*

| Johnson Memorial Hospital, Inc. | Somerset Capital Group, Ltd. | 2457797 | 5/23/2007 | 5/23/2017 | Leased equipment per Schedule No. 3 to Master Lease Agreement dated as of 4/12/2007. This filing is for informational purposes and does not create or evidence a security interest under the UCC). [Located at 201 Chestnut Hill Road, Stafford Springs, CT 06076] |
| Johnson Memorial Hospital, Inc. | Somerset Leasing Corp. I | 2475570 | 8/29/2007 | 8/29/2017 | Leased equipment (Master Lease 4/12/07 – Schedule #1) |
| Johnson Memorial Hospital, Inc. | Somerset Leasing Corp. XIV | 2636176 | 5/27/2008 | 5/27/2018 | Leased equipment (Master Lease 4/12/07 – Schedule #6) |
| Johnson Memorial Hospital, Inc. | Republic Bank and Med One Capital Funding, LLC | 2704636 | 7/15/2009 | 7/15/2019 | Numerous Alaris pump modules with software licenses (Leased) |
| Johnson Memorial Hospital, Inc. | Somerset Leasing Corp. VIII | 2779635 | 10/22/2010 | 10/22/2015 | Leased equipment per Schedule No. 6 to Master Lease Agreement dated as of 4/12/2007. This filing is for informational purposes and does not create or evidence a security interest under the UCC). [Located at 201 Chestnut Hill Road, Stafford Springs, CT 06076] |
| Johnson Memorial Hospital, Inc. | Bankwell Bank | 2779924 | 10/25/2010 | 10/25/2015 | Shimadzu "DR" FluoroSpeed300 RF System and leased equipment per Schedule No. 6 to Master Lease Agreement dated as of 4/12/2007. [Located at 201 Chestnut Hill Road, Stafford Springs, CT 06076] |
| Johnson Memorial Hospital, Inc. | Somerset Leasing Corp. VIII | 2794350 | 1/19/2011 | 1/29/2016 | Leased equipment per Schedule No. 7 to Master Lease Agreement dated as of 4/12/2007. This filing is for informational purposes and does not create or evidence a security interest under the UCC). [Located at 148 Harvard [sic] Avenue, Enfield, CT 06082] |
| Johnson Memorial Hospital, Inc. | Bankwell Bank | 2795853 | 1/28/2011 | 1/28/2016 | Leased equipment per Schedule No. 7 to Master Lease Agreement dated as of 4/12/2007. This filing is for informational purposes and does not create or evidence a security interest under the UCC). [Located at 148 |

*Execution Copy*

| | | | | | |
|---|---|---|---|---|---|
| | | | | | Harvard [sic] Avenue, Enfield, CT 06082] |
| Johnson Memorial Hospital, Inc. | Olympus America, Inc. | 2821357 | 6/14/2011 | 6/14/2016 | Long list of serial (or other type of numbers . . . . "This filing is filed for notice purposes only & the filing thereof shall not be deemed evidence of any intention to create a security interest under the UCC." |
| Johnson Memorial Hospital, Inc. | Olympus America, Inc. | 2853988 | 1/6/2012 | 1/6/2017 | Long list of serial (or other type of numbers . . . . "This filing is filed for notice purposes only & the filing thereof shall not be deemed evidence of any intention to create a security interest under the UCC." |
| Johnson Memorial Hospital, Inc. | General Electric Capital Corporation | 2874063 | 5/1/2012 | 5/1/2017 | See Equipment Schedule attached to filing |
| Johnson Memorial Hospital, Inc. | General Electric Capital Corporation | 2885562 | 7/5/2012 | 7/5/2017 | One Direct Supply Alma Soprano XI Diode Laser System |
| Johnson Memorial Hospital, Inc. | Total Communications, Inc. | 2894559 | 9/5/2012 | 9/5/2017 | List of serial (or other) numbers |
| Johnson Memorial Hospital, Inc. | Somerset Leasing Corp. VII Somerset Capital Group, Ltd. | 2895378 | 9/10/2012 | 9/10/2017 | Leased equipment per Schedule No. 8 to Master Lease Agreement dated as of 4/12/2007. [Located at 201 Chestnut Hill Road, Stafford Springs, CT 06076]. |
| Johnson Memorial Hospital, Inc. | Somerset Leasing Corp. XVIII Somerset Capital Group, Ltd. | 2917365 | 1/25/2013 | 1/25/2018 | Leased equipment per Schedule No. 3 R.1 to the Master Lease Agreement dated as of 4/12/2007. [Located at 201 Chestnut Hill Road, Stafford Springs, Ct 06076]. |
| Johnson Memorial Hospital, Inc. | Somerset Leasing Corp. XII | 2918071 | 1/28/2013 | 1/28/2018 | Leased equipment per Schedule No. 4 R to the Master Lease Agreement dated as of 4/12/2007. [Located at 201 Chestnut Hill Road, Stafford Springs, CT 06076]. |
| Johnson Memorial Hospital, Inc. | Farnam Street Financial, Inc. | 2949935 | 7/29/2013 | 7/29/2018 | Lease Agreement No. JO061413 |

*Execution Copy*

## SCHEDULE 1.6(b)(v)

### Cash Payment

To be prepared by the Buyer prior to Closing in accordance with Section 1.6(b)(v) of the Agreement.

*Execution Copy*

## SCHEDULE 3.3

### Necessary Approvals and Consents for the Sellers

Approval from the Bankruptcy Court for the transactions contemplated by this Agreement including as to assignment of the Assumed Contracts

Approval from the Attorney General and the applicable court, if necessary, for the transfer of the Charitable Assets and/or redesignation of the Buyer as a successor beneficiary of the Charitable Assets (see Section 1.2 of the Agreement)

Approval from the U.S. Department of Justice and/or the U.S. Federal Trade Commission of any Hart-Scott-Rodino premerger filing to the extent such filing is deemed necessary prior to Closing

Approval from the Department of Health Office of Health Care Access of the Certificate of Need application

Notice to the Stafford, Hazardville, and Enfield Fire Marshals, as applicable, of new ownership of Sellers' Owned Real Property and the change in tenancy for any properties listed in Schedule 1.2(b)

Recording of deeds and filing of conveyance tax returns in Enfield and Stafford Springs

Approval from Department of Health Drinking Water Section for the assignment of Community Water System Classification

Notice to CMS of change of ownership of the Medicare provider agreement or termination of Medicare provider agreement, as applicable

Notice to the Connecticut Department of Social Services of change of ownership of the provider enrollment agreement or termination of provider enrollment agreement, as applicable

To the extent that the Buyer elects to assume the Permits and Licenses set forth below the following notices and approvals are required:

1. Notice to Department of Health CLIA Laboratory Program of transfer of CLIA Certificates

2. Approval from the U.S. Nuclear Regulatory Commission for transfer of Materials License

3. Approval from the U.S. Food and Drug Administration for Mammography Facility Certification

4. Approval from the U.S. Drug Enforcement Administration for transfer of Controlled Substances Registrations

*Execution Copy*

5. Notice to State of Connecticut Department of Construction Services Bureau of Elevators of transfer of Elevator Operation Certificates

6. Approval by the Secretary of the State of the State of Connecticut for the reinstatement of Connecticut Service Mark 10016, Connecticut Service Mark 9088, Connecticut Service Mark 9890 and Connecticut Service Mark 9881 (which are currently expired)

7. Approval by the Secretary of State of the State of Connecticut of the assignment of the Connecticut Service Marks

8. If the Buyer is the purchaser in the JEC Transaction, approval by the Secretary of the State of the State of Connecticut of the assignment of Connecticut Service Mark 9891

9. Approval by the State of Connecticut Department of Energy and Environmental Protection Bureau for transfer of Radioactive Material and Industrial X-Ray Device Registrations, General Permit to Limit Potential to Emit, Groundwater Discharge Permit, Biomedical Waste Large Quantity Generator Permits, and Diagnostic and Therapeutic X-Ray Device Registrations

10. To the extent the Undetermined Licenses and Permits exist, approval by the State of Connecticut Department of Energy and Environmental Protection Bureau for their transfer

If it is determined prior to Closing that any DPH and DPC Licenses are transferable or assignable, then such notice, approvals and/or consent as may be required to transfer or assign them

This Schedule does not include any required approvals, consents, or filings with the Pension Benefit Guaranty Corporation

*Execution Copy*

## SCHEDULE 4.3

### Necessary Approvals and Consents for Buyer

Approval from the Bankruptcy Court for the transactions contemplated by this Agreement including as to assignment of the Assumed Contracts.

Approval from the Attorney General and the applicable court, if necessary, for the transfer of the Charitable Assets and/or redesignation of Buyer as a successor beneficiary of the Charitable Assets (See Section 1.2 of the Agreement)

Approval from the Department of Health Office of Health Care Access of the Certificate of Need application

Notice to the Enfield, Stafford Springs and Hazardville fire marshal, as applicable, of new ownership of Sellers' Owned Real Property and the change in tenancy for any properties listed in Schedule 1.2(b)

Recording of deeds and filing of conveyance tax returns in Enfield and Stafford Springs

Approval from Department of Health Drinking Water Section for the assignment of Community Water System Classification

Notice to CMS of change of ownership of any such Medicare provider agreement(s), to the extent Buyer elects to assume any such Medicare provider agreement(s), or notice to CMS of rejection of any Medicare provider agreement(s)

Notice to the Connecticut Department of Social Services of change of ownership of any such provider enrollment agreement(s), to the extent Buyer elects to assume any such provider enrollment agreement(s), or notice to the Connecticut Department of Social Services of rejection of any provider enrollment agreement(s)

All required approvals and consents from the Roman Catholic Church.

All required filings or notifications under the Hart-Scott Rodino Antitrust Improvements Act of 1976.

To the extent that the Buyer elects to assume the Licenses and Permits set forth below the following notices and approvals are required:

1. Notice to Department of Health CLIA Laboratory Program of transfer of CLIA Certificates

2. Approval from the U.S. Nuclear Regulatory Commission for transfer of Materials License

*Execution Copy*

3. Approval from the U.S. Food and Drug Administration for Mammography Facility Certification

4. Approval from the U.S. Drug Enforcement Administration for transfer of Controlled Substances Registrations

5. Notice to State of Connecticut Department of Construction Services Bureau of Elevators of transfer of Elevator Operation Certificates

6. Approval by the State of Connecticut Department of Energy and Environmental Protection Bureau for transfer of Radioactive Material and Industrial X-Ray Device Registrations, General Permit to Limit Potential to Emit, Groundwater Discharge Permit, Biomedical Waste Large Quantity Generator Permits, and Diagnostic and Therapeutic X-Ray Device Registrations

7. To the extent the Undetermined Licenses and Permits exist, Approval by the State of Connecticut Department of Energy and Environmental Protection Bureau for their transfer

The following consents and approvals, provided, however, that Buyer's obtaining such consents shall not be a condition precedent to Buyer's obligations to purchase the Assets in accordance with the terms of the Agreement:

- Consents required pursuant to documents executed in connection with issuance of $39,745,000 CHEFA Revenue Bonds, Series E, if applicable.

- Consents required pursuant to the documents executed in connection with issuance of $50,000,000 CHEFA Revenue Bonds, Series H, if applicable.

- Consents required pursuant to documents executed in connection with issuance of $60,000,000 CHEFA Revenue Bonds, Series I, if applicable.

- Consents required pursuant to the documents executed in connection with issuance of $40,000,000 CHEFA Revenue Bonds, Series J, if applicable.

- Consents required pursuant to the documents executed in connection with issuance of $35,000,000 CHEFA Revenue Bonds, Series K, if applicable.

- Consents required pursuant to the documents executed in connection with issuance of $20,000,000 CHEFA Revenue Bonds, Series L, if applicable.

- Consents required pursuant to documents executed in connection with issuance of $8,215,000 CHEFA Revenue Bonds, Series M, if applicable.

*Execution Copy*

If it is determined prior to Closing that any DPH and DPC Licenses are transferable or assignable, then such notice, approvals and/or consent as may be required to transfer or assign them.

Exhibit 1.4(b)

## ASSIGNMENT AND ASSUMPTION OF
## ASSUMED LIABILITIES, ASSUMED CONTRACTS AND ASSUMED LEASES

THIS **ASSIGNMENT AND ASSUMPTION OF ASSUMED LIABILITIES, ASSUMED CONTRACTS AND ASSUMED LEASES** (this "Agreement"), is made as of [ _____ __, 20__ ], by and among Saint Francis *Care*, Inc., a Connecticut corporation (the "Buyer"), on the one hand, and the entities executing this Agreement as "Sellers" on the signature page hereof (each a "Seller," and collectively, the "Sellers"), on the other hand. Capitalized terms used but not otherwise defined herein shall have the meanings given to such terms in the APA (as defined below).

**WHEREAS**, reference is made to (i) that certain Asset Purchase Agreement, effective as of January 14, 2015, by and among the Buyer and the Sellers (as may be amended, modified, supplemented or restated from time to time, collectively, the "APA"); and (ii) that certain Sale Order.

**NOW, THEREFORE**, for good and valuable consideration, the receipt, adequacy and legal sufficiency of which are hereby acknowledged, and as contemplated by the APA and the Sale Order:

1.      Each Seller hereby sells, transfers, assigns, conveys, grants, delegates and delivers to the Buyer, and the Buyer hereby accepts and assumes, effective as of the Effective Time, all of such Seller's right, title, and interest in and to, and the obligations under and with respect to, the Assumed Liabilities, and to the extent relating to events or periods on or after the Effective Time, all of such Seller's obligations under the Assumed Contracts and the Assumed Leases, including, without limitation, any collective bargaining agreements, only to the extent and in accordance with Section 1.4 of the APA and the Sale Order.

2.      Buyer hereby agrees that the Buyer shall be liable for, and hereby assumes and agrees to pay, perform, and discharge when due, effective as of the Effective Time, the Assumed Liabilities, and to the extent relating to events or periods on or after the Effective Time, all of each Seller's obligations under the Assumed Contracts and the Assumed Leases, including, without limitation, any collective bargaining agreements, except as set forth in Paragraphs 1 and 3 hereof.

3.      Nothing expressed or implied in this Agreement is intended to confer upon the Buyer any right, title, or interest in any of the Excluded Liabilities or Excluded Assets (as such term is defined in the APA), and the Buyer shall have no liability thereunder.

4.      Nothing expressed or implied in this Agreement is intended to confer upon any person, other than the parties hereto, or their respective successors or assigns, any rights, remedies, obligations, or liabilities under or by reason of this Agreement.

5.      Each Seller expressly agrees to obtain, execute, acknowledge and deliver such documents and other instruments, and take such other actions, as may be required to evidence or effectuate the sale, transfer, assignment, conveyance, grant, delegation and delivery of the Assumed Liabilities, Assumed Contracts or Assumed Leases to the Buyer as set forth herein, and

the Buyer expressly agrees to obtain, execute, acknowledge and deliver such documents and other instruments, and take such other actions, as may be required to evidence or effectuate the acceptance and assumption of the Assumed Liabilities, Assumed Contracts or Assumed Leases by the Buyer as set forth herein.

6.      This Agreement shall be governed by and construed in accordance with the laws of the State of Connecticut without regard to the principles of conflicts of laws thereunder.

7.      This Agreement may be executed in counterparts (including by facsimile or optically-scanned electronic mail attachment), each of which shall be deemed to be original, but all of which together shall constitute one and the same instrument.

8.      Nothing in this Agreement shall be deemed to supersede, enlarge or modify any of the provisions of the Sale Order or the APA (as applicable), all of which shall survive the execution and delivery of this Agreement as provided in, and subject to the limitations set forth in, the Sale Order or the APA (as applicable). If any conflict exists between the terms of this Agreement, on the one hand, and the terms of the Sale Order or the APA (as applicable) on the other hand, the terms of the Sale Order or the APA (as applicable) shall govern and control.

\* \* \*

*The remainder of this page is left blank intentionally. Signatures follow on the next page.*

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed and delivered as an instrument under seal as of the date first written above.

**BUYER:**

Saint Francis *Care*, Inc.


By:_____
Name: Christopher M. Dadlez
Title:   President and Chief Executive Officer


**SELLERS:**

Johnson Memorial Medical Center, Inc.


By:_____
Name: Patrick Mahon
Title:   Chairperson of the Board


Johnson Memorial Hospital, Inc.


By:_____
Name: Patrick Mahon
Title:   Chairperson of the Board


Home & Community Health Services, Inc.


By:_____
Name: Patrick Mahon
Title:   Chairperson of the Board

Johnson Health Care, Inc.


By:_____
Name: Patrick Mahon
Title:   Chairperson of the Board

Exhibit 2.2(c)

## BILL OF SALE AND GENERAL ASSIGNMENT

THIS **BILL OF SALE AND GENERAL ASSIGNMENT** (this "Bill of Sale"), is made as of [_____ ___, 20_ ], by and among Saint Francis *Care*, Inc., a Connecticut corporation (the "Buyer"), on the one hand, and the entities executing this Agreement as "Sellers" on the signature page hereof (each a "Seller," and collectively, the "Sellers"), on the other hand.

## $\underline{W} \underline{I} \underline{T} \underline{N} \underline{E} \underline{S} \underline{S} \underline{E} \underline{T} \underline{H}$:

**WHEREAS**, pursuant to (i) that certain Asset Purchase Agreement, effective as of January 14, 2015, by and among the Buyer and the Sellers (as may be amended, modified, supplemented or restated from time to time, collectively, the "APA"), and (ii) that certain Sale Order, the Sellers have agreed to sell, transfer, convey and assign to the Buyer, and the Buyer has agreed to purchase and acquire from the Sellers, the Assets.

**NOW, THEREFORE**, for good and valuable consideration, the receipt, adequacy and legal sufficiency of which are hereby acknowledged, and as contemplated by the APA:

1.      Each Seller hereby unconditionally sells, transfers, assigns, conveys, grants and delivers to the Buyer, effective as of the Effective Time, all of such Seller's rights, title and interests in and to all of the Assets, subject and pursuant to the Sale Order. Without limiting the generality of the foregoing, each Seller hereby sells, transfers, assigns, conveys, grants, delegates and delivers to the Buyer, and Buyer hereby accepts and assumes, effective as of the Effective Time, all of such Seller's right, title, and interest, including, without limitation, any Assumed Liabilities relating thereto (but not any Excluded Liabilities), to the extent relating to the period from and after the Effective Time, in and to the Assumed Leases and the Assumed Contracts, if any, to which such Seller is a party immediately prior to Closing (with respect to each Seller, the "Seller's Transferred Contracts"), a list of which is attached hereto as Schedule A. For the avoidance of doubt, each Seller hereby sells, transfers, assigns and quitclaims to the Buyer any of the rights of Seller in and to the names "Johnson Memorial Hospital," "Johnson Surgery Center," "Advanced Wound Center," "Community Cancer Center," "Home & Community Health Services," "Johnson Memorial Cancer Center" and "Karen Davis Krzynowek Infusion Center."

2.      At and after the Effective Time, the Buyer shall have the right and authority to collect all sums accruing for any and all periods or partial periods with respect to each Seller's Transferred Contracts, and the Buyer shall have the right and authority to endorse the name of such Seller on any checks or drafts received that evidence payment of any such sums. All amounts collected by the Buyer with respect to each Seller's Transferred Contracts, shall be for the Buyer's own account. Each Seller agrees to promptly transfer and deliver to the Buyer from time to time any cash or other property that such Seller may receive at or after the Effective Time in respect of any of such Seller's Transferred Contracts. All amounts collected under each Seller's Transferred Contract from and after the Effective Time shall be attributed first to current amounts due thereunder, and then to amounts past due, in reverse order of maturity.

3.      Subject to Section 1.6 of the APA, Buyer and each Seller hereby agree that the Buyer shall be responsible for the payment of Cure Costs (as such term is defined in the APA).

4.      Nothing expressed or implied in this Bill of Sale is intended to confer upon any person, other than the parties hereto, or their respective successors or assigns, any rights, remedies, obligations, or liabilities under or by reason of this Bill of Sale.

5.      Each Seller, for itself and its successors and assigns, expressly agrees to obtain, execute, acknowledge and deliver such documents and other instruments, and take such other actions, as may be required to evidence or effectuate the sale, transfer, assignment, conveyance, grant and delivery to the Buyer of such Seller's rights, title and interests in and to the Assets.

6.      This Bill of Sale shall be governed by and construed in accordance with the laws of the State of Connecticut without regard to the principles of conflicts of laws thereunder.

7.      This Bill of Sale may be executed in counterparts (including by facsimile or optically-scanned electronic mail attachment), each of which shall be deemed to be original, but all of which together shall constitute one and the same instrument.

8.      Nothing in this Bill of Sale shall be deemed to supersede, enlarge or modify any of the provisions of the APA or the Sale Order (as applicable), all of which shall survive the execution and delivery of this Bill of Sale as provided in, and subject to the limitations set forth in, the APA or the Sale Order (as applicable).  If any conflict exists between the terms of this Bill of Sale and the terms of the APA or the Sale Order (as applicable), the terms of the APA or the Sale Order (as applicable) shall govern and control.    All capitalized terms used but not defined in this Bill of Sale shall have the meaning assigned thereto in the APA or the Sale Order (as applicable).

* * *

*The remainder of this page is left blank intentionally.  Signatures follow on the next page.*

**IN WITNESS WHEREOF**, the parties hereto have caused this Bill of Sale and General Assignment to be duly executed and delivered as an instrument under seal as of the date first written above.

**BUYER:**

Saint Francis *Care*, Inc.

By:_____
Name: Christopher M. Dadlez
Title:   President and Chief Executive Officer

**SELLERS:**

Johnson Memorial Medical Center, Inc.

By:_____
Name: Patrick Mahon
Title:   Chairperson of the Board

Johnson Memorial Hospital, Inc.

By:_____
Name: Patrick Mahon
Title:   Chairperson of the Board

Home & Community Health Services, Inc.

By:_____
Name: Patrick Mahon
Title:   Chairperson of the Board

Johnson Health Care, Inc.

By:_____
Name: Patrick Mahon
Title:   Chairperson of the Board

## SCHEDULE A

## SELLERS' TRANSFERRED CONTRACTS

# Exhibit 2.2 (h)
## (Attached)

**COMMONWEALTH LAND TITLE INSURANCE COMPANY**
**AFFIDAVIT AND INDEMNITY AGREEMENT**

State of _____ )
County of _____ ) ss. *(town)* _____ ,   _____ ____, 20__

BEFORE ME, the undersigned authority, personally appeared [Name of officer signing] (the "Affiant") the [Title of officer signing] of  JOHNSON MEMORIAL HOSPITAL, INC. (the "Owner"), who first being duly sworn, deposes and says, to the best of my knowledge:

(1) That Affiant is duly authorized to make this affidavit of behalf of the Owner.

(2) That the Owner is the owner of that certain real property described in those certain title policy numbers MP2017268 and MP2322580, both as as amended (the "Title Commitment"), commonly known as 13 and 15 Magauran Drive, 0 Chestnut Hill Drive, 201 Chestnut Hill Road and 205 Chestnut Hill Road (but not of the building located at 205 Chestnut Hill Road), all of Stafford, Connecticut (the "Property").

(3) That the Owner is entitled to possession of the Property, and there is no person or entity in possession that has any right in the Property other than as provided in (7) below.

(4) That the Owner has not entered into any written agreement with any real estate broker, nor is Owner aware of anyone who has provided licensed services that resulted in the procuring of a person or entity for the purpose of buying, selling, or otherwise conveying or acquiring any interest in the Property.

(5) That there are no unrecorded labor, mechanics', or materialmen's liens against the Property, and no material has been furnished to or labor performed upon the Property except such that has been paid for in full, except for such labor or material for which Mechanic's Lien Subordinations have been attached hereto or as otherwise shown in Exhibit "A" attached hereto.

(6) That there are no unrecorded options or contracts to purchase, contracts for deed or mortgage commitments, sales agreements, participation agreements, mortgages, security interests, or unrecorded deeds, easements or rights-of-way with respect to the Property that will continue to apply to the Property following the completion of the sale of the Property to the purchaser identified in the above-referenced Title Commitment (the "Purchaser") pursuant to the Sale Order granted in the bankruptcy proceeding identified in the above-referenced Title Commitment (the "Bankruptcy Proceeding").

(7) That there are no existing tenancies, leases or other occupancies affecting the Property, except as shown in Exhibit "A" attached hereto, and that such tenancies, leases or other occupancies, if any, contain no options to purchase the Property or rights of first refusal to purchase the Property.

(8) That there is no action or proceeding, including but not limited to bankruptcy, which is now pending against Owner in any State or Federal Court which may be satisfied through a lien or attachment against the Property, nor is there any attachment or judgment which may now constitute a lien upon the Property, nor are there any claims or pending claims against Owner which may be satisfied through a lien or attachment against the Property, except in each case (a) as set forth in the above-referenced Title Commitment, or (b) that will continue to have such status or potential or actual effect following the completion of the sale of the Property to the Purchaser pursuant to the Sale Order granted in the Bankruptcy Proceeding.

(9) That Owner has received any and all corporate resolutions necessary in order to authorize the conveyance and /or mortgage of the Property.  Should the Title Company request a copy of the resolutions, Owner shall furnish copies within a reasonable time period.

(10) That the Owner is not a foreign Person, but rather is a "United States Person" within the meaning of Section 7701(a)(30) of the Internal Revenue Code of 1986, as amended (the "Code"), and that Owner's true and correct United States taxpayer identification number (or Social Security number) is

set forth below opposite the signature of Owner.  Owner is making the statements set forth herein for the purpose of releasing the Purchaser and/or Settlement Agent from any withholding obligation which might otherwise be imposed under Section 1445 (a) of the Code.

Nothing in the Affidavit shall affect in any way title insurance coverage heretofore provided to Owner by COMMONWEALTH LAND TITLE or its affiliates, or their respective predecessors-in-interest, with respect to the Property.

Dated as of this_____ day of _____, 20___.

JOHNSON MEMORIAL HOSPITAL, INC.

US Taxpayer ID No.                     By: _____
_____                      Name:
                                           Title:

Sworn to and subscribed before me this _____ day of _____, 20_____

                                       _____
                                       Notary Public
My Commission Expires: _____

## COMMONWEALTH LAND TITLE INSURANCE COMPANY
## AFFIDAVIT AND INDEMNITY AGREEMENT

State of _____ )
County of _____ ) ss. *(town)*_____,    _____ _____, 20___

BEFORE ME, the undersigned authority, personally appeared [Name of officer signing] (the "Affiant") the [Title of officer signing] of  JOHNSON MEMORIAL MEDICAL CENTER, INC. (the "Owner"), who first being duly sworn, deposes and says, to the best of my knowledge:

(1) That Affiant is duly authorized to make this affidavit of behalf of the Owner.

(2) That the Owner is the owner of that certain real property described in that certain title commitment number Hart1481041(A) and tite commitment number Hart14810419B) (collectively, the "Title Commitment"), commonly known as  241 Chestnut Hill Road and 55 and 68 Galbraith Road, all of Stafford, Connecticut (the "Property").

(3) That the Owner is entitled to possession of the Property, and there is no person or entity in possession that has any right in the Property other than as provided in (7) below.

(4) That the Owner has not entered into any written agreement with any real estate broker, nor is Owner aware of anyone who has provided licensed services that resulted in the procuring of a person or entity for the purpose of buying, selling, or otherwise conveying or acquiring any interest in the Property.

(5) That there are no unrecorded labor, mechanics', or materialmen's liens against the Property, and no material has been furnished to or labor performed upon the Property except such that has been paid for in full, except for such labor or material for which Mechanic's Lien Subordinations have been attached hereto or as otherwise shown in Exhibit "A" attached hereto.

(6) That there are no unrecorded options or contracts to purchase, contracts for deed or mortgage commitments, sales agreements, participation agreements, mortgages, security interests, or unrecorded deeds, easements or rights-of-way with respect to the Property that will continue to apply to the Property following the completion of the sale of the Property to the purchaser identified in the above-referenced Title Commitment (the "Purchaser") pursuant to the Sale Order granted in the bankruptcy proceeding identified in the above-referenced Title Commitment (the "Bankruptcy Proceeding").

(7) That there are no existing tenancies, leases or other occupancies affecting the Property, except as shown in Exhibit "A" attached hereto, and that such tenancies, leases or other occupancies, if any, contain no options to purchase the Property or rights of first refusal to purchase the Property.

(8) That there is no action or proceeding, including but not limited to bankruptcy, which is now pending against Owner in any State or Federal Court which may be satisfied through a lien or attachment against the Property, nor is there any attachment or judgment which may now constitute a lien upon the Property, nor are there any claims or pending claims against Owner which may be satisfied through a lien or attachment against the Property, except in each case (a) as set forth in the above-referenced Title Commitment, or (b) that will continue to have such status or potential or actual effect following the completion of the sale of the Property to the Purchaser pursuant to the Sale Order granted in the Bankruptcy Proceeding.

(9) That Owner has received any and all corporate resolutions necessary in order to authorize the conveyance and /or mortgage of the Property.  Should the Title Company request a copy of the resolutions, Owner shall furnish copies within a reasonable time period.

(10) That the Owner is not a foreign Person, but rather is a "United States Person" within the meaning of Section 7701(a)(30) of the Internal Revenue Code of 1986, as amended (the "Code"), and that Owner's true and correct United States taxpayer identification number (or Social Security number) is

set forth below opposite the signature of Owner.  Owner is making the statements set forth herein for the purpose of releasing the Purchaser and/or Settlement Agent from any withholding obligation which might otherwise be imposed under Section 1445 (a) of the Code.

Nothing in the Affidavit shall affect in any way title insurance coverage heretofore provided to Owner by COMMONWEALTH LAND TITLE or its affiliates, or their respective predecessors-in-interest, with respect to the Property.

Dated as of this_____ day of _____, 20____.


JOHNSON MEMORIAL MEDICAL CENTER, INC.


US Taxpayer ID No.                    By: _____
                                          Name:
_____                     Title:


Sworn to and subscribed before me this _____ day of _____, 20_____



_____
Notary Public
My Commission Expires: _____

**COMMONWEALTH LAND TITLE INSURANCE COMPANY**
**AFFIDAVIT AND INDEMNITY AGREEMENT**

State of _____ )
County of _____ ) ss.*(town)*_____,  _____ _____, 20__

BEFORE ME, the undersigned authority, personally appeared [Name of officer signing] (the "Affiant") the [Title of officer signing] of  JOHNSON MEMORIAL MEDICAL CENTER, INC. (the "Owner"), who first being duly sworn, deposes and says, to the best of my knowledge:

(1) That Affiant is duly authorized to make this affidavit of behalf of the Owner.

(2) That the Owner is the owner of that certain real property described in that certain title policy number MP1834143 (the "Title Commitment"), commonly known as  148 & 148A Hazard Avenue; 71, 75, 79 & 83 Middle Road and Units 1-6 of Nirenberg Medical Center, Enfield, CT (the "Property").

(3) That the Owner is entitled to possession of the Property, and there is no person or entity in possession that has any right in the Property other than as provided in (7) below.

(4) That the Owner has not entered into any written agreement with any real estate broker, nor is Owner aware of anyone who has provided licensed services that resulted in the procuring of a person or entity for the purpose of buying, selling, or otherwise conveying or acquiring any interest in the Property.

(5) That there are no unrecorded labor, mechanics', or materialmen's liens against the Property, and no material has been furnished to or labor performed upon the Property except such that has been paid for in full, except for such labor or material for which Mechanic's Lien Subordinations have been attached hereto or as otherwise shown in Exhibit "A" attached hereto.

(6) That there are no unrecorded options or contracts to purchase, contracts for deed or mortgage commitments, sales agreements, participation agreements, mortgages, security interests, or unrecorded deeds, easements or rights-of-way with respect to the Property that will continue to apply to the Property following the completion of the sale of the Property to the purchaser identified in the above-referenced Title Commitment (the "Purchaser") pursuant to the Sale Order granted in the bankruptcy proceeding identified in the above-referenced Title Commitment (the "Bankruptcy Proceeding").

(7) That there are no existing tenancies, leases or other occupancies affecting the Property, except as shown in Exhibit "A" attached hereto, and that such tenancies, leases or other occupancies, if any, contain no options to purchase the Property or rights of first refusal to purchase the Property.

(8) That there is no action or proceeding, including but not limited to bankruptcy, which is now pending against Owner in any State or Federal Court which may be satisfied through a lien or attachment against the Property, nor is there any attachment or judgment which may now constitute a lien upon the Property, nor are there any claims or pending claims against Owner which may be satisfied through a lien or attachment against the Property, except in each case (a) as set forth in the above-referenced Title Commitment, or (b) that will continue to have such status or potential or actual effect following the completion of the sale of the Property to the Purchaser pursuant to the Sale Order granted in the Bankruptcy Proceeding.

(9) That Owner has received any and all corporate resolutions necessary in order to authorize the conveyance and /or mortgage of the Property.  Should the Title Company request a copy of the resolutions, Owner shall furnish copies within a reasonable time period.

(10) That the Owner is not a foreign Person, but rather is a "United States Person" within the meaning of Section 7701(a)(30) of the Internal Revenue Code of 1986, as amended (the "Code"), and that Owner's true and correct United States taxpayer identification number (or Social Security number) is set forth below opposite the signature of Owner.  Owner is making the statements set forth herein for

the purpose of releasing the Purchaser and/or Settlement Agent from any withholding obligation which might otherwise be imposed under Section 1445 (a) of the Code.

Nothing in the Affidavit shall affect in any way title insurance coverage heretofore provided to Owner by COMMONWEALTH LAND TITLE or its affiliates, or their respective predecessors-in-interest, with respect to the Property.

Dated as of this_____ day of _____, 20___.


                              JOHNSON MEMORIAL MEDICAL CENTER, INC.



US Taxpayer ID No.                By: _____
_____              Name:
                                      Title:


Sworn to and subscribed before me this _____ day of _____, 20_____



                              _____
                              Notary Public

My Commission Expires: _____

Exhibit 2.2(k)

# LIMITED POWER OF ATTORNEY
## FOR USE OF DEA REGISTRATION
## AND OTHER REGISTRATION NUMBERS,
## AND DEA ORDER FORMS

Johnson Memorial Hospital, Inc., a Connecticut non-stock corporation ("Seller"), which operates the healthcare facility known as Johnson Memorial Hospital (including its outpatient satellite locations; collectively, "Registrant"), is authorized to sign the current applications for registration and licensure as the Registrant under the Controlled Substances Act of the United States, and operates a hospital pharmacy in accordance with its licensure as a short-term hospital under the laws of the State of Connecticut. Seller and Registrant have made, constituted and appointed, and by these representations do make, constitute, and appoint Saint Francis *Care*, Inc., a Connecticut corporation ("Buyer"), as successor in interest to Seller, as Seller's and Registrant's agent and attorney-in-fact for the limited purpose of utilizing Seller's and Registrant's DEA registration and its Connecticut Controlled Substance Registration for Hospitals (to the extent permissible under state law) to continue pharmacy operations at the pharmacy facilities located at Registrant ("Pharmacies") held by Seller and Registrant and listed on Rider A attached hereto. Buyer may act in this capacity until such time as Buyer obtains a new DEA registration and Connecticut Controlled Substance Registration for Hospitals, but in no event shall this limited power of attorney continue for more than one hundred twenty (120) days after the Effective Time as defined in that certain Asset Purchase Agreement (the "Agreement") dated as of January 14, 2015, by and among Buyer and Johnson Medical Center, Inc., a Connecticut corporation, Seller, Home & Community Health Services, Inc., a Connecticut corporation, and Johnson Health Care, Inc., a Connecticut corporation, each as sellers, unless otherwise agreed to in writing by Seller. Capitalized terms not otherwise defined herein (including all Riders hereto) shall have the meanings ascribed to them in the Agreement.

Seller and Registrant further grant this limited power of attorney to Buyer to act as the true and lawful agent and attorney-in-fact of Seller and Registrant, and to act in the name, place, and stead of Seller and Registrant, to execute applications for books of official order forms and to sign such order forms in requisition for controlled substances, in accordance with Section 308 of the Controlled Substances Act (21 U.S.C. Sec 828) and part 1305 of Title 21 of the Code of Federal Regulations, as is necessary for the treatment of the Pharmacies' patients.

Seller and Registrant recognize that they are legally responsible for the DEA registration and Connecticut Controlled Substances registration until such time as Buyer has obtained its own DEA and Connecticut registrations. Therefore, Seller and Registrant grant this limited power of attorney based upon the following covenants and warranties of Buyer: (a) Buyer shall follow and abide by all federal and state laws governing the regulation of controlled substances and pharmacy practice at all times while utilizing this limited power of attorney; (b) Buyer shall make timely application for, diligently pursue and use its best efforts to obtain its own DEA registration and Connecticut Controlled Substance Registration for Hospitals, which are required for the distribution of pharmaceuticals, including, but not limited to, controlled substances at the Pharmacies, in accordance with applicable law and as soon as practicable; and (c) Buyer shall defend, indemnify and hold Seller and Registrant, and their respective officers, directors, employees and agents, harmless from and against any liability, loss, claims, suits, penalties, damage or expense (including, without limitation, reasonable counsel fees and expenses) arising out of or in connection with Buyer's use or misuse of this limited power of attorney, Buyer's use

or misuse of the DEA registration, the Connecticut Controlled Substances registration and the
DEA Order Forms, or Buyer's breach of the covenants and warranties contained in this limited
power of attorney.

**IN WITNESS WHEREOF**, Seller and Registrant, on the one hand, and Buyer, on the other hand, have executed this Limited Power of Attorney For Use of DEA Registration and other Registration Numbers and DEA Order Forms effective as of [_____ ___, 20__].

**SELLER:**                              **BUYER:**

**JOHNSON MEMORIAL HOSPITAL, INC.**      **SAINT FRANCIS *CARE*, INC.**


By: _____           By: _____

Name: Patrick Mahon                      Name: Christopher M. Dadlez

Title:  Chairperson of the Board         Title:   President and Chief Executive Officer


**WITNESSES:**                           **WITNESSES:**

1. _____             1. _____

2. _____             2. _____


*[Signature Page to DEA LPOA]*

## RIDER A
## TO
## LIMITED POWER OF ATTORNEY

**Registrations at [_____]**
**Covered by Limited Power of Attorney**

| Name of License, Registration, Permit, Approval | Name of Administrative Agency | Expiration Date |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

Exhibit 2.2(l)
(Form)

## CERTIFICATE OF NON-FOREIGN STATUS

### Entity Transferor

Section 1445 of the Internal Revenue Code of 1986, as amended (the "Code") provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person. For U.S. tax purposes (including Code Section 1445), the owner of a disregarded entity (which has legal title to a U.S. real property interest under local law) will be the transferor of the property and not the disregarded entity. To inform the transferee that withholding of tax is not required upon the disposition of a U.S. real property interest by [    ], a [    ] (the "Company"), the undersigned hereby certifies the following on behalf of the Company:

1.     The Company is not a foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Code and Income Tax Regulations);

2.     The Company is not a disregarded entity as defined in Treasury Regulations Section 1.1445-2(b)(2)(iii);

3.     The Company's U.S. employer identification number is [    ]; and

4.     The Company's office address is:

       [    ]

The Company understands that this certification may be disclosed to the Internal Revenue Service by the transferee and that any false statement contained herein could be punished by fine, imprisonment, or both.

Under penalties of perjury I declare that I have examined this certification and to the best of my knowledge and belief it is true, correct, and complete, and I further declare that I have authority to sign this document on behalf of the Company.

By: _____

Name: _____

Title: _____

Date: _____, 20___

Exhibit 6.2(a)

## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT
## [_____] DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Case No. [_____]** |
| | § | |
| [_____], | § | **Chapter 11** |
| | § | |
| **Debtors.** | § | **Honorable** |

## ORDER (I) APPROVING BID PROCEDURES FOR THE SALE OF THE DEBTORS' ASSETS; (II) APPROVING PROCEDURES FOR THE CURE, ASSUMPTION AND ASSIGNMENT OF CONTRACTS; (III) PROVIDING CERTAIN PROTECTIONS TO SAINT FRANCIS *CARE*, INC.; AND (IV) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[1] of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") pursuant to sections 105(a), 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of an order approving the Bid Procedures, which are attached hereto as Exhibit 1 (Document No. [ ]), in connection with (i) the sale of all or substantially all of the Debtors' assets, (ii) approving the cure, assumption and assignment of contracts, and (iii) and providing certain protections to Saint Francis *Care*, Inc. ("SFC" or the "Buyer"), including the form and manner of service of the notice attached hereto as Exhibit 2 (Document No. [ ]) and the payment of the Break-Up Fee and Expense Reimbursement (as such terms are defined below), and granting other relief related thereto; and the Court having reviewed the Motion, and having considered the statements of counsel and evidence adduced with respect to the Motion at a hearing before the Court (the "Hearing"); the Court having found that (i) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, (ii) venue for this matter is proper in this district

---

[1] Capitalized terms not otherwise defined herein shall have the meanings given to them in the Motion or the APA (as such term is defined herein).

Exhibit 6.2(a)

pursuant to 28 U.S.C. §§ 1408 and 1409, (iii) this is a core proceeding pursuant to 28 U.S.C.

§ 157(b); (iv) notice of the Motion and the Hearing was sufficient under the circumstances, and

no further or other notice is required; and (v) a reasonable opportunity to object or be heard

regarding the relief requested in the Motion has been afforded to all interested persons; after due

deliberation the Court having determined that the relief requested in the Motion (x) represents a

sound exercise of the Debtors' business judgment, (y) is necessary and essential to maximize the

value of the Debtors' estates, and (z) is in the best interests of the Debtors, their estates and their

creditors; and upon the record herein; and after due deliberation thereon; and good and sufficient

cause having been shown;

IT IS HEREBY FOUND AND DETERMINED THAT:[2]

A.     The Debtors have articulated good and sufficient reasons for, and the best

interests of their estates will be served by, this Court granting the relief requested in the Motion,

including approval of (i) the Bid Procedures, (ii) the Break-Up Fee and Expense Reimbursement,

as provided for in the APA attached to the Motion as Exhibit [ ___ ] (the "APA"), for the sale of

all or substantially all of the Debtors' assets to the Buyer (the "Sale Transaction"), (iii) the form

and manner of the Auction and Sale Notice, (iv) the cure, assumption and assignment of

contracts, and (v) relief related thereto.

B.     The Bid Procedures are fair, reasonable and appropriate and are designed to

maximize the recovery with respect to the Sale Transaction.

C.     The Break-Up Fee and Expense Reimbursement to be paid under the

circumstances described herein to the Buyer are (i) actual and necessary costs and expenses of

preserving the Debtors' estates, within the meaning of Bankruptcy Code section 503(b),

---

[2] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. See Fed. R. Bankr. P. 7052.

**Exhibit 6.2(a)**

(ii) commensurate to the real and substantial benefits conferred upon the Debtors' estates by the Buyer's entry into the APA, and (iii) reasonable and appropriate in light of the size and nature of the proposed Sale Transaction and comparable transactions, the commitments that have been made and the efforts that have been and will be expended by the Buyer.

D.      Moreover, the Break-Up Fee and Expense Reimbursement are essential inducements and conditions relating to the Buyer's entry into, and continuing obligations under, the APA.   Unless it is assured that the Break-Up Fee and Expense Reimbursement will be available, the Buyer is unwilling to remain obligated to consummate the Sale Transaction or otherwise be bound under the APA (including the obligation to maintain its committed offer while such offer is subject to higher or otherwise better offers as contemplated by the Bid Procedures).   The Break-Up Fee and Expense Reimbursement induced the Buyer to submit a bid that will serve as a minimum or floor bid on which the Debtors, their creditors and other bidders can rely.   Accordingly, the Break-Up Fee and Expense Reimbursement are reasonable and appropriate and represent the best method for maximizing value for the benefit of the Debtors' estates.

E.      The Debtors have demonstrated a compelling and sound business justification for authorizing the payment of the Break-Up Fee and Expense Reimbursement under the circumstances, timing and procedures set forth in the Motion.

F.      The Debtors have provided support for their decision to authorize the payment of the Break-up Fee and Expense Reimbursement sufficient to satisfy all conditions set forth in the Bankruptcy Rules and the Local Bankruptcy Rules for the United States Bankruptcy Court for the District of Connecticut.

**Exhibit 6.2(a)**

G.     The Auction and Sale Notice is appropriate, adequate and sufficient, and is reasonably calculated to provide all interested parties with timely and proper notice of the Auction, the Sale Transaction and the Bid Procedures. No other or further notice is required for the Sale Transaction or the Bid Procedures, as set forth herein and in the Motion. The Debtors have demonstrated a compelling and sound business justification for the limitation of credit bidding at the Auction, except with respect to SFC, as is described in the Bid Procedures.

H.     The Debtors have articulated good and sufficient reasons for, and the best interests of their estates will be served by, this Court scheduling a subsequent Sale Hearing (as such term is defined in the Bidding Procedures) to consider granting other relief requested in the Motion, including approval of the Sale Transaction and the transfer of the assets to the Buyer free and clear of all Claims and Encumbrances pursuant to Bankruptcy Code section 363(f).

I.     As demonstrated by the compelling and sound business justifications set forth by the Debtors in the Motion and at the Hearing, the entry of this Order is in the best interests of the Debtors and their estates, creditors, and interest holders and all other parties in interest herein; and therefore

IT IS HEREBY ORDERED THAT:

1.     The Motion is GRANTED to the extent set forth herein.

2.     The Bid Procedures attached hereto as Exhibit 1 are approved in all respects and shall govern all bids and bid proceedings relating to the sale of the Debtors' assets. The Debtors are authorized to take any and all actions necessary or appropriate to implement the Bid Procedures.

**Exhibit 6.2(a)**

3.      The failure specifically to include or reference any particular provision of the Bid Procedures in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Bid Procedures be authorized and approved in their entirety.

4.      The form and manner of service of the Auction and Sale Notice described in the Motion, and attached hereto as Exhibit 2, are approved in all respects.  Within five (5) business days after the entry of this Order, the Debtors shall serve the Auction and Sale Notice by first class mail on: (i) the office of the United States Trustee, (ii) all creditors as defined in Section 101(1) of the Bankruptcy Code, (iii) all entities known to have asserted any lien, interest or encumbrance upon the Debtors' assets, (iv) counsel for SFC, (v) counsel for the Official Committee of Unsecured Creditors, if any, (vi) counsel to the Debtors' prepetition secured lenders, (vii) all entities known by the Debtors to have expressed an interest in acquiring the Debtors' assets in the previous calendar year, (viii) the United States Attorney's Office, (ix) the United States Department of Justice, (x) the Internal Revenue Service, (xi) the Pension Benefit Guaranty Corporation; (xii) appropriate state regulatory agencies, including, without limitation, the Connecticut Department of Energy & Environmental Protection, the Connecticut Attorney General's Office, the Connecticut Department of Revenue Services, and [list others]; (xiii) all counterparties to any executory contract or unexpired lease; (xiv) any other persons known by the Debtor to hold, assert or have threatened to assert and claims against the Debtor, including, without limitation, any malpractice or tort claims; (xv) Healthcare Finance Group, LLC and its counsel, and (xvi) all other parties who filed requests for notice under Bankruptcy Rule 2002 in these cases. Service of the Auction and Sale Notice, as set forth herein, constitutes sufficient notice of the Auction and Sale Hearing. [**NTD: This Section to be updated to provide for all necessary notice parties under applicable law.**]

**Exhibit 6.2(a)**

5.      The deadline for submitting a Qualified Bid shall be [_____ ___, 20__] at
5:00 p.m. (Prevailing Eastern Time) (the "Bid Deadline"). All Potential Bidders are required to
provide copies of their bids so as to be received by hand and by electronic mail by the following
parties on or before the Bid Deadline: by (a) counsel for the Debtor, Reid and Riege, P.C., One
Financial Plaza, Hartford, CT 06103 (Attn: Eric Henzy (ehenzy@rrlawpc.com), Jon P. Newton
(jnewton@rrlawpc.com, Mark X. Ryan (mryan@rrlawpc.com); (b) counsel for SFC, Hinckley,
Allen & Snyder LLP, 20 Church Street, Hartford, CT 06103, (Attn: William S. Fish, Jr.
(wfish@hinckleyallen.com), Thomas S. Marrion (tmarrion@hinckleyallen.com), and Sarah M.
Lombard (slombard@hinckleyallen.com)); (c) the Office of the United States Trustee for the
District of Connecticut, [____] Division [____ ____] (Attn: _____ (_____)];
(d) People's United Bank, c/o Neubert, Pepe & Monteith, P.C., 195 Church Street, New Haven
CT, 06510 (Attn: Douglas S. Skalka (dskalka@npmlaw.com); (e) counsel for Healthcare Finance
Group, LLC, Kaye Scholer LLP, 250 West 55th Street, New York, New York 10019-9710 (Attn:
Benjamin Mintz (benjamin.mintz@kayescholer.com) and Robinson & Cole LLP, 280 Trumbull
Street, Hartford, Connecticut 06103 (Attn: Michael Enright (menright@rc.com); and [(f)]
counsel for any Official Committee of Unsecured Creditors appointed in this case (collectively,
the "Notice Parties").

6.      Subject to the provisions of the Bidding Procedures, the Debtors are authorized to
solicit, initiate, encourage, facilitate, or take any other action designed to facilitate any inquiries
or proposals regarding any sale of assets, assumption of liabilities or similar transactions with
third parties until the Bid Deadline.

7.      The Buyer shall constitute a Qualified Bidder (as defined in the Bid Procedures)
for all purposes and in all respects with regard to the Bid Procedures.

**Exhibit 6.2(a)**

8.      Unless the Debtors receive an additional Qualified Bid, it will not hold an Auction, and SFC shall be named the Successful Bidder.

9.      If the Debtors receive an additional Qualified Bid (meaning at least one Qualified Bid in addition to the Buyer's existing Qualified Bid), the Debtors shall conduct the Auction on [_____ ___, 20__] at 12:00 noon (Prevailing Eastern Time) at the offices of [Reid and Riege, P.C., One Financial Plaza, Hartford, CT 06103], or such other place and time as the Debtors shall notify Qualified Bidders.

10.     If an Auction is conducted, the Qualified Bidder with the next highest or otherwise best Qualified Bid (including the Buyer), as determined by the Debtors in the exercise of their business judgment, at the Auction shall be required to serve as a back-up bidder (the "Back-Up Bidder") and keep such bid open and irrevocable until one (1) business day after the closing of the Sale Transaction with the Successful Bidder. Following the Sale Hearing, if the Successful Bidder fails to consummate the approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Back-Up Bidder will be deemed to be the new Successful Bidder, and the Debtors will be authorized, but not required, to consummate the sale with the Back-Up Bidder without further order of the Bankruptcy Court.

11.     Except as otherwise provided herein or in the APA, Good Faith Deposits shall be returned to each bidder not selected by the Debtors as the Successful Bidder or the Back-Up Bidder by no later than the fifth (5th) business day following the Sale Hearing. The Good Faith Deposit of the Back-Up Bidder shall be held by the Debtors until one (1) business day after the closing of the Sale Transaction with the Successful Bidder. The Good Faith Deposit of the Back-Up Bidder shall be returned within five (5) business days after the closing the sale between the Debtors and the Successful Bidder.

**Exhibit 6.2(a)**

12.     Objections to the Sale Transaction shall be in writing, shall state the basis of such objection with specificity and shall be filed with the Court, and served so as to be received on or before [three days after the Auction], at 4:00 p.m. (prevailing Eastern Time) on the Notice Parties.

13.     The Sale Hearing, at which the Debtors shall seek approval of the Successful Bid, shall be held in this Court on [one week after Auction], at 10:00 a.m. (prevailing Eastern Time). The Sale Hearing may be adjourned or rescheduled without further notice other than an announcement of the adjourned date at the Sale Hearing.

14.     The failure of any person or entity to timely file its objection shall be an absolute bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Motion, or the consummation and performance of the Sale Transaction, if any (including the transfer free and clear of all Claims and Encumbrances of the Debtors' assets pursuant to the Sale Transaction).

15.     The Break-Up Fee (in the amount of $750,000) and the Expense Reimbursement (in an amount not to exceed $200,000) are hereby approved and the Debtors are hereby authorized and directed to perform their respective obligations thereunder without further application to or order from the Court. In the event of the consummation of the Sale Transaction to a party that is not the Buyer or affiliated with the Buyer, the Break-Up Fee and Expense Reimbursement shall be paid out of the cash proceeds of the sale to a Successful Bidder (other than the Buyer). The Break-Up Fee and Expense Reimbursement shall constitute a super-priority administrative expense of the Debtors under Section 503(b) and 507(a) of the Bankruptcy Code but shall be subject in priority to the Debtors' indebtedness to Healthcare Finance Group, LLC ("HFG").

Exhibit 6.2(a)

16.     Thirty (30) days prior to the Closing, the Debtors will file a notice, substantially in the form attached to the Motion as Exhibit [   ] (the "Cure Notice") with the Court and the Court will serve such Cure Notice by first class mail on the nondebtor counterparties to the Designated Contracts (as such term is defined in the APA) (collectively, the "Assumption and Assignment Procedures").

17.     The Assumption and Assignment Procedures and the Cure Notice substantially in the form attached hereto as Exhibit [   ] are hereby approved.

18.     The Debtors are authorized and empowered to take such steps, expend such sums of money and do such other things as may be necessary to implement and effect the terms and requirements established and relief granted in this Order.

19.     To the extent, if any, anything contained in this Order conflicts with the Motion, this Order and the provisions of the Bid Procedures attached hereto shall govern and control.

20.     Notwithstanding the possible applicability of Bankruptcy Rule 6004(h), this Order shall take effect immediately upon its entry.

21.     This Court shall retain jurisdiction to hear and determine all matters arising from or relating to the implementation of this Order.

Dated:     [_____, ___, 20__]
           [_____, Connecticut]

                                   _____
                                   HONORABLE [   ]
                                   UNITED STATES BANKRUPTCY JUDGE

Exhibit 6.2(a)

## EXHIBIT 1

### Bid Procedures

Set forth below are the bid procedures (the "Bid Procedures") to be employed with respect to the sale of all or substantially all of the assets (the "Assets") of Johnson Memorial Medical Center, Inc., Johnson Memorial Hospital, Inc., Home & Community Health Services, Inc., and Johnson Health Care, Inc., debtors and debtors-in-possession (collectively, the "Debtors") in the chapter 11 cases (collectively, the "Chapter 11 Cases") pending in the United States Bankruptcy Court for the District of Connecticut (the "Bankruptcy Court"), Case No. [ ].

The Debtors propose to sell substantially all of their assets (the "Sale Transaction") to the stalking horse bidder Saint Francis *Care*, Inc. ("SFC" or "Buyer") for the aggregate purchase price (the "Purchase Price") set forth in that certain Asset Purchase Agreement, dated [January ___, 2015], by and among SFC and the Debtors (the "APA"). The Sale Transaction pursuant to the APA is subject to competitive bidding as set forth herein and approval by the Bankruptcy Court pursuant to section 363 of title 11 of the United States Code (the "Bankruptcy Code") and rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

### Participation Requirements

Any person desiring to submit a bid for the all or part of the Debtors' assets (a "Potential Bidder") will be required to deliver (unless previously delivered) to the Debtors, [on or before] [NTD: To discuss timing] the Bid Deadline (as defined below), the following in addition to the other materials required hereby (collectively, the "Participation Requirements"):

(1)    an executed confidentiality agreement in form and substance satisfactory to the Debtors; and

(2)    satisfactory written evidence of available funds or a firm, irrevocable and unconditional commitment for financing sufficient for the Potential Bidder to consummate the Sale Transaction.

The financial information and credit-quality support of any Potential Bidder must demonstrate the financial capability of the Potential Bidder to timely consummate the Sale Transaction pursuant to a Qualified Bid (as defined below).

### Due Diligence

The Debtors will afford any Potential Bidder who satisfies the Participation Requirements such due diligence access or additional information as the Debtors, in their business judgment, determine to be reasonable and appropriate; provided, however, that the same access and information must also be made available to the Buyer. Additional due diligence will not be provided after the Bid Deadline.

**Exhibit 6.2(a)**

Interested investors requesting information about the qualification process, and Qualified Bidders (as defined below) requesting information in connection with their due diligence, should contact [____].

### Bid Deadline

A Potential Bidder that desires to make a bid must deliver written copies of its bid by hand and email to the following parties so as to be received no later than 5:00 p.m. (prevailing Eastern Time) on [____] (the "Bid Deadline"): by (a) counsel for the Debtor, Reid and Riege, P.C., One Financial Plaza, Hartford, CT 06103 (Attn: Eric Henzy (ehenzy@reidandriege.com), Jon P. Newton (jnewton@rrlawpc.com, Mark X. Ryan (mryan@rrlawpc.com); (b) counsel for SFC, Hinckley, Allen & Snyder LLP, 20 Church Street, Hartford, CT 06103, (Attn: William S. Fish, Jr. (wfish@hinckleyallen.com), Thomas S. Marrion (tmarrion@hinckleyallen.com), and Sarah M. Lombard (slombard@hinckleyallen.com)); (c) the Office of the United States Trustee for the District of Connecticut, [___] Division [_____ (Attn: _____ (_____ ___)]; (d) People's United Bank, c/o Neubert, Pepe & Monteith, P.C., 195 Church Street, New Haven CT, 06510 (Attn: Douglas S. Skalka (dskalka@npmlaw.com); (e) Healthcare Finance Group, LLC, c/o Kaye Scholer LLP, 250 West 55th Street, New York, New York 10019-9710 (Attn: Benjamin Mintz (benjamin.mintz@kayescholer.com) and Robinson & Cole LLP, 280 Trumbull Street, Hartford, Connecticut 06103 (Attn: Michael Enright (menright@rc.com); [___] and [(f)] counsel for any Official Committee of Unsecured Creditors appointed in this case.

### Bid Requirements

Each bid must be a written offer from a Potential Bidder, not contingent on any event not provided for in the APA, including any due diligence investigation, receipt of financing or receipt of further approvals (other than customary regulatory approvals), that (1) is received in accordance with the time deadlines and in the form provided for herein; (2) offers to consummate the Sale Transaction on terms no less favorable to the Debtors than those set forth in the APA; (3) provides that such Potential Bidder shall assume the Reimbursement Obligation (as such term is defined in the APA) directly attributable to Debtors and the Workers' Compensation Liabilities (as such term is defined in the APA) directly attributable to Debtors or provide a substitute guaranty and letter of credit substantially similar to the Credit Support (as such term is defined in the APA) and acceptable to the Hartford Fire Insurance Company and sufficient to release the Buyer from any obligations thereunder; (4) provides adequate assurances that such Potential Bidder will provide services equivalent to those provided by the Buyer under the Affiliation Agreements (as such term is defined in the APA) between the date of Bankruptcy Court approval and the closing date for the applicable Alternative Transaction and continue to operate the Debtors' businesses following the closing of the Alternative Transaction; (5) includes a marked copy of the APA to show any proposed amendments thereto (the "Modified Purchase Agreement") and a clean and executed Modified Purchase Agreement; (6) includes a statement that there are no conditions precedent to the Potential Bidder's ability to enter into a definitive agreement and that all necessary internal and shareholder approvals have been obtained prior to the bid; (7) states that such offer is binding and irrevocable until the consummation of the Sale Transaction; (8) offers to pay a purchase price that is greater than $[__], which is the purchase price contained in the APA, including all cash, non-cash consideration and Assumed Liabilities

**Exhibit 6.2(a)**

($[ ]), plus the Break-Up Fee in cash ($750,000), plus the Expense Reimbursement (in an amount in cash not to exceed $200,000), plus $250,000, and otherwise on terms at least as favorable to Debtors as those set forth in the APA (the "Initial Bid Increment"); provided, however, after such Initial Bid Increment, all further overbids must be in increments of at least $100,000; provided, further, that if such overbid is made against a bid last made by SFC, then such overbid must be at least $100,000 more than such SFC bid plus the Break-Up Fee in cash ($750,000) plus the Expense Reimbursement (in an amount in cash not to exceed $200,000), and the Debtors shall, in their discretion, have determined that such overbids satisfy such bidding increment requirement; (9) discloses the identity of each entity that will be bidding or otherwise participating or investing in connection with such bid including their affiliates, and the complete terms of any such participation; (10) includes the names and contact information of members of the Potential Bidder who will be available to answer questions regarding the offer; (11) includes the names of the Potential Bidder's external advisors including financial, legal and accounting firms, as well as industry consultants or other resources; (12) provides adequate assurances that it will offer employment to the Debtors' employees as provided for in the APA; (13) contains a description of (a) how the Potential Bidder intends to comply with regulations or licensing, or the ability to do so through management or ownership of similar facilities, required for the operation of the Facilities (as such term is defined in the APA), and (b) relevant experience owning and/or operating health care facilities similar to the Facilities; (14) identifies with particularity which executory contracts and unexpired lease the Potential Bidder wishes to take assignment of and provides details of the Potential Bidder's proposal to pay any related cure costs (subject to the Potential Bidder's right to make changes consistent with the APA or the Sale Order); (15) contains sufficient information concerning the Potential Bidder's ability to provide adequate assurance of performance with respect to executory contracts and unexpired leases to be assumed and assigned; (16) provides adequate assurances that it is able to pay each of the Break-Up Fee and Expense Reimbursement to SFC in cash; (17) contains all other information reasonably requested by the Debtors; and (18) provides a statement acknowledging that the Potential Bidder (other than the Buyer) is not entitled to any break-up fee, termination fee, expense reimbursement or similar payment.

The Debtors will consider all bids submitted whether or not they conform to the form set forth in the APA and will consider bids for less than all of the assets proposed to be sold under the APA; provided, however, following the date of the Sale Hearing, and only if the APA is approved by the Bankruptcy Court, Sellers will not participate in any discussions with, or furnish any information to, any person or entity with respect to any Alternative Transaction regardless of the terms thereof. Should any overbidding take place as set forth herein, the Buyers shall have the right, but not the obligation, to participate in the overbidding and to be approved as the overbidder at the Sale Hearing based upon any such overbid.

Additionally, bids must be accompanied by (1) a wire transfer to the Debtors of an amount in immediately available funds equal to at least $1,500,000 (the "Good Faith Deposit"), and (2) written evidence of available cash or a firm, irrevocable and unconditional commitment for financing and such other evidence of ability to consummate the transaction as the Debtors may reasonably request. To the extent any Potential Bidder proposes to include non-cash consideration in its bid (other than assumption of debt), such non-cash consideration must be freely marketable and such bid must be accompanied by the form of note or other type of

**Exhibit 6.2(a)**

instrument in connection with such non-cash consideration. Except as set forth herein with respect to the Buyer, no party shall be entitled to credit bid on account of any prepetition claim against the Debtors pursuant to Bankruptcy Code section 363(k) or otherwise.

## Qualified Bids and Bidders

A bid received from a Potential Bidder that meets the requirements set forth in the preceding three paragraphs will be considered a "Qualified Bid" if the Debtors, in consultation with their advisors, reasonably believe that such bid is higher or otherwise better than the bid set forth in the APA and would be reasonably expected to be consummated if selected as the Successful Bid (as defined below).

The Debtors will review each bid received from a Potential Bidder and, following consultation with People's United Bank ("People's") and HFG, determine whether it meets the requirements of a Qualified Bid. A Potential Bidder making a Qualified Bid who has also satisfied the Participation Requirements will be deemed a "Qualified Bidder." The APA is a Qualified Bid and the Buyer is a Qualified Bidder for all purposes and requirements of these Bid Procedures at all times.

In determining whether a bid is a Qualified Bid, the Debtors will consider factors such as (1) the amount of such bid, (2) the risks and timing associated with consummating such bid, (3) the risks associated with any non-cash consideration in such bid, (4) the ability of the Potential Bidders to obtain appropriate regulatory approvals, (5) any excluded assets or executory contracts and leases, and (6) any other factors deemed relevant by the Debtors in their reasonable discretion.

In addition, the Debtors, following consultation with People's and HFG, may reject any bid that (1) is on terms that are more burdensome or conditional than the terms of the APA, (2) includes non-cash consideration which is not freely marketable, (3) is subject to any due diligence, financing condition or other contingencies or conditions that are not included in the APA, or (4) is received after the Bid Deadline.

The Good Faith Deposits of all Qualified Bidders shall be held by an escrow agent in a separate account for the Debtors' benefit. If a Successful Bidder fails to consummate an approved sale of the Assets because of a breach of a failure to perform on the part of such Successful Bidder, such Successful Bidder's Good Faith Deposit will be forfeited to the Debtors as provided for in the APA.

Subject to other provisions of these Bid Procedures, the Debtors will, no later than 5:00 p.m. (prevailing Eastern Time) on [_____ __, 20__], advise each Potential Bidder that submits a bid whether its bid is a Qualified Bid.

## Auction Participation

Unless otherwise agreed to by the Debtors, only Qualified Bidders, People's, HFG, and their respective legal or financial professionals are eligible to attend or participate at the Auction

**Exhibit 6.2(a)**

(as defined below). Subject to the other provisions of these Bid Procedures, if the Debtors do not receive any Qualified Bids other than the APA or if no Qualified Bidder other than the Buyer has indicated its intent to participate in the Auction, the Debtors will not hold an auction and the Buyer will be named the Successful Bidder.

## Auction

If more than one Qualified Bid has been received and more than one Qualified Bidder has indicated its intent to participate in the Auction, the Debtors will conduct an auction (the "Auction") for the sale of all or substantially all of the Debtors' assets. Each Qualified Bidder participating at the Auction will be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale Transaction. Prior to the Auction, the Debtors will select, in their sole reasonable discretion, the Qualified Bid that represents the then-highest or otherwise best value to the Debtors (the "Baseline Bid") to serve as the starting point for the Auction.

The Auction shall take place at 12:00 noon (prevailing Eastern Time) on [_____ __, 20__] at the offices of [Reid and Riege, P.C., One Financial Plaza, Hartford, CT 06103]. At the Auction, only the Buyer and other Qualified Bidders will be permitted to increase their bids or make any subsequent bids. The bidding will start at the purchase price and terms proposed in the Baseline Bid and after the Initial Bid Increment will continue in increments of at least $100,000 in cash or cash equivalents; provided, however, that if such overbid is made against a bid last made by SFC, then such overbid must be at least $100,000 more than such SFC bid plus the Break-Up Fee in cash ($750,000) plus the Expense Reimbursement (in an amount in cash not to exceed $200,000). Qualified Bidders may participate in person or by representative. The Auction shall be transcribed by a qualified court reporter.

Based upon the terms of the Qualified Bids received, the number of Qualified Bidders participating in the Auction and such other information as the Debtors reasonably determine is relevant, the Debtors may conduct the Auction in the manner they reasonably determine, in their business judgment and following consultation with People's and HFG, will promote the goals of the bid process, will achieve the maximum value for all parties in interest and is not inconsistent with any of the provisions of these Bid Procedures, the Bankruptcy Code or any order of the Bankruptcy Court entered in connection herewith. Such rules will provide that (1) the procedures must be fair and open, with no participating Qualified Bidder disadvantaged in any material way as compared to any other Qualified Bidder; (2) all bids will be made and received in one room, on an open basis, and all other Qualified Bidders will be entitled to be present for all bidding with the understanding that the true identity of each Qualified Bidder will be fully disclosed to all other Qualified Bidders and that all material terms of each Qualified Bid will be fully disclosed to all other bidders throughout the entire Auction; and (3) each Qualified Bidder will be permitted a fair, but limited, amount of time to respond to the previous bid at the Auction. Notwithstanding anything contained in these Bidding Procedures, the Debtors may modify or waive any provisions of these Bidding Procedures at the Auction if, in their reasonable judgment following consultation with People's and HFG, such modification or waiver will better promote the goals of the Auction.

**Exhibit 6.2(a)**

The Auction shall continue until there is only one offer that the Debtors determine, following consultation with People's and HFG and subject to Bankruptcy Court approval, is the highest or best offer from among the Qualified Bidders (including the Buyer) submitted at Auction. In making this decision, the Debtors may consider, without limitation, the amount of the purchase price, the form of consideration being offered, the likelihood of the Qualified Bidder's ability to close a transaction and the timing thereof, the number, type and nature of any changes to the Purchase Agreement requested by each Qualified Bidder, the effect of the Sale Transaction on the patients of the Debtors, and the net benefit to the Debtors' estates (the "Successful Bid"). The Qualified Bidder submitting such Successful Bid shall become the "Successful Bidder," and shall have such rights and responsibilities of a purchaser, as set forth in the APA or the Modified Purchase Agreement, as applicable.

Immediately prior to the conclusion of the Auction, the Debtors shall (1) review each bid made at the Auction on the basis of financial and contractual terms and such other factors as may be relevant to the sale process, including those factors affecting the speed and certainty of consummating the Sale Transaction; (2) identify the Successful Bid; and (3) notify all Qualified Bidders at the Auction, prior to its conclusion, of the name or names of the Successful Bidder and the amount and other material terms of the Successful Bid.

All bidders at the Auction shall be deemed to have consented to these Bidding Procedures and to the core jurisdiction of the Bankruptcy Court and waived any right to a jury trial in connection with any disputes relating to the Auction and the construction and enforcement of the APA.

## SFC Reservation of Rights

SFC, as participant in the postpetition senior secured lending facility with the Debtors, and/or its assignee, has the right to submit a credit bid for the assets up to the full amount of SFC's secured claim in accordance with § 363(k) of the Bankruptcy Code; provided, however, that SFC's right to credit-bid shall not limit the Successful Bidder's obligation to pay the HFG debt in full at closing unless the Successful Bidder and HFG agree on the terms of assumption of such debt.

## Right to Credit Break-Up Fee and Expense Reimbursement

With respect to any subsequent bid(s) made by SFC and/or its assignee, SFC and/or its assignee has the right in all such subsequent bid(s) to receive a credit or credits up to the full amount of the Break-Up Fee and the Expense Reimbursement with respect to such subsequent bid(s).

## Acceptance of Qualified Bids

The Debtors presently intend to sell all or substantially all of their assets to the Qualified Bidder that submits the highest and best bid. The Debtors' presentation to the Bankruptcy Court for approval of any Successful Bid does not constitute the Debtors' acceptance of such bid. The Debtors will be deemed to have accepted a bid only when it has been approved by the

Exhibit 6.2(a)

Bankruptcy Court at the Sale Hearing (defined below). After conclusion of the Auction, but prior to the Sale Hearing, the Successful Bidder shall complete and execute all agreements, contracts, instruments or other documents evidencing and containing the terms and conditions upon which the Successful Bid was made and make and pay for all necessary filings with all applicable governmental or other authorities.

## Assumption of Executory Contracts and Unexpired Leases

The APA may provide for the assumption and assignment of executory contracts and unexpired leases to the Buyer. The proposed process for evaluating which executory contracts and unexpired leases will be assigned should be similar to the process proposed in the APA. In all circumstances, the Buyer or Qualified Bidder shall be responsible for all cure amounts under Bankruptcy Code section 365.

## Modifications

The Debtors, following consultation with People's and HFG, may (1) determine, in their business judgment, which bid or bids, if any, constitute the highest or otherwise best offer for the Debtors' assets; (2) reject, at any time before entry of an order of the Bankruptcy Court approving any bid as the Successful Bid, any bid that, in the Debtors' sole discretion, is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code or the Bid Procedures, or (c) contrary to the best interests of the Debtors and the Debtors' estates and creditors; provided, that Buyer's bid and the APA, after entry of these Bidding Procedures Order, may not be rejected under (a), (b) or (c) of this provision; and (3) withdraw, in its business judgment, the Motion if contrary to the best interests of the Debtors and the Debtors' estates and creditors.

## Sale Hearing

The Debtors will seek entry of an order from the Bankruptcy Court at a hearing (the "Sale Hearing") to begin on [_____ ___, 20__] at 10:00 a.m. (prevailing Eastern Time), to approve and authorize the Sale Transaction to the Successful Bidder on terms and conditions determined in accordance with the Bid Procedures.

## Break-Up Fee or Expense Reimbursement

In the event that the APA is terminated under the circumstances described in the APA, to the extent approved in the Bidding Procedures Order, the Debtors shall pay the Buyer the Break-Up Fee and Expense Reimbursement as, when and to the extent provided in the APA.

The Debtors' obligation to pay the Break-Up Fee and Expense Reimbursement shall survive the termination of the APA, dismissal or conversion of the Bankruptcy Case, and confirmation of any plan of reorganization or liquidation, including the Plan, and shall constitute a super-priority administrative expense of the Debtors under section 503(b) and 507(a) of the Bankruptcy Code.

**Exhibit 6.2(a)**

### No Entitlement to Fees for Potential Bidders or Qualified Bidders

Neither the tendering of a bid nor the determination that a bid is a Qualified Bid shall entitle a potential bidder or a Qualified Bidder to any break-up, termination or similar fee and all potential bidders and Qualified Bidders waive any right to seek a claim for substantial contribution.

### Back-Up Bidder and Return of Good Faith Deposit

If an Auction is conducted, the Qualified Bidder with the next highest or otherwise best Qualified Bid (including the Buyer), as determined by the Debtors in the exercise of their business judgment, at the Auction shall be required to serve as a back-up bidder (the "Back-Up Bidder") and keep such bid open and irrevocable until one (1) business day after the closing of the Sale Transaction with the Successful Bidder. Following the Sale Hearing, if the Successful Bidder fails to consummate the approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Back-Up Bidder will be deemed to be the new Successful Bidder, and the Debtors will be authorized, but not required, to consummate the sale with the Back-Up Bidder without further order of the Bankruptcy Court.

Except as otherwise provided herein or in the APA, Good Faith Deposits shall be returned to each bidder not selected by the Debtors as the Successful Bidder or the Back-Up Bidder by no later than the fifth (5th) business day following the Sale Hearing. The Good Faith Deposit of the Back-Up Bidder shall be held by the Debtors until one (1) business day after the closing of the Sale Transaction with the Successful Bidder. The Good Faith Deposit of the Back-Up Bidder shall be returned within five (5) business days after the closing the sale between the Debtors and the Successful Bidder.

**Exhibit 6.2(a)**

EXHIBIT 2

NOTICE

**Exhibit 6.2(a)**

Eric Henzy
State Bar No. [ ]
Reid and Riege, P.C.
One Financial Plaza
Hartford, CT 06103

Attorneys for [_____], Debtors and Debtors in Possession

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF CONNECTICUT
## [_____] DIVISION

| | | |
|---|---|---|
| **In re:** | ) | **Case No. [_____]** |
| | ) | |
| **[_____],** | ) | **Chapter 11** |
| | ) | |
| **Debtors.** | ) | **Honorable** |

### NOTICE OF AUCTION AND SALE

**PLEASE TAKE NOTICE** that on [_____, 20__], the above-referenced debtors and debtors-in-possession (collectively, the "Debtors"), filed their Motion of Debtors for Orders (I) Approving (A) Bid Procedures, (B) Procedures for the Cure, Assumption and Assignment of Contracts, and (C) Providing Certain Protections to Saint Francis *Care*, Inc., and (II) Authorizing the (A) Sale of Substantially All of the Debtors' Assets to Saint Francis *Care*, Inc. and (B) the Procedures Governing the Assumption and Assignment of Contracts (the "Sale Motion") with the United States Bankruptcy Court for the District of Connecticut, [_____] Division (the "Bankruptcy Court"). The Debtors have received a Qualified Bid from Saint Francis *Care*, Inc. ("Buyer"). All parties that may be interested in submitting a bid for the substantially all of the Debtors' assets[3] or any portion thereof or taking part in the Auction must read carefully both the Bid Procedures and the order approving the Bid Procedures (the "Bid Procedures Order").

---

[3] Unless otherwise defined herein, all capitalized terms shall have the same meaning ascribed to them in the Bid Procedures.

**Exhibit 6.2(a)**

**PLEASE TAKE FURTHER NOTICE** that on [_____ __, 20__], following a hearing held on [_____ __, 20__], the Bankruptcy Court entered the Bid Procedures Order and scheduled a hearing to consider the Sale Motion for [_____ __, 20__] (prevailing Eastern Time) (the "Sale Hearing"). You may obtain a copy of the APA (as such term is defined in the Bid Procedures) by making a written request to the undersigned counsel.

Only those parties that submit Qualified Bids may participate in the Auction; if you are interested in determining how to submit such a Qualified Bid, you must comply with the terms of the Bid Procedures. Any party in interest wishing to receive a complete set of the APA, the Sale Motion, and the Bid Procedures Order may do so free of charge by contacting Reid and Riege, P.C., One Financial Plaza, Hartford, CT 0610, Attn: Eric Henzy.

**PLEASE TAKE FURTHER NOTICE** that any party that wishes to take part in this process and submit a bid for the Assets, any portion thereof, or other of the Debtors' assets, must submit its competing bid prior to [_____ __, 20__], at 5:00 p.m. (prevailing Eastern Time) (the "Bid Deadline") to: (a) counsel for the Debtors, Reid and Riege, P.C., One Financial Plaza, Hartford, CT 06103 (Attn: Eric Henzy (Attn: Eric Henzy (ehenzy@rrlawpc.com), Jon P. Newton (jnewton@rrlawpc.com, Mark X. Ryan (mryan@rrlawpc.com); (b) counsel for SFC, Hinckley, Allen & Snyder LLP, 20 Church Street, Hartford, CT 06103, (Attn: William S. Fish, Jr. (wfish@hinckleyallen.com), Thomas S. Marrion (tmarrion@hinckleyallen.com), and Sarah M. Lombard (slombard@hinckleyallen.com)); (c) the Office of the United States Trustee for the District of Connecticut, [____] Division [_____] (Attn: _____ (_____)]; (d) People's United Bank, c/o Neubert, Pepe & Monteith, P.C., 195 Church Street, New Haven CT, 06510 (Attn: Douglas S. Skalka (dskalka@npmlaw.com); (e) Healthcare Finance Group, LLC, c/o Kaye Scholer LLP, 250 West 55th Street, New York, New York 10019-9710 (Attn:

Exhibit 6.2(a)

Benjamin Mintz (benjamin.mintz@kayescholer.com) and Robinson & Cole LLP, 280 Trumbull Street, Hartford, Connecticut 06103 (Attn: Michael Enright (menright@rc.com); and [(f)] counsel for any Official Committee of Unsecured Creditors appointed in this case.

**PLEASE TAKE FURTHER NOTICE** that if a Qualified Bid (other than Buyer's Qualified Bid) is received by the Bid Deadline, an auction (the "Auction") with respect to a contemplated transaction shall take place on [_____  __, 20__], at 12:00 noon (prevailing Eastern Time) at the offices of [Reid and Riege, P.C., One Financial Plaza, Hartford, CT 06103]. If, however, no such Qualified Bid is received by the Bid Deadline, then the Auction will not be held, Buyer will be deemed the Successful Bidder, the APA will be the Successful Bid, and, at the Sale Hearing, the Debtors will seek approval of and authority to consummate the transaction contemplated by the APA.

Only a Qualified Bidder who has submitted a Qualified Bid will be eligible to participate at the Auction. Only the authorized representatives of each of the Qualified Bidders, the Committee, and the Debtors shall be permitted to attend the Auction. At the Auction, Qualified Bidders will be permitted to increase their bids. The bidding at the Auction shall start at the purchase price stated in the Baseline Bid as disclosed to all Qualified Bidders prior to commencement of the Auction, with any initial bid over the Baseline Bid being at least the amount of the Baseline Bid plus the Break-Up Fee in cash ($750,000), plus the Expense Reimbursement (in an amount in cash not to exceed $200,000), plus $250,000, and bidding thereafter continuing in increments of at least $100,000; provided, further, that if such overbid is made against a bid last made by SFC, then such overbid must be at least $100,000 more than such SFC bid plus the Break-Up Fee in cash ($750,000) plus the Expense Reimbursement (in an amount in cash not to exceed $200,000). The Successful Bid shall be determined by the Debtors

**Exhibit 6.2(a)**

in their discretion, in consultation with the Committee, or as determined by the Bankruptcy Court in the event of a dispute.

At the Sale Hearing, the Debtors will present the Successful Bid to the Bankruptcy Court for approval. The Debtors will sell the Assets or any portion thereof to the Successful Bidder. If the Successful Bidder fails to consummate an approved sale because of a breach or a failure to perform on the part of such Successful Bidder, the next highest or otherwise best Qualified Bid, as approved at the Sale Hearing, shall be deemed to be the Successful Bid and the Debtors shall be authorized to effect such Sale without further order of the Bankruptcy Court.

**PLEASE TAKE FURTHER NOTICE** that any responses or objections to the Motion must be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, and shall be filed with the Bankruptcy Court electronically by registered users of the Bankruptcy Court's case filing system (the Procedures Manual for the Electronic Case Filing System can be found at [＿＿], the official website for the Bankruptcy Court) and, by all other parties in interest, on a 3.5 inch disk, in text-searchable Portable Document Format (PDF), Microsoft Word or any other Windows-based word processing format (in either case, with a hard-copy delivered directly to Chambers), and shall be served upon: (a) the Notice Parties; and (b) all those persons and entities that have formally requested notice by filing a written request for notice, pursuant to Bankruptcy Rule 2002 and the Local Bankruptcy Rules, so as to be actually received no later than [＿＿＿＿, 20＿] at 4:00 p.m. (prevailing Eastern Time). Only those responses that are timely filed, served and received will be considered at the Hearing. Failure to file a timely objection may result in entry of orders granting the Motion as requested by the Debtors.

Exhibit 6.2(a)

Dated: [_____ __ ___, 20__]

**REID AND RIEGE, P.C.**

**Exhibit 6.2(b)**

## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT
## [____] DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Case No.** |
| | § | |
| [____] | § | **Chapter 11** |
| | § | |
| **Debtors.** | § | **Honorable** |

### ORDER AUTHORIZING AND APPROVING (I) THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS TO SAINT FRANCIS *CARE*, INC.; (II) THE PROCEDURES GOVERNING THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS; AND (III) RELATED RELIEF[1]

Upon the motion of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), pursuant to sections 105(a), 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code") and Federal Rules of Bankruptcy Procedure 2002, 6004, 9007 and 9014 (the "Bankruptcy Rules"), for entry of an order authorizing and approving, among other things, the sale of all or substantially all of the Debtors' assets, real and personal, tangible and intangible, associated with owning, leasing, managing and operating the Facilities (collectively, the "Business") to Saint Francis *Care*, Inc. or its designee(s) (collectively, "SFC") free and clear of all Claims and Encumbrances (as defined below) and related relief (Docket No. [   ]) (as amended, the "Motion");[2] and the Order Approving Bid Procedures and Providing Certain Protections to SFC and Granting Related Relief (Docket No. [   ]) (the "Bid Procedures Order"); and it appearing that due and appropriate notice of the Motion, the Bid Procedures Order, the Bid Procedures, the Auction and the Sale Hearing was given; and it appearing that no other notice of

---

[1] Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact when appropriate. See Fed. R. Bankr. P. 7052.

[2] Capitalized terms not otherwise defined herein shall have the meanings given to them in the Motion or that certain Asset Purchase Agreement by and between the [Debtors], as sellers, and SFC, as buyer (the "APA"). A copy of the APA is attached as Exhibit 1 hereto.

the relief granted by this Order need be given; and the Court having conducted a hearing on the

Motion on [ ] (the "Sale Hearing") at which time all interested parties were offered an

opportunity to be heard with respect to the Motion; and the Debtors having determined that SFC

has submitted the highest and best bid for the assets of the Debtors that SFC has offered to

purchase as more specifically described in the APA (the "Purchased Assets"); and all parties in

interest having been heard, or having had the opportunity to be heard, regarding entry of this

Order and approval of the Sale Transaction (as such term is defined in the Bid Procedures Order)

and the APA (as such term is defined in the Bid Procedures Order); and this Court being fully

advised in the premises; this Court, based upon the arguments, testimony and evidence presented

to it, hereby makes the following findings of fact and conclusions of law:

A.  This Court has jurisdiction to hear and determine the Motion and to grant the relief requested in the Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue of these cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.  This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). To any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure as made applicable by Bankruptcy Rule 7054, this Court expressly finds that there is no just reason for delay in the implementation of this Order, and expressly directs entry of judgment as set forth herein.

C.  This proceeding is a "core proceeding" within the meaning of 28 U.S.C. § 157(b)(2)(A), (N) and (O).

D.  The statutory predicates for the Motion are sections 105, 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 9007 and 9014.

E.  As evidenced by the affidavits of service filed with the Court, and based upon the representations of counsel at the Sale Hearing, (i) proper, timely and adequate notice of the Motion, the Bid Procedures Order, the Sale Hearing, the Sale Transaction, the Auction and the Bid Deadline as approved herein has been provided in accordance with Bankruptcy Rules 2002, 6004, 9007 and 9014, (ii) such notice was good, sufficient and appropriate under the circumstances, and (iii) no other or further notice of the Motion, the Bid Procedures Order, the Sale Hearing, the Sale Transaction, the Auction or the Bid Deadline as provided herein is necessary or shall be required.

F.  A reasonable opportunity to object or be heard with respect to the Motion and the Sale Transaction has been afforded to all interested persons and entities, including, without

limitation: (i) the office of the United States Trustee, (ii) all creditors as defined in Section 101(1) of the Bankruptcy Code, (iii) all entities known to have asserted any lien, interest or encumbrance upon the Debtors' assets, (iv) counsel for SFC, (v) counsel for the Official Committee of Unsecured Creditors, if any, (vi) counsel to the Debtors' prepetition secured lenders, (x) all entities known by the Debtors to have expressed an interest in acquiring the Debtors' assets in the previous calendar year, (vii) the United States Attorney's Office, (viii) the United States Department of Justice, (ix) the Internal Revenue Service, (x) the Pension Benefit Guaranty Corporation; (xi) appropriate state regulatory agencies, including, without limitation, the Connecticut Department of Energy & Environmental Protection, the Connecticut Attorney General's Office, the Connecticut Department of Revenue Services, and [list others]; (xii) all counterparties to any executory contract or unexpired lease; (xviii) any other persons known by the Debtor to hold, assert or have threatened to assert and claims against the Debtor, including, without limitation, any malpractice or tort claims, (xiv) Healthcare Finance Group, LLC, and (xv) all other parties who filed requests for notice under Bankruptcy Rule 2002 in these cases. **[NTD: This Section to be updated to provide for all necessary notice parties under applicable law.]**

G.      Notice, as specified in the preceding paragraph and as evidenced by the affidavits of service filed with the Court, has been provided in the form and manner specified in the Motion and required by the Bid Procedures Order, and such notice is reasonable and adequate.

H.      The process for the sale of the Purchased Assets was conducted in accordance with the Bid Procedures Order. At the conclusion of the Auction, SFC was deemed the Successful Bidder with the highest and best offer for the Purchased Assets.

I.      The Auction was conducted in accordance with the Bid Procedures Order. The Auction was conducted in a non-collusive, fair and good faith manner and a reasonable opportunity has been given to any interested party to make a higher and better offer for the Purchased Assets.

J.      SFC is purchasing the Purchased Assets in good faith and is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code, and is therefore entitled to the protection of that provision.

K.      The APA was negotiated, proposed and entered into by the Debtors and SFC without collusion, in good faith and from arms'-length bargaining positions. Neither the Debtors nor SFC have engaged in any conduct that would cause or permit the Sale Transaction or any part of the transactions contemplated by the APA to be avoidable under section 363(n) of the Bankruptcy Code.

L.      As demonstrated by (i) any testimony and other evidence proffered or adduced at the Sale Hearing, and (ii) the representations of counsel made on the record at the Sale Hearing, the Debtors afforded interested potential purchasers a full and fair opportunity to qualify as Qualified Bidders under the Bid Procedures and to submit an offer for the Purchased Assets.

M.      SFC is not an "insider" of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code.

N.      The consideration provided by SFC for the Purchased Assets pursuant to the APA (i) is fair and reasonable, (ii) is the highest and best offer for the Purchased Assets, (iii) will provide a greater recovery for all of the Debtors' stakeholders than would be provided by any other practical available alternative and (iv) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Transfer Act and all other applicable laws.

O.      The Debtors have demonstrated a sufficient basis and compelling circumstances requiring the Debtors to enter into the APA and sell the Purchased Assets under section 363 of the Bankruptcy Code, and such actions are appropriate exercises of the Debtors' business judgment and are in the best interests of the Debtors, their estates and their creditors.

P.      The marketing and bidding processes implemented by the Debtors and their advisors, as set forth in the Motion, were fair, proper, and reasonably calculated to result in the best value received for the Purchased Assets.

Q.      The Debtors have full authority and power to execute and deliver the APA and related agreements and all other documents contemplated by the APA, to perform their obligations therein and to consummate the Sale Transaction. Except as set forth in the APA, no additional consents or approvals are necessary or required for the Debtors to enter into the APA, perform their obligations therein and consummate the Sale Transaction.

R.      SFC would not have entered into the APA and would not consummate the Sale Transaction, thus adversely affecting the Debtors, their patients, the Debtors' estate and the Debtors' creditors, if the Purchased Assets were not sold to it free and clear of all Claims and Encumbrances or if SFC would, or in the future could, be liable for any Claims and Encumbrances against the Purchased Assets, except as specifically provided in the APA.

S.      Not selling the Purchased Assets free and clear of any and all Liens (other than Permitted Liens), claims (as defined in section 101(5) of the Bankruptcy Code), security interests, mortgages, encumbrances, obligations, including employee benefit obligations (including, without limitation, under the Employee Retirement Income Security Act or the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), and further including any obligations to former employees of the Debtors under COBRA), Liabilities (other than Assumed Liabilities), including liabilities under CERCLA and all other Environmental Laws, charges against or interests in property, adverse claims, claims of possession, rights of way, licenses, easements or restrictions of any kind, demands, guarantees, actions, causes of actions, suits, defenses, deposits, credits, allowances, options, rights, restrictions, remedies, limitations, contractual commitments, rights of first refusal, rights of setoff or recoupment, or interests of any kind or nature whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or subsequent to the commencement of this chapter 11 case, whether imposed by agreement, understanding, law, equity or otherwise, including, without limitation, any rights or claims based on theories of transferee or successor liability under applicable law, statute, rule, regulation, common law or equitable principle, including, without limitation, any Environmental Laws, labor or employment laws (such as unemployment compensation), ERISA, the Code, and COBRA, of any Governmental Entity, including, without limitation, the Pension Benefit

#52798842                                    4

Guaranty Corporation, the IRS, state and local taxing authorities and any Governmental Entity, whether arising before or after the commencement of the Bankruptcy Case and whether imposed by agreement, understanding, law, equity, regulation, custom or otherwise, including, without limitation, the Benefit Plans (as such term is defined in the APA), save and excepting only those Liabilities expressly assumed by SFC in writing pursuant to the APA, subject to applicable law, including section 363 of the Bankruptcy Code (collectively, the "Claims and Encumbrances") would adversely impact the Debtors' estate, and the sale of the Purchased Assets other than as free and clear of all Claims and Encumbrances would be of substantially less value to the Debtors' estate.

T.     The provisions of section 363(f) of the Bankruptcy Code have been satisfied. All holders of Claims and Encumbrances, if any, who did not object, or withdrew their objections to the Sale Transaction, are deemed to have consented to the Sale Transaction.

## IT IS HEREBY ORDERED, ADJUDGED AND DECREED, EFFECTIVE

## IMMEDIATELY, AS FOLLOWS:

1.     The relief requested in the Motion is granted and approved in all respects, as set forth herein. The Debtors' entry into the APA and the Sale Transaction is hereby approved in all respects. Objections to the relief sought in the Motion that have not been previously resolved or withdrawn are hereby overruled on their merits.

2.     The Debtors are authorized and directed to take any and all actions necessary or appropriate to (a) consummate the Sale Transaction in accordance with the Motion, the APA and this Order, and (b) perform, consummate, implement and close fully the Sale Transaction, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the APA including, without limitation, consenting to the assignment by SFC of any of its rights under or relating to the APA.

3.     Those holders of Claims and Encumbrances and other non-Debtor parties who did not object, or who withdrew their objections to entry of this Order, the Motion, the Bid Procedures Order, the Sale Hearing, the Sale Transaction and the APA are deemed to have consented to this Order, the Bid Procedures Order, the Sale Transaction and the APA pursuant to

section 363(f)(2) of the Bankruptcy Code and are enjoined from taking any action against SFC, its successors, its assigns, its representatives, its affiliates, its properties, or any agent of the foregoing to recover any claim which such person or entity has against the Debtors or any of their affiliates or any of the Debtors' property. Those holders of Claims and Encumbrances and other non-Debtor parties who did object, if any, fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are adequately protected by having their Claims and Encumbrances, if any, attach to the proceeds of the Sale Transaction ultimately attributable to the property against or in which they assert a Claim or Encumbrance.

Sale and Transfer of the Purchased Assets

4.     Upon Closing, the Purchased Assets transferred, sold and delivered to SFC shall be free and clear of all Claims and Encumbrances of any person or entity, except as specifically provided in the APA, including, without limitation, as specifically provided for with respect to the HFG Debt and the People's Debt. The transfer of the Purchased Assets to SFC constitutes a legal, valid and effective transfer of the Purchased Assets and shall vest SFC with all right, title and interest in and to the Purchased Assets.

5.     Upon closing of the Sale Transaction, this Order shall be construed as, and shall constitute for any and all purposes, a full and complete general assignment, conveyance and transfer of the Purchased Assets pursuant to the terms of the APA.

6.     Effective on the Closing, all entities, including, but not limited to, the Debtors, creditors, employees, former employees and shareholders, administrative agencies, tax and regulatory authorities, governmental departments, secretaries of state, federal, state and local officials, and their respective successors or assigns, including, but not limited to, persons asserting any Claim or Encumbrance against each Debtors' assets, shall be permanently and forever barred, restrained and enjoined from commencing or continuing in any manner any

#52798842                                             6

action or other proceeding of any kind against the Purchased Assets or SFC (or its successors, assigns, agents or representatives) as alleged successor or otherwise with respect to any Claims and Encumbrances on or in respect of the Purchased Assets, except as specifically provided in the APA, including, without limitation, as specifically provided for with respect to the HFG Debt and the People's Debt.

7.     Each and every term and provision of the APA, together with the terms and provisions of this Order, shall be binding in all respects upon all entities, including, but not limited to the Debtors, SFC, creditors, employees, former employees and shareholders, administrative agencies, governmental departments, secretaries of state, federal, state and local officials and their respective successors or assigns, including but not limited to persons asserting any Claim or Encumbrance against or interest in the Debtors' estate or the Debtors' assets, including any subsequent appointment of a trustee or other fiduciary under any section of the Bankruptcy Code.

8.     Upon the Closing, all entities holding Claims and Encumbrances of any kind and nature against the Debtors' assets hereby are barred from asserting such Claims and Encumbrances against SFC (or its successors, assigns, agents or representatives) and/or the Purchased Assets and, effective upon the transfer of the Purchased Assets to SFC upon Closing, the Claims and Encumbrances shall attach to the proceeds of the Sale Transaction with the same force, validity, priority and effect, if any, as against the Debtors' assets, except as specifically provided in the APA, including, without limitation, as specifically provided for with respect to the HFG Debt and the People's Debt.

9.     The APA and the Sale Transaction may be specifically enforced and are binding upon, and not subject to rejection or avoidance by, the Debtors or any Chapter 7 or Chapter 11

trustee of the Debtors appointed pursuant to the Bankruptcy Code or other representative or their estates.

10. This Order (a) is and shall be effective as a determination that, upon Closing, all Claims and Encumbrances existing as to the Debtors' assets conveyed to SFC have been and hereby are adjudged to be unconditionally released, discharged and terminated, with all such Claims and Encumbrances attaching automatically to the proceeds in the same manner and priority, except as specifically provided in the APA, and (b) shall be binding upon and govern the acts of all entities, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies or units, governmental departments or units, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Debtors' assets conveyed to SFC. All Claims and Encumbrances of record as of the date of this Order shall be removed and stricken as against the Purchased Assets in accordance with the foregoing, except as specifically provided in the APA, including, without limitation, as specifically provided for with respect to the HFG Debt and the People's Debt. All entities are authorized and specifically directed to strike all such recorded Claims and Encumbrances against the Purchased Assets from their records, official or otherwise.

11. If any person or entity which has filed financing statements, mortgage, notices of lis pendens or other documents or agreements evidencing Claims and Encumbrances on the Purchased Assets shall not have delivered to the Debtors prior to closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction,

releases of liens and easements and any other documents necessary for the purpose of documenting the release of all Claims and Encumbrances which the person or entity has or may assert with respect to the Purchased Assets, the Debtors are hereby authorized and directed upon closing, and SFC is hereby authorized upon closing, to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Purchased Assets.   Upon closing of the Sale Transaction, each of the Debtors' creditors is authorized and directed to execute such documents and take all such actions as may be necessary to release their respective Claims and Encumbrances against the Purchased Assets.

12.   Upon closing, SFC (or its successors, assigns, agents or representatives) shall not be deemed to be (a) a successor to the Debtors, (b) de facto merged with the Debtors, or (c) a mere continuation of the Debtors.   Without limiting the generality of the foregoing, and except as specifically provided in the APA, SFC (or its successors, assigns, agents or representatives) shall not be liable for any Claims and Encumbrances against the Debtors or any of its predecessors or affiliates or assets under any theory of antitrust, environmental, labor or employment, de facto merger, mere continuation, whether known or unknown, other than as expressly provided for in the APA or in this Order.

Assumption and Assignment of Contracts

13.   Not less than thirty (30) days prior to the Closing, SFC shall provide (i) documentation identifying all Contracts or Real Property Expense Leases and Real Property Income Leases (collectively, "Leases") that SFC wishes to be assumed by the Debtors and assigned by the Debtors to SFC at Closing (the "Transferred Contracts"); (ii) documentation identifying all Contracts or Leases that SFC may, at a later date, wish to be assigned by the Debtors (the "Designated Contracts"); and (iii) all Contracts or Leases that SFC will not request the Debtors to assume or assign (the "Excluded Contracts").   At any time between the Closing

and the 10th day following the Closing, SFC may, upon prior notice to the Debtors, re-designate any Designated Contract as either a Transferred Contract or an Excluded Contract. Each Debtor agrees not to reject any Contract or Lease on or before the 10th day following the Closing except for Excluded Contracts and to continue to perform all obligations under such Contracts so long as SFC pays any expenses related thereto. Following the Closing, SFC shall be responsible for any payments that arise under any Designated Contract prior to the Buyer's re-designation of any such Designated Contract as an Excluded Contract. The Debtors shall assume in the Bankruptcy Case, any Transferred Contract that is designated by SFC to the Debtors on or before the 10th day following the Closing, provided that SFC shall pay all scheduled and disclosed cure amounts in connection with such assumption, and assign said Transferred Contracts to SFC. The proposed assignments shall take place pursuant to an order of the Court.

Additional Provisions

14.     The provisions of this Order and the APA and any actions taken pursuant hereto or thereto shall survive entry of any order which may be entered (a) confirming or consummating any plan of reorganization of the Debtors, (b) converting any of the Debtors' cases from chapter 11 to chapter 7, (c) dismissing any of the Debtors' bankruptcy cases or (d) appointing a chapter 11 trustee or examiner, and the terms and provisions of the APA as well as the rights and interests granted pursuant to this Order and the APA shall continue in this or any superseding case and shall be binding upon the Debtors, SFC and their respective successors and permitted assigns.

15.     Each and every federal, state and governmental agency or department and any other person or entity is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA.

16.     Upon Closing, SFC shall pay to the Debtors the Purchase Price, less the Good-Faith Deposit. The consideration provided by SFC for the Purchased Assets under the APA constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Transfer Act and all other applicable laws.

17.     Nothing contained in any order of any type or kind entered in this chapter 11 case or any related proceeding subsequent to entry of this Order, nor in any chapter 11 plan confirmed in this chapter 11 case, shall conflict with or derogate from the provisions of the APA or the terms of this Order. Further, the provisions of this Order and any actions taken pursuant hereto shall survive the entry of an order confirming any plan of reorganization or liquidation for the Debtors, the conversion of the Debtors' case from chapter 11 to a case under chapter 7 of the Bankruptcy Code or the dismissal of the Debtors' bankruptcy cases.

18.     To the extent, if any, anything contained in this Order conflicts with a provision in the APA, this Order shall govern and control.

19.     SFC is purchasing the Purchased Assets in good faith and is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code, and is therefore entitled to the protection of that provision. The consideration provided by SFC for the Purchased Assets is fair and reasonable, and the Sale Transaction may not be avoided under section 363(n) of the Bankruptcy Code.

20.     This Court retains jurisdiction, even after conversion of this chapter 11 case to a case under chapter 7, to (a) interpret, implement and enforce the terms and provisions of this Order (including any injunctive relief provided in this Order) and the terms of the APA, all amendments thereto and any waivers and consents thereunder and of each of the agreements executed in connection therewith; (b) protect SFC (and its successors, assigns, agents and

representatives) and the Purchased Assets from and against any of the Claims and Encumbrances; (c) resolve any disputes arising under or related to the APA or the Sale Transaction; (d) adjudicate all issues concerning alleged pre-Closing Claims and Encumbrances and any other alleged interests in and to the Debtors' assets, including the extent, validity, enforceability, priority and nature of all such alleged Claims and Encumbrances and any other alleged interests; (e) adjudicate any and all issues and/or disputes relating to the Debtors' right, title or interest in the Debtors' assets, the Motion and/or the APA; and (f) dispose of all claims that are not Assumed Liabilities under the APA.

21.     From and after the date hereof, the Debtors shall act in accordance with the terms of the APA and the Debtors, to the extent they have not already done so, shall execute the APA at or prior to Closing.

22.     This Order constitutes an authorization of conduct by the Debtors and nothing contained herein shall be deemed to constitute a ruling with regard to the sovereign immunity of any state. The failure of any state to object to the entry of this Order shall not operate as a waiver with respect thereto.

23.     This Order and the APA shall be binding in all respects upon all creditors (whether known or unknown) of the Debtors, all successors and assigns of SFC, the Debtors and their affiliates and subsidiaries, the Debtors' assets, and any subsequent trustee appointed in the Debtors' chapter 11 cases or in any chapter 7 case or upon (a) a conversion of this chapter 11 case to a case under chapter 7 or (b) dismissal of the Debtors' bankruptcy case.

24.     The failure specifically to include any particular provisions of the APA in this Order shall not diminish or impair the efficacy of such provisions, it being the intent of the Court

that the APA and each and every provision, term and condition thereof be, and therefore is, authorized and approved in its entirety.

25.     The provisions of this Order are nonseverable and mutually dependent.

26.     The automatic stay of section 362(a) of the Bankruptcy Code shall not apply to and otherwise shall not prevent the exercise or performance by any party of its rights or obligations under the APA, including, without limitation, with respect to any cash held in escrow pursuant to the provisions thereof.

27.     This Sale Order shall take effect immediately and shall not be stayed pursuant to Bankruptcy Rules 6004(g), 6004(h), 6006(d), 7062, or otherwise.

Dated:     [_____ ___, 20__]
           [_____, Connecticut]

                         _____
                         HONORABLE [ ]
                         UNITED STATES BANKRUPTCY JUDGE

Exhibit 6.2(b)

# EXHIBIT 1

**Exhibit 12.8**

## MEDICAL RECORDS CUSTODY AGREEMENT

This **MEDICAL RECORDS CUSTODY AGREEMENT** (this "Agreement"), is made as of [_____  _____, 20__], by and among Saint Francis *Care*, Inc., a Connecticut corporation (the "Buyer"), on the one hand, and the entities executing this Agreement as "Sellers" on the signature page hereof (each a "Seller," and collectively, the "Sellers"), on the other hand, in connection with that certain Asset Purchase Agreement, effective as of January 14, 2015, by and among the Buyer and the Sellers (as may be amended, modified, supplemented or restated from time to time, collectively, the "APA"). Capitalized terms used but not otherwise defined herein shall have the meanings given to such terms in the APA. This Agreement shall be deemed to be effective from and after the Effective Time.

### RECITALS:

WHEREAS, the Sellers have filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Connecticut;

WHEREAS, the Buyer and the Sellers have entered into the APA. Under the APA and the Sale Order, the Buyer is acquiring substantially all of the Sellers' assets, real and personal, tangible or intangible, associated with owning, leasing, managing and operating the Facilities and in particular the Acquired Medical Records (as such term is defined below) and assuming certain liabilities of the Sellers, in accordance with sections 105, 363 and 365 of the Bankruptcy Code; and

WHEREAS, as part of such acquisition and as set forth in the APA, the Buyer is taking ownership and custody of certain medical records (the "Acquired Medical Records").

**NOW THEREFORE,** in consideration of the mutual promises set forth in the APA, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree to the following:

1.     Transfer of Medical Records. Each Seller hereby transfers, and the Buyer hereby accepts, ownership and possession of, all Acquired Medical Records in whatever format such records are now maintained by such Seller, including both hard paper copy and electronic formats. Each Seller hereby transfers title, to the extent permissible under applicable law, and delivers custody to the Buyer of all of its Acquired Medical Records. Each Seller hereby appoints the Buyer as the custodian of its Acquired Medical Records, and as custodian the Buyer hereby agrees to assume control, custody and possession of such Seller's Acquired Medical Records and to provide for the maintenance and safekeeping of all of such Seller's Acquired Medical Records

2.     Maintenance and Access.   The Buyer hereby agrees to use commercially reasonable efforts to retain, manage, and safeguard the Acquired Medical Records pursuant to the terms of this Agreement and all applicable federal and state laws, statutes, regulations, and rules, including without limitation, the HIPAA Privacy and Security Rules, as amended under the HITECH Act. The Buyer shall, to the extent reasonably practicable and permitted by law, permit each Seller to access its Acquired Medical Records, and make copies of such Acquired Medical

#52778920

Records at no charge in the event such Seller ever needs to access any of its Acquired Medical Records (i) to support billing and collection efforts for professional services rendered by a Seller prior to the Closing Date, (ii) to respond to any inquiry related to the professional services rendered by a Seller, (iii) to investigate and defend any allegation relating to the rendition of professional services, or (iv) for any other legitimate purpose. The Buyer agrees to process all requests for release of the Acquired Medical Records pursuant to policies and procedures customarily applied by the Buyer with respect to its medical records and to notify a Seller promptly of receipt of any request for such Seller's Acquired Medical Records other than from a former patient of such Seller (by way of example and not limitation, subpoenas and court orders) which names such Seller or any individual formerly employed by or otherwise associated with such Seller. The Buyer shall also respond to any request for, or otherwise concerning, the Acquired Medical Records from patients ("Patient Requests") in compliance with all applicable federal and state laws including, without limitation, limits on copying charges, and all Patient Requests shall be subject to the Buyer's established copying charges.

3.      Inquiries to Sellers. In the event an inquiry relative to the Acquired Medical Records is received by a Seller rather than by the Buyer as the custodian, such Seller shall promptly notify the inquiring party that the Buyer is maintaining exclusive custody and control of the Acquired Medical Records and direct such inquiring party to contact the Medical Records Director of the Buyer.

4.      Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Connecticut without regard to the principles of conflicts of laws thereunder.

5.      Counterparts. This Agreement may be executed in counterparts (including by facsimile or optically-scanned electronic mail attachment), each of which shall be deemed to be original, but all of which together shall constitute one and the same instrument.

\* \* \*

*The remainder of this page is left blank intentionally. Signatures follow on the next page.*

2

#52778920

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed and delivered as an instrument under seal as of the date first written above.

**BUYER:**

Saint Francis *Care*, Inc.

By:_____
Name: Christopher M. Dadlez
Title:  President and Chief Executive Officer

**SELLERS:**

Johnson Memorial Medical Center, Inc.

By:_____
Name: Patrick Mahon
Title:  Chairperson of the Board

Johnson Memorial Hospital, Inc.

By:_____
Name: Patrick Mahon
Title:  Chairperson of the Board

Home & Community Health Services, Inc.

By:_____
Name: Patrick Mahon
Title:  Chairperson of the Board

Johnson Health Care, Inc.

By:_____
Name: Patrick Mahon
Title:  Chairperson of the Board